**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| IRISH 4 REPRODUCTIVE HEALTH, *et al.*, <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br>  Defendants. | Case No. 3:18-cv-0491-PPS-JEM |

## FEDERAL DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the Federal

Defendants respectfully move to dismiss Plaintiffs' Complaint.  In support of this Motion,

Defendants respectfully refer the Court to the attached Memorandum of Points and

Authorities.  A proposed order is submitted herewith.


Dated: October 11, 2018          Respectfully submitted,

                                 JOSEPH H. HUNT
                                 Assistant Attorney General

                                 /s/ Rebecca M. Kopplin
                                 REBECCA M. KOPPLIN
                                 Trial Attorney (California Bar No. 313970)
                                 JUSTIN M. SANDBERG
                                 Senior Trial Counsel
                                 MICHAEL GERARDI
                                 Trial Attorney
                                 CHRISTOPHER R. HEALY
                                 Trial Attorney
                                 DANIEL RIESS
                                 Trial Attorney
                                 United States Department of Justice
                                 Civil Division, Federal Programs Branch
                                 1100 L Street, NW

Washington, D.C.  20001
Telephone:  (202) 514-3953
Facsimile:  (202) 616-8202
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Federal Defendants' Motion to Dismiss was served on counsel for all parties using the Court's CM/ECF system on October 11, 2018.


<u>*/s/ Rebecca M. Kopplin*</u>
REBECCA M. KOPPLIN
*Counsel for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| IRISH 4 REPRODUCTIVE HEALTH *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES *et al.*,<br><br>    Defendants. | Case No. 3:18-cv-0491-PPS-JEM |

**MEMORANDUM IN SUPPORT OF FEDERAL**
**DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

ISSUES STATEMENT ..................................................................................................... 1

INTRODUCTION ........................................................................................................... 2

BACKGROUND ............................................................................................................. 6

I.    The Affordable Care Act and the Contraceptive-Coverage Mandate................................. 6

II.   Challenges to the Contraceptive-Coverage Mandate and Accommodation ...................... 8

III.  The Interim Final Rules .......................................................................................... 10

IV.   Settlement of Notre Dame Case............................................................................... 11

V.    The IFRs Are Enjoined ............................................................................................ 13

VI.   The Present Case.................................................................................................... 14

ARGUMENT.................................................................................................................. 15

I.    The Court Should Dismiss for Threshold Reasons. ...................................................... 15

      A.    Plaintiffs' Challenges to the Settlement Agreement May Not Proceed................ 15

            1.    Counts I, V, VI, and VII Should Be Dismissed Because APA
                  Review Is Unavailable Because the Settlement Agreement Is
                  Committed to Agency Discretion, and Because an Alternative
                  Remedy Exists. ........................................................................................ 16

                  a.    The Settlement Agreement Cannot be Reviewed Under the
                        APA, Because Alternative Remedies at Law Exist. .................... 16

                  b.    The Settlement Agreement Is Committed to Agency
                        Discretion, and Is Therefore Unreviewable under the APA. ........ 17

      B.    Plaintiffs Lack Standing to Challenge the IFRs in Counts III-VII. ...................... 20

II.   The Court Should Dismiss the Complaint for Failure to State a Claim Because the
      Settlement Agreement Is Not Void for Illegality, and Because the Agencies
      Lawfully Promulgated the IFRs.................................................................................. 22

      A.    Count II Should Be Dismissed Because the Settlement Agreement Is Not
            Void for Illegality. ............................................................................................. 22

      B.    The Court Should Dismiss Count III Because the Agencies Lawfully
            Issued The IFRs Without Notice and Comment.................................................. 24

1.       The ACA Expressly Permits Issuance of the Interim Final Rules............ 24

2.       "Good Cause" Exists To Issue the IFRs. ................................................... 27

3.       If the Lack of Formal Notice-and-Comment Was An Error, It Was
         Harmless. ............................................................................................... 30

C.       Counts I and IV Should Be Dismissed. .............................................................. 31

1.       RFRA Justifies the Expanded Religious Exemption. ............................... 31

2.       The Moral Exemption Is Justified by Longstanding Precedent............... 35

3.       The ACA Gives the Agencies Discretion to Extend and Modify
         Exemptions for Any Contraceptive Coverage Mandate. ......................... 36

4.       Plaintiffs' Additional Substantive APA Arguments Have No Merit........ 38

5.       Count I Should Be Dismissed Because the Settlement Agreement
         Does Not Violate the APA....................................................................... 38

D.       The Court Should Dismiss Plaintiffs' Constitutional Challenges Because
         They Fail to State Valid Claims........................................................................... 39

1.       The IFRs Do Not Violate the Establishment Clause. .............................. 39

2.       The Rules and Settlement Agreement Do Not Violate the
         Due Process Clause.................................................................................. 43

3.       The IFRs and Settlement Agreement Are Consistent With Equal
         Protection Principles. .............................................................................. 46

CONCLUSION................................................................................................................... 49

# TABLE OF AUTHORITIES

## CASES

*Asiana Airlines v. FAA*,
    134 F.3d 393 (D.C. Cir. 1998) ............................................................................................. 25, 26

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
    512 U.S. 687 (1994) .............................................................................................................. 40

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014) ............................................................................................. 5, 8, 32, 33

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ........................................................................................................ 37, 38

*CIGNA Corp. v. Amara*,
    563 U.S. 421 (2011) .............................................................................................................. 17

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) .............................................................................................................. 17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................................................. 21

*Coker v. Sullivan*,
    902 F.2d 84 (D.C. Cir. 1990) ............................................................................................... 16

*Conservation Law Foundation v. Evans*,
    360 F.3d 21 (1st Cir. 2004) ................................................................................................... 30

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*,
    483 U.S. 327 (1987) ........................................................................................... 40, 41, 42, 43

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ........................................................................................................ 41, 48

*Daniels v. Williams*,
    474 U.S. 327 (1986) .............................................................................................................. 44

*Doe v. Bolton*,
    410 U.S. 179 (1973) ........................................................................................................ 35, 48

*Dordt College v. Burwell*,
    801 F.3d 946 (8th Cir. 2015) ............................................................................................... 33

*Eisenstadt v. Baird*,
   405 U.S. 438, (1972)................................................................................................ 45

*Energy Transp. Grp., Inc. v. Skinner*,
   752 F. Supp. 1 (D.D.C. 1990), *aff'd sub nom. Energy Transp. Grp., Inc. v.*
   *Mar. Admin.*, 956 F.2d 1206 (D.C. Cir. 1992)............................................. 18, 19, 20

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)................................................................................................ 38

*Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*,
   778 F.3d 422 (3d Cir. 2015).................................................................................... 33

*Griswold v. Connecticut*,
   381 U.S. 479 (1965).................................................................................... 44, 45, 49

*Harris v. McRae*,
   448 U.S. 297 (1980).................................................................................... 45, 46, 49

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .................................................................................. 14

*Heckler v. Chaney*,
   470 U.S. 821 (1985)................................................................................ 1, 17, 18, 19

*Heller v. Doe*,
   509 U.S. 312 (1993)................................................................................................ 47

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
   480 U.S. 136 (1987)........................................................................................ 40, 43

*Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*,
   335 F.3d 607 (7th Cir. 2003) .................................................................................. 17

*Idris v. City of Chi.*,
   552 F.3d 564 (7th Cir. 2009) .................................................................................. 44

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,
   256 F.3d 548 (7th Cir. 2001) .................................................................................. 21

*Lee v. Weisman*,
   505 U.S. 577 (1992)................................................................................................ 40

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971)........................................................................................ 41, 42

*Little Sisters of the Poor Home for the Aged v. Burwell*,
    794 F.3d 1151 (10th Cir. 2015) ............................................................ 33

*Locke v. Davey*,
    540 U.S. 712 (2004)............................................................................... 41

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................... 20

*Lynch v. Donnelly*,
    465 U.S. 668 (1984)............................................................................... 40

*Lyng v. Int'l Union*,
    485 U.S. 360 (1988)............................................................................... 48

*Maher v. Roe*,
    432 U.S. 464 (1977)............................................................................... 45

*Mahoney v. U.S. Consumer Products Safety Comm'n*,
    146 F. App'x 587, 2005 WL 2114062 (3d Cir 2005) ............................ 18

*Marcello v. Bonds*,
    349 U.S. 302 (1955)............................................................................... 25

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976)........................................................................ 48, 49

*McCleskey v. Kemp*,
    481 U.S. 279 (1987)............................................................................... 19

*McCreary Cty. v. ACLU of Ky.*,
    545 U.S. 844 (2005)............................................................................... 42

*Methodist Hosp. of Sacramento v. Shalala*,
    38 F.3d 1225 (D.C. Cir. 1994) .............................................................. 26

*Musacchio v. United States*,
    136 S. Ct. 709 (2016)............................................................................. 25

*Nat. Res. Def. Council, Inc. v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987)............................................................... 38

*N.Y. State Dep't of Law v. FCC*,
    984 F.2d 1209 (D.C. Cir. 1993) ...................................................... 18, 19

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) .................................................................................................. 46

*Priests for Life v. U.S. Dep't of Health and Human Servs.*,
    772 F. 3d 229 (D.C. Cir. 2014) ................................................................................ 33

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) .................................................................................................. 33

*Riverbend Farms, Inc. v. Madigan*,
    958 F.2d 1479 (9th Cir. 1992) ................................................................................. 30

*Santana v. Cook Cty. Bd. of Review*,
    679 F.3d 614 (7th Cir. 2012) .................................................................................... 44

*Service Employees Int'l Union, Local 102 v. County of San Diego*,
    60 F.3d 1346 (9th Cir. 1994) .................................................................................... 29

*Sharpe Holdings, Inc. v. HHS*,
    801 F.3d 927 (8th Cir. 2015), *vacated and remanded sub nom. HHS v. CNS Int'l Ministries*,
    No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016) ............................................ 34

*Sherman ex rel. Sherman v. Koch*,
    623 F.3d 501 (7th Cir. 2010) .............................................................................. 41, 42

*Shinseki v. Sanders*,
    556 U.S. 396 (2009) .................................................................................................. 30

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ................................................................................. 30

*Sweeney v. Pence*,
    767 F.3d 654 (7th Cir. 2014) .................................................................................... 48

*Swift & Co. v. United States*,
    276 U.S. 311 (1928) .................................................................................................. 18

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ............................................................................................. 16

*U.S. Steel Corp. v. EPA*
    605 F.2d 283 (7th Cir. 1979) .............................................................................. 27, 30

*United States v. Carpenter*,
    526 F.3d 1237 (9th Cir. 2008) ................................................................................. 18

*United States v. Hercules, Inc.*,
   961 F.2d 796 (8th Cir. 1992) ............................................................. 18

*United States v. Int'l Union of Operating Eng'rs*,
   638 F.2d 1161 (9th Cir. 1979) ............................................................ 19

*United States v. Seeger*,
   380 U.S. 163 (1965) ..................................................................... 35, 48

*University of Notre Dame v. Burwell*,
   786 F.3d 606 (7th Cir. 2015) ............................................................ 3, 11

*University of Notre Dame v. Burwell*,
   136 S. Ct. 2007 (2016) .............................................................. *passim*

*University of Notre Dame v. Sebelius*,
   988 F. Supp. 2d 912 (N.D. Ind. 2013), *aff'd*, 743 F.3d 547 (7th Cir. 2014),
    *cert. granted, vacated, and remanded*, 135 S. Ct. 1528 (Mar. 9, 2015),
   *aff'd on remand*, 786 F.3d 606 (7th Cir. 2015),
    *cert. granted, vacated, and remanded*, 136 S. Ct. 2007 (May 16, 2016). ................................ 3

*Vahora v. Holder*,
   626 F.3d 907 (7th Cir. 2010) ............................................................. 17

*Wallace v. Jaffree*,
   472 U.S. 38, (1985) ....................................................................... 42

*Walz v. Tax Comm'n of City of New York*,
   397 U.S. 664 (1970) ..................................................................... 40, 41

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ....................................................................... 44

*Webster v. Doe*,
   486 U.S. 592 (1988) ....................................................................... 26

*Webster v. Reprod. Health Servs.*,
   492 U.S. 490 (1989) ....................................................................... 45

*Welsh v. United States*,
   398 U.S. 333 (1970) ..................................................................... 35, 48

*Wengler v. Druggists Mut. Ins. Co.*,
   446 U.S. 142 (1980) ....................................................................... 46

