# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

|  |  |  |
|---|---|---|
| IRISH 4 REPRODUCTIVE HEALTH, *et al.*, | ) ) ) ) |  |
| Plaintiffs | ) ) | Case No. 3:18-cv-491-PPS-MGG |
| v. | ) ) | Judge Philip Simon |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) |  |
| Defendants. | ) |  |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNIVERSITY OF NOTRE DAME'S MOTION TO DISMISS

Matthew A Kairis
JONES DAY
325 John H McConnell Blvd
 Suite 600
Columbus, OH 43216
(614) 281-3605
makairis@jonesday.com

*Counsel for Defendant*
*University of Notre Dame*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    A.    The Mandate and the Religious Exemption ......................................... 2

    B.    The So-Called "Accommodation" ......................................................... 3

    C.    Notre Dame's Litigation Against the Government ............................... 4

    D.    The Expanded Exemption and the Government's Settlement with Notre Dame ........................................................................................... 6

    E.    This Litigation ....................................................................................... 7

ARGUMENT ........................................................................................................... 7

I.    PLAINTIFFS' ATTACK ON THE SETTLEMENT AGREEMENT IS NOT RIPE FOR ADJUDICATION BECAUSE CURRENT REGULATIONS EXEMPT NOTRE DAME FROM THE MANDATE ....................................... 7

II.    THE GOVERNMENT'S DECISION NOT TO ENFORCE THE MANDATE AGAINST NOTRE DAME IS NOT JUDICIALLY REVIEWABLE ........................... 10

III.    THE SETTLEMENT AGREEMENT IS NOT ILLEGAL ............................... 13

    A.    The Settlement Does Not Violate the Affordable Care Act ............... 14

    B.    The Settlement Does Not Violate Any Supreme Court Order ........... 16

    C.    The Settlement Does Not Violate the Constitution ............................ 18

IV.    NOTRE DAME IS ENTITLED TO AN EXEMPTION UNDER RFRA ...................... 22

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)......................................................................................................8

*Am. Petroleum Inst. v. E.P.A.*,
  683 F.3d 382 (D.C. Cir. 2012) ...................................................................................8

*Archdiocese of St. Louis v. Burwell*,
  28 F. Supp. 3d 944 (E.D. Mo. 2014).......................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................21, 22

*Ass'n of Irritated Residents v. EPA*,
  494 F.3d 1027 (D.C. Cir. 2007) ...............................................................................11

*Baeder v. Heckler*,
  768 F.2d 547 (3d Cir. 1985)......................................................................................8

*Bridenbaugh v. O'Bannon*,
  185 F.3d 796 (7th Cir. 1999) ...................................................................................18

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014) ..................................................................................... *passim*

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) .....................................................................................8

*California v. Health & Human Servs.*,
  No. 17-CV-05783-HSG, 2019 WL 178555 (N.D. Cal. Jan. 13, 2019).................8, 9

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ...................................................................................19

*Cohen v. City of Des Plaines*,
  8 F.3d 484 (7th Cir. 1993) .......................................................................................19

*Community Nutrition Inst. v. Block*,
  749 F.2d 50 (D.C. Cir. 1984)...................................................................................10

*Conn v. Gabbert*,
  526 U.S. 286 (1999)..................................................................................................20

*Corp. of Presiding Bishop of Church of Jesus Christ of
  Latter-Day Saints v. Amos*,
  483 U.S. 327 (1987)...............................................................................19, 20, 21, 22

*Cty. of Allegheny v. ACLU*,
  492 U.S. 573 (1989)..................................................................................................20

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)..................................................................................................18

## TABLE OF AUTHORITIES
(continued)

Page(s)

*DeStefano v. Emergency Housing Grp., Inc.*,
247 F.3d 397 (2d Cir. 2001)..................................................................19, 20

*E. Tex. Baptist Univ. v. Sebelius*,
988 F. Supp. 2d 743 (S.D. Tex. 2013) ...................................................15

*Edwards v. Aguillard*,
482 U.S. 578 (1987)...............................................................................18

*Emp't Div. v. Smith*,
494 U.S. 872 (1990)...............................................................................22

*Gonzales v. O Centro Espirita Beneficente Uniao*,
546 U.S. 418 (2006)...............................................................................24

*Harris v. McRae*,
448 U.S. 297 (1980)...............................................................................21

*Heckler v. Chaney*,
470 U.S. 821 (1985)...............................................................11, 12, 13, 16

*Hobbie v. Unemployment Appeals Comm'n*,
480 U.S. 136 (1987)...............................................................................18

*Lemon v. Kurtzman*,
403 U.S. 602 (1971)...............................................................................18

*Locke v. Davey*,
540 U.S. 712 (2004)...............................................................................20

*Lynch v. Donnelly*,
465 U.S. 668 (1984)...............................................................................18

*Mahoney v. U.S. Consumer Prods. Safety Comm'n*,
146 F. App'x 587 (3d Cir. 2005) .......................................................11, 12

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
301 F. Supp. 3d 248 (D. Mass. 2018) ...................................................9

*Mueller v. Allen*,
463 U.S. 388 (1983)...............................................................................18

*Pennsylvania v. Trump*,
No. CV 17-4540, 2019 WL 190324 (E.D. Pa. Jan. 14, 2019) .............8, 9

*Priests for Life v. U.S. Dep't of Health & Human Servs.*,
808 F.3d 1 (D.C. Cir. 2015)...................................................................15

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*,
867 F.3d 338 (3d Cir. 2017)...................................................................9

*Roman Catholic Archdiocese of Atlanta v. Sebelius*,
No. 1:12-cv-03489, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014) .........15

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Roman Catholic Archdiocese of New York v. Sebelius*,
    987 F. Supp. 2d 232 (E.D.N.Y. 2013) ........................................................15

*Rust v. Sullivan*,
    500 U.S. 173 (1991)..................................................................................21

*Salman Ranch, Ltd. v. Comm'r*,
    647 F.3d 929 (10th Cir. 2011) ...................................................................9

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
    801 F.3d 927 (8th Cir. 2015) ...................................................................15

*Sherman ex rel. Sherman v. Koch*,
    623 F.3d 501 (7th Cir. 2010) ...................................................................18

*Singer Mgmt. Consultants, Inc. v. Milgram*,
    650 F.3d 223 (3d Cir. 2011).....................................................................10

*Texas v. United States*,
    523 U.S. 296 (1998)..................................................................................10

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981)..................................................................................22