*Zorach v. Clauson*,
   343 U.S. 306 (1952) ................................................................... 40, 41, 42

*Zubik v. Burwell*,
   136 S. Ct. 1557 (2016) ................................................................... *passim*

## **FEDERAL STATUTES**

5 U.S.C. § 551 *et seq.* ..................................................................... 1

5 U.S.C. § 553 ......................................................................... *passim*

5 U.S.C. § 559 ........................................................................ 24, 25

5 U.S.C. § 701 ........................................................................ 15, 17

5 U.S.C. § 704 ......................................................................... 4, 16

5 U.S.C. § 706 ........................................................................ 27, 30

26 U.S.C. § 4980H ........................................................................ 7

26 U.S.C. § 9833 .............................................................. 4, 11, 25, 37

28 U.S.C. § 516 .......................................................................... 19

28 U.S.C. §§ 517–19 ..................................................................... 19

29 U.S.C. § 1132 ...................................................................... 16, 17

29 U.S.C. § 1191c ............................................................. 4, 11, 25, 37

42 U.S.C. § 300gg-13 ............................................................... *passim*

42 U.S.C. § 300gg-92 ........................................................ 4, 11, 25, 37

42 U.S.C. § 2000bb-1 .................................................................... 32

42 U.S.C. § 18011 ........................................................................ 7

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, 124 Stat. 119 (2010) ........................................... 24

## **LEGISLATIVE MATERIALS**

S. Doc. No. 248, 79th Cong., 2d Sess. 260 (1946) ...................................... 30

## STATE STATUTES

18 Pa. Stat. & Cons. Stat. Ann. § 3213 (West) ............................................................... 35

Cal. Health & Safety Code § 123420 ............................................................................... 35

Ind. Code §§ 16-34-1-3 .................................................................................................... 35

Md. Code Ann., Health – Gen. § 20-214 ......................................................................... 35

## REGULATIONS

47 Fed. Reg. 38,409 (Aug. 31, 1982) ............................................................................... 37

75 Fed. Reg. 41,726 (July 19, 2010) ........................................................................... 27, 31

76 Fed. Reg. 46,621 (Aug. 3, 2011) .......................................................................... *passim*

77 Fed. Reg. 8725 (Feb. 15, 2012) ..................................................................................... 6

77 Fed. Reg. 16,501 (Mar. 12, 2012) ............................................................................... 31

78 Fed. Reg. 8456 (Feb. 6, 2013) ....................................................................................... 6

78 Fed. Reg. 39,870 (July 2, 2013) ................................................................................. 6, 7

79 Fed. Reg. 51,092 (Aug.27, 2014) .............................................................................. 7, 27

80 Fed. Reg. 41,318 (July 14, 2015) ................................................................................... 8

81 Fed. Reg. 47,741 (July 22, 2016) ............................................................... 9, 23, 28, 31

82 Fed. Reg. 47,792 (Oct. 13, 2017) ......................................................................... *passim*

82 Fed. Reg. 47,838 (Oct. 13, 2017) ......................................................................... *passim*

Executive Order 13765, 82 Fed. Reg. 8351 (Jan. 20, 2017) ........................................... 12

Executive Order 13798, 82 Fed. Reg. 21,975 (May 4, 2017) ......................................... 12

## OTHER AUTHORITIES

*See* Letter from Rev. John Jenkins, President of the Univ. of Notre Dame, to Faculty and Staff
   ("Notre Dame President's Letter"), Feb. 7, 2018, *available at*

ix

https://president.nd.edu/writings-addresses/2018-writings/
letter-on-health-care-coverage/ ..................................................................................... 14, 20, 21

Michael Asimow, *Interim-Final Rules: Making Haste Slowly*,
51 Admin. L. Rev. 703 (1999) ................................................................................................ 26

FAQs About Affordable Care Act Implementation,
*available at* https://www.dol.gov/sites/default/files/ebsa/aboutebsa/our-activities/resource-
center/faqs/aca-part-36.pdf ............................................................................................................. 9

## ISSUES STATEMENT

1) Can Plaintiffs raise Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, claims against the Federal Defendants, given that the APA precludes review of final agency actions when there are adequate alternative remedies, and plaintiffs have potential contract law claims against the University of Notre Dame?

2) Can Plaintiffs challenge Federal Defendants' decision regarding how to exercise its enforcement discretion notwithstanding *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (concluding that an agency's decision to "refus[e] to take enforcement steps" is a decision presumptively committed to "an agency's absolute discretion")?

3) Do Plaintiffs have standing to challenge the interim final rules ("IFRs") even though Notre Dame did not rely on them and they had already been enjoined when Plaintiffs filed their complaint?

4) Should the Court void the settlement agreement between Federal Defendants and Notre Dame under *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), even though the Court did not reach a decision on the merits in that case?

5) Should the Court enjoin the IFRs under the Administrative Procedure Act's (APA) notice and comment rulemaking requirement when another statute specifically authorized HHS to forgo a comment period and when, in any case, the agency had good cause to forgo a pre-issuance comment period under the APA and any failure to provide a pre-issuance comments period was harmless?

6) Should the Court enjoin the IFR that expands the religious exemption to the contraceptive-coverage mandate for lack of a "valid justification," Compl. ¶ 203, when the Religious Freedom Restoration Act (RFRA) requires the government to eliminate

1

substantial government-imposed burdens on religious liberty, the mandate imposed such a burden, and the ACA and RFRA give the government discretion in how to alleviate such burdens?

7) Should the Court enjoin the IFR that creates a moral exemption to the contraceptive-coverage mandate for lack of a "valid justification," Compl. ¶ 203, when there is a long history of providing protections to conscience-based objections, particularly in the area of health care, and the Affordable Care Act (ACA) gives the government discretion to alleviate the burden on conscience?

8) Should the Court enjoin the IFRs and the Settlement Agreement under the Establishment Clause when they do not endorse a particular religious belief, but rather free parties to act as they otherwise would in the absence of state-imposed regulations?

9) Should the Court enjoin the IFRs and the Settlement Agreement under the Due Process Clause of the Fifth Amendment when the Supreme Court has held that individuals have no entitlement to the subsidization of their rights?

10) Should the Court enjoin the IFRs and the Settlement Agreement under the Equal Protection principle of the Fifth Amendment when they do not, in fact, discriminate on the basis of sex and when they do not deprive plaintiffs of a fundamental right, because there is no constitutional right to subsidized contraceptives?

## <u>INTRODUCTION</u>

This action is the latest chapter in protracted litigation regarding the so-called contraceptive-coverage mandate. Since the adoption of the mandate pursuant to the Patient Protection and Affordable Care Act (ACA), numerous entities, including the University of Notre Dame, brought lawsuits to challenge both the mandate and an accommodation provided by the

government that attempted to address the religious objections of certain organizations to the mandate.  On two separate occasions, the Supreme Court vacated lower court rulings denying Notre Dame's motion to enjoin governmental enforcement of the mandate;[1] but those rulings did not resolve Notre Dame's legal objections to the mandate and the accommodation.  Instead, the Court directed that the parties "on remand should be afforded an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'"  *See Zubik v. Burwell*, 136 S. Ct. 1560 (2016) (per curiam).  Despite numerous rounds of rulemaking and the solicitation of public comments, however, the administering agencies—the Departments of Health and Human Services (HHS), Labor, and the Treasury—were unable to find a way to amend the accommodation to both satisfy the organizations' conscience objections and ensure that women covered by those organizations' health plans receive contraceptive coverage.

In an effort to comply with the *Zubik* Court's direction, resolve the ongoing litigation, and alleviate the burden on those with religious or moral objections to contraceptive coverage, the agencies issued two interim final rules ("IFRs") expanding the religious exemption to the mandate and creating a new exemption for organizations with moral objections.[2]  In addition, and consistent with the *Zubik* Court's direction that the parties work to "accommodat[e]" the competing interests in play, defendants also reached a settlement agreement ("Settlement Agreement") with Notre Dame and other entities in litigation with the government.  Notre Dame

---

[1]  *See University of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912 (N.D. Ind. 2013) (denying Notre Dame's motion for a preliminary injunction), *aff'd*, 743 F.3d 547 (7th Cir. 2014), *cert. granted, vacated, and remanded*, 135 S. Ct. 1528 (Mar. 9, 2015), *aff'd on remand*, 786 F.3d 606 (7th Cir. 2015), *cert. granted, vacated, and remanded*, 136 S. Ct. 2007 (May 16, 2016).

[2]  Those IFRs are presently subject to injunctions in several district courts, injunctions the government has appealed.

announced changes to its health plan in February 2018 on the basis of this settlement, deciding not to cover contraceptives to which it has a religious objection.

Plaintiffs, individuals enrolled in health plans provided by Notre Dame, challenge the IFRs and the Settlement Agreement as unlawful under the Administrative Procedure Act ("APA"), the text of the ACA, the Establishment Clause of the First Amendment, and the Due Process and Equal Protection guarantees of the Fifth Amendment.  Plaintiffs further allege that the Settlement Agreement violates binding Supreme Court precedent.

These claims are without merit, and the Court should dismiss Plaintiffs' complaint with prejudice for several independent reasons.  As a threshold matter, the Court lacks jurisdiction over Plaintiffs' claims.  With respect to the IFRs, which are already subject to two separate nationwide injunctions, an order by this Court enjoining the IFRs would not redress Plaintiffs' alleged harm.  And Plaintiffs certainly have no standing to challenge the IFRs for those who object to the contraceptive mandate on non-religious moral grounds, upon which Notre Dame, a religious institution, has never purported to rely.  As for the Settlement Agreement, the APA does not provide jurisdiction for Plaintiffs' claims for two independent reasons.  First, the APA only permits judicial review of final agency actions "for which there is no other adequate remedy in a court," 5 U.S.C. § 704.  Here, there plainly is one: Plaintiffs' claims involving Notre Dame's plan for its employees, which they must pursue as provided under ERISA.  Second, decisions to refrain from enforcement action, such as the Settlement Agreement, are presumptively committed to agency discretion as a matter of law and beyond the scope of judicial review.

Turning to the merits, Plaintiffs are wrong to assert that issuance of the IFRs was procedurally infirm.  The agencies had express statutory authority, independent of the APA, to issue IFRs here, 26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92, and also had

"good cause" under the APA to do so, 5 U.S.C. §§ 553(b), (d), in order to alleviate the burden imposed by the contraceptive-coverage mandate on those with sincere religious or moral objections to providing such coverage, as well as to clear up uncertainty caused by lengthy and unresolved litigation.

Plaintiffs' substantive challenges to the IFRs and Settlement Agreement are also without merit.  The same provision of the ACA that authorized the agencies to issue the original exemption for churches equally authorizes the expanded exemptions.  *See* 42 U.S.C. § 300gg-13(a)(4); 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011); 82 Fed. Reg. 47,792, 47,806 (Oct. 16, 2017).  The Religious Freedom Restoration Act (RFRA) independently authorized, and indeed required, issuance of the religious exemption as a means of eliminating the substantial burden on religious exercise that the Supreme Court held in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), was imposed by the contraceptive-coverage mandate.  The exemptions are consistent with the Supreme Court's rulings in *Zubik* and are neither arbitrary nor capricious. Moreover, it is settled law that the government may accommodate religion without running afoul of the Establishment Clause; neither the IFRs nor the Settlement Agreement advance religion, but instead relieve a burden on religious practice.  Plaintiffs' Fifth Amendment claims also lack merit.  The IFRs and Settlement Agreement do not draw sex- or religion-based distinctions in violation of equal protection principles, nor do they affirmatively deny access to contraceptives in violation of Plaintiffs' substantive or procedural due process rights.

The broad position that Plaintiffs advocate would undermine religious exercise and freedom of conscience, while the mandate remains in place for the vast majority of employers. The Court should dismiss this action.

## BACKGROUND

**I.      The Affordable Care Act and the Contraceptive-Coverage Mandate**

The ACA requires most group health plans and health-insurance issuers that offer group

or individual health coverage to provide coverage for certain preventive services without "any

cost sharing requirements."  42 U.S.C. § 300gg-13(a).  The Act does not specify the types of

preventive care that must be covered.  Instead, as relevant here, the Act requires coverage, "with

respect to women," of such "preventive care and screenings . . . as provided for in

comprehensive guidelines supported by the Health Resources and Services Administration

[HRSA]," a component of HHS.  *Id.* § 300gg-13(a)(4).