*United Liberty Life Ins. Co. v. Ryan*,
    985 F.2d 1320 (6th Cir. 1993) ..................................................................11

*United States v. Gary*,
    963 F.2d 180 (8th Cir. 1992) ....................................................................11

*Univ. of Notre Dame v. Burwell*,
    135 S. Ct. 1528 (2015)...........................................................................5, 16

*Univ. of Notre Dame v. Burwell*,
    136 S. Ct. 2007 (2016).......................................................................*passim*

*Univ. of Notre Dame v. Burwell*,
    786 F.3d 606 (7th Cir. 2015) ......................................................................5

*Univ. of Notre Dame v. Sebelius*,
    743 F.3d 547 (7th Cir. 2014) ......................................................................5

*Univ. of Notre Dame v. Sebelius*,
    988 F. Supp. 2d 912 (N.D. Ind. 2013) ........................................................4

*Washington v. Davis*,
    426 U.S. 229 (1976)..................................................................................21

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)..................................................................................21

*Wis. Cent., Ltd. v. Shannon*,
    539 F.3d 751 (7th Cir. 2008) ....................................................................10

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Zubik v. Burwell,*
  136 S. Ct. 1557 (2016)..................................................................................... *passim*

*Zubik v. Sebelius,*
  983 F. Supp. 2d 576 (W.D. Pa. 2013).......................................................................15

STATUTES

26 U.S.C. § 4980D....................................................................................................4

26 U.S.C. § 4980H....................................................................................................4

28 U.S.C. § 516.......................................................................................................13

28 U.S.C. § 519.......................................................................................................13

42 U.S.C. § 300gg-13..........................................................................................12, 14

42 U.S.C. § 2000bb-1....................................................................................4, 22, 23, 24

42 U.S.C. § 2000bb-2...............................................................................................22

42 U.S.C. § 2000cc-5...............................................................................................22

OTHER AUTHORITIES

26 C.F.R. § 54.9815-2713AT (2015)..................................................................3, 4, 23

75 Fed. Reg. 41,726 (July 19, 2010)...........................................................................3

76 Fed. Reg. 46,621 (Aug. 3, 2011).............................................................................3

78 Fed. Reg. 39,870 (July 2, 2013)..........................................................................3, 9

81 Fed. Reg. 47,741 (July 22, 2016)............................................................................6

82 Fed. Reg. 47,792 (Oct. 13, 2017).......................................................................7, 24

82 Fed. Reg. 47,838 (Oct. 13, 2017)............................................................................7

83 Fed. Reg. 57,536 (Nov. 15, 2018)............................................................................7

83 Fed. Reg. 57,592 (Nov. 15, 2018).......................................................................7, 20

*Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion,*
  1999 WL 1262049 (O.L.C. June 15, 1999) ...............................................................13

## INTRODUCTION

After the government issued regulations requiring student and employer health plans to provide coverage for all FDA-approved contraception, the University of Notre Dame spent half a decade challenging that Mandate in federal court. The litigation involved two different decisions from the Seventh Circuit that were vacated by two different orders of the Supreme Court. *See Univ. of Notre Dame v. Burwell*, 136 S. Ct. 2007 (2016) (mem.). In the wake of the Supreme Court's second order—which also enjoined the government from enforcing the Mandate against the University—the parties reached a settlement whereby the government agreed not to enforce the Mandate against Notre Dame, and Notre Dame agreed to drop its claims.

Plaintiffs now launch a collateral attack on this exercise of the government's enforcement discretion. According to their second cause of action (the only one to which Notre Dame is a party), the settlement was "illegal" because the government had an absolute duty to enforce the Mandate against religious objectors like Notre Dame, despite the University's substantial claim under the Religious Freedom Restoration Act ("RFRA") and the Supreme Court's injunction. This attack on the settlement should be dismissed. It is not ripe for adjudication, it is not judicially reviewable, and it is without merit.

With respect to ripeness, it would be premature for this Court to adjudicate the validity of the settlement agreement because the government has issued new regulations that exempt Notre Dame (and similar entities) from the Mandate. That regulatory exemption makes the settlement challenge moot: by its terms, the Mandate does not apply to Notre Dame and would not apply even if the settlement were struck down. Although the validity of the exemption is currently being litigated, that litigation is far from being resolved. Until that litigation is complete, any challenge to the settlement agreement should be deferred.

– 1 –

Even if it were ripe for adjudication, the settlement is not judicially reviewable because it is a classic exercise of the government's enforcement discretion. When the government decides not to enforce a regulation against a particular private party—for example, if the government perceives a risk that it might not prevail, or that its resources would be better spent elsewhere—that decision cannot be second-guessed by courts. Prosecutorial discretion falls to the Executive Branch, and cannot be overridden by the judiciary. Indeed, a contrary ruling would prompt a flood of litigation and invite judicial review of thousands of discretionary enforcement decisions.

In any event, the settlement was perfectly lawful. It is beyond dispute that the Department of Justice has authority to settle litigation on behalf of the federal government. That is particularly true when the claims at issue have succeeded in federal courts, and the plaintiffs would have a reasonable prospect of success were the litigation to continue. That is the case here. At the time of the settlement, multiple courts had ruled against the government on the RFRA dispute, the circuits had split on the issue, and the Supreme Court itself had determined that the government could not enforce the challenged regulations against Notre Dame. Under those circumstances, the government's authority to settle the litigation is indisputable.

## BACKGROUND

### A.    The Mandate and the Religious Exemption

When Congress enacted the Affordable Care Act in 2010, it generally required group health plans to provide coverage for "preventive care" for women, but "did not specify what types of preventive care must be covered." *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751, 2762 (2014) (quoting 42 U.S.C. § 300gg-13(a)(4)). "Instead, Congress authorized the Health Resources and Services Administration ("HRSA"), a component of [the U.S. Department of Health and Human Services], to make that important and sensitive decision." *Id*.

The government first implemented the preventive-care mandate through an interim final rule in July 2010, which did not identify the type of "preventive services" that would be required. *See* 75 Fed. Reg. 41,726 (July 19, 2010). In August 2011, HRSA announced that those services would include all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling." *Hobby Lobby*, 134 S. Ct. at 2762.