In August 2011, HRSA adopted the recommendation of the Institute of Medicine to issue

guidelines requiring coverage of, among other things, the full range of FDA-approved

contraceptive methods.  *See* 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012).  Coverage for such

contraceptive methods was thus required for plan years beginning on or after August 1, 2012.

*See* 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).

At the same time, the agencies, invoking their authority under 42 U.S.C. § 300gg-

13(a)(4), promulgated rules authorizing HRSA to exempt churches and their integrated

auxiliaries from the contraceptive coverage  mandate.  *See* 76 Fed. Reg. at 46,623.  The rules

were finalized in February 2012.  *See* 77 Fed. Reg. at 8725.  While various religious groups

urged the agencies to expand the exemption to all organizations with religious or moral

objections to providing contraceptive coverage, *see* 78 Fed. Reg. 8456, 8459-60 (Feb. 6, 2013),

the agencies instead offered only what they termed an "accommodation" for religious not-for-

profit organizations with religious objections to providing contraceptive coverage, *see* 78 Fed.

Reg. 39,870, 39,874-82 (July 2, 2013).  The accommodation allowed a group health plan

6

established or maintained by an eligible objecting employer, or arranged for students by eligible organizations that are institutions of higher education, to opt out of any requirement to directly "contract, arrange, pay, or refer for contraceptive coverage." *Id.* at 39,873-74.  The regulations then generally required the employer's or school's health insurer or third-party administrator (in the case of self-insured plans) to provide or arrange contraceptive coverage for plan participants. *See id.* at 39,875-80.

In the case of self-insured church plans, however, coverage by the plan's third-party administrator under the accommodation was voluntary.  Church plans are exempt from the Employee Retirement Income Security Act of 1974 (ERISA), and the authority to enforce a third-party administrator's obligation to provide separate contraceptive coverage derived solely from ERISA.  The agencies thus could not require the third-party administrators of those plans to provide or arrange for such coverage, nor impose fines or penalties for failing to provide such coverage.  *See* 79 Fed. Reg. 51,092, 51,095 n.8 (Aug. 27, 2014).

Other entities were also exempt from the contraceptive coverage mandate.  The ACA itself exempts from the preventive-services requirement, including the contraceptive-coverage mandate, so-called grandfathered health plans (generally, those plans that have not made specified changes since the Act's enactment), *see* 42 U.S.C. § 18011, which cover tens of millions of people, *see* 82 Fed. Reg. 47,792, 47,794 & n.5 (Oct. 13, 2017).  And employers with fewer than fifty employees are not subject to the tax imposed on employers that fail to offer health coverage, *see* 26 U.S.C. § 4980H(c)(2), although small employers that *do* provide non-grandfathered coverage must comply with the preventive services requirement.

## II.      Challenges to the Contraceptive-Coverage Mandate and Accommodation

Many employers objected to the contraceptive-coverage mandate.  In *Hobby Lobby*, the Supreme Court held that RFRA prohibited applying the mandate to closely held, for-profit corporations with religious objections to providing contraceptive coverage.  The Court held that the mandate "impose[d] a substantial burden on the exercise of religion" for employers with religious objections, 134 S. Ct. at 2779, and that, even assuming a compelling governmental interest, application of the mandate to such employers was not the least restrictive means of furthering that interest, *id.* at 2780.  The Court observed that the agencies had already established an accommodation for not-for-profit employers and that this less-restrictive alternative could be extended to closely held for-profit corporations with religious objections.  *Id.* at 2782.  The Court did not decide, however, "whether an approach of this type complies with RFRA for purposes of all religious claims."  *Id.*

In response to *Hobby Lobby*, the agencies promulgated rules extending the accommodation to closely held for-profit entities with religious objections to providing contraceptive coverage.  *See* 80 Fed. Reg. 41,318, 41,323-28 (July 14, 2015).  But numerous entities continued to challenge the mandate.  They argued that the accommodation burdened their exercise of religion because they sincerely believed that the required notice and the provision of contraceptive coverage in connection with their health plans made them complicit in providing such coverage.

A split developed in the circuits, *see* 82 Fed. Reg. at 47,798, and the Supreme Court granted certiorari in several of the cases.  Following refinement of the parties' positions suggesting a possible compromise, however, the Court vacated the judgments and remanded the cases to the respective courts of appeals.  *See Zubik*, 136 S. Ct. 1557 (2016) (per curiam).  The

Court "d[id] not decide whether [the plaintiffs'] religious exercise ha[d] been substantially burdened, whether the Government ha[d] a compelling interest, or whether the current regulations [we]re the least restrictive means of serving that interest." *Id.* at 1560. Instead, the Court directed that on remand the parties "be afforded an opportunity to arrive at an approach going forward that accommodates [the plaintiffs'] religious exercise while at the same time ensuring that women covered by [the plaintiffs'] health plans receive full and equal health coverage, including contraceptive coverage." *Id.* In the meantime, the Court precluded the government from "impos[ing] taxes or penalties on [the plaintiffs] for failure to provide the [notice required under the accommodation]." *Id.* at 1561. Similar orders were entered in other pending cases. *See, e.g.*, *Notre Dame v. Burwell*, 136 S. Ct. 2007 (2016).

In response to *Zubik*, the agencies sought public comment to determine whether further modifications to the accommodation could resolve the religious objections asserted by various organizations while providing a mechanism for coverage for their employees. *See* 81 Fed. Reg. 47,741 (July 22, 2016). The agencies received over 54,000 comments, but could not find a way to amend the accommodation to both satisfy objecting organizations and provide contraceptive coverage to their employees. *See* FAQs About Affordable Care Act Implementation Part 36, at 4 (Jan. 9, 2017).[3] The then-pending litigation—more than three dozen cases brought by more than 100 separate plaintiffs—remained unresolved. In addition, some nonreligious organizations with moral objections to providing contraceptive coverage filed suits challenging the mandate. That litigation also led to conflicting decisions by the courts. *See* 82 Fed. Reg. 47,838, 47,843 (Oct. 13, 2017).

---

[3] *Available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf (last visited October 11, 2018).

### III.  The Interim Final Rules

In an effort "to resolve the pending litigation and prevent future litigation from similar plaintiffs," the agencies concluded that it was "appropriate to reexamine" the mandate's exemption and accommodation.  82 Fed. Reg. at 47,799.  Following that reexamination, the agencies issued two IFRs that expanded the exemption while continuing to offer the existing accommodation as an optional alternative.  The first rule expanded the religious exemption to all nongovernmental plan sponsors, as well as institutions of higher education in their arrangement of student health plans, to the extent that those entities have sincere religious objections to providing contraceptive coverage.  *See id.* at 47,806.

The agencies acknowledged that contraceptive coverage is "an important and highly sensitive issue, implicating many different views."  82 Fed. Reg. at 47,799.  But "[a]fter reconsidering the interests served by the [m]andate," the "objections raised," and "the applicable Federal law," the agencies "determined that an expanded exemption, rather than the existing accommodation, [wa]s the most appropriate administrative response to the religious objections raised by certain entities and organizations."  *Id.*  The agencies also explained that the new approach was necessary because "[d]espite multiple rounds of rulemaking," and even more litigation, they "ha[d] not assuaged the sincere religious objections to contraceptive coverage of numerous organizations" or resolved the pending legal challenges that had divided the courts. *Id.*

The second rule created a similar exemption for entities with sincerely held moral objections to providing contraceptive coverage (but unlike the religious exemption did not apply to publicly traded companies).  *See* 82 Fed. Reg. 47,838.  The rule was intended "to bring the [m]andate into conformity with Congress's long history of providing or supporting conscience

protections in the regulation of sensitive health-care issues," *id.* at 47,844, as well as similar

efforts by the States, *id.* at 47,847, and to resolve legal challenges by moral objectors that had

given rise to conflicting court decisions, *id.* at 47,843.

The agencies concluded that their express statutory authority to issue "interim final

rules," 26 U.S.C. § 9833, 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92, provided them with

authority to issue the IFRs without prior notice and comment.  The agencies also concluded that

they had "good cause" to do so under the APA, 5 U.S.C. §§ 553(b), (d), in order to protect

religious liberty and end the unresolved and unresolvable litigation that had beset the prior rules.

*See* 82 Fed. Reg. at 47,813-15; 82 Fed. Reg. at 47,854-56.

The agencies did, however, solicit comments for 60 days post-promulgation.  *See* 82 Fed.

Reg. at 47,792; 82 Fed. Reg. at 47,838.  The comment period expired on December 5, 2017.

HHS received over 200,000 comments and is currently reviewing them.

## IV.     Settlement of Notre Dame Case

Notre Dame sponsors health insurance plans for both students and faculty and staff (and

their dependents).  *See* Compl. ¶ 11.  In 2013, it filed a lawsuit challenging the contraceptive

coverage mandate, as modified by the accommodation.  *See Univ. of Notre Dame v. Burwell*, 786

F.3d 606, 612 (7th Cir. 2015), *cert. granted*, *judgment vacated*, 136 S. Ct. 2007, 195 L. Ed. 2d

210 (2016).  It argued that the accommodation made it a "conduit" of the provision of

contraceptive coverage, in violation of its religious beliefs.  *Id.* at 612.  The Seventh Circuit

rejected this argument, *id.* at 612-19, but the Supreme Court granted certiorari, vacated the Court

of Appeals' injunction, and remanded the case in light of the *Zubik* decision, thereby offering the

parties a chance to try to resolve their dispute, *Notre Dame*, 136 S. Ct. 2007.

11

Following the Supreme Court's remands, the President issued Executive Orders establishing that it is the policy of the Government "to vigorously enforce Federal law's robust protections for religious freedom" and to "exercise all authority and discretion available ... to waive, defer, grant exemptions from, or delay the implementation of any provision or requirement of the [Affordable Care] Act that would impose . . . a cost, fee, tax, penalty, or regulatory burden on . . . health insurers . . .[or] purchasers of health insurance."  Executive Order 13798, Promoting Free Speech and Religious Liberty 82 Fed. Reg. 21,675 (May 4, 2017); Executive Order 13765, Minimizing the Economic Burden on the Patient Protection and Affordable Care Act Pending Repeal, 82 Fed. Reg. 8,351 (Jan. 20, 2017).

And in the fall of 2017, the Departments of HHS, Labor, and Treasury issued the IFRs, which state that "requiring certain objecting entities or individuals to choose between the Mandate, the accommodation, or penalties for noncompliance imposes a substantial burden on religious exercise under RFRA," that "the application of the Mandate to certain objecting employers [i]s [not] necessary to serve a compelling governmental interest," and that "alternative approaches can further the interest the Departments previously identified behind the Mandate." 82 Fed. Reg. at 47,800, 47,806 (Oct. 13, 2017).

In light of the remand order, the Executive Orders, and the IFRs, the Department of Justice exercised its discretion to settle then-pending lawsuits, like the one brought by Notre Dame.  These suits challenged the old legal regime, which was at odds with the new legal framework for contraceptive coverage foreshadowed by the Executive Orders and established in the IFRs.  *See* Settlement Agreement, Compl., Ex. A, at 2-3 (noting, in justifying the settlement, that the remand, Executive Orders, and new rules have placed the litigation in an "extraordinary posture").  Accordingly, the settlement with Notre Dame executed on October 13, 2017 provides,

12

in relevant part, that "[t]he Government [ ] will treat Plaintiffs and their health plans, including their insurance issuers and/or third party administrators in connection with those health plans, as exempt from the Regulations [in place prior to the IFRs] or any materially similar regulation or agency policy." *Id.* at 4, ¶ 2.  The agreement goes on to define a "materially similar regulation or agency policy" as one that "includes any requirement that Plaintiffs, their insurance issuers, or their third-party administrators provide any of the Objectionable Coverage through or in connection with Plaintiffs' health plans." *Id.*

## V.    The IFRs Are Enjoined

The IFRs have been challenged in several lawsuits, and two district courts have issued injunctions.  In *California v. Azar*, 4:17-cv-5783 (N.D. Cal.), ECF No. 105, the court issued a nationwide preliminary injunction blocking implementation of the IFRs because the Court concluded that the APA required the agencies to go through notice-and-comment rulemaking before issuing the IFRs.  In *Commonwealth of Pennsylvania v. Trump,* 2:17-cv-4540 (E.D. Pa.), ECF No. 59, the court preliminarily enjoined implementation of the IFRs both because they had not gone through notice-and-comment rulemaking and because that court concluded that the agencies lacked statutory authority to issue rules providing religious and moral exemptions to the contraceptive coverage mandate.  These decisions are both on appeal.  *See California v. Azar*, Nos. 18-15144, 18-15166, 18-15255 (9th Cir.); *Commonwealth of Pennsylvania v. President of the United States*, Nos. 17-3752 and 18-1253 (3d Cir.).[4]

---

[4] Two courts have dismissed challenges to the IFRs for lack of standing, *Commonwealth of Massachusetts v. Dep't of Health and Human Services*, 17-cv-11930 (D. Mass.), ECF No. 89; *Campbell v. Trump*, No. 1:17-cv-2455 (D. Col.),  ECF No. 22, while other suits have been stayed, *ACLU v. Azar*, No. 4:17-cv-5772 (N.D. Cal.); *Washington v. Trump*, No. 2:17-cv-1510 (W.D. Wash.).