On the same day, the government also "amend[ed] the interim final rules to provide HRSA additional discretion to exempt certain religious employers" from the Mandate. 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011). In its original form, the religious exemption was quite narrow: an employer was eligible only if it had "the inculcation of religious values as its purpose," and "primarily" employed and served those "who share[d] its religious tenets." *Id*. In response to public outcry, the government modestly expanded the exemption to cover all "houses of worship and their integrated auxiliaries," although it continued to exclude most religious nonprofit organizations. 78 Fed. Reg. 39,870, 39,887 (July 2, 2013).

### B.      The So-Called "Accommodation"

For nonprofit religious entities that were not eligible for the exemption, the government devised what it inaptly labeled an "accommodation." The accommodation was designed to allow religious organizations to avoid directly *paying for* religiously objectionable coverage, but it still required them to offer health plans that provided what the government called "seamless" access to such coverage. Under the accommodation, a religious organization must first "contract[] with one or more third party administrators" or "provide[] benefits through one or more group health insurance issuers." 26 C.F.R. § 54.9815-2713AT(b)(1)(i), (c)(1). The organization must then either sign and submit a "self-certification" directly to its insurance company, or sign and submit a "notice" to the Government providing detailed information regarding its plan name and type,

– 3 –

along with "the name and contact information for any of the plan's [third-party administrators and] health insurance issuers." *Id*. § 54.9815-2713AT(a)(3), (b)(1), (c)(1).

Once the religious organization submits the required form, its health insurer (or third-party administrator) becomes subject to a unique obligation to "provide or arrange payments for contraceptive services" to individuals enrolled in the organization's health plans. *Id*. § 54.9815-2713AT(b)(2), (c)(2)(ii). Thus, although the religious organization is purportedly insulated from the cost, the contraceptive "payments" are available to plan beneficiaries only "so long as [they] are enrolled in [the] plan" that the religious organization provides. *Id*. § 54.9815-2713AT(d). And in order to avoid penalties, the religious organization must continue offering a plan that entitles its beneficiaries to the free contraceptive "payments." *See* 26 U.S.C. § 4980H (dropping health coverage exposes employers to penalties of $2,000 per year per employee); *id*. § 4980D(b) (offering a noncompliant health plan incurs penalties of $100 per day per affected beneficiary).

### C.    Notre Dame's Litigation Against the Government

Along with many other nonprofit religious organizations, Notre Dame filed a suit challenging the Mandate under RFRA. That statute prohibits the government from compelling a religious organization to act contrary to its religious beliefs unless such compulsion is the "least restrictive means" of furthering a compelling government interest. 42 U.S.C. § 2000bb-1.

In 2013, this Court issued an opinion rejecting Notre Dame's RFRA claim. *See Univ. of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912 (N.D. Ind. 2013). Despite acknowledging that some other courts had reached a different result, the Court held that forcing Notre Dame to comply with the "accommodation" does not impose a "substantial burden" on its religious exercise. *Id*. at 922, 924. A divided panel of the Seventh Circuit affirmed. In an opinion authored by Judge Posner, the majority concluded that there was no "substantial" burden because the

– 4 –

University could comply with the Mandate in "no more than five minutes" by "signing and mailing" a form. *See Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014). In dissent, Judge Flaum rejected the majority's analysis, explaining that the accommodation imposed a substantial burden "by putting substantial pressure on Notre Dame to act in ways that (as the university sees it) involve the university in the provision of contraceptives." *Id*. at 565.

Shortly after the Seventh Circuit's decision, the Supreme Court issued its opinion in *Hobby Lobby*, which upheld a RFRA challenge to the Mandate brought by a for-profit corporation. 134 S. Ct. 2751. Although that case did not involve the "accommodation" for nonprofit entities, its reasoning was instructive. First, the Court held that the judiciary must defer to a plaintiff's religious belief that taking a particular act would be objectionable because it would "facilitate" wrongdoing by another. *Id*. at 2778. Second the Court held that a "substantial burden" exists when a plaintiff is compelled to act contrary to its religious beliefs on pain of "substantial" penalty. *Id*. at 2776. Third, the Court held that those who refuse to comply with the Mandate face "substantial" penalties, which include severe "economic consequences" for those that try to avoid compliance by "dropping insurance coverage altogether." *Id*.

In the wake of *Hobby Lobby*, Notre Dame filed a petition for certiorari. The Supreme Court granted the petition, vacated the Seventh Circuit's decision, and remanded for further consideration in light of the principles that *Hobby Lobby* articulated. *See Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015) (mem.). On remand, the Seventh Circuit again rejected Notre Dame's RFRA claim on "substantial burden" grounds. *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 613 (7th Cir. 2015). Once again, Notre Dame filed a petition for certiorari.

While Notre Dame's petition was pending, the Supreme Court granted certiorari in a series of different cases to resolve a circuit split over whether the "accommodation" violated

RFRA.  In the end, however, an eight-member Supreme Court chose not to resolve that question. Instead it reached a compromise: It temporarily enjoined the government from enforcing the accommodation against the plaintiffs, while remanding the case so the parties could be "afforded an opportunity to arrive at an approach going forward" that might satisfy both sides. *Zubik v. Burwell*, 136 S. Ct. 1557, 1560-61 (2016) (per curiam). After *Zubik*, the Supreme Court again vacated the Seventh Circuit's *Notre Dame* decision and remanded for further proceedings while the parties tried to reach an accord. *Univ. of Notre Dame v. Burwell*, 136 S. Ct. 2007 (2016).

On July 22, 2016, the government issued a Request for Information soliciting comments as to how it might alter the regulations to implement the compromise contemplated by the Supreme Court in *Zubik*. *See* 81 Fed. Reg. 47,741 (July 22, 2016). After receiving 54,000 comments, the government announced in January 2017 that it would not be amending the regulations at that time. *See* Dkt. #43, Amended Complaint ¶ 82 ("Am. Compl.").

> **D.     The Expanded Exemption and the Government's Settlement with Notre Dame**

Nevertheless, settlement discussions continued while Notre Dame and various other plaintiffs had their cases held in abeyance. In October 2017, after years of litigation, the government finally reached a settlement with Notre Dame and some (but not all) of the other plaintiffs. In the Notre Dame settlement, the government agreed that it would not enforce the Mandate or the accommodation against the University, in exchange for the University's dismissing its claims. *See* Dkt. # 1-1, Settlement Agreement ¶ 4, 8-9 ("Settlement").