## VI.     The Present Case

In February 2018, Notre Dame announced that its health plans would not cover abortifacients or sterilization (which had never been covered) because of the University's "grave[]" religious objections to such contraceptive methods, but that it would cover contraceptive methods that simply prevent conception.  *See* Letter from Rev. John Jenkins, President of the Univ. of Notre Dame, to Faculty and Staff ("Notre Dame President's Letter"), Feb. 7, 2018, *available at* https://president.nd.edu/writings-addresses/2018-writings/letter-on-health-care-coverage/;[5] Compl. ¶ 123.

In June 2018, Plaintiffs—an association and individuals who use Notre Dame's faculty or student health plans—filed this lawsuit against the three agencies that issued the IFRs, their Secretaries (in their official capacities), and the University.  Compl. ¶¶ 12-18.  The complaint includes seven causes of action directed at the federal defendants:  (1) the Settlement Agreement violates the APA because, among other alleged reasons, it "is not in accordance with the ACA requirement that group health plans and individual health insurance cover without cost-sharing the contraceptive services identified in HRSA's Women's Preventive Service Guidelines," Compl. ¶¶ 160-77; (2) the Settlement Agreement is void under federal common law because it is illegal under the *Zubik* remand order (for failing to provide cost-free contraceptive coverage), the ACA, and the Constitution, *id.* ¶¶ 178-83; (3) the IFRs violate the APA because they were not issued using notice-and-comment rulemaking, *id.* ¶¶ 184-92; (4) the substance of the IFRs violates the APA, because they contradict the Constitution and the ACA, *id.* ¶¶ 193-206; (5) the

---

[5] The letter is incorporated in the Complaint by reference, so it may be considered without converting this motion to a motion for summary judgment.  *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009) (noting that the Seventh Circuit has been "relatively liberal" in considering documents without converting motions to dismiss into motions for summary judgment).

Settlement Agreement and the IFRs violate the First Amendment's Establishment Clause, *id.* ¶¶ 207-11; (6) the Settlement Agreement and the IFRs violate the Fifth Amendment's Due Process Clause, by depriving plaintiffs of a fundamental right (access to contraceptives) without notice and an opportunity to be heard, *id.* ¶¶ 212-18; and (7) the Settlement Agreement and IFRs violate the Fifth Amendment's Equal Protection Clause because, among other alleged reasons, they "target women for adverse treatment," *id.* ¶¶ 219-226.

## ARGUMENT

### I.      The Court Should Dismiss for Threshold Reasons.

#### A.      Plaintiffs' Challenges to the Settlement Agreement May Not Proceed.

Plaintiffs challenge the Settlement Agreement between Defendants and Notre Dame, alleging that it violates the APA, the ACA, the First and Fifth Amendments, and the precedential decisions of U.S. courts.  *See* Pls.' Compl., Prayer for Relief; Ex. A.  These claims should be dismissed.

Because there are adequate alternative remedies available, Plaintiffs' APA challenge to the Settlement Agreement is not ripe.  Furthermore, even if there were no such alternative remedies, the APA claim would be unreviewable under 5 U.S.C. § 701(a)(2).  Plaintiffs' constitutional challenges to the Settlement Agreement under the Establishment Clause, substantive Due Process, and the Equal Protection Clause fail for the same reasons their challenges to the IFRs fail.  *See infra* Pts. II.D.1-3.  Finally, Plaintiffs cannot establish that the Settlement Agreement is void for illegality.

    **1.**    **Counts I, V, VI, and VII Should Be Dismissed Because APA Review Is Unavailable Because an Alternative Remedy Exists and the Settlement Agreement Is Committed to Agency Discretion.**

        **a.**    **The Settlement Agreement Cannot Be Reviewed Under the APA, Because Alternative Remedies at Law Exist.**

As an initial matter, APA review is unavailable for Plaintiffs' challenges to the Settlement Agreement.  The APA only permits a plaintiff to obtain judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704; *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016).  An alternative remedy is adequate if it would remedy the injury about which the plaintiff complains.  *See Coker v. Sullivan*, 902 F.2d 84, 90 n.5 (D.C. Cir. 1990).  Here, numerous such remedies exist.

Plaintiffs are pursuing alternative remedies that would cure the injuries about which they complain.  For example, Plaintiffs argue that the Settlement Agreement will cause them to "lose meaningful access to contraceptive services," *id*. ¶ 1, and that the Settlement Agreement should be enjoined because they believe it to be "illegal under and contrary to controlling orders and precedential decisions of the federal courts, federal statutes, and the U.S. Constitution."  *Id*. ¶ 161.  If Plaintiffs were to prevail under any of their non-APA claims and Settlement Agreement were voided, then it could not cause Plaintiffs to "lose meaningful access to contraceptive services."

Moreover, Plaintiffs Natasha Reifenberg, Jane Doe 2, and Jane Doe 3, who are all enrolled as dependents in Notre Dame's faculty and staff health plan, have an additional adequate alternative remedy.  As ERISA plan members, they may bring a civil action to enjoin any act or practice that they believe violates any provision of title I of ERISA or the terms of the plan.  29 U.S.C. § 1132(a)(3).  Because the relevant ACA provisions were incorporated into title I of ERISA, these plaintiffs would have a cause of action if they believed their plan did not

conform to ERISA's mandate.  *See id.*  If Plaintiffs were successful, this Court would have the power to provide "appropriate equitable relief" to remedy injuries flowing from any violation of title I of ERISA or the terms of the plan.  29 U.S.C. § 1132(a)(3); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 438–44 (2011) (discussing the scope of "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3)).  Thus, Plaintiffs cannot pursue their APA challenges to the Settlement Agreement.

> **b.      The Settlement Agreement Is Committed to Agency Discretion, and Is Therefore Unreviewable under the APA.**

Plaintiffs' APA claim challenging the Settlement Agreement should also be dismissed for lack of jurisdiction because it challenges an agency action "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore beyond the scope of APA review.  Agency action is committed to agency discretion by law when the statute is drawn so that a court would have "no meaningful standard against which to judge the agency's unfettered exercise of discretion." *Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010).  In other words, there is "no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971).  The "classic example of such an action is an agency's decision not to prosecute." *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*, 335 F.3d 607, 615 (7th Cir. 2003).

In *Heckler v. Chaney*, the Supreme Court concluded that an agency's decision to "refus[e] to take enforcement steps" is a decision presumptively committed to "an agency's absolute discretion" and "general[ly] unsuitab[le] for judicial review."  470 U.S. 821, 831 (1985).  The Court gave three primary rationales—first, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as whether "agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement

action requested best fits the agency's overall policies," and whether the agency has the resources to undertake the action at all. *Id*. Second, "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts are called upon to protect." *Id*. at 832. Finally, "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive branch not to indict – a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Id*. In *Chaney*, the Court noted that the presumption of commitment to agency discretion can be rebutted when the substantive statute has provided guidelines for the agency to follow in exercising its discretion. *Id*. at 833.

Courts have extended the *Chaney* presumption to agency decisions to settle enforcement actions. *See, e.g.*, *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1213-15 (D.C. Cir. 1993); *Mahoney v. U.S. Consumer Products Safety Comm'n*, 146 F. App'x 587, 589, 2005 WL 2114062, at *2 (3d Cir 2005); *see also United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (concluding that the Attorney General's decision to settle civil litigation is committed to agency discretion); *Energy Transp. Grp., Inc. v. Skinner*, 752 F. Supp. 1, 13 (D.D.C. 1990), *aff'd sub nom. Energy Transp. Grp., Inc. v. Mar. Admin.*, 956 F.2d 1206 (D.C. Cir. 1992) ("[T]he decision to settle litigation or approve the settlement of litigation to which the United States is a party is akin to an agency's decision not to institute enforcement proceedings or a prosecutor's decision not to prosecute."). A clear and unambiguous expression from Congress is required to limit the Attorney General's authority to conduct litigation involving the United States. *Swift & Co. v. United States*, 276 U.S. 311, 316-17 (1928); *United States v. Hercules*,

*Inc.*, 961 F.2d 796, 798-99 (8th Cir. 1992); *see also United States v. Int'l Union of Operating Eng'rs*, 638 F.2d 1161, 1162 (9th Cir. 1979).

Applying *Chaney* to the Government's settlement decisions makes sense.  Like the decision not to initiate an enforcement action, the decision to settle is a decision "to refuse to take enforcement steps," *Chaney*, 470 U.S. at 831; it differs only in that it is a decision not to take additional, rather than initial, enforcement steps.  What is more, the same rationales for the *Chaney* presumption apply in the settlement context.  The decision to settle involves a "complicated balancing" of factors within the agencies' expertise, such as the availability of resources, policy goals, and prospects for success.  *N.Y. State Dep't of Law*, 984 F.2d at 1213.  The refusal to take additional enforcement steps also does not constitute an exercise of coercive power.  To the contrary, it is a refusal to exercise coercive power.  *Id*.  And to continue the analogy to prosecutorial discretion set out in *Chaney*, just as prosecutors have the discretion to decline to indict, so too do they have the discretion to enter plea bargains, *McCleskey v. Kemp*, 481 U.S. 279, 312 (1987)—thus agencies, another component of the Executive Branch, have the discretion to settle administrative enforcement actions.  In short, precedent and reason demonstrate that an agency's decision to settle is committed to its discretion and so unsuitable for judicial review.

These considerations apply with full force to the Settlement Agreement here because both procedurally and substantively, the agreement reflects a decision by the Executive over the manner by which it will exercise its enforcement discretion.  As a matter of procedure, the discretion to conduct litigation is committed to the DOJ, under the direction of the Attorney General, by statute. 28 U.S.C. § 516; *see also* 28 U.S.C. §§ 517–19.  This discretion includes the power to agree not to pursue further litigation, through settlement.  *See Skinner*, 752 F. Supp. at

13.  The Settlement Agreement is one such settlement, terminating ongoing litigation between

the Government and Notre Dame, in the discretion of the agencies and the DOJ.  By agreeing not

to pursue further litigation against Notre Dame to enforce any contraceptive coverage mandate

with respect to the coverage to which those plaintiffs objected, the Settlement Agreement, in

substance, reflects an act or judgment of executive non-enforcement.  *See* Settlement Agreement

at 3–7.  In particular, the Government agreed that it would not enforce any fines or penalties

against Notre Dame for failing to provide the objectionable coverage.  *See id*. at 5–6.  For these

reasons, the Government's decision to enter into a Settlement Agreement, under which it agreed

not to pursue certain enforcement action, is committed to DOJ's discretion and beyond the

bounds of APA review.

**B.     Plaintiffs Lack Standing to Challenge the IFRs in Counts III-VII.**

Plaintiffs' claims challenging the IFRs should be dismissed for lack of standing.  To have

standing to challenge the IFRs, Plaintiffs must demonstrate that they have suffered an injury in

fact, which is traceable to the IFRs, and which can be redressed by order of the Court directed at

the IFRs.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992).  Plaintiffs cannot satisfy

this standard because an order of the Court enjoining the IFRs will not redress Plaintiffs' alleged

injuries (*i.e.*, Notre Dame's refusal to continue to subsidize certain contraceptives).