In addition, the government decided to adopt a broader policy change.  While preserving the regulatory "accommodation" as an option for those who wished to avail themselves of it, the government issued a new interim final rule expanding the Mandate's religious exemption to include all religiously objecting nonprofits, closely held for-profit companies, and "institution[s]

of higher education" such as Notre Dame. 82 Fed. Reg. 47,792, 47,835 (Oct. 13, 2017). The

government simultaneously exempted similar entities with non-religious moral objections to the

Mandate. *See* 82 Fed. Reg. 47,838, 47,849 (Oct. 13, 2017). The government requested public

comments on these rules by December 2017. 82 Fed. Reg. at 47,792. After receiving comments,

the government issued final rules in November 2018. *See* 83 Fed. Reg. 57,536 (Nov. 15, 2018)

(religious exemption); 83 Fed. Reg. 57,592 (Nov. 15, 2018) (moral exemption). The final rules

make relatively minor changes intended to clarify the scope of the exemptions, but those changes

are immaterial to this litigation. *See* 83 Fed. Reg. at 57,537; 83 Fed. Reg. at 57,593. The final

rules took effect on January 14, 2019. *See* 83 Fed. Reg. at 57,536; 83 Fed. Reg. at 57,592.

### E.  This Litigation

Plaintiffs filed their original complaint in June 2018 and an Amended Complaint in

December 2018. The gravamen of their complaint is that the government has acted unlawfully in

two different ways: first, by expanding the Mandate's discretionary religious exemption to cover

all objecting religious schools like Notre Dame; and second, by entering an individual settlement

promising not to enforce the Mandate against the University.

Plaintiffs assert various claims against the government, but they mention Notre Dame in

only their second cause of action, arguing that the settlement agreement is "void for illegality."

Am. Compl. ¶¶ 183-88. Although Plaintiffs seek an injunction requiring the government to

enforce the Mandate against Notre Dame, they do not seek relief against the University itself.

### ARGUMENT

### I.  PLAINTIFFS' ATTACK ON THE SETTLEMENT AGREEMENT IS NOT RIPE FOR ADJUDICATION BECAUSE CURRENT REGULATIONS EXEMPT NOTRE DAME FROM THE MANDATE

Under the doctrine of prudential ripeness, this Court should refrain from deciding

Plaintiffs' challenge to the settlement agreement until the validity of the Mandate's religious

exemption has been definitively resolved. "Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to." *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012). To decide whether a claim is ripe for review, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Here, current regulations exempt Notre Dame from the Mandate wholly apart from the settlement agreement. As long as those regulations remain on the books (and the government continues to defend them in litigation), it would be premature to consider a challenge to the settlement.

Although two courts have entered preliminary injunctions against the exemption, *Pennsylvania v. Trump*, No. CV 17-4540, 2019 WL 190324 (E.D. Pa. Jan. 14, 2019); *California v. Health & Human Servs.*, No. 17-CV-05783-HSG, 2019 WL 178555 (N.D. Cal. Jan. 13, 2019), those injunctions have not been finalized, do not bind the court here, and are unlikely to endure. As an initial matter, the injunction in the California case applies only to states that are parties to that litigation. *See California*, 2019 WL 178555, at *25. Because Indiana is not a party there, the California injunction has no effect here. And while the Pennsylvania court issued a nationwide injunction, the Third Circuit is likely to (at the very least) narrow that injunction to cover only the states that are the party-plaintiffs in that case—which, again, do not include Indiana. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (explaining that any injunction against the Mandate's regulatory exemptions "must be no broader . . . than necessary to redress the injury shown by the plaintiff states" in a particular case); *cf. Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985) (upholding invalidation of a regulation as applied to a particular case, but vacating injunction that purported to prevent "the Secretary from utilizing [that] regulation in all cases other than the one at issue here").

Even putting aside the scope of the preliminary injunctions in *California* and *Pennsylvania*, those decisions are unlikely to survive on the merits. Most importantly, those courts were wrong to conclude that the government lacks authority to expand the Mandate's religious exemption beyond churches and religious orders. *E.g.*, *California*, 2019 WL 178555, at *12-22; *Pennsylvania*, 2019 WL 190324, at *17-26. As even the Obama administration recognized, the government has broad authority to craft a religious exemption from the Mandate. *See* 78 Fed. Reg. at 39,874. The Third Circuit has agreed, indicating that the government also has broad leeway to determine the scope of the exemption—i.e., whether it should be limited to "houses of worship," or should "apply[]" more broadly to other "nonprofit entities" with the same religious objections. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 352 (3d Cir. 2017). There is no basis to conclude that the government somehow has authority to exempt churches and religious orders, but not other religious entities.

The preliminary injunctions are also likely to be reversed for two other reasons. First, because the plaintiffs in those cases are states, they do not have standing to challenge the Mandate's exemptions. *See Massachusetts v. U.S. Dep't of Health & Human Servs.*, 301 F. Supp. 3d 248, 250 (D. Mass. 2018) (dismissing materially identical state challenges for lack of standing). And second, contrary to the *Pennsylvania* decision, 2019 WL 190324, at *13, the opportunity for full notice and comment on the *final* rules cured any APA violation resulting from the lack of notice and comment on the *interim* final rules. *See, e.g.*, *Salman Ranch, Ltd. v. Comm'r*, 647 F.3d 929, 940 (10th Cir. 2011) ("While the . . . temporary regulations were issued without notice and comment, now that the regulations have issued in final form [after notice and comment], these arguments are moot . . . ."), *rev'd on other grounds*, 566 U.S. 971 (2012).

– 9 –

For these reasons, Plaintiffs' attack on the settlement agreement "is not ripe for adjudication [because] it rests upon contingent future events that may not occur"—i.e., the speculative possibility that the regulatory exemption will be invalidated as a result of ongoing litigation. *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). After all, a preliminary injunction is nothing more than a "tentative assessment": it is "not a final determination" or "even law of the case." *Community Nutrition Inst. v. Block*, 749 F.2d 50, 56 (D.C. Cir. 1984) (Scalia, J.).  Indeed, in the Third Circuit, the fact that a plaintiff has established the requisite likelihood of success on the merits "does not [even] mean [that she is] more likely than not" to ultimately prevail.  *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). "Ripeness is predicated on the central perception . . . that courts should not render decisions absent a genuine need to resolve a real dispute." *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008). Thus, unless and until the Mandate's regulatory exemption is definitively struck down, Plaintiffs cannot show that there is any dispute "of sufficient immediacy and reality" to warrant adjudicating their challenge to the settlement agreement. *Id*.