When Notre Dame announced that it would no longer cover certain contraceptives, it

explained that it reached this decision based on the settlement: "In October 2017, however, the

case was settled favorably, giving the University, its insurers and third party administrators the

option of an exemption from providing these drugs and services."  *See* Notre Dame President's

Letter, Feb. 7, 2018, *available at* https://president.nd.edu/writings-addresses/2018-

writings/letter-on-health-care-coverage/.  Indeed, at the time of the announcement, the IFRs had

already been enjoined, *California v. Azar*, 4:17-cv-5783 (N.D. Cal.), ECF No. 105 (issued Dec. 21, 2017), so Notre Dame could not have based its decision on the IFRs.

Enjoining the IFRs would not redress Plaintiffs' injuries. Notre Dame's decision would be unaffected because the basis for its decision—the Settlement Agreement—would still stand. In other words, Plaintiffs' claimed injuries are not traceable to the IFRs[6], meaning that Plaintiffs lack standing to challenge them. Plaintiffs cannot ground standing in a speculative claim that one day Notre Dame might rely on the IFRs to take an action that might harm the Plaintiffs.[7] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (concluding that standing cannot be based on a speculative injury claims). The need to avoid resolving claims based on speculative injuries is especially acute when those claims are constitutional claims: "[F]ederal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001), as amended (July 2, 2001). Plaintiffs' challenges to the IFRs should therefore be dismissed for lack of jurisdiction.

There are also several reasons that individual plaintiffs do not have standing to challenge the IFRs or the Settlement Agreement. Irish 4 Reproductive Health Member 2, for example, alleges that to avoid added cost, she has decided to switch from the NuvaRing to a hormonal

---

[6] Even if Plaintiffs' claims were traceable to the IFRs, they would only be traceable, at most, to the Religious IFR, not the Moral IFR, as Notre Dame has never claimed that its objections are grounded in nonreligious moral views. *See, e.g.*, Notre Dame President's Letter, available at https://president.nd.edu/writings-addresses/2018-writings/letter-on-health-care-coverage/. Moreover, Plaintiffs, who have the burden to establish standing, have not alleged that they lack access to more comprehensive contraceptive coverage, a fact that should be readily available to them—and the absence of which undermines their claims of harm.

[7] Not only is there uncertainty about what Notre Dame will do in the future as to these issues (and it has changed course several times with regard to these issues, Compl. ¶¶ 113, 119-120, 123), but there is no certainty that Plaintiffs will be eligible for, or will choose to use, Notre Dame health plans in the future.

long-acting IUD, and "does not know if the IUD will have the same efficacy as the NuvaRing for controlling her menstrual pain."  Compl. ¶ 12b.  She provides no reason in her allegations for this Court to presume the new IUD will *not* have the same efficacy as the NuvaRing—for this reason, her injury is speculative.  Similarly, Jane Doe 2 alleges she uses an oral contraceptive for non-contraceptive medical purposes, which may still be available to her for those purposes, if not for the purpose of preventing pregnancy.  *See* Compl. ¶ 15.  In any event, non-contraceptive uses of oral contraceptive medications are not the subject of either the Settlement Agreement or the IFRs.  *See, e.g.*, 82 Fed. Reg. 47,806 n.45 ("Where a drug approved by the FDA for contraceptive use is prescribed exclusively for a non-contraceptive and non-preventive use to treat an existing condition, it would be outside the scope of the Guidelines.").

## II.    The Court Should Dismiss the Complaint for Failure to State a Claim Because the Settlement Agreement Is Not Void for Illegality, and Because the Agencies Lawfully Promulgated the IFRs.

### A.    Count II Should Be Dismissed Because the Settlement Agreement Is Not Void for Illegality.

Plaintiffs' Second Cause of Action alleges that the Settlement Agreement is void for illegality under federal common law.  *See* Compl. ¶¶ 178–83.  They allege that the Settlement Agreement violates the ACA, the Establishment Clause, the Due Process Clause, and the Supreme Court's rulings in *Zubik v. Burwell* and *Notre Dame v. Burwell*.  136 S. Ct. 1557; 136 S. Ct. 2007.  Even if Plaintiffs' challenges related to the Settlement Agreement were reviewable, they would fail.  The Settlement Agreement does not violate the ACA, Establishment Clause, or Due Process Clause, for all of the reasons stated in the sections of this brief addressing the same challenges to the IFRs, and Defendants respectfully refer the Court to those sections for Defendants' position.  *See also infra* at 40 (discussing Count I's APA challenge to the Settlement Agreement).  And the Settlement Agreement does not violate the Supreme Court's rulings in

*Zubik* and in *Notre Dame*, because neither of those rulings mandated a particular resolution of Notre Dame's original lawsuit.

In *Zubik* and *Notre Dame*, the Supreme Court vacated and remanded the cases to the circuit courts, with an instruction that the parties on remand should be "afforded an opportunity to arrive at an approach going forward" that balanced the competing positions of the parties. 136 S. Ct. at 1560; 136 S. Ct. 2007 (incorporating *Zubik*'s reasoning). In doing so, the Court provided its characterization of what an ideal resolution would look like: one that "accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage.'" But the Court did not mandate that the parties pursue one course of action over another—it simply vacated and remanded the case with an instruction that the parties should *attempt* to resolve the case in the manner described. *See Zubik*, 136 S. Ct. at 1560–61 (courts of appeal should "allow the parties sufficient time to resolve any outstanding issues between them"); *Notre Dame*, 136 S. Ct. 2007. And the parties did so—through months of negotiation and a Request for Information that solicited 54,000 comments, *see* 81 Fed. Reg. 47,741—before the Government relied on its authority under RFRA and its enforcement discretion to issue the IFRs and Settlement Agreement. The Settlement Agreement is thus fully consistent with the Supreme Court's orders.

Plaintiffs here argue that the Settlement Agreement is illegal because it violates *Zubik*'s reference to "full" coverage, Compl. ¶¶ 79, 165–67, but the Settlement Agreement does not preclude plan members or beneficiaries from receiving the objectionable contraceptive coverage. The Settlement Agreement simply requires that any such coverage be provided "through a separate or distinct health plan, or other arrangement that is separate and distinct from Plaintiffs'

23

health plan." Settlement Agreement at 4. Although this resolution may not have been optimal

for all sides, it is not contrary to the Court's rulings. For these reasons, the Settlement

Agreement does not violate binding Supreme Court precedent from *Zubik* and *Notre Dame*.

**B.      The Court Should Dismiss Count III Because the Agencies Lawfully Issued
          The IFRs Without Notice and Comment.**

Plaintiffs' challenge to the process by which the Departments issued the IFRs likewise

fails. Although the APA ordinarily requires agencies to publish a "[g]eneral notice of proposed

rulemaking," and "give interested persons an opportunity to participate in the rule making." 5

U.S.C. § 553(b)-(c), the APA also recognizes that Congress may "expressly" modify that

requirement. *Id.* § 559. Moreover, the APA allows agencies to depart from the usual notice-and-

comment requirement for "good cause." *Id.* §§ 553(b)(3)(B), 553(d)(3). Both exceptions apply

here, and regardless, any error in forgoing notice and comment was harmless.

**1.      The ACA Expressly Permits Issuance of the Interim Final
          Rules.**

The Secretaries of the three agencies are expressly permitted by law to promulgate

"interim final rules" to administer the statutory provisions that govern the scope of the

contraceptive-coverage mandate. Specifically, the agencies promulgated the contraceptive-

coverage mandate, and the interim rules expanding the exemptions from that mandate, pursuant

to the ACA's preventive-services provision, 42 U.S.C. § 300gg-13. Congress enacted this

provision as an amendment to title XXVII of the Public Health Service Act. *See* Patient

Protection and Affordable Care Act, Pub. L. No. 111-148, § 1001, 124 Stat. 119, 130-32 (2010)

(enacting new section 2713). Congress also incorporated this provision into ERISA and the

Internal Revenue Code. *See id.* § 1562(e)-(f), 124 Stat. at 270.

Congress placed the preventive-services provision in titles of the Public Health Service Act, ERISA, and the Internal Revenue Code that may be carried out through IFRs. Section 2792 of the Public Health Service Act authorizes the Secretary of HHS to promulgate "such regulations as may be necessary or appropriate to carry out the provisions of [title XXVII of the Act]," along with "any interim final rules as the Secretary determines are appropriate to carry out [title XXVII]." 42 U.S.C. § 300gg-92. Corresponding provisions in ERISA (section 734, 29 U.S.C. § 1191c) and the Internal Revenue Code (section 9833, 26 U.S.C. § 9833) likewise authorize the Secretary of Labor and the Secretary of the Treasury, respectively, to promulgate not only "such regulations as may be necessary or appropriate" but also "any interim final rules as the Secretary determines are appropriate to carry out [part 7 of subtitle B of title I of ERISA (requirements for group health plans) and chapter 100 of subtitle K of the Internal Revenue Code (requirements related to health-insurance coverage)]." Congress placed the ACA's preventive-services provision in title XXVII of the Public Health Service Act, part 7 of subtitle B of title I of ERISA, and chapter 100 of subtitle K of the Internal Revenue Code.

These provisions granted the agencies discretion to depart from normal notice-and-comment requirements in promulgating the IFRs at issue here. While Congress must act "expressly" to authorize departure from the APA's notice-and-comment requirement, 5 U.S.C. § 559, Congress need not "employ magical passwords," *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). "[T]he import of the § 559 instruction is that Congress's intent to make a substantive change be clear." *Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998) (citation omitted). Congressional intent to dispense with notice and comment thus can be gleaned from "the text, context, and relevant historical treatment of the provision at issue." *Musacchio v. United States*, 136 S. Ct. 709, 717 (2016) (citation omitted).

25

Here, the statutes' references to "interim final rules" manifests Congress's clear intent to confer discretion on the agencies to depart from the APA's notice-and-comment requirement. *See Asiana Airlines*, 134 F.3d at 398 (finding express congressional intent to allow departure from APA's notice-and-comment requirement where statute authorized "not a proposed rule, but an 'interim final rule'"); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1237 (D.C. Cir. 1994) (statute authorizing issuance of IFRs followed by opportunity for comment expressed Congress's "clear intent" that APA's notice-and-comment procedures "need not be followed"). "Interim final rule" is a term of art that refers to rules issued without prior notice and comment, *see* Michael Asimow, *Interim-Final Rules: Making Haste Slowly*, 51 Admin. L. Rev. 703, 703 (1999), and failing to construe it as waiving the APA's notice-and-comment requirement would render the term superfluous, especially where, as here, the statutes at issue separately authorize the agencies to promulgate final regulations, *see Asiana Airlines*, 134 F.3d at 39 (noting the "cardinal principle of interpretation requir[ing] [a court] to construe a statute so that no provision is rendered inoperative or superfluous" (citations omitted)).

Moreover, each statute authorizes the respective Secretary to "promulgate any interim final rules as the Secretary determines are appropriate to carry out [specified provisions]."  This broad language confirms Congress's clear intent to delegate to the agencies the decision whether and when to issue these IFRs.  *Cf. Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that statute authorizing CIA to terminate employees "whenever the Director 'shall deem such termination necessary or advisable in the interests of the United States'" "fairly exudes deference to the Director" and "foreclose[s] the application of any meaningful judicial standard of review").

Since the 1996 enactment of section 2792 of the Public Health Service Act and the corresponding provisions of the Internal Revenue Code and ERISA, which are rare in the U.S.

26

Code, the Secretaries of each administration have relied on them as authority to issue IFRs in a wide variety of contexts related to group health plans. Indeed, the agencies expressly relied on this statutory authority to issue IFRs relating to the contraceptive-coverage mandate in 2010, 2011, and 2014. *See* 75 Fed. Reg. 41,726, 41,729-30 (July 19, 2010); 76 Fed. Reg. 46,621, 46,624 (Aug. 3, 2011); 79 Fed. Reg. 51,092, 51,095 (Aug. 27, 2014).

At a minimum, even if the Secretaries lack unfettered discretion to choose when to issue IFRs, these statutes should be read to inform the APA's standard for when it is appropriate for agencies to depart from notice-and-comment requirements. Under that reading, this Court should review the Secretaries' determination of "appropriate[ness]," not "good cause." And while neither determination was "arbitrary and capricious" under the APA, 5 U.S.C. § 706, that is especially clear if the standard is merely "appropriate" rather than "good cause."