## II.   THE GOVERNMENT'S DECISION NOT TO ENFORCE THE MANDATE AGAINST NOTRE DAME IS NOT JUDICIALLY REVIEWABLE

In any event, the settlement agreement is not judicially reviewable because it reflects the government's discretionary decision not to enforce the Mandate against Notre Dame. Whether Notre Dame is *subject* to the Mandate is distinct from whether the government must *enforce* it against Notre Dame. In the settlement, the government agreed that it would not "enforc[e]" "any law or regulation requiring the provision of the Objectionable Coverage" against Notre Dame or its "health plans, insurers, or third-party administrators acting in connection with [Notre Dame's] health plans." *See* Settlement ¶ 4. That individual enforcement decision is committed to the absolute discretion of the Executive Branch, and is not subject to judicial review.

– 10 –

In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme Court made clear that courts typically cannot review a decision of the Executive Branch to refrain from enforcing a statute or regulation against a particular private party. Instead, "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," *id.* at 831, and is "presumed immune from judicial review." *Id.* at 832. The reason for this is simple: "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 831. For example, "the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* Accordingly, "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832.

There are only three ways that an agency's enforcement decision can be subject to judicial review: (1) where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," (2) where the agency refuses "to institute proceedings based solely on the belief that it lacks jurisdiction," and (3) where the agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 & n.4 (citations omitted).[1]

---

[1] Because settlements involve a determination whether to bring or continue an enforcement action, courts properly apply the *Heckler* standard when assessing whether to review an agency settlement agreement. *See, e.g.*, *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C. Cir. 2007) (applying *Heckler* to settlement decision); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1327 (6th Cir. 1993) (same); *United States v. Gary*, 963 F.2d 180, 184-85 (8th Cir. 1992) (same); *Mahoney v. U.S. Consumer Prods. Safety Comm'n*, 146 F. App'x 587, 590 (3d Cir. 2005) (same).

Here, Plaintiffs cannot satisfy any of these criteria. *First*, the government's decision not to enforce the Mandate against Notre Dame is not premised on any belief that it "lacks jurisdiction." *Id*. Instead, the government made the discretionary decision that it should forgo enforcement in order to settle the RFRA claim and related claims asserted by Notre Dame and the other plaintiffs who were parties to the settlement agreement. That is the same type of decision the government makes whenever it decides to settle a claim brought against it by a private party seeking relief from a regulatory burden.

*Second*, the statute does not provide any "guidelines for the agency to follow in exercising its enforcement powers" with respect to the Mandate. *Mahoney*, 146 F. App'x at 589. While Plaintiffs cite the ACA's general "preventive care" requirement, *see* Am. Compl. ¶ 186.b, that specifies only what the statute requires of private parties: It says that health plans generally must provide, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines" adopted by the HRSA.  42 U.S.C. § 300gg-13(a)(4). But this says nothing about how the government should *enforce* the statute in any particular case.

*Third*, the settlement agreement does not "adopt[] a general policy that is so extreme as to amount to an abdication of [the government's] statutory responsibilities." *Heckler*, 470 U.S. at 833 & n.4 (internal quotation marks omitted). As a threshold matter, the settlement agreement does not "adopt" any "general policy" at all, because it applies only to a discrete group of religious nonprofit organizations that had been litigating against the government for years in a small handful of cases. The government's agreement not to enforce the Mandate against Notre Dame and a few other individual plaintiffs does not commit it to any "general" policy.

Even if a settlement with individual litigants could somehow be construed as adopting a "general policy," it can hardly be characterized as an "extreme" "abdication" of the

government's duty. At the time of the settlement, multiple courts had held that enforcing the Mandate against religious objectors violated RFRA, even with the so-called "accommodation." *See infra* p. 15. Indeed, the Supreme Court had enjoined the government from enforcing the "accommodation" against nonprofit religious entities, including Notre Dame itself, and had vacated every court of appeals decision that had upheld the "accommodation." *See Zubik*, 136 S. Ct. at 1561; *Notre Dame*, 136 S. Ct. 2007. In light of these circumstances, it was perfectly reasonable for the government to decide that it was not "likely to succeed" in litigating against Notre Dame, that its "resources" would be "best spent" elsewhere, or that continued litigation would not "fit[] the agency's overall policies." *Heckler*, 470 U.S. at 831. That is precisely the type of prudential enforcement decision that is committed to Executive discretion, and is not subject to judicial review.

## III.    THE SETTLEMENT AGREEMENT IS NOT ILLEGAL

Even if the settlement agreement were reviewable, it must be upheld as a lawful exercise of the government's settlement authority. The government has broad authority to settle claims brought against it, and RFRA claims are no exception. The government's settlement power "has long been understood to exist as an incident to the Attorney General's statutory authority to supervise litigation for the United States" pursuant to 28 U.S.C. §§ 516, 519. *See generally Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 1999 WL 1262049, at *8 (O.L.C. June 15, 1999) (citing cases). The Attorney General and his subordinates have "broad discretion in determining when, and on what terms, settlement would best serve the interests of the United States." *Id*. at *9. To be sure, a settlement may be unlawful if it violates a mandatory enforcement duty or some other provision of law. *Id*. But here, as explained above, there is no mandatory enforcement duty because the Executive Branch has complete discretion whether to enforce the Mandate against any particular private

– 13 –

party, including Notre Dame. There is thus no merit to Plaintiffs' claim that the settlement is "void for illegality." Compl. ¶¶ 178-83 (Count II).

**A.      The Settlement Does Not Violate the Affordable Care Act**

Plaintiffs primarily contend that the settlement agreement violates 42 U.S.C. § 300gg-13(a)(4), which requires health plans to provide, "with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines" adopted by the Health Resources and Services Administration. *See* Am. Compl. ¶ 186.b. As discussed above, however, this provision simply imposes a general requirement on health plans; it says nothing about the government's duty to *enforce* that requirement against any particular party, which is left to executive discretion. *See supra* pp. 10-13. The statute thus has nothing to say about the legality of the government's agreement not to enforce the Mandate against Notre Dame.

At the very least, the government does not have any mandatory duty to enforce the Mandate in the face of a substantial claim that enforcement would violate federal law. That is precisely the case here. At the time of the settlement between the government and Notre Dame, the Supreme Court had already held that RFRA prohibited the government from enforcing the Mandate against religious objectors. *See Hobby Lobby* 134 S. Ct. 2751. That holding eliminated any basis to believe that the government had a mandatory duty to enforce against Notre Dame.