### 2. "Good Cause" Exists To Issue the IFRs.

Even if the statutes administered by the agencies did not expressly authorize them to depart from the APA's notice-and-comment requirements, the agencies had "good cause" to do so under the APA itself. There are two relevant "good cause" standards within the APA. First, an agency may issue IFRs without engaging in notice and comment at all when the agency for good cause finds that prior notice-and-comment procedures "are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Second, when an agency "only dispenses with *prior* notice and comment, and not notice and comment altogether," Section 553(d)(3) of the APA applies, which "encompass[es] more situations" than those specified by 553(b)(3)(B). *U.S. Steel Corp. v. EPA,* 605 F.2d 283, 289-90 (7th Cir. 1979) (emphasis added). In a case such as this one, "where a regulation is made effective before notice and comment, the agenc[ies] could rely on either 'good cause' provision." *Id.* at 286.

27

Here, as the preamble to the religious exemption explains, waiting for the completion of notice and comment procedures before making the new rules effective was "impracticable" and "contrary to the public interest" under section 553(b)(3)(B) because the status quo was untenable. The agencies had "been subject to temporary injunctions protecting many religious nonprofit organizations from being subject to the accommodation process against their wishes, while many other organizations [we]re fully exempt [or] ha[d] permanent court orders blocking the contraceptive coverage requirement." 82 Fed. Reg. at 47,814. But still "[o]ther objecting entities," including some not-for-profit entities that sued the agencies, did not have "the protection of court injunctions." *Id.*

To add to the uncertainty, the courts of appeals were divided on whether the accommodation imposed a substantial burden on organizations with religious objections. *See* 82 Fed. Reg. at 47,798 (citing cases). As discussed above, the Supreme Court granted certiorari in several of those cases and vacated those decisions to see whether the parties could find an approach that would accommodate the plaintiffs' religious objections and ensure that women covered by the plaintiffs' health plans received contraceptive coverage. *See Zubik*, 136 S. Ct. at 1560-61. But the Court did not decide "whether [the plaintiffs'] religious exercise ha[d] been substantially burdened," or "whether the current regulations [we]re the least restrictive means of serving [a compelling governmental] interest." *Id.* at 1560.

Because the Court did not resolve the controversy in the circuits regarding whether the accommodation satisfied RFRA, significant uncertainty remained. In response to *Zubik*, the agencies issued a request for information, *see* 81 Fed. Reg. 47,741 (Jul. 22, 2016), but despite receiving over 54,000 comments, the agencies were unable to "find a way" to amend the

accommodation to satisfy objecting eligible organizations and provide contraceptive coverage for their employees.  82 Fed. Reg. at 47,814.

Given this unsustainable state of affairs and the agencies' determination that "requiring certain objecting entities or individuals to choose between the [m]andate, the accommodation, or penalties for noncompliance has violated RFRA," 82 Fed. Reg. at 47,814, good cause existed to bypass the normal notice-and-comment requirements.  In particular, good cause existed to issue the expanded religious exemption as an interim final rule "to cure such violations (whether among litigants or among similarly situated parties that have not litigated), to help settle or resolve cases, and to ensure, moving forward, that [the agencies'] regulations are consistent with any approach [they] have taken in resolving certain litigation matters."  *Id.*  The agencies' need to halt what they had determined to be their own ongoing violations of their statutory obligations further underscores the existence of good cause.

The government need not try to untangle a Gordian knot caused by competing court decisions and unsettled law before acting.  Indeed, courts have concluded that good cause can be demonstrated where the government seeks to bring certainty, finality, and predictability to an otherwise intractable state of affairs.  In *Service Employees Int'l Union, Local 102 v. County of San Diego*, 60 F.3d 1346 (9th Cir. 1994), for example, the fact that "the federal courts were issuing conflicting decisions" on the applicability of the Fair Labor Standards Act, and that "local governments were therefore unable to predict whether they were complying with [the statute]," constituted good cause to issue an interim rule.  *Id.* at 1352 n.3. As noted, that is precisely the case here.

Finally, even if the Court concludes this case falls short of the standard of "good cause" outlined in section 553(b)(3)(B), it may "nonetheless hold that [the agencies] had 'good cause'

within the meaning of 553(d)(3)" to make the regulations effective prior to the completion of

notice-and-comment rulemaking.  *U.S. Steel Corp.*, 605 F.2d at 289.  As discussed, numerous

court rulings had issued respecting the contraceptive coverage mandate's application to religious

entities, including *Zubik*'s directive to find an acceptable accommodation for both religious

employers and women seeking contraceptives.  The "demonstrable urgency of the conditions

[the IFRs] are designed to correct" justifies their issuance prior to completion of the notice-and-

comment process.  *Id.* (quoting S. Doc. No. 248, 79th Cong., 2d Sess. 260 (1946)).  Accordingly,

the agencies have amply justified their decision to issue the new rules as IFRs, and Plaintiffs'

procedural challenge to these regulations should be rejected.

### 3.      If the Lack of Formal Notice-and-Comment Was An Error, It Was Harmless.

In any event, any error in forgoing notice and comment was harmless.  The APA's

judicial review provision instructs courts to take "due account . . . of the rule of prejudicial

error."  5 U.S.C. § 706.  Courts routinely apply this instruction when they determine whether an

agency has failed to comply with the APA's notice-and-comment requirement.  *See*

*Conservation Law Foundation v. Evans*, 360 F.3d 21, 29 (1st Cir. 2004); *Riverbend Farms, Inc.*

*v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992); *Small Refiner Lead Phase-Down Task Force v.*

*EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983).  The burden falls on the party asserting error to

demonstrate prejudice.  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Here, the agencies issued the IFRs after receiving "more than 100,000 public comments"

throughout six years of publishing and modifying these regulations, as part of an extensive

discussion about whether and by what extent to expand the exemptions at issue here.  82 Fed.

Reg. at 47,814.  The public has had multiple opportunities to comment on the scope of the

exemptions and accommodations through multiple rounds of rulemaking, including the issuance

of three IFRs, one ANPRM, two NPRMs, and one RFI on these issues. *See* 75 Fed. Reg. 41,726; 77 Fed. Reg. 16,501; 81 Fed. Reg. 47,741. Plaintiffs do not allege that they provided comments on the expanded exemptions during any of these rulemakings, including the notice-and-comment period for the IFRs that recently closed, and HHS has not been able to identify any comments submitted under the names of the named Plaintiffs. The substantive objections Plaintiffs posit here were submitted in response to earlier rounds of rulemaking, as well. *See, e.g.*, AR CD6 at 218156, 262356 (raising equal protection concerns), *id.* at 264577, 265920 (raising Establishment Clause concerns), *id.* at 272126, 272089 (raising RFRA concerns), *id.* at 264554, 269764 (raising anti-discrimination concerns). Plaintiffs cannot plausibly establish harm based on a lack of prior notice-and-comment, particularly when they appear to have neglected to participate in various iterations of that process in the first place.

### C.      Counts I and IV Should Be Dismissed.

In Count I, Plaintiffs allege that the Settlement Agreement violates the Administrative Procedure Act, and in Count IV, Plaintiffs allege that the IFRs "were adopted with no valid justification," Compl. ¶ 203, and, relatedly, violate the Women's Health Amendment, 42 U.S.C. § 300gg-13(a)(4). Not so. The expanded religious exemption is justified by the agencies' authority—and duty—under RFRA to eliminate substantial burdens on the exercise of religion imposed by the government. And the moral exemption is justified by the government's similar, and well recognized, interest in protecting objections of conscience especially in the area of healthcare. Moreover, the Settlement Agreement does not violate the APA for the reasons discussed below.

### 1.      RFRA Justifies the Expanded Religious Exemption.

31

RFRA prohibits the government from "substantially burden[ing] a person's exercise of religion" unless the application of the burden to that person is "the least restrictive means" of furthering a "compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  Under *Hobby Lobby*, RFRA requires the government to eliminate the substantial burden imposed by the contraceptive-coverage mandate.  The expanded religious exemption is a permissible—and in the case of some objecting employers, required—means of doing so.

In *Hobby Lobby*, the Supreme Court held that the contraceptive-coverage mandate, standing alone, "imposes a substantial burden" on objecting employers.  134 S. Ct. at 2775-78.  And the Court further held that application of the mandate to objecting employers was not the least restrictive means of furthering any compelling governmental interest, because the accommodation would have satisfied the objecting employers' religious concerns in that case.  *See id.* at 2780-83.  But the Court did not decide whether the accommodation would satisfy RFRA for all religious claimants, nor did it suggest that the accommodation is the only permissible way for the government to comply with RFRA and the ACA, even assuming the existence of a compelling governmental interest.  *See id.* at 2782.  Moreover, as the agencies noted, other lawsuits have shown that "many religious entities have objections to complying with the accommodation based on their sincerely held religious beliefs."  82 Fed. Reg. at 47,806.

The agencies reasonably decided to adopt the religious exemption to satisfy their RFRA obligation to eliminate the substantial burden imposed by the mandate.  Although RFRA prohibits the government from substantially burdening a person's religious exercise where doing so is not the least restrictive means of furthering a compelling interest—as is the case with the contraceptive-coverage mandate, per *Hobby Lobby*—RFRA does *not prescribe* the remedy by which the government must eliminate that burden.  The agencies previously chose to attempt to

do so through the accommodation, but nothing in RFRA compelled that choice or prohibits the agencies from now employing the more straightforward choice of an exemption—much like the existing and unchallenged exemption for churches.  Indeed, if the agencies had simply adopted an exemption from the outset—as they did for churches—no one could reasonably have argued that doing so was improper because the agencies should have created the accommodation instead.  Neither RFRA nor the ACA compels a different result here based merely on path dependence.

The agencies' choice to adopt an exemption in addition to the accommodation is particularly reasonable given the existing litigation over whether the accommodation violates RFRA.  *See* 82 Fed. Reg. at 47,798; *Priests for Life v. U.S. Dep't of Health and Human Servs.*, 772 F. 3d 229 (D.C. Cir. 2014); *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015). *Dordt College v. Burwell*, 801 F.3d 946, 949-50 (8th Cir. 2015); *see also Ricci v. DeStefano*, 557 U.S. 557, 585 (2009) (holding that an employer need only have a strong basis to believe that an employment practice violates Title VII's disparate-impact ban in order to take certain types of remedial action that would otherwise violate Title VII's disparate-treatment ban).

To be sure, if providing an exemption for an objecting religious employer would prevent the contraceptive-coverage mandate from achieving a compelling governmental interest as to that employer, then RFRA would not authorize that exemption.  *See Hobby Lobby*, 134 S. Ct. at 2779-80.  But the agencies expressly found that application of the mandate to objecting entities—like Notre Dame—neither serves a compelling governmental interest nor is narrowly tailored to any such interest.  That is so for multiple reasons, including:  Congress did not

33

mandate coverage of contraception at all; that the preventive-services requirement was not made applicable to "grandfathered plans"; the previous religious exemption excused churches and their related auxiliaries, and also effectively exempted entities that participated in self-insured church plans; multiple federal, state, and local programs provide free or subsidized contraceptives for low-income women; and entities bringing legal challenges to the mandate have been willing to provide coverage of some, though not all, contraceptives (as Notre Dame has).  *See* 82 Fed. Reg. at 47,800-06.  Accordingly, the agencies reasonably exercised their discretion in adopting the exemption as a valid means of complying with their obligation under RFRA to eliminate the substantial burden imposed by the contraceptive-coverage mandate, whether or not the accommodation is a valid means of compliance.  *See id.*

All of that said, the accommodation *does* violate RFRA for at least some employers and schools (like Notre Dame), by using plans that they themselves sponsor to provide contraceptive coverage that they object to on religious grounds, which they sincerely believe makes them complicit in providing such coverage.  *See* 82 Fed. Reg. at 47,800.  In light of that sincere religious belief, forcing objecting employers to use the accommodation plainly imposes a substantial burden under *Hobby Lobby*.  *See Sharpe Holdings, Inc. v. HHS*, 801 F.3d 927, 939-43 (8th Cir. 2015), *vacated and remanded sub nom. HHS v. CNS Int'l Ministries*, No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016).  Indeed, after extensive study, the government previously determined that it could identify no means short of an exemption that would resolve all religious objections, *see supra* p. 12-13.  It thus was not just reasonable, but required, for the agencies to

provide an exemption to the contraceptive coverage mandate (rather than just the accommodation) to satisfy their RFRA obligations.[8]

### 2. The Moral Exemption Is Justified by Longstanding Precedent.

The moral exemption is also well justified. It is designed to protect "sincerely held moral convictions" by exempting those with such convictions from facilitating the provision of contraceptive services. 82 Fed. Reg. at 47,839. The government may permissibly accommodate deeply held non-religious moral convictions and has furthered this important interest in a variety of contexts since the founding. *See Welsh v. United States*, 398 U.S. 333, 340 (1970) (individual qualified as a religious conscientious objector to the draft if he or she "deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by … God' in traditionally religious persons") (plurality opinion); *United States v. Seeger*, 380 U.S. 163 (1965) (similar holding); *Doe v. Bolton*, 410 U.S. 179, 197–98 (1973). Indeed, Congress has repeatedly legislated conscience protections in sensitive health contexts, including the provision of contraceptive services. *See* 82 Fed. Reg. 47,838 n.1 (collecting statutes). Moreover, many states, including Indiana, protect non-religious moral beliefs in healthcare. *See, e.g.*, 18 Pa. Stat. & Cons. Stat. Ann. § 3213 (West) (conscience clause permitting medical professionals and facilities to opt out of providing abortions); Cal. Health & Safety Code § 123420; Ind. Code §§ 16-34-1-3, 16-34-1-4; Md. Code Ann., Health – Gen. § 20-214. Plaintiffs' argument thus fails.