To be sure, *Hobby Lobby* left open the possibility that the government might have discretionary authority to adopt a different "approach" to "achiev[e] its desired goal" of providing contraceptive coverage without forcing religious objectors to include such coverage in their health plans. *Id*. at 2780-81. According to the Supreme Court, "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing [contraceptives] to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Id*. at 2780. Or, alternatively, the government might try an

"accommodation" that could satisfy some religious objectors by insulating them from the financial cost of providing contraceptive coverage, while still requiring their insurance companies or third-party administrators to provide such coverage in connection with their health plans—although the Court reserved the question of whether this latter type of "accommodation" would itself violate RFRA in the case of some religious objectors. *Id*. at 2782 n.40. But in all events, the Court did not suggest that the government had a *mandatory duty* to create any such "accommodation," much less to enforce it in any particular case. The Court simply held that RFRA required the government to grant religious exemptions from the Mandate, and left it up to the government whether to try an alternative route to provide contraceptive coverage.

As the Supreme Court anticipated, several courts in the wake of *Hobby Lobby* held that enforcing the "accommodation" against religious objectors did indeed violate RFRA, because it forced them to act in a way that they believed made them complicit in providing contraceptive coverage in violation of their religious beliefs.[2] In addition, by the time the government entered the settlement with Notre Dame, the Supreme Court had specifically held that the government could not enforce the "accommodation" against Notre Dame, and had vacated two different decisions of the Seventh Circuit upholding its enforcement against Notre Dame. *See Notre Dame*, 136 S. Ct. at 2007 (holding that "the Government may not impose taxes or penalties on

---

[2] *See, e.g.*, *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927 (8th Cir. 2015), *cert. granted and judgment vacated by* No. 15-775, 2016 WL 2842448 (U.S. May 16, 2016); *Archdiocese of St. Louis v. Burwell*, 28 F. Supp. 3d 944, 955 (E.D. Mo. 2014); *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489, 2014 WL 1256373, at *18 (N.D. Ga. Mar. 26, 2014), *aff'd in part, vacated in part by* 818 F.3d 1122 (11th Cir. 2016); *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743, 765 (S.D. Tex. 2013), *rev'd*, 793 F.3d 449 (5th Cir. 2015), *judgment vacated by* 136 S. Ct. 1557; *Roman Catholic Archdiocese of New York v. Sebelius*, 987 F. Supp. 2d 232, 252 (E.D.N.Y. 2013), *rev'd*, 796 F.3d 207 (2d Cir. 2015), *cert. granted and judgment vacated by* 136 S. Ct. 2450 (2016); *Zubik v. Sebelius*, 983 F. Supp. 2d 576, 605-06 (W.D. Pa. 2013), *rev'd*, 778 F.3d 422 (3d Cir. 2015), *judgment vacated and remanded by* 136 S. Ct. 1557; *see also Priests for Life v. U.S. Dep't of Health & Human Servs.*, 808 F.3d 1, 14 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc).

[Notre Dame] for failure to" comply with the regulations); *Notre Dame*, 135 S. Ct. 1528 (vacating Seventh Circuit decision upholding "accommodation" against RFRA challenge). Moreover, the Supreme Court had specifically enjoined the enforcement of the "accommodation" against other religious colleges and universities that were indistinguishable from Notre Dame. *See Zubik*, 136 S. Ct. at 1561 (holding that the government could not enforce the "accommodation" against, inter alia, Catholic University or Thomas Aquinas College).

Under these circumstances, the government did not have an absolute duty to enforce the Mandate or the "accommodation" in Notre Dame's specific case. Indeed, for the reasons outlined below, RFRA required the government to exempt Notre Dame. *See infra* Section IV. But at a minimum, it was entirely within the government's discretion to settle Notre Dame's RFRA claims for a host of prudential reasons, including its judgment that it was not "likely to succeed" if it continued litigating against Notre Dame, and that its "resources" would be "best spent" elsewhere. *Heckler*, 470 U.S. at 831.

### B.   The Settlement Does Not Violate Any Supreme Court Order

Even though the Supreme Court's decisions in *Zubik* and *Notre Dame* expressly enjoined the government from enforcing the Mandate or the "accommodation" against Notre Dame, Plaintiffs insist that the government's non-enforcement decision somehow violates those decisions. *See* Am. Compl. ¶ 186.a. They are incorrect.

In *Zubik*, a group of religious plaintiffs challenged the "accommodation," which required that they either "cover certain contraceptives as part of their health plans," or "submit a form either to their insurer or to the Federal Government," which would result in their insurance company (or third-party administrator) providing the objectionable coverage to their plan beneficiaries. 136 S. Ct. at 1559. The Court declined to provide any definitive resolution of the challenge, stating that it "expresse[d] no view on the merits" of the plaintiffs' RFRA claim, and

– 16 –

did not decide "whether the Government has a compelling interest" in mandating contraceptive coverage. *Id*. at 1560. At the same time, however, the Court vacated a series of decisions that had upheld the "accommodation," and ordered that the government could "not impose taxes or penalties on petitioners for failure to" comply with the "accommodation." *Id*. at 1561. The Court also made clear that the government still had independent discretion to provide contraceptive coverage: As long as the government did not enforce the Mandate against the plaintiffs, "[n]othing in this opinion . . . precludes the Government from. . . facilitat[ing] the provision of full contraceptive coverage going forward." *Id*. at 1561 (internal quotation marks omitted).

By its terms, the *Zubik* order did not impose any enforcement obligation on the government. Quite the opposite: it held that the government could *not* enforce the Mandate or the "accommodation" against the plaintiffs. To be sure, the Court stated that "the parties on remand should be afforded an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by [their] health plans receive full and equal health coverage, including contraceptive coverage." *Id*. at 1560 (internal quotation marks omitted). But giving the government "an opportunity" to come up with a new way to provide contraceptive coverage is not the same as *requiring* it to do so.

The Supreme Court's *Notre Dame* order did nothing more than apply *Zubik* to Notre Dame's particular case. The Court reiterated that "the Government may not impose taxes or penalties on petitioners for failure to" comply with the "accommodation." 136 S. Ct. at 2007. And while the Court stated that the government was not "preclude[d]" from devising some alternative means "to facilitate the provision of full contraceptive coverage going forward," it did not remotely suggest that the government was *obligated* to do so. *Id*.

– 17 –

C.      **The Settlement Does Not Violate the Constitution**

Finally, Plaintiffs argue that the government's settlement with Notre Dame violates the Establishment Clause and the Due Process Clause of the Constitution. Am. Compl. ¶ 186(c)-(d). They are wrong on both counts.