---

[8] The arguments demonstrating that RFRA supports the adoption of the religious exemption similarly demonstrate that RFRA supports the settlement agreement.

3.      The ACA Gives the Agencies Discretion to Extend and Modify
        Exemptions for Any Contraceptive Coverage Mandate.

Plaintiffs' allegations that the IFRs and the settlement agreement violate the Women's

Health Amendment, § 300gg-13(a)(4) fail because the ACA grants HRSA, and in turn the

agencies, significant discretion to shape the content and scope of any preventive-services

guidelines adopted pursuant to § 300gg-13(a)(4).  The ACA does not specify the types of

preventive services that must be included in such guidelines.  Instead, as relevant here, it

provides only that, "with respect to women," coverage must include "such additional preventive

care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA]."  42

U.S.C. § 300gg-13(a)(4).  Several textual features of § 300gg-13(a) demonstrate that this

provision grants HRSA broad discretionary authority.

First, unlike the other paragraphs of the statute, which require preventive-services

coverage based on, inter alia, "current recommendations of the United States Preventive Services

Task Force," recommendations "in effect . . . from the Advisory Committee on Immunization

Practices of the Centers for Disease Control and Prevention," or "the comprehensive guidelines"

that HRSA had already issued with respect to preventive care for children, the paragraph

concerning preventive care for women refers to "comprehensive guidelines" that did not exist at

the time.  *Compare* 42 U.S.C. § 300gg-13(a)(1), (2), (3), *with id*. § 300gg-13(a)(4).  That

paragraph thus necessarily delegated the creation of the guidelines to HRSA.

Second, nothing in the statute mandated that the guidelines include contraception, let

alone for all types of employers with covered plans.  On the contrary, the statute provides only

for coverage of preventive services "as provided for in comprehensive guidelines supported by

[HRSA] for purposes of this paragraph."  42 U.S.C. § 300gg-13(a)(4).  The use of the phrase "for

purposes of this paragraph" makes clear that HRSA should consider the mandate in shaping the

36

guidelines, and the use of the phrase "as provided for" suggests that HRSA may define not only the services to be covered under that mandate, but also the manner or reach of that coverage. That suggestion is further reinforced by the absence of the words "evidence based" or "evidence-informed" in this subsection, as compared with § 300gg-13(a)(1), (3), which indicates that Congress authorized HRSA to consider factors beyond the scientific evidence in deciding whether to support a coverage mandate for particular preventive services.

Accordingly, § 300gg-13(a)(4) must be understood as a positive grant of authority for HRSA to develop the women's preventive-services guidelines and for the agencies, as the administering agencies of the applicable statutes, to shape that development. *See* 26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92. That is especially true for HHS, as HRSA is a component of HHS that was unilaterally created by the agency and is subject to the agency's general supervision. *See* 47 Fed. Reg. 38,409 (Aug. 31, 1982). The text of § 300gg-13(a)(4) thus plainly authorized HRSA to recognize an exemption from otherwise-applicable guidelines that it adopts, and nothing in the ACA prevents HHS and the other agencies from directing that HRSA recognize such an exemption. Indeed, since their first rulemaking on this subject in 2011, the agencies have consistently interpreted the broad delegation to HRSA in § 300gg-13(a)(4) as including the power to reconcile the ACA's preventive-services requirement with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive-coverage mandate. *See* 76 Fed. Reg. 46,623.

In light of this statutory and regulatory backdrop, the agencies' exercise of authority to expand the exemption is, at the very least, a reasonable construction of the statute entitled to deference. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

### 4.      Plaintiffs' Additional Substantive APA Arguments Have No Merit.

Plaintiffs also claim that the IFRs violate the APA because they are "inconsistent with the weight of the hundreds of thousands of comments that were submitted for each of the previous rules relating to the contraceptive coverage requirement."  Compl. ¶ 202.  This allegation is based on two fundamental misunderstandings of administrative law.

First, under the APA, agencies do not count comments and then pick the version of the rule that has the most votes.  "The substantial-evidence standard has never been taken to mean that an agency rulemaking is a democratic process by which the majority of commenters prevail by sheer weight of numbers."  *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 122 n.17 (D.C. Cir. 1987).  Rather, an agency considers any comments that it receives on a proposed or interim final rule and determines, in the exercise of its discretion, what rule to adopt in view of those comments, statutory requirements, past regulations, and other relevant considerations.  "The number and length of comments, without more, is not germane" to this inquiry.  *Id.*

Second, as Plaintiffs note, these comments were from previous rulemakings.  Agencies are not forever prohibited from changing a rule, and no heightened standard of review applies simply because an agency has changed its mind.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).  Rather, agencies simply need to "display awareness that [they are] changing position" and explain any decision to "disregard[] facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 515-16.  Those standards were easily satisfied by the IFRs.

### 5.      Count I Should Be Dismissed Because the Settlement Agreement Does Not Violate the APA.

Count I alleges a violation of the APA, for numerous reasons that are largely coextensive with their challenges to the IFRs, and with Plaintiffs' separate challenge to the Settlement

Agreement in Count II.  *See supra* Part II.A.  Specifically, Count I alleges that the Settlement

Agreement is not in accordance with *Zubik* and *Notre Dame*, *see* Compl. ¶ 165, that the

Settlement Agreement violates the ACA's Women's Health Amendment and was thus entered in

excess of statutory authority, *id.* ¶ 168, and that the Settlement Agreement violates the First and

Fifth Amendments.  *Id*. at 36.  As discussed above, *supra* Part II.A, the Settlement Agreement

does not violate *Zubik* and *Notre Dame*.  Nor does the Settlement Agreement violate the

Women's Health Amendment—just as the IFRs provide discretion to create exemptions in the

IFRs, *see supra* Part II.C.3, so too do they allow the Government to settle ongoing litigation by

providing such an exemption.  Furthermore, the Settlement Agreement does not violate the

Constitution, for the same reasons that the IFRs do not: the Settlement Agreement does not

violate the Establishment Clause because it aims to relieve a burden on religion, not

impermissibly establish religion, *see infra* Part II.D.1, it does not violate the Due Process Clause

because Plaintiffs do not have a constitutionally protected liberty interest in receiving employer-

subsidized contraceptives, *see infra* Part II.D.2, nor does it violate the Equal Protection Clause,

*see infra* Part II.D.3, because the Settlement Agreement does not discriminate against women on

the basis of sex, on its face or otherwise.  For these reasons and for the reasons discussed in the

other respective sections of this brief, this Court should dismiss Count I.

### D.      The Court Should Dismiss Plaintiffs' Constitutional Challenges Because They Fail to State Valid Claims.

#### 1.      The IFRs Do Not Violate the Establishment Clause.

Count V alleges that the IFRs violate the Establishment Clause.  Compl. ¶¶ 207-11.

Specifically, Plaintiffs allege that the IFRs intend to and have the effect of advancing religious

interests.  *Id*. ¶ 210(b).  This allegation has no merit.  The IFRs' protections of religious exercise

for entities and individuals with objections to contraception based on religious beliefs and moral

convictions do not run afoul of the Establishment Clause.  The IFRs do not themselves promote or subsidize a religious belief or message, as demonstrated most clearly by the fact that their application is not limited to religious entities or persons.  Instead, the IFRs free entities and individuals with religious or moral objections to the provision of contraception to act as they otherwise would in the absence of state-imposed regulations.  This Court should hold that the IFRs represent a constitutional exercise of executive authority to alleviate unjustified substantial burdens on the exercise of moral convictions and religious beliefs.

When the government relieves such burdens, it does not violate the Establishment Clause; rather, "it follows the best of our traditions."  *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).  The Supreme Court's cases "leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice."  *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994).  Rather, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."  *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987)).[9]

---

[9] *See also Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any."); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 676-77 (1970) ("Few concepts are more deeply embedded in the fabric of our national life . . . than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise generally so long as none was favored over others and none suffered interference."); *Lee v. Weisman*, 505 U.S. 577, 627 (1992) (Souter, J., concurring) (stating that the Establishment Clause is not violated when the government accommodates religious beliefs "by relieving people from generally applicable IFRs that interfere with their religious callings").

The Supreme Court has repeatedly held that "there is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)) (internal punctuation omitted).  On that basis, the Supreme Court has upheld a broad range of accommodations against Establishment Clause challenges, including the exemption of religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion, *see Amos*, 483 U.S. at 335-39; a state property tax exemption for religious organizations, *see Walz*, 397 U.S. at 672-80; and a state program releasing public school children during the school day to receive religious instruction at religious centers, *see Zorach*, 343 U.S. at 315.

The Supreme Court and the Seventh Circuit continue to apply the three-part test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to evaluate Establishment Clause challenges to government acts seeking to accommodate the practice of religious beliefs.  *See Amos*, 483 U.S. at 335; *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010). The *Lemon* test requires that government actions (1) have "a secular legislative purpose," (2) have a "principal or primary effect" that "neither advances nor inhibits religion," and (3) do not "foster an excessive government entanglement with religion."  *Lemon*, 403 U.S. at 612-13 (citations and internal punctuation omitted).  The IFRs easily satisfy that test.

With respect to *Lemon*'s first prong, the IFRs serve the legitimate secular purpose of alleviating significant governmental interference with the exercise of religion.  *Amos*, 483 U.S. at 335; *see* 82 Fed. Reg. at 47,793 (purpose of the IFRs is "to better balance the Government's interest in ensuring coverage for contraceptive and sterilization services in relation to the

41

Government's interests, including as reflected throughout Federal law, to provide conscience

protections for individuals and entities with sincerely held religious beliefs in certain health care

contexts, and to minimize burdens in our regulation of the health insurance market").

As the Supreme Court has explained, the first prong of the *Lemon* test "does not mean

that the law's purpose must be unrelated to religion—that would amount to a requirement that

the government show a callous indifference to religious groups, and the Establishment Clause

has never been so interpreted." *Amos*, 483 U.S. at 335 (quoting *Zorach*, 343 U.S. at 314). "A

statute may be motivated in part by a religious purpose and nonetheless satisfy the first criterion

of *Lemon*. *Sherman*, 623 F.3d at 507 (citing *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985)). "Thus,

a secular purpose need not be the exclusive one; it is sufficient if the government had *a* secular

purpose." *Id*. (citation and internal punctuation omitted). Furthermore, "the Supreme Court has

recognized that the purpose prong of *Lemon* has rarely been determinative 'because [the]

government does not generally act unconstitutionally, with the predominant purpose of

advancing religion.'" *Id*. (quoting *McCreary Cty. v. ACLU of Ky*., 545 U.S. 844, 863 (2005)).

Here, there is no indication in the IFRs of any intent on the part of the Agencies to

advance any particular faith or to promote religion in general. Instead, the IFRs merely seek to

alleviate certain substantial hardships faced by entities and individuals in the provision of health

insurance. Indeed, the fact that the IFRs also apply to entities and individuals with secular, non-

religious moral beliefs regarding the provision of contraception confirms that the IFRs possess a

secular purpose.

Finally, the IFRs also satisfy the second prong of the *Lemon* test because their "principal

or primary effect . . . neither advances nor inhibits religion." *Lemon*, 403 U.S. at 612. The

Supreme Court has made clear that removing barriers to the exercise of religious freedom does

not advance religion; to the contrary, "there is ample room for accommodation of religion under the Establishment Clause." *Amos*, 483 U.S. at 338.  The IFRs do not themselves promote or subsidize a religious belief or message; instead, they free entities and individuals with objections to contraception based on religious beliefs and moral convictions to practice those beliefs and convictions as they otherwise would in the absence of certain state-imposed regulations.