**1.**      The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144-45 (1987). Whether or not an accommodation is required, "there is room for play in the joints," which "allow[s] the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause.'" *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005). That is what the government did here by deciding to settle Notre Dame's RFRA claim.

In general, government action does not violate the Establishment Clause as long as it (1) it has a secular purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Here, the settlement agreement easily passes this test.

*First*, the government's settlement of Notre Dame's RFRA claim did not lack a secular purpose. "[A] secular purpose need not be the exclusive one; it [is] sufficient if the government had '*a* secular purpose.'" *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 800 (7th Cir. 1999). Thus, Plaintiffs must show that the settlement "was motivated *wholly* by religious considerations." *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984) (emphasis added). Moreover, the court must "defer[]" to the government's "articulation of a secular purpose" as long as it is "sincere and not a sham." *Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987); *see also Mueller v. Allen*, 463 U.S. 388, 394 (1983); *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 508 (7th Cir. 2010).

Here, the settlement served at least two permissible secular purposes: it lifted a regulatory burden from Notre Dame, and it ended the costly RFRA litigation that Notre Dame and other plaintiffs had been pursuing against the government for half a decade. *See* Settlement at 1. There is no reason to think that either of these secular purposes was a sham. After all, it is well established that the government "acts with [a] proper purpose" when it "lift[s] a regulation that burdens the exercise of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338 (1987).

*Second*, the settlement agreement did not have the primary effect of advancing religion. Instead, the settlement merely grants Notre Dame the freedom to act in accordance with *its* religious beliefs—the same freedom it had exercised for decades prior to the Mandate. By allowing Notre Dame that freedom, the government itself is not "advancing" any religion. *See Amos*, 483 U.S. at 337 (stating that "to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence," which does not occur when the government merely "*allows* [private religious organizations] to advance religion, which is their very purpose."); *Cohen v. City of Des Plaines*, 8 F.3d 484, 491 (7th Cir. 1993)  (same); *Charles v. Verhagen*, 348 F.3d 601, 610 (7th Cir. 2003).

*Third*, Plaintiffs cannot "seriously contend[] that [the settlement agreement] impermissibly entangles church and state." *Amos*, 483 U.S. at 339. To the contrary, it "effectuates a more complete separation of the two." *Id.* Far from entangling the government in religious matters, exempting Notre Dame *eliminates* government interference in questions of faith and "avoids intrusive inquiry into religious belief and practice." *Cohen*, 8 F.3d at 493.

That being the case, the settlement agreement likewise does not constitute a forbidden "endorsement" of religion. *See DeStefano v. Emergency Housing Grp., Inc.*, 247 F.3d 397, 410-

– 19 –

11 (2d Cir. 2001) ("[A]nalysis of the criteria for determining a practice's primary effect also resolves any endorsement challenge."). In any event, the government's grant of exemptions that equally accommodate religious *and secular* moral objections to the Mandate, 83 Fed. Reg. 57,592, belies any notion that the settlement "convey[s] a message that religion or a particular religious belief is *favored* or *preferred*," *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 593 (1989).

　　**2.**　　The settlement agreement also does not violate either the equal-protection or due-process components of the Fifth Amendment. The Supreme Court has made clear that where an accommodation comports with the Religion Clauses, it receives only minimal scrutiny under other constitutional provisions. *See Amos*, 483 U.S. at 338-39; *see also Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004). This principle reflects the rule that courts will analyze constitutional claims under "explicit provision[s]" rather than "more generalized notion[s] of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (internal quotation marks omitted). It also makes good sense. Where a court determines that a religious accommodation does not violate the Establishment Clause, it has necessarily concluded that the government does not endorse—and certainly is not responsible for—conduct undertaken by religious groups pursuant to the accommodation. As the Supreme Court explained when upholding a Title VII exemption that enables employers to hire and fire on the basis of religion, a religious accommodation "allows churches"—rather than "the government itself"—"to advance religion." *Amos*, 483 U.S. at 337. Thus, any perceived burden resulting from a religious accommodation must be attributed to the private actor, not to the government. *See id.* at 337 n.15 ("Undoubtedly, [the employee's] freedom of choice in religious matters was impinged upon, but it was the Church . . . and not the Government, who put him to the choice of changing his religious practices or losing his job.").

Here, as detailed above, the government's decision not to enforce the Mandate against Notre Dame comports with the Religion Clauses. *Supra* pp. 18-20. Thus, like the Title VII exemption in *Amos*, it is subject only to rational basis review. *Amos*, 483 U.S. at 339. It easily passes that test, as the settlement is rationally related to the government's interests in ending costly litigation and lifting regulatory burdens from Notre Dame's religious practices.

But even setting *Amos* to the side, Plaintiffs have failed to state a claim under the Due Process Clause. While that Clause provides "heightened protection" for "certain fundamental rights and liberty interests," it applies only "against government *interference*." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (emphasis added). And here, Plaintiffs do not challenge any government *restriction* on their liberty—they remain entirely free to obtain and use contraceptives. Instead, Plaintiffs object to the government's decision not to force Notre Dame to subsidize or facilitate their use of particular forms of contraception. The Supreme Court, however, has long distinguished between government *interference* with individual rights, and the government's decision not to *subsidize or enhance the exercise* of such rights.  Only the latter is at issue here, and denying this type of subsidy does not implicate the Due Process Clause. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173 (1991); *Harris v. McRae*, 448 U.S. 297 (1980).

Likewise, it is black-letter law that a valid equal-protection claim requires factual allegations sufficient to show that the *government itself* engaged in unlawful discrimination by acting with a "discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Here, any allegedly discriminatory actions taken pursuant to the settlement agreement are necessarily the actions of *private* parties. What is more, "[u]nder extant precedent[,] purposeful discrimination requires more than intent as volition or intent as awareness of consequences." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, Plaintiffs must allege facts sufficient to show

– 21 –

the government entered into the settlement agreement "'because of,' not merely 'in spite of,'" its purportedly discriminatory results. *Id.* at 677. At most, however, the allegations in the Amended Complaint show the government was *indifferent* as to how Notre Dame would act pursuant to the agreement. That being the case, Plaintiffs cannot overcome the far "more likely explanation[]," *id.* at 678, 681, that the government's purpose in adopting the settlement was simply to "lift[] a regulation that burdens the exercise of religion," *Amos*, 483 U.S. at 338; *supra* pp. 18-19.