The IFRs satisfy the third and final prong of *Lemon* because they do not "entangle the State in an unlawful fostering of religion." *Hobbie*, 480 U.S. at 145.  In *Amos*, the Supreme Court upheld a statutory provision that exempted religious groups from Title VII's prohibition against religious discrimination, stating that "[i]t cannot be seriously contended that [the statute] impermissibly entangles church and state; the statute effectuates a more complete separation of the two . . . ." *Amos*, 483 U.S. at 339.  The IFRs operate in a similar manner: they reduce state interference with religious exercise.  Far from entangling the government in unlawful fostering of religion, the IFRs in fact achieve a more complete separation of church and state.

In sum, the IFRs have a secular purpose, their primary effect is neither to advance nor inhibit religion, and they do not foster excessive government entanglement religion. Accordingly, the IFRs represent a permissible accommodation of religious beliefs and moral convictions consistent with the Establishment Clause.[10]

### 2.    The Rules and Settlement Agreement Do Not Violate the Due Process Clause.

Plaintiffs contend that the IFRs and Settlement Agreement violate the Due Process Clause of the Fifth Amendment.  More specifically, Plaintiffs' due process allegations comprise two distinct challenges, one substantive and one procedural.  First, Plaintiffs allege that

---

[10] Plaintiffs' allegation that the settlement agreement violates the Establishment Clause, Compl. ¶ 181(c), fails for similar reasons.

Defendants have violated the substantive component of the Due Process Clause, by infringing on Plaintiffs' fundamental right to access contraceptives.  Compl. ¶ 214.  Second, Plaintiffs maintain that Defendants have violated the procedural component of the Due Process Clause by depriving Plaintiffs of their liberty interest (in accessing contraceptives) without notice and an opportunity to be heard.  *Id.* ¶ 215.  Though distinct challenges, they both fail for the same reason:  Plaintiffs do not have a constitutionally protected interest in receiving employer-subsidized contraceptives.

The substantive component of the Due Process Clause prohibits the government from taking certain actions regardless of the procedures it follows but (as is relevant here) only if the action would infringe on a fundamental right or liberty.  *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Idris v. City of Chi.*, 552 F.3d 564, 566 (7th Cir. 2009).  A fundamental right or liberty is one that is "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks omitted).  Similarly, the procedural component of the due process clause requires the government to satisfy certain procedural obligations with regard to an action, but (as is relevant here) only if the government action jeopardizes a protected liberty interest.  *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 621 (7th Cir. 2012) ("As a necessary component of a procedural due process claim, Santana must identify a protected property or liberty interest.").

Plaintiffs' due process allegations lack merit because the refusal to subsidize, or to require employers to subsidize, the use of contraceptives does not infringe on any protected liberty interest.  The Supreme Court has recognized a fundamental right to privacy that encompasses certain decisions about contraceptive use.  *See, e.g., Griswold v. Connecticut*, 381

U.S. 479 (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972).  But the Court has squarely rejected

the argument that the refusal to fund the exercise of a liberty interest constitutes an infringement

of that interest.  For example, in *Harris v. McRae*, 448 U.S. 297 (1980), the Court considered the

constitutionality of the Hyde Amendment, which restricted the use of federal funds for abortions.

The Court concluded that "regardless of whether the freedom of a woman to choose to terminate

her pregnancy for health reasons lies at the core or the periphery of the due process liberty

recognized in *Wade*, it simply does not follow that a woman's freedom of choice carries with it a

constitutional entitlement to the financial resources to avail herself of the full range of protected

choices."  *Id.* at 316.  Put otherwise, the Court noted that "the Hyde Amendment . . . represents

simply a refusal to subsidize certain protected conduct.  A refusal to fund protected activity,

without more, cannot be equated with the imposition of 'penalty' on that activity" in violation of

the Constitution.  *Harris*, 448 U.S. at 317 n.19; *see also Maher v. Roe*, 432 U.S. 464 (1977);

*Webster v. Reprod. Health Servs*., 492 U.S. 490, 509 (1989).

The same logic applies here.  The IFRs and Settlement Agreement do not prohibit the use

of any contraceptives or punish any women for their use.  The IFRs simply relieve those with

sincere religious and moral objections to all or some contraceptives from the obligation to

subsidize or facilitate the subsidization of contraceptives to which they object.  And the

Settlement Agreement circumscribes the government's use of its enforcement discretion to

achieve the same constitutionally permissible end, *i.e.*, the government has agreed not to enforce

rules that require Notre Dame to subsidize or facilitate the subsidization of contraceptives to

which it harbors a sincere religious objection.  The IFRs and Settlement Agreement, therefore,

comport with the Due Process Clause.

### 3.  The IFRs and Settlement Agreement Are Consistent With Equal Protection Principles.

Plaintiffs allege that the IFRs and Settlement Agreement violate the equal protection principle of the Fifth Amendment in three ways:  (1) "the expansive exemptions that they create impermissibly target women for adverse treatment," Compl. ¶ 221; (2) they "endors[e] one set of religious beliefs to the exclusion of others," *id.* ¶ 222; and (3) "they discriminate against individuals who seek to exercise their fundamental right to make personal decisions regarding the use of contraception," *id.* ¶ 223.  None of these arguments has merit.  The IFRs and Settlement Agreement do not discriminate on the basis of sex, facially or otherwise.  Nor do they endorse any religion.  *See supra* Part II.D.1.  And they do not discriminate against those invoking their fundamental right to use contraceptives.  Rather, they allow those with sincere religious and moral objections to some or all contraceptives to decline to subsidize, or facilitate the subsidization of, those contraceptives to which they object, which is consistent with equal protection and due process principles given the absence of a fundamental right to subsidized contraception.  *See Harris*, 448 U.S. at 316 (finding no right to subsidized abortion).

When faced with a claim of discrimination on the basis of sex, courts assess (1) whether the classification is facially based upon sex and, if not, (2) whether there are other factors—such as the purpose of the law or the existence of a disparate impact—that demonstrate an invidious intent to discriminate on the basis of sex.  *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979).  With regard to "this second inquiry, impact provides an important starting point, but purposeful discrimination is the condition that offends the Constitution."  *Id.* (citations omitted).  Sex-based distinctions are subject to intermediate scrutiny, meaning that the distinction must be substantially related to an important governmental interest.  *Wengler v. Druggists Mut. Ins. Co*., 446 U.S. 142, 150 (1980).  All other distinctions that do not target a

protected class or burden a fundamental right are subject to rational-basis review.  *Heller v. Doe*, 509 U.S. 312, 319–20 (1993).  Under this standard, "a classification must be upheld … if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id*. at 320 (citation omitted).

Plaintiffs contend that the "the expansive exemptions that the[] [rules and Settlement Agreement] create impermissibly target women for adverse treatment," Compl. ¶ 221.  But neither the IFRs nor the Settlement Agreement discriminates against women on the basis of sex, facially or otherwise.  The IFRs and HRSA Guidelines generally require employer coverage for female contraceptives, while providing an exemption for those with religious and conscience objections.  The IFRs and guidelines do not require any coverage of male contraceptives.  *See* 78 Fed. Reg. at 8,458 n.3.  Nor could they:  the statutory provision requiring coverage for additional preventive services supported by HRSA pertains only to such services for "women."  42 U.S.C. § 300gg-13(a)(4).  Thus, the IFRs do *not* treat men more favorably, and any sex-based distinctions flow from the statute requiring preventive services for women only, not from the agencies "impermissibly targeting" women.  Moreover, any distinctions in coverage among women are not premised on sex, but on the existence of a religious or moral objection to facilitating the provision of contraceptives.  Similarly, the Settlement Agreement does not draw any sex-based lines.  Rather, it provides to Notre Dame, via an exercise of enforcement discretion memorialized in a contract, the same basic protection provided to all religious objectors by the rule-based exemptions.  As with the IFRs, any sex-based distinctions flow from the statute requiring preventive services for women only, not from the agencies "impermissibly targeting" women.

Because the IFRs and Settlement Agreement do not create sex-based distinctions, they are subject to rational basis review.  And they satisfy "the low bar of rational basis review," *Sweeney v. Pence*, 767 F.3d 654, 668 (7th Cir. 2014), because they are rationally related to legitimate government interests, *Lyng v. Int'l Union*, 485 U.S. 360, 370 (1988).  The religious exemption rule accommodates religion by "provid[ing] conscience protections for individuals and entities with sincerely held religious beliefs in certain health care contexts."  82 Fed. Reg. at 47,793.  The Settlement Agreement does the same.  And the accommodation of religious beliefs is an important government interest, as the Supreme Court recognized in *Cutter*, 544 U.S. at 724-25.  Indeed, for the same reasons, the IFR and Settlement Agreement would satisfy intermediate scrutiny.

The Moral Exemption Rule also has a rational basis (and also satisfies intermediate scrutiny).  It is designed to protect "sincerely held moral convictions" by exempting those with such convictions from facilitating the provision of contraceptive services.  82 Fed. Reg. at 47,839.  The government may permissibly accommodate deeply held moral, but not necessarily religious, convictions and has furthered this important interest in a variety of contexts since the founding.  *See Welsh*, 398 U.S. 333; *Seeger*, 380 U.S. 163; *Bolton*, 410 U.S. 179; 82 Fed. Reg. at 47,838 n.1.

Plaintiffs also allege that the IFRs and Settlement Agreement "discriminate against individuals who seek to exercise their fundamental right to make personal decisions regarding the use of contraception," Compl. ¶ 223, and that the government cannot satisfy the exacting scrutiny that attaches to such a classification, *id.* ¶ 224.  This argument is flawed.  "[E]qual protection analysis requires strict scrutiny of a [governmental] classification only when the classification impermissibly interferes with the exercise of a fundamental right."  *Mass. Bd. of*

48

*Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  And while, as noted earlier, the Supreme Court has

recognized a fundamental right to privacy that encompasses decisions about contraceptive use,

*see, e.g.*, *Griswold*, 381 U.S. 479, it has also clearly held that a fundamental right is not infringed

by a mere lack of subsidization, *see Harris*, 448 U.S. at 316.  The IFRs and Settlement

Agreement address the subsidization of contraceptives and thus do not infringe on any

fundamental right.  The IFRs and Settlement Agreement distinguish between those who attend

school at, or are employed by, a school or employer that object to some or all contraceptives, and

those who attend school or work at a non-objecting school or employer.  As discussed earlier,

this distinction is subject to rational basis review, a low bar that it easily passes.  Plaintiffs

remain free to use contraceptives, as well as to seek out contraceptive coverage from other

sources.  Plaintiffs' equal protection allegations fail.

## CONCLUSION

For the foregoing reasons, the Federal Defendants respectfully request the Court to

dismiss this action for lack of subject matter jurisdiction and failure to state a claim on which

relief can be granted.[11]


Dated: October 11, 2018                    Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

---

[11] Plaintiffs are not entitled to any relief, as explained above.  But, should the Court
ultimately decide otherwise, Defendants request the right to submit additional briefing on the
appropriate remedy.  Relevant to that discussion, as to the IFRs, will be the severability
provisions of the IFRs, 82 Fed. Reg. at 47,835 & 47,862, which explain (among other things)
that relief should be narrowly focused, and that an adverse finding should not be understood to
invalidate elements of the regulations not directly applicable to the plaintiffs in a particular
case.  The severability provisions also undercut Plaintiffs' standing to challenge aspects of the
regulations not directly applicable to them.

/s/ Rebecca M. Kopplin
REBECCA M. KOPPLIN
Trial Attorney (California Bar No. 313970)
JUSTIN M. SANDBERG
Senior Trial Counsel
MICHAEL GERARDI
Trial Attorney
CHRISTOPHER R. HEALY
Trial Attorney
DANIEL RIESS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20001
Telephone:  (202) 514-3953
Facsimile:  (202) 616-8202
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Federal Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the Memorandum in Support of Federal

Defendants' Motion to Dismiss was served on counsel for all parties using the Court's CM/ECF

system on October 11, 2018.


*/s/ Rebecca M. Kopplin*
REBECCA M. KOPPLIN
*Counsel for Federal Defendants*