## IV.   NOTRE DAME IS ENTITLED TO AN EXEMPTION UNDER RFRA

The government was not only authorized to enter into a settlement agreement with Notre Dame, it was—and is—*required* to do so by federal law. Under RFRA, the government may not "substantially burden" the "exercise of religion" unless doing so is the least restrictive means to satisfy a compelling government interest. 42 U.S.C. § 2000bb-1. Enforcing the Mandate against Notre Dame would violate RFRA because it would force Notre Dame to violate its religious beliefs, but it is not the least restrictive means of advancing any compelling interest. The government itself has disavowed any compelling interest in enforcement, and there are plainly less restrictive ways that it could provide contraceptive coverage if it so chose.

**A.**   The government substantially burdens the exercise of religion when it forces a person to act in violation of his religious beliefs on pain of substantial penalty. RFRA protects "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000cc-5(7)(A), 2000bb-2(4) (emphasis added). An "exercise of religion" includes any "religiously motivated conduct," including the "abstention" from conduct "for religious reasons." *Emp't Div. v. Smith*, 494 U.S. 872, 875, 877 (1990). Accordingly, whenever the government imposes a substantial penalty on someone for refusing to act in a way that would violate his religious beliefs, it "substantially burdens" his "exercise of religion" under RFRA. *Hobby Lobby*, 134 S. Ct. at 2775; *Thomas v. Review Bd.*, 450 U.S. 707, 715-16 (1981).

– 22 –

Were the government to enforce the Mandate against Notre Dame, it would substantially burden the University's religious exercise by forcing it to act in violation of its religious beliefs on pain of substantial penalty. Even under the "accommodation," a religious objector must take affirmative steps to "compl[y]" with the Mandate by signing and submitting a "self-certification" or providing a similar legal "notice" to the government, and by offering health plans that provide access to the objectionable coverage. 26 C.F.R. § 54.9815-2713AT(a)(3), (b)(1), (c)(1) (2015). Notre Dame objects to taking these actions because it believes doing so would make it complicit in a scheme to provide all FDA-approved contraception, without exception. Courts may not second-guess that type of religious judgment about moral complicity. Once Notre Dame draws a line between conduct that is "consistent with [its] religious beliefs" and conduct that is "morally objectionable," "it is not for [a court] to say that [its] religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 134 S. Ct. at 2778-79. Instead, the court's role is limited to assessing whether the *penalty* that Notre Dame would face for refusing to take the required actions is "substantial." *Id*. at 2779. Here, that question is beyond dispute. Non-compliance would subject Notre Dame to the same severe penalties that were deemed "substantial" in *Hobby Lobby*. *Id*.

**B.** Because enforcing the Mandate against Notre Dame would substantially burden its religious exercise, the only question is whether such enforcement is the "least restrictive means" of advancing a compelling interest. Notably, RFRA puts the burden on the government to justify the denial of a requested religious exemption: The "[g]*overnment*" must "demonstrate[]" that enforcing the law against the particular "person" at issue is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b)

– 23 –

(emphasis added); *Gonzales v. O Centro Espirita Beneficente Uniao*, 546 U.S. 418, 431 (2006). This demanding standard requires an exemption for Notre Dame for two reasons.

    **1.**    Most importantly, the government itself has conceded that it lacks any compelling need to enforce the Mandate against Notre Dame. That concession is dispositive, because the government bears the burden to "demonstrate[]"that it has a compelling interest in enforcing the law against the particular "person" who seeks an exemption. 42 U.S.C. § 2000bb-1(b). Indeed, counsel are aware of no case in which a RFRA exemption has been denied after the government itself admitted that the exemption would not threaten a compelling interest.

    The government has also given several persuasive reasons why exempting Notre Dame and similar entities does not undermine any compelling interest. At least five of those reasons are directly relevant here. First, in the ACA, "Congress did not mandate that contraception be covered at all," but left the question up to "administrative discretion," which "indicates that the Departments' judgment should carry particular weight" in assessing the relative interests involved. 82 Fed. Reg. at 47,800-01. Second, Congress itself created an exemption for "grandfathered" plans, which meant that "approximately 25.5 million people" were still not covered by the Mandate as of 2017—a number that dwarfs those affected by religious exemptions. *Id*. Third, the old exemption was both over- and under-inclusive because it drew arbitrary lines based on organizational structure, and the new exemption is far more tailored. *Id*. at 47,801-02. Fourth, when an exempt religious college announces that it will not provide free contraceptive coverage, students and employees are free to choose whether to attend or work for the college "with an understanding" that if they do, they must be "respectful of [its religious] beliefs." *Id*. at 47,802. Fifth, the government concluded that the empirical evidence does not

– 24 –

adequately prove that mandating free contraceptive coverage has any measurable impact on women's health, particularly among women who can already afford them. *Id*. at 47,803-05.

  **2.** Even if the government had a compelling need to provide contraceptive coverage to Notre Dame's students and employees, it could plainly do so without piggybacking on Notre Dame's private health plans and forcing the University to act in violation of its religious beliefs. As the Supreme Court has explained, "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing [contraceptives] to any women who are unable to obtain them under their health-insurance policies due to [Notre Dame's] religious objections." *Hobby Lobby*, 134 S. Ct. at 2780. Or, at the very least, the government could take other steps to "facilitate the provision of full contraceptive coverage" without forcing Notre Dame to comply with the Mandate regulations, as the Supreme Court expressly contemplated in *Zubik*, 136 S. Ct. at 1561, and *Univ. of Notre Dame*, 136 S. Ct. at 2007.

## CONCLUSION

  For the foregoing reasons, Plaintiffs' claim against Notre Dame should be dismissed.

Dated: February 12, 2019         Respectfully submitted,

                */s/ Matthew A. Kairis*
                Matthew A. Kairis (OH 0055502)
                JONES DAY
                325 John H. McConnell Blvd., Suite 600
                Columbus, OH 43215
                Tel.: 614-281-3605
                Fax: 614-461-4198
                makairis@jonesday.com

                *Attorney for Defendant*
                *University of Notre Dame*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served to the

Plaintiffs' counsel and to the government defendants using the Court's CM/ECF system on the

12th day of February, 2019:

/s/ Matthew A. Kairis
Matthew A. Kairis (OH 0055502)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215
Tel.: 614-281-3605
Fax: 614-461-4198
makairis@jonesday.com

*Counsel for Defendant*
*University of Notre Dame*