```
 1                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
 2                      SOUTH BEND DIVISION

 3   IRISH 4 REPRODUCTIVE            )
     HEALTH, ET AL.,                 )
 4                                   )
         Plaintiffs,                 )
 5                                   )
     vs.                             ) 3:18-CV-491
 6                                   )
     U.S. DEPARTMENT OF              )
 7   LABOR, ET AL.,                  )
                                     )
 8       Defendants.                 )

 9        TRANSCRIPT OF ORAL ARGUMENT ON MOTION TO DISMISS
                         June 20, 2019
10            BEFORE THE HONORABLE PHILIP P. SIMON
                 UNITED STATES DISTRICT JUDGE
11

12   A P P E A R A N C E S:

13   FOR THE PLAINTIFFS:

14                      ALISON TANNER
                        CARMEN N. GREEN
15                      Americans United for Separation of Church
                        and State
16                      1310 L Street NW
                        Suite 200
17                      Washington, DC  20005
                        (202) 466-3234
18
                        MICHELLE I. BANKER
19                      National Women's Law Center
                        11 Dupont Circle NW
20                      Suite 800
                        Washington, DC  20036
21                      (202) 588-7602

22                      JEFFREY A. MACEY
                        Macey Swanson LLP
23                      455 N Pennsylvania Street
                        Suite 401
24                      Indianapolis, IN  46204
                        (317) 637-2345
25
```

```
 1   A P P E A R A N C E S (Continued):

 2   FOR THE FEDERAL DEFENDANTS:

 3                        REBECCA M. KOPPLIN
                          U.S. Department of Justice
 4                        Civil Division
                          Federal Programs Branch
 5                        1100 L Street NW
                          Washington, DC  20005_(202) 514-3953
 6

 7   FOR THE DEFENDANT, UNIVERSITY OF NOTRE DAME:

 8                        ANTHONY J. DICK
                          Jones Day
 9                        51 Louisiana Avenue NW
                          Washington, DC  20001
10                        (202) 879-7679

11                        MATTHEW A. KAIRIS
                          Jones Day
12                        325 John H. McConnell Boulevard
                          Suite 600
13                        P.O. Box 165017
                          Columbus, OH  43216
14                        (614) 281-3605

15

16

17

18

19

20

21

22

23

24

25
```

```
 1         (The following proceedings were held in open court

 2         beginning at 10:07 a.m., reported as follows:)

 3              DEPUTY CLERK:  All rise.

 4              THE COURT:  Good morning, everyone.

 5         You can be seated.

 6         All right.  We're on the record in Cause No. 3:18-CV-491.

 7    Irish 4 Reproductive Health versus HHS, et al.

 8         So why don't I have everybody introduce themselves so I

 9    know who we're dealing with here.

10              MR. KAIRIS:  Matt Kairis for Notre Dame.

11              THE COURT:  Good to see you again, Mr. Kairis.

12              MR. DICK:  Anthony Dick for Notre Dame.

13              THE COURT:  All right.

14              MS. KOPPLIN:  Rebecca Kopplin for the federal

15    defendants, Your Honor.

16              THE COURT:  Okay.

17              MR. MACEY:  Jeff Macey for the plaintiffs,

18    Your Honor.

19              THE COURT:  Mr. Macey.

20              MS. GREEN:  Carmen Green for the plaintiffs.

21              THE COURT:  Okay.

22              MS. TANNER:  Alison Tanner for the plaintiffs.

23              THE COURT:  All right.

24              MS. BANKER:  Michelle Banker for the plaintiffs.

25              THE COURT:  You guys brought a whole load of people
```

1    here.

2          Mr. Kairis, I assume you'll be speaking for Notre Dame?

3          **MR. KAIRIS:**  Actually, Anthony Dick will.

4          **THE COURT:**  All right.  Mr. Dick will.  Okay.

5          Obviously, Ms. Kopplin, you'll be speaking for the federal

6    defendants.

7          Who can I be talking to here -- so it would be Ms. Tanner,

8    is it?

9          **MS. TANNER:**  Yes.  Michelle Banker and Alison Tanner

10   will be splitting the argument for the plaintiffs, Your Honor.

11         **THE COURT:**  Okay.  Fair enough.

12         You have given me a lot to digest here.  It's an

13   interesting case.  I'll hear from Notre Dame first.  I will

14   give you as much time as you reasonably need, and then, you

15   know, when I have heard enough, I'll tell you.

16         **MR. DICK:**  Thank you, Your Honor.  Anthony Dick for

17   the University of Notre Dame.

18         So the only claim that names Notre Dame as a defendant in

19   this case is a challenge to the settlement agreement, and it's

20   our submission that the settlement agreement is unreviewable

21   under *Heckler v. Chaney*, which generally bars judicial review

22   of executive enforcement decisions; and, in particular, in this

23   case, the settlement agreement that was reached between the

24   government and the University of Notre Dame, along with a group

25   of other plaintiffs in various lawsuits.  The government in

```
 1    that settlement agreement promised that it would not enforce

 2    the contraceptive mandate against the University.

 3              THE COURT:  Why did the government settle the case?

 4         MR. DICK:  The government settled the case for a

 5    number of reasons.  Number one, to get rid of the claims that

 6    Notre Dame had brought against the government for a RFRA

 7    violation under the mandate.  The government had actually lost

 8    a number of those cases.

 9              THE COURT:  I thought the government won seven out of

10    eight of them in the circuit courts.

11         MR. DICK:  That's right.  The government -- there was

12    a circuit split.  The government had won seven out of eight,

13    but the Supreme Court --

14              THE COURT:  It was the Eighth Circuit that had ruled

15    and that's what prompted the appeal to the Supreme Court.

16         MR. DICK:  Well, that was one of the things that

17    prompted the appeal, right.  The Supreme Court granted cert

18    after that circuit split developed.  But then the Supreme Court

19    had vacated all of the various circuit court decisions and

20    remanded the cases, so the government, essentially, had a big

21    mess on its hands with wide disagreement among lower courts.

22    You had a number of permanent injunctions that had been entered

23    by district courts in favor of various plaintiffs.

24         The government had gotten its order from the Supreme Court

25    in Zubik which effectively barred the government from enforcing
```

```
 1   the accommodation against the plaintiffs while they had an

 2   opportunity to, basically, go back and work things out to try

 3   to find a solution that would satisfy both sides.

 4          THE COURT:  Right.  I would understand why Notre Dame

 5   would want to, you know, settle the case.  I don't understand

 6   why the government settled the case.

 7      The overwhelming majority of the appellate courts had

 8   ruled that the RFRA claim was not a good one, and so why didn't

 9   they just reinstitute the accommodation and put it back in the

10   lap of the Supreme Court to figure it out?

11          MR. DICK:  Well, Your Honor, I suppose the government

12   would be in a better position to answer that question than we

13   would.  I mean, from our perspective, we were quite confident

14   in, ultimately, prevailing at the Supreme Court.  In

15   particular, after Justices Kavanaugh and Gorsuch joined the

16   bench, because they were both on record as circuit judges

17   joining or authoring opinions saying that the accommodation was

18   a violation of RFRA, Justice Kavanaugh, then Judge Kavanaugh in

19   the D.C. Circuit, wrote a dissent from the denial of en banc

20   rehearing in *Priests for Life*, and then Judge Gorsuch joined a

21   dissent from denial in the Tenth Circuit case taking the same

22   position.

23      I understand Your Honor reached a different conclusion.

24          THE COURT:  Well, on a very thin preliminary record

25   too.
```

1          **MR. DICK:**  Sure.  Right.

2          **THE COURT:**  To be fair.

3          **MR. DICK:**  That's right.

4     And so I think all of that just goes to the point that

5     there was a very sharp dispute.  There were a number of courts

6     that had gone different ways.  To be sure, the circuits were

7     lopsided seven to one; but from the government's perspective,

8     they had these claims out there.  They had the risk of

9     attorney's fees in a lot of cases.  They had, you know, just

10    uncertainty that a lot of parties needed to deal with, and I

11    think from their perspective they wanted to conclude these

12    claims.  They had promulgated a new rule which they could have

13    argued may have mooted out some of the challenges, but there

14    would have been a fight about mootness, about whether these

15    claims were capable of repetition --

16         **THE COURT:**  How is the settlement agreement being

17    fair to the mandate of the Supreme Court to, essentially, try

18    to preserve, you know, healthcare for women and under these

19    circumstances?  It seems like it's a total abdication of that.

20         **MR. DICK:**  Well, Your Honor, we think that the

21    Supreme Court's order was to give the parties an opportunity to

22    go back and find a compromise that would satisfy all sides, and

23    the government took the position that such a compromise was

24    impossible because of the nature of the statutory mandate.  It

25    actually required the provision of this coverage in connection

 1   with health plans.

 2        The plaintiffs, and I was part of the team that had

 3   briefed the case in the Supreme Court in *Zubik* and various

 4   other cases, was part of the settlement negotiations, and the

 5   plaintiffs felt very strongly that the regulatory methods that

 6   the government was trying to use were insufficient to provide

 7   the kind of separation from the coverage that they believed

 8   their religious views required.

 9        And as a result of that, the government said it couldn't

10   reach a compromise, so it had to choose one side or the other.

11   And in this case, it chose to err on the side of protecting the

12   religious liberty of the plaintiffs who were involved.  We

13   think that was certainly a fair and reasonable resolution at a

14   time when there was a serious question about whether RFRA

15   prohibited the enforcement of the accommodation.

16            **THE COURT:**  All right.  I mean, it would have been

17   just as easy to -- I guess these are more questions for the

18   federal defendants -- but to just require the Supreme Court to

19   make a decision on it, right?

20            **MR. DICK:**  Well, I think --

21            **THE COURT:**  Other than collapsing and paying Jones

22   Day a bunch of money and making Notre Dame whole, essentially.

23   I mean, it was a total collapse.

24            **MR. DICK:**  Well, with respect, Your Honor, it wasn't

25   a total collapse in the sense that the new administration that

1  came in had a choice about whether it was going to require

2  contraceptive coverage as part of the mandate at all.  And

3  there were many people who were urging the new administration

4  to take the position, because, remember, Congress did not

5  define what preventative care means.  It left it up to

6  executive discretion.

7       So the new administration came in and many people were

8  urging it to redefine preventive care, as it, obviously, would

9  have had authority to do, to not include controversial

10  contraceptives, including some that many consider to be

11  abortion-inducing drugs.  Instead, the new administration

12  decided that it would keep that definition in place.

13          **THE COURT:**  What else can preventive care be?  I

14  mean, is it --

15          **MR. DICK:**  Preventive care all across the board.

16          **THE COURT:**  Across the --

17          **MR. DICK:**  Cancer screenings, all kinds of things.

18  Congress, I would submit, probably could not have enacted a law

19  that would have specifically referenced contraceptive coverage

20  in it, so they punted on that to the administration.

21       But my only point is the new administration kept that

22  mandate in place.  It estimated that the religious exemption

23  would apply to fewer than .1 percent of women who would be

24  affected by employer-based coverage, so 99.9 percent of

25  employers throughout the country continued to be covered.  It's

1   only a very narrow slice of employers that actually objected to

2   this on religious grounds.

3       I think the administration decided that for that very

4   small portion of employers who have sincere conscience-based

5   objections, in a diverse and pluralistic society, there are

6   other employers, there are other universities, that people have

7   a right to go to.  There is room in a diverse and pluralistic

8   society for a very tiny portion of employers and universities

9   like Notre Dame where they can be out from under the heel of

10  this federal mandate.

11      And, you know, there's a natural sorting.  It's a free

12  society.  People can decide to go to other universities.  They

13  can decide to go to other employers, and all we're asking for,

14  and the administration decided to grant, is in this very

15  small -- it's a minority religious view these days; and in a

16  very small circumstance, we're going to allow some diversity,

17  we're going to allow some people that have an exemption, rather

18  than putting them to the choice of violating their religious

19  beliefs or facing severe penalties.

20          **THE COURT:**  But when, you know, the White House

21  changed and the view of what preventive care, you know, might

22  mean, is it not true that the agency that was tasked with

23  deciding what that means came up with a laundry list of

24  services that needed to be covered?  Did those remain the same?

25          **MR. DICK:**  I believe they did, Your Honor.

1    Certainly --

2            **THE COURT:**  Based on the Institute of Medicine's

3    evaluation?

4            **MR. DICK:**  Correct.

5            **THE COURT:**  What's the name of that agency, HR

6    something?

7            **MR. DICK:**  Yeah, the Health Resources Services

8    Administration, I believe, HRSA.  The government will correct

9    me if I'm wrong with respect to the precise acronym.  I think

10   she's indicating that I have it right.

11       They, of course, you know, have discretion based on a

12   number of factors under *Chevron* to decide what preventive

13   services mean.  The new administration decided to reach this

14   compromise position where it would keep the mandate in place

15   for almost every employer in the country, 99.9 percent, and

16   only create this very narrow religious exemption.

17       And the plaintiffs have tried to portray this as depriving

18   women nationwide of coverage.  We think it is quite a

19   reasonable and narrow compromise that applies in very limited

20   circumstances.

21           **THE COURT:**  But any employer can opt for it.

22           **MR. DICK:**  Only if the employer has sincere religious

23   or moral objections, which is quite a small universe of

24   employers.

25           **THE COURT:**  How do you know that?

1        **MR. DICK:**  Well, we know that because of the number

2    of people who brought claims, who brought RFRA claims, and who

3    have sought to take advantage of the exemptions that exist, the

4    regulatory exemptions.  There is just a very, very small

5    number.

6        The government in the final rules that they promulgated

7    discussed their estimate, and I think they have been reasonably

8    accurate with that.  The government can speak more to, perhaps,

9    how they got to that estimate, but I don't think the plaintiffs

10   have disputed that that's a very small, very small number.

11       **THE COURT:**  So your position is, and maybe you can

12   flesh this out for me on the settlement agreement, that I don't

13   really need to get to that issue unless I find that the rules

14   have been promulgated improperly?  Can you flesh that out for

15   me?

16       **MR. DICK:**  That's right, Your Honor.

17       So we think, basically, and we have argued this in terms

18   of prudential ripeness, that the Court would have discretion to

19   manage its docket and to say, "Look, as long as there are

20   regulations that exempt the University from the mandate, then

21   the settlement is a moot point," because the settlement just

22   says, "We're not going to enforce any regulations that may

23   apply."  There are currently no regulations that apply as long

24   as the regulatory exemption remains in place.  So we think the

25   most sensible course of action would be to wait until that

1   regulatory dispute is fully resolved.

2       As Your Honor pointed out, the Supreme Court is probably

3   going to have to answer this at the end of the day.  We think

4   that could happen by the end of next term.  Again, we feel

5   quite confident that the regulations, the exemption, will be

6   upheld.

7       And I would just point out, late last week, something I

8   just found out about, there has now been a nationwide

9   injunction issued by the Northern District of Texas prohibiting

10  the enforcement of the accommodation -- prohibiting the

11  government from enforcing the accommodation, so that's a case

12  call *Deotte*.  I have a copy.

13          **THE COURT:**  Say that again.  So I know there's the

14  nationwide injunction in Philadelphia, I think it was.

15          **MR. DICK:**  Correct.

16          **THE COURT:**  Somewhere in the Third Circuit.

17          **MR. DICK:**  Right.

18          **THE COURT:**  And then there's a regional injunction

19  out of the Ninth Circuit.

20          **MR. DICK:**  That's right, Your Honor.

21          **THE COURT:**  Are you saying the injunction in Texas is

22  the opposite --

23          **MR. DICK:**  Yes.

24          **THE COURT:**  -- of the injunction in --

25          **MR. DICK:**  Essentially, yes.

```
 1          So the injunction issued by the Northern District of Texas

 2    late last week, and the case is called Deotte, D-E-O-T-T-E -- I

 3    have a copy of the opinion if Your Honor would like to see

 4    it -- the judge there certified a nationwide class of employers

 5    who object to the accommodation.

 6          And the reason that was a live dispute is because you had

 7    the nationwide injunction in Philadelphia striking down the

 8    exemption, so you had a defensive suit brought by objecting

 9    religious employers in Texas.  And the judge there just granted

10    this nationwide injunction in favor of the religious objectors

11    saying, "Okay.  If you're going to strike down the exemption,

12    I'm going to enjoin," and did, enter permanent injunction

13    against the accommodation.  So you've now got -- it's a giant

14    mess, Your Honor.

15               THE COURT:  What a mess.

16          MR. DICK:  And we think this underscores why the

17    Supreme Court is likely to get involved.  We think the Supreme

18    Court is likely to say, "Enough is enough.  The regulations are

19    valid.  The government has discretion not to enforce this

20    against religious objectors."

21               THE COURT:  So what is -- this settlement agreement,

22    was it unique to just Notre Dame and HHS, or, as I understand

23    it, there were 70 other similar settlement agreements?

24          MR. DICK:  That's right.  Well, not similar

25    settlement agreements.  There was this one settlement that was
```

1   entered between the government and 74, I believe it was,

2   plaintiffs who had brought a number of suits.  I mean, many of

3   these suits --

4           THE COURT:  This Exhibit A --

5       MR. DICK:  Correct.

6           THE COURT:  -- is this a global settlement --

7       MR. DICK:  Correct.

8           THE COURT:  -- of --

9       MR. DICK:  Okay.  And Exhibit B lists the cases that

10  were brought to which those parties were plaintiffs.

11          THE COURT:  I see.

12      So has anybody else challenged the settlement agreement in

13  any of those other cases?

14          MR. DICK:  Not to our knowledge, Your Honor.

15  Frankly, we think that's because it's quite obviously

16  unreviewable under *Heckler*.  These are the first plaintiffs who

17  thought that a Court could possibly review the settlement,

18  which is a nonenforcement agreement; so in our view, it's just

19  clearly unreviewable.

20      The regulations, we agree, are challengeable in a proper

21  case.  When the government says it's not going to enforce a

22  regulation against a named group of parties in a way of

23  settling the claims those parties have brought, there's just no

24  case ever where a Court has reviewed that kind of thing that

25  we've found.  And we just think under *Heckler* it's clearly

1    barred by Supreme Court precedent.

2             **THE COURT:**  So no other claim has been brought around

3    the country challenging any of these other 73 --

4             **MR. DICK:**  Correct, not challenging the settlement as

5    far as we are aware.

6             **THE COURT:**  You can continue.

7             **MR. DICK:**  Thank you, Your Honor.

8             **THE COURT:**  All right.  Thank you, Mr. Dick.

9       Ms. Kopplin, I guess I'll hear from you now.

10            **MS. KOPPLIN:**  Thank you, Your Honor.  So if it's all

11   right with Your Honor, I'd like to start with the settlement

12   agreement since that's where Mr. Dick just left off.

13            **THE COURT:**  Sure.

14            **MS. KOPPLIN:**  There's just a couple things that

15   jumped out at me as you two were talking that I thought I would

16   chime in on as we went.

17      First, to the question of why the government settled these

18   cases, I guess I have to temper your expectations.  I don't

19   know that much about that, and I'm not sure how much I could

20   say on the record if I did, but I think the key point is that

21   the decision of how to prioritize resources from litigation and

22   when to settle cases is committed to the agencies, and that's a

23   decision that the executive branch made in this case

24   appropriately.  That's not something -- we would agree with

25   Notre Dame, that that should be unreviewable under *Heckler v.*

1    *Chaney.*

2        You also had mentioned the *Zubik* orders, and, of course,

3    one of plaintiffs' main objections to the settlement agreement

4    is that they believe it violates *Zubik*.

5        Similarly, reading *Zubik*, it's clear the Supreme Court is

6    not mandating that any particular policy steps be taken.  They

7    do ask the parties be afforded an opportunity to solve their

8    problems, and the agencies tried very hard to do this.  As we

9    described in our briefing, the agencies asked for public

10   comments and actually reviewed more than 54,000 of them -- this

11   is all during the prior Obama administration -- and ultimately

12   concluding during that administration they just could not find

13   a way to satisfy both sides completely, but it certainly was

14   not --

15       **THE COURT:**  What was wrong with the accommodation

16   paradigm that was set up before?  I mean, eight circuits had

17   agreed with the government that this wasn't a violation of RFRA

18   and things were going great for the government in the

19   litigation.  So why did they give up the ghost?  I mean, it's

20   mystifying to me.

21       **MS. KOPPLIN:**  Again, I'm just speculating because I

22   don't have anything to say about that in particular.  I think

23   you're referencing that there was circuit court decisions.  In

24   the district courts, the record was much more mixed than that.

25   The Supreme Court had not definitively ruled on this question

 1    of whether or not there are entities that are substantially

 2    burdened by the accommodation.

 3         We now take the position that there are such entities, and

 4    that's something the Supreme Court was explicitly avoiding

 5    deciding in *Zubik*.  I think the Supreme Court recognizes this

 6    is a very difficult question.  I mean, to be frank, Your Honor,

 7    if the Supreme Court had a specific policy in mind, they

 8    probably would have ordered the parties to do it.  They kind of

 9    gave this punt to say go back and look at it yourselves because

10    they were hoping the parties were going to work it out because

11    of the difficulty of these issues.

12         **THE COURT:**  Right.  But things would have been a lot

13    easier if the government had just stuck with the original

14    regulation and forced the issue with the Supreme Court and got

15    an answer, right?  Instead, you just collapsed on it and gave

16    the plaintiffs in all of those cases exactly what they wanted,

17    and paid their lawyer fees.

18         **MS. KOPPLIN:**  I mean, respectfully, Your Honor, I

19    guess I'm not sure if there's much more I can say about that.

20    The government's taken the position now that it feels is

21    correct.

22         One thing I wanted to note on this question of -- I know

23    you spoke a lot with Mr. Dick about how the number of employers

24    affected is actually likely to be small and you were asking how

25    do we know it is going to be small.  This is in the rules, and

 1   I'm sure you've read that, sort of the government's predictions

 2   of how many people would be affected.

 3        I just wanted to also point out the reason we expect it to

 4   be small is because there's no financial incentive to opt out.

 5   It seems people generally understand that paying for

 6   contraceptives might even be cheaper than paying for, sort of,

 7   postpartum and prepartum care.  So financially there's not

 8   going to be a big drive here that people will be opting out

 9   just for fun or because they want to save money somehow, so we

10   don't really expect people would have any incentive to opt out

11   unless they had a sincere religious objection.

12        So going to *Heckler*, and this is sort of addressing Count

13   1, which is plaintiffs' attempts to challenge the settlement

14   agreement under the APA, as Notre Dame alluded to, this is a

15   decision that's been committed to the agency's discretion.  And

16   that's for all the same reasons the Supreme Court was relying

17   on in *Heckler*, the fact that there's limited enforcement

18   resources agencies have, the fact that they have to prioritize

19   those decisions, and the fact this is akin to prosecutorial

20   discretion.

21        And as we mentioned in our briefing, there's a number of

22   cases that hold that a nonenforcement settlement agreement is

23   basically the same as a nonprosecution agreement in terms of

24   *Heckler v. Chaney*.

25        I would like to also briefly address Count 2, which is

```
1   where the plaintiffs have sort of raised this common law
2   illegality challenge to the settlement agreement.  As we
3   mentioned in our briefing, there's a number of procedural
4   issues with this.  And in many ways, it collapses with the
5   merits of the final rules.
6       So I'll just point out, in addition to the problems with
7   Zubik I mentioned, it's especially odd that plaintiffs think
8   that their same constitutional challenges and ACA challenges
9   apply to the settlement agreement.
10      For example, plaintiffs identify nothing the ACA that
11  would tell the agencies when they have to take enforcement
12  action.  There's nothing in there that says, HHS, here is how
13  you're going to decide which agencies you're going to
14  prioritize.  So it's not clear how a decision to settle a
15  lawsuit could violate the ACA in that sense.
16      It's also not clear to me how, for example, plaintiffs'
17  equal protection claims that they raise against the final rules
18  could apply to the settlement agreement.  A settlement
19  agreement, by its nature, is about a discrete group of people.
20  Here it's about the parties and the case the government was
21  settling.  It's not a classification that sort of cuts, you
22  know, generally across the population the way the
23  classifications are analyzed under the Equal Protection Clause.
24  So I think that when you're looking at that, it's just
25  important to be very careful to separate those things out.
```

1          I'd also like to briefly address plaintiffs' claims which

2     they have added in their opposition that are not in their

3     amended complaint that the settlement agreement violates

4     internal DOJ guidance that they cite to in the opposition.

5          As we mentioned in our briefing, this is not legally

6     binding.  That guidance does not create a legal effect on

7     anyone.  So this is not the kind of thing that something could

8     be void for illegality even if it did violate it; and on its

9     terms, the settlement agreement is completely in compliance

10    with that guidance.  The guidance says everything else it says

11    and then it says, "And this is something that should be

12    interpreted with the discretion and the Attorney General can

13    make exceptions as litigation calls for it."  So this is not a

14    situation where there has been a violation.

15         Finally, I think this is kind of just the direction the

16    plaintiffs are taking us down, is this idea that they want to

17    come into court and have judges be looking at DOJ's internal

18    policy memos and asking if DOJ has correctly applied them in

19    making every decision at whether to settle every piece of

20    litigation, and that's not something that's been happening

21    historically, and we would take the position that that's not

22    something that the Court should do.

23              **THE COURT:**  You don't need to say anything more about

24    that.

25              **MS. KOPPLIN:**  Thank you, Your Honor.

1      Unless you have further questions about the settlement

2   agreement, I would like to talk about the final rules.

3          **THE COURT:**  Sure.

4          **MS. KOPPLIN:**  So, first, on the question of whether

5   or not the final rules are procedurally proper, I think the

6   first key point is that we're only looking now at the final

7   rules.  This is a -- plaintiffs are seeking prospective relief.

8   Only the final rules are now in effect.  So whatever happens to

9   the plaintiffs in the future is going to happen because of the

10  final rules, not the IFRs, and any relief that this Court could

11  give would only be relief that could change the final rules.

12         **THE COURT:**  Aren't the final rules tainted by what

13  took place prior to that?

14         **MS. KOPPLIN:**  No, Your Honor.

15         **THE COURT:**  Why not?

16         **MS. KOPPLIN:**  That's for several reasons.

17      First -- I just want to put this at the front level.

18  Plaintiffs' taint theory would effectively prevent the

19  government from ever being able to go back and make any rule in

20  this area.  And that just can't be right, that if the

21  government did error once and issue a rule without proper

22  notice and comment, there's some kind of a subject matter ban

23  where now the government can never issue a rule about religious

24  exemptions for contraception.  That just can't be the case.

25      So that leads us to the question of, okay, so how should

1    the government then act to cure a problem with notice and

2    comment.  The answer is, the government should go back and it

3    should do notice and comment.  And then after that notice and

4    comment, it should issue a new rule.  And that's exactly what

5    happened here.

6         THE COURT:  Why do they issue these interim rules?

7    This is not something I deal with very often, so you need to --

8    what was the point of the IFRs?  Why not just do it the way you

9    are supposed to do it?

10        MS. KOPPLIN:  Well, sure, and they did do that

11   eventually.

12        THE COURT:  I understand that, but for the year that

13   the IFRs were in the place -- just take it out of the context

14   of this case.  Educate me on that process because I don't

15   understand it.  Is that a common thing?

16        MS. KOPPLIN:  In this context, it is very common.

17   The IFRs are -- sorry.  IFRs is also the process that past

18   administrations used to issue the past exemptions here, so the

19   initial exemption for churches and their integrated

20   auxiliaries, that was done by the Obama administration as an

21   IFR.  So it's not something that's unusual or rare in this

22   particular context.

23        So the reason for that is that the ACA actually gives

24   statutory authority to the agencies to issue interim final

25   regulations that may be necessary to carry out the mandate, and

1    that's 42 U.S.C. § 300gg-92.  So that's a specific provision

2    relating to the ACA.

3         In addition, the APA, in general, says that agencies can

4    issue IFRs, so it can skip doing notice and comment first when

5    there's good cause.  And so this is in 5 U.S.C. § 553(b)(3)(B)

6    and in 553(d)(3).  There's two different possible definitions

7    of good cause.  So one is whenever it would be impractical,

8    unnecessary, or contrary to the public interest to do a notice

9    and comment first, and the other is a little bit broader than

10   that.

11        So as we've explained in our briefing, the reason the

12   agency did the IFR originally was because they had the

13   statutory authority and they wanted to resolve the litigation

14   and bring clarity sooner to that.  Now, I do know that other

15   Courts have disagreed that that was correct.  So to sort of do

16   a belt-and-suspenders approach, the agencies then went back and

17   took comments and issued the final rules after those comments.

18        So the IFRs also are explicitly asking for comments.  In

19   the IFRs, it says, "This is an interim final rule with a

20   request for comment.  Here is how you submit your comments.

21   Here's how long we will be taking comments for."  So the agency

22   had thought about that up front.  They ultimately received

23   about 110,000 comments they considered.

24             **THE COURT:**  To the IFRs?

25             **MS. KOPPLIN:**  To the IFRs.  And those are the

1  comments they considered and responded to when they issued the

2  final rules.  I will even note that --

3        **THE COURT:**  But the final rules are pretty much

4  identical to the IFRs, correct?

5        **MS. KOPPLIN:**  They're pretty similar.  There were

6  some clarifications made where people would have comments and

7  say, "This is unclear to us," and they would kind of clarify,

8  "This is what we meant."  I wouldn't say there was any

9  groundbreaking changes.

10       And plaintiffs in their brief kind of suggest, "Oh, that

11  shows that the agencies weren't taking the comments seriously

12  if they didn't make a complete about-face."  But that's not the

13  standard.

14       The APA says the agencies have to consider it and they

15  have to explain their reasons.  There's no requirement that

16  they have to agree with any particular comment.  And in this

17  case, they just didn't agree with those comments.

18       And the Seventh Circuit has addressed the question of how

19  open an agency's mind would be, and it did that in the *U.S.*

20  *Steel Corp.* case that we mention in our briefing.  So they

21  are -- just like here, the EPA listed a list of non-attainment

22  areas without doing notice and comment first.  It issued an

23  interim list, and then it took comments on that list and then

24  it issued a final list.

25       And so the Seventh Circuit considered this question of,

1    "Well, was the agency's mind open when it took those comments

2    even though it had already done its interim action?"  It

3    concluded that there was no reason to think the agency's mind

4    wasn't open.  It said, "Look, we looked at what the final rules

5    said.  They considered the comments and responded to them.

6    There's no reason for us to think it would have responded

7    differently if it had done it in the other order, so that's

8    fine."

9         So applying that same logic here, the agencies have taken

10   the 110,000 comments and they have responded to them.  In fact,

11   I believe the Court in California even concluded on the second

12   go-around of the final rules that there was no reason to think

13   the agencies hadn't adequately considered the comments and now

14   the agencies have issued the final rules.

15             THE COURT:  Did these rules supersede the prior

16   rules, the so-called accommodation?

17             MS. KOPPLIN:  I believe so.  I'm sorry.  They

18   superseded the IFRs.  The accommodation is still an option for

19   people who want to use it.

20             THE COURT:  If the Third Circuit affirms that

21   nationwide injunction and deems the current regulations were

22   improperly promulgated, does the old paradigm just go back into

23   place or has that been erased by the actions with these new

24   regulations?  Do you understand what I'm getting at?

25             MS. KOPPLIN:  I think you're asking if the exemption

```
 1    for church and their integrated auxiliaries and the

 2    accommodation process still exists, and I think they do either

 3    way.  The final rules don't try to write those out.

 4              THE COURT:  They are voluntary at this point.

 5              MR. KAIRIS:  Under the final rules, yes.  I think if

 6    the final rules don't exist --

 7              THE COURT:  What I'm saying is would they be

 8    mandatory if it's found that the rulemaking was improper on the

 9    ones that are under consideration here?

10              MS. KOPPLIN:  I mean, I think it would depend exactly

11    what the Third Circuit's order said.  But my understanding is

12    if the Third Circuit just said, "We're going to vacate the

13    final rules," then it would go back to how it was before the

14    final rules were, barring any other judicial opinions that may

15    have, you know, held otherwise or led to some kind of contrary

16    position.

17              THE COURT:  What's the status of that Third Circuit

18    case; it's been argued?

19              MS. KOPPLIN:  It was just argued a few weeks ago, I

20    think, Your Honor.

21              THE COURT:  Okay.  And the Ninth Circuit case was

22    just argued on Friday?

23              MS. KOPPLIN:  Correct.

24              THE COURT:  I had a chance to watch -- you can watch

25    the videos of the Ninth Circuit arguments.  I had a chance to
```

 1  watch that.

 2          MS. KOPPLIN:  It's pretty cool.

 3          THE COURT:  Yeah, it is really cool, isn't it?  It's

 4  very helpful to be able to do that.

 5      It's very hard to read the tea leaves about what's going

 6  to happen, but my strong sense is that the Ninth Circuit's

 7  going to defer to what the Third Circuit does, in the sense of

 8  just stand down until the Third Circuit decides what it wants

 9  to do.

10      But if the rules are set aside, then we just go back to

11  what it was under when Notre Dame came to this Court five years

12  ago, is that right?

13          MS. KOPPLIN:  I mean, like I said, I think it depends

14  exactly what the orders say, because we've had some confusion,

15  but that's my understanding, is that, if the Third Circuit

16  says, "We're going to vacate these IFRs," then the

17  accommodation still exists.  It came from a different IFR,

18  right.  The exemption still exists.  And, again, that's setting

19  aside anything other Courts may be doing to the contrary.

20      I know counsel from Notre Dame mentioned this *Deotte* case.

21          THE COURT:  Right.

22          MS. KOPPLIN:  So I guess unless you have further

23  questions about the procedural issues, I would like to move to

24  the merits of the final rules.

25          THE COURT:  Sure.

1          **MS. KOPPLIN:**  So there's two main arguments here.

2    One is that the final rules are authorized by the Women's

3    Health Amendment in the ACA; they are completely in harmony

4    with it.  And two is that they are both authorized and required

5    by RFRA.  So I'll start with the Women's Health Amendment.

6        In the ACA, the Women's Health Amendment requires that

7    HRSA set up comprehensive guidelines to describe what

8    additional preventative care and screenings for women will be

9    covered.  And there's a couple references in this section.

10       And this is 42 U.S.C. § 300gg-13(a)(4).

11          **THE COURT:**  Got it here.

12          **MS. KOPPLIN:**  There's a couple references in this

13   section that suggest that HRSA is getting quite a bit of

14   discretion to make decisions here.  So first is the fact that

15   it's referring to comprehensive guidelines, and those

16   guidelines don't exist yet.  So Congress knows that HRSA is

17   going to make them up.

18       Two, so broad that Congress hasn't even said, "You have to

19   cover contraception."  Like, that's kind of the level of

20   generality that HRSA is operating at.

21       Three, as we mention in our briefing, this provision

22   doesn't say that it has to be evidence-based or

23   evidence-informed, even though other provisions do limit HRSA

24   that way, to being evidence-based or evidence-informed -- I'm

25   sorry -- not HRSA or whoever the appropriate decision-maker

1    would be.

2        Fourth, this provision says that the regulation should be

3    as provided for by HRSA, suggesting that HRSA has the

4    discretion to select not just the services to be covered but

5    also the manner in which those services be provided and who

6    will provide them.

7        **THE COURT:**  So did HRSA change its mind prior to the

8    issuance of the new regulations -- rules?

9        **MS. KOPPLIN:**  My understanding is that HRSA is a

10   subsidiary of HHS, so HRSA kind of -- whatever the secretary of

11   HHS says, he has authority over HRSA, so HRSA, you know, is in

12   line with --

13       **THE COURT:**  Just by fiat he can -- I mean, doesn't

14   this direct HRSA to do a full-blown study and figure out what

15   should be in this pot and what shouldn't be?  And they did

16   that.  And did they redo that before issuing these new rules?

17       **MS. KOPPLIN:**  I think what happened is just what's

18   described in the rules themselves, here was the process that

19   was followed.

20       **THE COURT:**  So the answer is no, really.  They didn't

21   go back to the Institute of Medicine and ask for a

22   re-evaluation or anything like that, just somebody in

23   Washington changed their mind.

24       **MS. KOPPLIN:**  Well, I will point out -- again --

25       **THE COURT:**  Is that right?

1      **MS. KOPPLIN:**  I don't have any information about that

2   other than what's in their rules.  So what I'm telling you

3   happened, I guess, is -- what is in their rules is what

4   happened.

5      **THE COURT:**  And nothing in the rules suggest that

6   HRSA as an agency with the assistance of the Institute of

7   Medicine, or whatever it's known by now, did -- changed their

8   view of what should go in this pot of preventative care?

9      **MS. KOPPLIN:**  Well, I mean, again, HRSA is a

10  component that answers to HHS; so to the extent that HHS takes

11  a position, I don't know if we can separate out if HRSA has

12  taken that position or not.

13     **THE COURT:**  But the statute directs HRSA to do that,

14  not HHS writ large.  Does that matter?

15     **MS. KOPPLIN:**  I don't think it does.  I don't know

16  that plaintiffs have advanced any arguments on this point.

17  But, again, we take the position that HRSA is just a component

18  of HHS that answers to HHS.

19     And this is also the same way -- again, going back in

20  time, this is the same way this has been done previously by

21  past administrations to make the initial exemption for churches

22  and their integrated auxiliaries and the accommodation, which I

23  understand plaintiffs do not object to and yet --

24     **THE COURT:**  Slow down.

25     **MS. KOPPLIN:**  Sorry.

 1      So that's the same process that led to both of those.  I

 2 don't understand plaintiffs to object to those, so it seems

 3 strange to now just object because they don't like the content

 4 of this third iteration.

 5           **THE COURT:**  But they didn't object to them because it

 6 was after a comprehensive study that was done by HRSA.

 7 Whereas, here, it doesn't seem like there was any of that.  It

 8 was just flip the switch and change the policy.

 9           **MS. KOPPLIN:**  I'm sorry, Your Honor.  So I understand

10 that HRSA did do a study to arrive at the list of

11 contraceptives, but I was referring to when the initial

12 exemption for churches and their integrated auxiliaries went

13 into effect.

14      I don't know that HRSA went back and did research on the

15 issue of churches and their integrated auxiliaries and did a

16 study on that point.  I don't know that HRSA did a similar

17 study on the accommodation either on the effect of letting this

18 be provided -- you know, through the third-party administrators

19 and the issuers.

20      And, finally, in this entire realm of the Women's Health

21 Amendment, this is HHS's statute to interpret.  They have the

22 expertise here, and we argue that they are entitled to *Chevron*

23 deference, which means that plaintiffs have to show not just

24 that their reading is a sensible reading but that our reading

25 is, in fact, foreclosed by the statute, which in light of the

 1   past practice in this area I don't know how it could be

 2   foreclosed by the statute.

 3         If you don't have further questions on the ACA, I would

 4   like to address RFRA.

 5              THE COURT:  (Nodding.)

 6              MS. KOPPLIN:  Thank you, Your Honor.

 7         So RFRA is a generalized statute, all right, a background

 8   norm for the federal government.  It tells the federal

 9   government it cannot substantially burden a person's exercise

10   of religion unless the application of that burden to that

11   person is the least restrictive means of further and compelling

12   government interest.  So we kind of have two arguments here

13   I'll just lay out before I get into them.

14         In *Hobby Lobby*, the Supreme Court did identify a

15   substantial burden on nonprofit corporations like Hobby Lobby,

16   in that it found that it was substantial because the size of

17   penalties the ACA imposed were so large.

18         So, first, our position is that in light --

19              THE COURT:  That was mandating contraception by the

20   employer, by the employer's plan, right?

21              MS. KOPPLIN:  Correct.

22              THE COURT:  And, you know, that's a reasonable

23   decision that, of course, that substantially burdens somebody's

24   exercise of their religious beliefs.  But the Notre Dame case,

25   by way of example, is just a completely different kettle of

1   fish.  They weren't requiring them to include it in their

2   health plan.

3       **MS. KOPPLIN:**  So I think that the logic of *Hobby*

4   *Lobby* actually dictates that Notre Dame is also substantially

5   burdened.  *Hobby Lobby* is very --

6       **THE COURT:**  How is that?

7       **MS. KOPPLIN:**  *Hobby Lobby* says we can't second-guess

8   these individuals.  It's not for the Court to try and draw a

9   line and tell them if their practice, you know, really is what

10  their practice is.  So when an entity says, "It substantially

11  burdens my religious practice to be complicit in this process

12  where I submit this form and later contraceptives are provided

13  through my plan," we can't be second-guessing if that really

14  isn't a violation of religious belief or not.

15      **THE COURT:**  That's what they were doing prior to the

16  accommodation.

17      **MS. KOPPLIN:**  I'm sorry.  That's what --

18      **THE COURT:**  They were telling employees, "We don't

19  cover this."  And now they're just telling the federal

20  government, "We don't cover this."

21      **MS. KOPPLIN:**  I mean, again, I don't --

22      **THE COURT:**  How is that -- I don't understand that.

23      **MS. KOPPLIN:**  I am not an objector, so I don't know

24  if I could explain it to you.  But I'm saying that if there are

25  people, which I understand there are, who say, "Providing this

 1   form to the government to lead -- to start this process, this

 2   violates my religious beliefs," the Supreme Court in *Hobby*

 3   *Lobby* told us it's not for Courts to try and draw that line and

 4   say, "This seems really similar to the other notice you used to

 5   be giving," to me.

 6        **THE COURT:**  In *Hobby Lobby*, Hobby Lobby as a

 7   corporation did not want to provide on their dime contraceptive

 8   services.  Good on them.  That's their business.  That's not

 9   what we're talking about here.

10        **MS. KOPPLIN:**  So just to clarify.  So our first

11   argument is that in *Hobby Lobby* that was the substantial burden

12   identified, the one on those for-profit corporations.  At the

13   time, the agencies had chosen to respond to that burden through

14   the accommodation.  They said, "Look, we made this

15   accommodation, here is what you can do."

16        And our position is that that was a permissible response

17   under RFRA but also that the agencies have leeway under RFRA to

18   make a reasonable response and that they can now say, "Okay, we

19   previously chose to meet that substantial burden of the

20   accommodation, but now we are going to take the more

21   straightforward path and just create the exemption instead.

22   The accommodation was a bit convoluted, people were having

23   problems with it.  To meet that same substantial burden,

24   instead of using the accommodation, we'll leave that as an

25   option, but we're also just going to create a broader

1  exemption."

2       And our second argument is that, as I just alluded to,

3  under the logic of *Hobby Lobby*, there is an additional

4  substantial burden on different entities to participate in the

5  accommodation process, and the final rules are an appropriate

6  response to alleviate that substantial burden.

7            THE COURT:  What's that substantial burden?

8            MS. KOPPLIN:  So this would be on entities who

9  believe that participating in the accommodation process is a

10  violation of their religion.  And *Hobby Lobby* said that the

11  substantiality, at least, is not in question.  Once it's

12  established that their religious beliefs have been violated, we

13  know it's a substantial burden because the burden is this

14  threat of penalties under the ACA, that, as the Court noted in

15  *Hobby Lobby*, it's an easy call that's substantial because the

16  magnitude of the penalties is just so large.

17            THE COURT:  So this is under the paradigm of them

18  filling out the form and sending it in to HHS?

19            MS. KOPPLIN:  Correct.

20            THE COURT:  Okay.

21            MS. KOPPLIN:  So that's the two ways that we've

22  structured this.

23       And to go further, the agencies correctly concluded in

24  their rules that the accommodation was not the least

25  restrictive means of serving any compelling government

1    interest, and they lay this out at some length.  But the short

2    version is that it's hard to show a compelling interest when

3    there's already many other exemptions.  And there were already

4    a number of entities that did not have to provide

5    contraception, so there's all of the grandfathered plans, which

6    is, I think, about 25 million people when the ACA was enacted,

7    is the other past exemptions for churches and their integrated

8    auxiliaries, there's the accommodation, and to weigh against

9    that, there's the fact that many women do have access to

10   contraception through other sources, through perhaps someone

11   else's plan, parents' plan, their spouse's plan, through a

12   state, federal, or local program or perhaps even if they happen

13   to have an employer who objects, their employer may not object

14   to the contraception that they want.

15       Most objecting employers -- well, I guess, many objecting

16   employers only object to some of the methods.  So, for example,

17   here, I think there's only a handful that Notre Dame objects

18   to, and the others they don't object to.

19       So in light of that, the agencies re-evaluated the

20   administrative record and concluded that there was no reason to

21   believe that the accommodation was the least restrictive means

22   of serving a compelling government interest.

23       And furthermore, I mean, as we pointed out in our

24   briefing, the government here is not taking the position that

25   it is a compelling government interest, and we're not aware of

```
 1    cases where Courts have sort of told the government what their

 2    interest was over the government's objection.

 3         Once a burden has been established, RFRA doesn't prescribe

 4    the precise remedy that the agencies have to take to fix that

 5    burden.  So RFRA -- the agencies here chose to put in place the

 6    accommodation first in the prior exemption, but there's nothing

 7    that told them in RFRA they had to do that specific thing.

 8         And, in fact, that choice led them into a long morass and

 9    decades of litigation, which is how we're still here today.

10    We've been here for years.  We are still here today.  Our

11    position is that's why the agencies should be entitled to a

12    little bit of leeway, instead of being told under RFRA there's

13    one exact thing you can do in RFRA, you have to hit that

14    bullseye, or otherwise you have to just keep incrementing one

15    step at a time and getting sued every step and one day finally

16    the Court will tell you, "Okay.  This is the exact magic step

17    where you can stop."

18         I mean, it's our position that the agencies should be able

19    to short-circuit that process by saying, "Okay.  Look, we know

20    this was a substantial burden.  Here is our reasonable approach

21    to solving that.  Even if it wasn't the one exact path that was

22    preordained, this is something we should have the leeway to do

23    to try and help people have the substantial burdens

24    alleviated."

25         Unless there's further questions about RFRA, I would like
```

1   to address plaintiffs' constitutional claims.

2           **THE COURT:**  Sure.

3           **MS. KOPPLIN:**  So just briefly, starting with the

4   Establishment Clause, plaintiffs appear to be arguing that the

5   final rules in the settlement agreement, to some extent,

6   establish religion.  That's just not the case.  There's

7   numerous Supreme Court cases that state that there's room in

8   between the Establishment Clause and the Free Exercise Clause

9   where the government can accommodate religion.

10          And we think this is a lot like the *Amos* case where the

11  government found that it was okay to exempt religious employers

12  from Title VII restrictions on hiring and firing and that that

13  was just going to be alleviating a government burden on the

14  employers and not entangling the government in religion.

15          So similarly here, the government is not affirmatively

16  directing anyone to do anything.  Instead it's just alleviating

17  a burden on some of these employers and letting them go ahead

18  and act in accordance with their religious beliefs.  So for all

19  the same reasons that applied in *Amos*, this would satisfy the

20  *Lemon v. Kurtzman* test and not violate the Establishment

21  Clause.

22          In addition, on due process, plaintiffs make two

23  arguments, one about the fundamental right to access

24  contraceptives and one about a liberty interest.  But they both

25  fail for the same reason, and that's that there's not a

1  constitutionally protected interest in receiving employer

2  subsidized contraceptives.

3       The Court wrote about this extensively in *Harris v. McRae*,

4  and it said there's a difference between not subsidizing and

5  preventing access.  Nothing in the final rules punishes anyone

6  for using contraceptives.  Nothing prevents people from

7  obtaining contraceptives.  It just says, "We used to require a

8  large group of people to subsidize contraceptives.  Now we've

9  made that group slightly smaller."

10          **THE COURT:**  Why were the students cut out of the

11  settlement discussion?

12          **MS. KOPPLIN:**  I'm not sure, Your Honor.  Again, I

13  don't have much knowledge about that.  Plaintiffs made an

14  argument that this sort of is an additional reason the

15  settlement agreement is void; and as we noted in our briefing,

16  if you read the cases they cite, those cases actually say you

17  can't dispose of the claims of a third party and you can't have

18  a legally binding effect on a third party through a settlement

19  agreement.  But, obviously, neither of those things happened

20  here.

21       The settlement agreement doesn't change anything about

22  whatever claims plaintiffs might have.  They, in this lawsuit,

23  are bringing some claims; and if they wanted to bring other

24  claims in other lawsuits, the settlement agreement doesn't stop

25  them.  The settlement agreement just says the agencies are not

```
 1    going to take enforcement action in these categories.  So it's

 2    certainly not the case the settlement agreement has bound the

 3    plaintiffs.

 4            THE COURT:  Does the settlement agreement prevent the

 5    students from -- were the students' rights impacted by the

 6    settlement agreement?

 7            MS. KOPPLIN:  Not to my understanding, Your Honor.

 8    Any claims they may have had that they wanted to bring through

 9    private enforcement, they could still bring through private

10    enforcement.  The settlement agreement is just the government

11    saying, "We're not going to take government enforcement action

12    on these topics."

13            THE COURT:  Against Notre Dame and the other --

14            MS. KOPPLIN:  Right, and the other parties that were

15    signatories to the agreement.

16        Finally, on equal protection, plaintiffs can't show

17    there's any facial discrimination against women.  Obviously,

18    the text of the final rules is written in terms of whether or

19    not the employers have religious objections, not the sex of any

20    individuals.  And if there was any distinction based on sex, it

21    seems like it would actually go all the way back up to the ACA

22    here, which is where the women's health mandate came from.

23        Plaintiffs instead seem to be kind of arguing a disparate

24    impact theory, that this is something that will have an effect

25    on women because women are the ones who use contraceptives.
```

1   But in order to win on that theory, they would have to show

2   purposeful discrimination which they just can't do.  So in the

3   absence of any facial discrimination, we think rational basis

4   review applies, and certainly the agencies here had a rational

5   reason in order to alleviate the substantial burdens on

6   religious exercise to take this action.  And we also think that

7   even if intermediate scrutiny did apply, which it doesn't, but

8   that would also be satisfied because the accommodation of

9   religious beliefs is an important government interest which the

10  Supreme Court recognized in *Cutter*.

11       So unless you have any further questions, Your Honor, then

12  I would just respectfully ask that you dismiss the claims as to

13  the federal defendants.

14            **THE COURT:**  All right.  Thank you.

15       Ms. Tanner, am I going to hear from you first?  Or

16  Ms. Banker, I'm sorry.

17            **MS. BANKER:**  Good morning, Your Honor.

18            **THE COURT:**  Good morning.

19            **MS. BANKER:**  My name is Michelle Banker arguing for

20  the plaintiffs.  I will be covering the jurisdictional and

21  other threshold issues in this case.  I will be covering the

22  illegality of the settlement agreement and our procedural APA

23  claim against the rules.  My colleague Alison will be covering

24  our substantive APA challenge to the rules and our

25  constitutional claims.

1      Your Honor, the settlement at issue is both reviewable and

2  it is unlawful.  It is different in kind than the settlements

3  that the Court usually sees in the ordinary course of

4  litigation for three reasons.

5      First, although defendants have said on multiple occasions

6  that the settlement is simply a promise not to enforce the

7  ACA's contraceptive coverage requirement, that is a

8  mischaracterization of what the settlement --

9          **THE COURT:**  Because it is future, prospective, right?

10         **MS. BANKER:**  Exactly.  And I think, Your Honor, it

11  might actually be helpful for us to read a couple passages from

12  what the settlement agreement actually says.

13         **THE COURT:**  I have it in front of me here.  What page

14  are you on?

15         **MS. BANKER:**  Sure.  Well, I have it by paragraph.

16         **THE COURT:**  That's fine.  You can just tell me the

17  paragraph.

18         **MS. BANKER:**  Okay.  So if you take a look at

19  paragraph 2.

20      It says, "The government will treat plaintiffs and their

21  health plans, including their insurance issuers and/or

22  third-party administrators in connection with those plans, as

23  exempt from the regulations or any materially similar

24  regulation or agency policy."

25      Skipping to 2E, Your Honor.

 1          It says, "No person may receive the objectionable

 2     coverage" -- meaning contraceptive coverage -- "as an automatic

 3     consequence of enrollment in any health plan sponsored by

 4     plaintiffs."

 5          And just looking also at 2B.

 6          "If the objectionable coverage is provided, it may not be

 7     provided as part of any plan sponsored by plaintiffs."

 8          Your Honor, this is not merely a promise not to enforce.

 9     It is a statement that Notre Dame is exempt from the

10     contraceptive coverage requirement.

11          THE COURT:  But how is that any different than the

12     paradigm under the accommodation?  I mean, my understanding

13     when we dealt with this, I don't know, five, six years ago and

14     had three days to write a 30-page opinion, my impression was

15     that the provision of contraceptive services was totally

16     separate from Notre Dame and that it was the third-party

17     administrator that procured it on behalf of the students.  And

18     so isn't that sort of just stating the same thing?

19          MS. BANKER:  Your Honor, this agreement is basically

20     saying that even though that is the case, that previously it

21     was the third-party administrator and the insurance issuer that

22     were coming in and providing separate payments to the Notre

23     Dame students, this is saying that Notre Dame can even block

24     their plans from doing that.

25          THE COURT:  How is that saying that?

 1        **MS. BANKER:**  Because it's saying that "...will treat

 2   plaintiffs and their health plans, including their insurance

 3   issuers or third-party administrators, as exempt from the

 4   regulations or any materially similar regulation or agency

 5   policy."

 6      So what they have done is they have invoked this agreement

 7   as saying, "We can tell our plans that they cannot provide

 8   these separate payments that they were otherwise providing

 9   under the accommodation to our students.  And as a result of

10   that, our clients, Notre Dame students and the 17,000 people on

11   these plans, no longer have access to contraceptive coverage

12   without cost-sharing as required under the ACA."  They have

13   decided that this means they can no longer comply, and as a

14   result, the TPA and the insurance issuer isn't providing those

15   separate payments any longer.

16        **THE COURT:**  So are you saying, let's say, in 2021

17   there's new rules --

18        **MS. BANKER:**  Uh-huh.

19        **THE COURT:**  -- that this would inoculate Notre Dame

20   from complying with those new rules should they ever go into --

21        **MS. BANKER:**  Yes.  I mean, that is what -- not even

22   rules.  This purports to exempt them from any materially

23   similar regulation or agency policy.  It even seems --

24   purports -- points to say that future laws -- I mean, even laws

25   of Congress, perhaps, which is clearly something the agency

 1   can't do, cannot require Notre Dame to provide contraceptive

 2   coverage.  It's an affirmative statement that they don't need

 3   to provide contraceptive coverage forever.

 4       This is not merely a promise not to enforce the ACA.  It

 5   is something entirely and wholly different, and so that is the

 6   first reason, Your Honor, that this isn't an ordinary

 7   nonenforcement decision.

 8       Your Honor, there's a second major reason why this is not

 9   an ordinary nonenforcement decision subject to *Heckler*.

10       Excuse me.  I'm going to grab some water.

11           **THE COURT:**  Sure.

12       Ms. Banker, can I get you to slow down too.

13           **MS. BANKER:**  Sorry about that.

14           **THE COURT:**  It's very difficult for my court

15   reporter -- all of you guys.  It's very, very difficult for her

16   to try to process this, and for me to try to process this too.

17           **MS. BANKER:**  Sure.  Sorry, Your Honor.

18       So the second reason why *Heckler* does not govern this case

19   is because this settlement is one of a series of agency actions

20   taken to attempt to undermine the ACA's contraceptive coverage

21   requirement, and I think it would be helpful to give a brief

22   timeline of events to give the context for what is actually

23   going on here.

24       So in October of 2017, the agencies issue the interim

25   final rules.  Although the defendants say that this is only

1   going to affect .1 percent of people and that this is a tiny,

2   tiny exemption, that is an absolute mischaracterization of what

3   these rules do.  They are the exemption that swallows the rule,

4   and this is why I believe the California Courts said these turn

5   the contraceptive requirement from a legal entitlement to an

6   essentially gratuitous benefit.

7         By the department's own estimates, hundreds of thousands

8   of people will be affected by these rules.  And there's no

9   mechanism for oversight to prevent abuse.  They truly are the

10  exemptions that swallow the rules whole.  So that was their

11  first step.

12        Then just days later, the department's executed settlement

13  agreements with Notre Dame, and we know that at least with 97

14  other entities, plus, unknown affiliated entities.  This

15  includes the one instrument with Notre Dame and 73 other

16  entities.  Plus we know of at least 20-odd other settlement

17  agreements, and we strongly suspect that there are others out

18  there.

19             **THE COURT:**  Why were these secret?

20             **MS. BANKER:**  There were intervenors, student

21  intervenors in these cases, at least in the Notre Dame case,

22  that were not included in the settlement negotiations, and the

23  case was just dismissed on Rule 41 dismissal.  They were not

24  included in that process.

25             **THE COURT:**  I remember in October of '17, I wondered,

1  "What's going on with this case," and it just kind of

2  disappeared.

3           MS. BANKER:   That's right.   That's right, Your Honor.

4      And I will also say that there's another thing the

5  government said that is just not correct.

6      This agreement, it absolutely does extinguish the claims

7  of the Notre Dame students who are impacted by this.  By this

8  agreement, it says that Notre Dame is exempt.  This isn't just

9  saying the government will not enforce.  This is saying Notre

10 Dame is exempt from the contraceptive coverage requirement or

11 any similar law or regulation.

12     And so what that means is that as long as this agreement

13 exists, it stands between my clients and any private

14 enforcement action, whether that be through ERISA to a state

15 insurance commissioner, any way that they might have to try to

16 enforce this right, this agreement now stands between them.  It

17 absolutely impermissibly trades away the rights of third

18 parties.  It is not merely an agreement not to enforce, and for

19 this reason, it is not subject to *Heckler* discretion.

20     Your Honor, two circuit courts have already held that a

21 settlement agreement that violates the law is reviewable under

22 the APA.  This is the Fourth in *Executive Business Media* and

23 the Ninth Circuit in *Carpenter*.  The defendants try to

24 distinguish this case by trying to fit it into these cases, by

25 trying to fit it into *Heckler*'s law to apply exception.

 1   Notably, actually, Notre Dame brings this up but the government

 2   doesn't.

 3        And the fact of the matter is, is that neither of those

 4   cases mention *Heckler*, neither of those cases tried to fit it

 5   into the law to apply exception.  They said, rightly, when an

 6   agency action --

 7             **THE COURT:**  What do you mean by "law to apply

 8   exception"?

 9             **MS. BANKER:**  Sure.  Sure.  Sure.

10        So there is one exception to *Heckler* that exists that says

11   if the statutes kind of very specifically tell the agencies how

12   to enforce the law, then that could be one of the several

13   exceptions to *Heckler*.

14        But this isn't something -- these cases were wholly

15   outside of the *Heckler* decision and even though they were

16   decided after *Heckler*, and for good reason.  Because when

17   agency action violates the law, even if it just takes the form

18   of a settlement agreement, that is reviewable by a Court.  Two

19   circuit courts have already held so, so can this Court.

20        The last point I would like to make, Your Honor -- and

21   actually, I want to take a step back and talk a little bit more

22   about the timeline of events we were discussing before.

23        So an honest general policy point -- so they executed

24   these settlement agreements with dozens of entities, including

25   Notre Dame, and we don't know how many others.  A few months

1    later, in addition to this, they began filing briefs refusing

2    to substantively defend the Affordable Care Act's Birth Control

3    Benefit in legal challenges.  As of July 2018, we know of at

4    least 13 cases where they filed briefs -- by "they," meaning

5    the federal defendants -- filed briefs throwing up their hands

6    and saying, "We're not going to defend this on the merits."

7         Finally, in November of 2018, the federal defendants

8    finalized the interim final rules in -- as final rules that

9    were, essentially, identical.

10        So, Your Honor, *Heckler* doesn't apply, A, because this

11   isn't a promise not to enforce, but, B, because this is the

12   extreme case that the Supreme Court contemplated when it

13   decided *Heckler* in footnote four of that decision where they

14   said that *Heckler* would not apply where the federal defendants

15   or agencies have consciously and expressly adopted a general

16   policy that is so extreme as to amount to an abdication of its

17   statutory responsibilities.

18        That's what's happening here, Your Honor, that's what this

19   timeline of events shows.  The administration is refusing to

20   enforce the contraceptive coverage requirement against anyone,

21   and I will note that federal defendants have not pointed to a

22   single case where they have enforced the contraceptive coverage

23   requirement.

24             **THE COURT:**  I understand, and I'm sympathetic.  But I

25   don't -- you keep saying the contraceptive requirement, but

1   what the ACA said was, "Come up with preventative care and then

2   we're going to let the agency decide what that means."  And

3   they used to agree with you, but they don't agree with you

4   anymore.

5            MS. BANKER:  Sure.  And I will say, Your Honor, my

6   colleague, Alison, is prepared to talk at length about the

7   substantive issues behind what the ACA requires and not.

8        But simply that, as you mentioned before, what the statute

9   does is it provides for, you know, coverage of preventive

10  services as required by HRSA.  And HRSA has not changed the

11  list of services that are to be included in it.  All the

12  statute gives discretion to the agencies to do is to prescribe

13  what may be covered but not who may be covered.  And, again, I

14  will let my colleague talk in more detail about that.

15       So, Your Honor, we're in a situation where they have --

16  the federal defendants have not enforced the contraceptive

17  coverage requirement against anybody.  They haven't pointed to

18  a single case where they're doing this.  Instead they've

19  effectuated this general policy to undermine the ACA by issuing

20  the rules, refusing to defend litigation, and as relevant to

21  this case, by settling out litigation.

22       The rules and the settlement were executed just one week

23  apart.  They are a belt and suspenders of the unlawful scheme

24  that's going on here, and a settlement agreement is simply the

25  document that effectuates this general policy as to Notre Dame

1   and to Notre Dame students and to my clients.

2       Your Honor, the federal defendants should not be allowed

3   to inoculate themselves from judicial review by effectuating

4   their general policy through multiple piecemeal settlement

5   agreements and then calling them individual nonenforcement

6   decisions.  Agencies are obligated by the constitution to take

7   care that the laws are faithfully executed, not to undermine

8   those laws.

9       This extreme position would allow the Executive to usurp

10  the legislative function by decline to following the law as

11  Congress enacted it, and that's just simply not how our

12  government works.  It is a perversion of basic principals of

13  separation of powers.  And it is certainly not what the Supreme

14  Court decided when -- or contemplated when it decided *Heckler*

15  *v. Chaney*.

16      And finally, Your Honor, on the question of *Heckler*, even

17  if *Heckler* -- if the Court determines that *Heckler* applies, it

18  would not preclude the Court from reviewing agency action that

19  violates the constitution.  *Heckler* interpreted the

20  committed-to-agency-discretion-by-law exception to the APA but

21  violating constitutional mandates cannot be committed to agency

22  discretion nor can the APA, a statutory provision, constrain

23  review of constitutional claims.

24      And the *Heckler* Court itself recognized this.  Both the

25  majority and Justice Brennan in concurrence recognized that the

1    majority's holding did not reach claims that the agency

2    violated constitutional rights.

3         And as my colleague, Alison, will discuss, the settlement

4    agreement violates both the Establishment Clause and the due

5    process and equal protection guarantees of the Fifth

6    Amendment --

7              THE COURT:   How come nobody else challenged this

8    settlement agreement, all these other colleagues and

9    universities that settled with the government -- and I drew the

10   short straw I guess -- and so what's going on with that?   It

11   does strike me that that makes this a little novel.

12             MS. BANKER:   Yeah.   And I would say, quite frankly,

13   Your Honor, I don't know that a lot of people know what's going

14   on.   We found out about the settlement agreement through a FOIA

15   request because one day our students' coverage changed and we

16   didn't know why and the University president mentioned in a

17   press release a favorable settlement with the administration.

18             THE COURT:   That's literally how you found out?

19             MS. BANKER:   Yes, sir.   Yes, Your Honor.

20        So in the end, Your Honor, I will just say that agencies

21   literally have no power to act, except as Congress permits, and

22   for this reason the settlement agreement is reviewable, and it

23   cannot survive judicial scrutiny.

24             THE COURT:   Why should I -- I mean, this settlement

25   agreement issue is kind of a quagmire.   You have to win on both

```
 1    issues, right?  You have to both show that the rules were

 2    promulgated in violation of the APA and that the settlement

 3    agreement is illegal in some way.

 4        Why should I not just shelf this until this kind of gets

 5    worked out way above my pay grade on the rules part of this?

 6            MS. BANKER:  Well -- so, Your Honor, I would say that

 7    with respect to the settlement agreement, my clients are

 8    experiencing harms right now.  They are currently paying for

 9    their birth control when --

10            THE COURT:  Yeah, but I -- unless -- if the rules

11    remain as promulgated, that's going to continue to occur.

12            MS. BANKER:  Well, so right now several courts have

13    issued preliminary injunctions on these rules, and if things --

14    and they have also said that the rules are not likely to stand,

15    right.  So if we are waiting on the Supreme Court to decide the

16    legality of the rules, we're talking June 2020 at the earliest

17    for the possibility that these rules will be allowed to stand,

18    notwithstanding the fact that the Courts who have considered

19    them already have said that they are likely to be vacated.

20        And so my clients will have to wait for, what, a year-plus

21    for a determination of their rights, and meanwhile they are

22    being harmed currently.  And so I think this is a very ripe

23    controversy absolutely --

24            THE COURT:  I'm not saying it's not a ripe

25    controversy, but I was, in some respects, surprised to see that
```

```
 1    you all did not ask for a preliminary injunction.

 2            MS. BANKER:  Yes, Your Honor.

 3            THE COURT:  Is that a tactical decision to avoid,

 4    sort of, a fire drill kind of problem?  Can you speak to that?

 5            MS. BANKER:  Sure.

 6        Ultimately, Your Honor, our clients are students.

 7    Students tend to graduate and move on, so cases can be held up

 8    thru the preliminary injunction process and not reach final --

 9    you know, final judgment, and so we wanted to just move the

10    case forward rather than going through that process and seeking

11    a PI.

12            THE COURT:  I'm grateful.

13            MS. BANKER:  Thank you, Your Honor.

14        And with respect to this argument on standing and

15    ripeness, I do want to point out that Notre Dame points to the

16    existence of the rules to contend that plaintiffs can't

17    challenge the settlement while plaintiffs -- where the federal

18    defendants point to the existence of the settlement to say the

19    plaintiffs can't challenge the rules.  The law doesn't leave

20    plaintiffs in this catch-22.

21        As Notre Dame admits in its reply papers, its refusal to

22    provide coverage is based on both the regulatory exemption and

23    the settlement agreement.  And these are simultaneous and

24    independent causes of plaintiffs' harm they are experiencing

25    right now.
```

 1          And as we discussed before, absent the rules and the

 2   settlement, plaintiffs would have contraceptive coverage

 3   through the preexisting accommodation process, and so the only

 4   way to get complete relief is for the Court to remove both of

 5   the impediments of them accessing coverage.

 6          **THE COURT:**  What would be the remedy here on the

 7   settlement agreement?  Like, what would I do, enjoin its

 8   enforcement?

 9          **MS. BANKER:**  Yes, that's right.  Our contention is

10   that the settlement agreement between Notre Dame and the

11   federal defendants is void, and it's void for illegality.  It's

12   void *ab initio*.  And, yes, absolutely, and to vacate the rules,

13   Your Honor.

14          **THE COURT:**  I mean, I understand the rules --

15          **MS. BANKER:**  Right.

16          **THE COURT:**  -- that seems a little more inside the

17   box, and it's still a difficult question.  But the idea that

18   some judge sitting in Hammond is just going to tell, you know,

19   the Attorney General that they can't settle a lawsuit, that

20   gives me some discomfort.

21          **MS. BANKER:**  I would suggest Your Honor take a look

22   at the cases *Executive Business Media* and *Carpenter*.  And these

23   are both cases that squarely addressed the Department of

24   Justice's authority to settle litigation, and it said that this

25   authority stops at the walls of illegality.  If I may just read

1    to you some language from these cases.

2         *Executive Business Media*, which is 3 F.3d 759, Fourth

3    Circuit, 1993.  "We think it alien to our concept of law to

4    allow the chief legal officer of the country to violate its

5    laws under the cover of settling litigation.  The Attorney

6    General's authority to settle litigation for its government

7    clients stops at the walls of illegality."

8         In *United States v. Carpenter*, 526 F.3d 1237, Ninth

9    Circuit, 2008.  "While it is true that the Attorney General has

10   plenary discretion to settle litigation to which the federal

11   government is a party, a decision that is discretionary is not

12   rendered unreviewable in all circumstances.  Rather, where an

13   action is committed to absolute agency discretion by law,

14   Courts have assumed the power to review allegations that an

15   agency exceeded its legal authority, acted unconstitutionally,

16   or failed to follow its own regulations."

17        There's precedent to do this, Your Honor.  The Court may

18   do this as well.

19             THE COURT:  Is there any discovery that would have to

20   be taken in this case?

21             MS. BANKER:  I think we would need to see the

22   administrative record that the federal defendants put forward,

23   but we do have constitutional claims, Your Honor, that could be

24   helpful -- that we may need discovery on going forward.

25             THE COURT:  Right.  So in some respects isn't it -- I

```
 1    mean, if you're looking for a quick ruling, isn't it in many
 2    ways to your benefit that I grant their motions and you get it
 3    up to the circuit so that they can decide it more quickly?
 4    Whereas, if I agree with you and I deny their motion to
 5    dismiss, this is just going to languish in litigation for
 6    another year, two years, however long it is to take discovery,
 7    do summary judgment, et cetera.
 8            MS. BANKER:  I disagree, Your Honor.  I think there's
 9    a chance if you dismiss this motion this would be appealed.
10    That appeal would be remanded back to this Court to reach final
11    judgment.  It would take even longer than if you were --
12            THE COURT:  How would they appeal?
13            MS. BANKER:  I'm sorry.  We would appeal.
14            THE COURT:  Right.
15            MS. BANKER:  We would appeal.  And then ultimately
16    win and then come back and then we would have to go through the
17    process of reaching final judgment.  Your Honor, respectfully,
18    if you deny their motion, we will move quickly to move forward
19    to reach final judgment in this case.
20        Your Honor, a couple other things unless you have further
21    questions on the reviewability.
22            THE COURT:  (No audible response.)
23            MS. BANKER:  Court's indulgence.  One second.
24        The federal defendants raised an argument about privity of
25    contract for the first time in their reply papers that I would
```

1    like to address with the Court right now.

2         Because it was raised for the first time on reply, it

3    should be deemed waived; but in any event, the cases upon which

4    the federal defendants rely concern a suit to enforce a

5    contract where the Tucker Act typically supplies the waiver of

6    sovereign immunity.  But the question of whether a contract

7    should be enforced is entirely separate from the question posed

8    in this case which is whether a contract is unlawful and thus

9    should be deemed void for illegality.

10        Such a question is not founded upon a contract, which is

11   the phrase for which the Tucker Act typically supplies waiver

12   of sovereign immunity.  Instead it is a legal claim and the

13   waiver of sovereign immunity is supplied by the APA.  And

14   because it a legal claim, the privity requirement is not

15   applicable.

16        For this reason, it is not surprising that in the

17   *Executive Business Media* case and *Carpenter* case that I just

18   read for you, third parties challenged a settlement agreement

19   with the government and privity was not an obstacle.

20        Your Honor, turning to the substantive illegality of the

21   settlement agreement.  We have already touched on several

22   reasons why the agreement is unlawful, but I just want to make

23   clear that the agreement is unlawful, in part, because it

24   creates this blanket exemption from the Affordable Care Act

25   that -- as my colleague will discuss -- is not authorized by

```
 1   the Affordable Care Act but also because the Supreme Court has

 2   made clear in this case, Local 93, that parties who chose to

 3   resolve litigation through settlement may not dispose of the

 4   claims of a third party and may not impose duties or

 5   obligations on a third party without that party's agreements.

 6        Again, the federal government has said that hasn't

 7   happened here, and we completely disagree.  Our view is that

 8   this agreement will extinguish the ability of our clients to

 9   privately enforce their right to contraceptive coverage through

10   either ERISA or some other mechanism.  As long as this

11   agreement exists, it stands as an impediment to them being able

12   to enjoy the benefits of the right they are entitled to by law.

13        Second, the settlement defies the Supreme Court's

14   unambiguous instruction in Zubik and in Notre Dame's own case

15   to resolve legal challenges to the contraceptive coverage

16   requirement in a manner that accommodates the religious

17   exercise while at the same time ensuring -- ensuring that women

18   covered by the entity's health plans receive full and equal

19   health coverage, including contraceptive coverage.

20        This is not merely a suggestion.  It is a direction.  That

21   whatever resolutions defendants reached, it was required to

22   ensure that plaintiffs received the coverage they are entitled

23   to by the ACA.

24        However, federal defendants have done just the opposite.

25   They are allowing Notre Dame to block its students from
```

 1   receiving coverage through the accommodation process.

 2       Moreover, the settlement agreement is also illegal because

 3   it is trading away the constitutional rights of my clients in

 4   defiance of DOJ internal guidance.  I will say to the point

 5   about raising new claims that we didn't plead, we knew DOJ

 6   internal guidance is simply like case law.  It interprets the

 7   law as it exists.  We're not bringing a new claim.  We pled in

 8   the complaint that the settlement agreement violates the law,

 9   and the DOJ internal guidance that we are citing to is

10   interpreting that law and why what is going on here is

11   unlawful.

12       And so the ways that it's unlawful, as explained by this

13   DOJ guidance, is that it trades away the constitutional rights

14   of parties, which the Moss memo very specifically says agencies

15   cannot do.  And further, it purports to bind future

16   administration.  It cabins that future discretion which, again,

17   as the Meese memo says, it's improper and is not what DOJ

18   should be doing when it enters into settlement agreements.

19       And as my colleague Alison will discuss, because it also

20   defies the ACA and is not authorized by RFRA and violates the

21   Fifth and First Amendments of the constitution, it is illegal

22   for those reasons as well.

23       Unless Your Honor has any further questions on the

24   settlement illegality, I would be happy to turn to the

25   procedural APA claim now.

```
 1              THE COURT:  Let's take about a 10-minute break before
 2    you do.
 3              MS. BANKER:  Okay.  Thank you.
 4         (A recess was had at 11:20 a.m.)
 5         (The following proceedings were held in open court
 6         beginning at 11:29 a.m., reported as follows:)
 7              DEPUTY CLERK:  All rise.
 8              THE COURT:  Ms. Banker, do you want to continue
 9    there?
10              MS. BANKER:  Your Honor, before we get into the
11    procedural APA claim, I did want to make a point about the
12    Deotte case that opposing counsel raised.
13         So, yes, that was decided, I think, just last week.  To be
14    clear, this wasn't a nationwide injunction.  It was a
15    nationwide class.  And the class members are as yet
16    unspecified, but more importantly --
17              THE COURT:  He certified a class?
18              MS. BANKER:  He certified a class and issued an
19    injunction on a class-wide basis.
20         So I think the most important thing to know is that class
21    is for employers, and the student that we present in that case
22    would not be covered by that injunction, number one.
23         Number two, the State of Nevada had tried to intervene in
24    that lawsuit, and the intervention motion was just never
25    granted.  So at this point, I don't know what the next steps
```

```
 1    are.  I imagine there will be an appeal of some sort, so that

 2    case is yet to be sorted out.  It is by no means a final

 3    determinant about what's going on in these cases.

 4            THE COURT:  This is an absolute mess, right?  It's a

 5    mess.

 6            MS. BANKER:  There is a lot going on, Your Honor.

 7    There is a lot going on, but currently speaking, our clients

 8    are suffering concrete harms from what's going on.

 9            THE COURT:  It's very frustrating as a lower court

10    judge to -- it just seems to me that it was the parties'

11    obligation to force an answer from the Supreme Court.

12            MS. BANKER:  That's right.

13            THE COURT:  What's done is done, and instead we have

14    this -- I don't understand it.  Go ahead.

15            MS. BANKER:  But instead what the government did is

16    they settled all the cases and just stopped defending

17    litigation entirely writ large, which is why we think this is

18    just an abdication of their responsibility to enforce rather

19    than undermine the Affordable Care Act.

20            THE COURT:  Thinking they're buying peace in

21    litigation and here they are in Indiana on another lawsuit.

22            MS. BANKER:  Right.

23            THE COURT:  And probably more to come.

24            MS. BANKER:  And that goes to show that this wasn't a

25    discretionary decision of allocating resources in this or that
```

1   litigation.  They just didn't defend at all.

2            **THE COURT REPORTER:**  I'm sorry.  You need to please

3   slow down.

4            **THE COURT:**  Yeah.  I mean, all of you guys, you speak

5   so fast it's very hard -- you guys understand this stuff so

6   much better than we do.  And, you know, trying to process this,

7   it's hard.  It really is.

8            **MS. BANKER:**  My apologies.  I'm a fast talker anyway,

9   so I will slow down.

10       So turning to the procedural APA claim.  Federal

11  defendants issued the rules initially as procedurally defective

12  interim final rules and then this error infected the final

13  rules as well.  And this is under the standard set forth by the

14  D.C. Circuit.  Notwithstanding what federal defendants claim,

15  the solicitation of post-promulgation comments does not cure

16  this defect.

17       First, the interim final rules could only have been issued

18  where Congress had expressly stated that the APA was

19  inapplicable or where there was good cause, which is a very

20  narrow exception.  It applies to limited emergency situations

21  or routine and inconsequential rules and every Court to

22  consider the issue, including the Ninth Circuit, the Northern

23  District of California, and the Eastern District of

24  Pennsylvania twice, have held that federal defendant's issuance

25  of rules of IFRs failed this test.  There was no emergency, and

1   the significant public outcry over these rules really

2   illustrates that they are anything but routine.

3        In addition, the Eastern District of Pennsylvania recently

4   held that the final rules are also procedurally infirm,

5   notwithstanding the solicitation of post-promulgation comments.

6   The Eastern District of Pennsylvania held that "The failure to

7   comply with the APA's notice and comment requirements when

8   issuing the IFRs fatally tainted the final rules such that the

9   issuance of the final rules violated the APA."

10        And this is under a standard that the D.C. Circuit has

11   consistently reiterated, which is that when an agency foregoes

12   notice and comment the resulting rules are presumed invalid.

13   The presumption can only be rebutted if the government -- not

14   the plaintiffs -- if the government makes a compelling showing

15   that it has kept an open mind.  The burden is on the government

16   and not on the plaintiffs.

17        The Third Circuit has also held, as the Eastern District

18   of Pennsylvania phrased it, that "There is a deep skepticism

19   towards the curative powers of post-promulgation notice and

20   comment procedures."  And in that circuit, the presumption of

21   invalidity simply cannot be rebutted.  In other words,

22   post-promulgation comments cannot cure the initial procedural

23   defect.

24        Your Honor, the federal defendants have discussed a case

25   in the Seventh Circuit that is entirely inapposite.  The

```
 1    Seventh Circuit has not addressed whether an agency's
 2    solicitation of post-promulgation comments after issuing an
 3    interim final rule that failed to comport with the APA's notice
 4    and comment requirements can cure the APA violation.  The
 5    single case they rely on is inapposite because it involved a
 6    very particular provision of the Clean Air Act in which
 7    Congress explicitly shifted the burden onto the plaintiffs to
 8    prove that the regulation at issue would have been
 9    substantively different had the EPA engaged in notice and
10    comment.
11         So they changed it from requiring the government to show
12    an open mind to requiring the plaintiffs to show actual
13    prejudice, which is an entirely different standard.  No similar
14    provision is at play here.
15         So under the APA, at best, the government has the burden
16    of proving that it's mind remained open.  At worse,
17    solicitation of post-promulgation comments simply cannot cure
18    the procedural defect at all.  Here the plaintiffs have
19    actually --
20              THE COURT:  What would they do in the case where they
21    screw up and so there's a defect in the procedure?  What are
22    they supposed to do?  How do they address that?
23              MS. BANKER:  Sure.
24         The way they could have done it here, but they didn't, is
25    to invalidate the IFRs, issue a new notice of proposed rule
```

1   making, and go to the comment process.

2          THE COURT:   But isn't that what they did to get to

3   the final rules?

4          MS. BANKER:   No, they kept the interim final rules in

5   effect, but so egregiously, after doing that, they took actions

6   immediately thereafter to entrench their policy decision.   In

7   fact, rather than keeping an open mind, they started executing

8   settlement agreements relying on and further entrenching the

9   rules just starting a week afterwards, a week after

10  promulgating the interim final rules.

11      They refused to defend litigation challenging the ACA

12  contraceptive coverage requirement in court while they

13  vigorously defended the IFRs at the same exact time they were

14  purporting to consider comments on those rules.   In addition,

15  they started the process of implementing the forms for the new

16  optional accommodation.

17      And so, Your Honor, even though the plaintiffs don't have

18  the burden, even though the burden is on the government to keep

19  an open mind, we actually have a lot of evidence here that they

20  did not have an open mind.   All of these things which we have

21  pled in the complaint show that.

22      The policy reasons behind this are strong because if

23  agencies can cure their procedural APA violations by issuing

24  rules first and then seeking comments later, the exception will

25  swallow the rule and the APA's notice and comment requirement

1    becomes meaningless.  It's precisely to prevent agencies from

2    acting first and thinking later that these requirements exist.

3         And, you know, this is exactly some of the policy reasons

4    animating the Court's decision in Pennsylvania to say, "No,

5    these final rules were procedurally ineffective.  They are also

6    infirm because the interim final rules were also infirm."

7         In fact, I think a quote from the Pennsylvania Court is a

8    little bit helpful.  What they said is that "Participants are

9    less likely to influence agency action in later stages of the

10   agency decision-making process and this is especially the case

11   where an agency has already issued interim final rules which

12   suggests it has decided what federal policy should be.

13   Post-issuance commentary does not ameliorate the need for

14   notice and comment because by the time agencies issue interim

15   rules they are less likely to head to public input.  Last,

16   permitting post-issuance commentary carte blanche would write

17   the notice and comments out of the APA."

18        Your Honor, unquestionably federal defendant's mind was

19   made up, and it's unsurprising then that the rules are

20   materially and functionally the same.  Accordingly, as the

21   Eastern District of Pennsylvania already held, the final rules

22   are fatally tainted by the IFR's procedural infirmities and

23   must be set aside.

24        Your Honor, I will just finish by saying that the

25   settlement agreement is both reviewable and it is unlawful and

```
 1   the final rules are procedurally infirm.  And my colleague,

 2   Alison, will explain more why the rules are also substantively

 3   unlawful and violate the constitution.

 4               THE COURT:  Thank you.  Thanks, Ms. Banker.

 5           MS. BANKER:  Thank you, Your Honor.

 6               THE COURT:  Ms. Tanner.

 7           MS. TANNER:  Good morning, Your Honor.  Alison Tanner

 8   for plaintiffs.

 9       As previously explained, I will be addressing the

10   subjective APA violations and the constitutional claims here.

11       Now, federal defendants have traded away the plaintiffs'

12   rights and have done so in excess of their statutory authority,

13   arbitrarily and capriciously, and in violation of federal law

14   and the constitution.

15       Turning first to plaintiffs' subjective APA claims.  We're

16   treading little new ground here, Your Honor.  Two federal

17   district courts have already held that the plaintiffs' states

18   [verbatim] are likely to succeed on the merits of their claim

19   that federal defendants did not have the authority, either

20   under the ACA or RFRA, to create these rules.

21       First, the defendants' proposed interpretation of the ACA

22   is simply outside of the universe of Chevron because what they

23   are interpreting here, or proposing to interpret, was not

24   delegated to them.  Both of the federal district court

25   decisions already decided here have rested on a fundamental
```

 1    principle of administrative law which is that federal agencies

 2    do not have the authority to act unless and until they are

 3    conferred the power to do so by Congress.  And both of those

 4    courts held that the ACA specifically designates who must

 5    provide the comprehensive women's preventative healthcare

 6    services, and nowhere in the ACA does it delegate to the

 7    agencies any authority to create exemptions from the clearly

 8    defined category.

 9         So if we look at the ACA itself, it says that all

10    nongrandfathered group health plans and health insurance

11    issuers shall provide coverage for comprehensive women's health

12    services as provided for in comprehensive guidelines created by

13    HRSA.  And so that speaks plainly that the category of who must

14    provide is all nongrandfathered group health plans and health

15    insurance issuers.  And when a federal law creates the

16    authority to give meaning to what is occurring here, what

17    constitutes women's preventative healthcare, it does not

18    typically grant authority to create exemptions from those laws.

19         And so what HRSA did is they filled in the blank of what

20    women's preventative healthcare, was and then now with these

21    rules, HHS is trying to carve out who.  But there is simply

22    nothing in the statute that grants them the authorization to do

23    so.

24         The federal agencies are --

25              THE COURT:  But this can't be any broader than what

1   they are asking HHS to do.  I mean, the language of the

2   statute, not surprisingly, is extremely broad; and they are

3   delegating to HHS to put the details in there.  Why is that not

4   implicit in that that exemption could exist?

5          MS. TANNER:  The language of the statute delegates to

6   HRSA the authority to determine broadly what constitutes

7   women's preventative healthcare, what is necessary, and HRSA

8   identified 10 different services that were essential.  But the

9   statute is not broad in terms of who must provide that

10  insurance coverage.  That is clear within the statute; it is

11  all nongrandfathered group health plans and health insurance

12  issuers.  There's nothing within there that suggests that the

13  agencies have the authority to create new exemptions there.

14      And, Your Honor, defendants try to stretch this phrase

15  within the statute "as provided for" to give them the authority

16  to grant these exemptions.  But this interpretation deserves no

17  deference because it is contrary to the plain meaning of that

18  phrase within the context of this statute because here in this

19  particular subsection of the preventive health services

20  statute, uniquely, here, the comprehensive guidelines simply

21  have not been created yet.  And so "as provided for" means

22  nothing more than the comprehensive guidelines would be

23  provided at a later date by HRSA.

24      To sharpen this point, I can provide you with a

25  hypothetical.  Imagine that Congress created a statute that

1    says, "All cars must have seat belts that meet certain

2    specifications, including any additional specifications as

3    provided for in guidelines drafted by the seat belt safety

4    administration."

5        So if the seat belt safety administration issued

6    guidelines that exempted red cars, that would not plausibly be

7    an exercise of the authority delegated to them by Congress.

8    Rather, that would be the seat belt safety administration

9    replacing their judgment for Congress's judgment that all cars,

10   red cars, green cars, and blue cars must include safe seat

11   belts.  That's exactly what's occurring here, Your Honor.

12       Now, defendants attempt to point to a myriad of other

13   textual inferences in order to construct statutory authority

14   under the ACA, but this runs counter to yet another important

15   principle of administrative law, which is that Congress knows

16   how to speak plainly.  If Congress had intended to grant the

17   agencies here the authority to create exemptions under the ACA,

18   it simply would have said so, but it did not.

19       Further, Your Honor, even if the agencies were granted

20   somehow under the ACA the authority to create exemptions --

21           THE COURT:  So was it permissible for them to create

22   exemptions for churches?

23           MS. TANNER:  Your Honor, the exemptions for churches

24   are wholly different.

25           THE COURT:  I understand that, but if I accept you at

 1   face value, even that would have been improper.

 2              MS. TANNER:   Rather, Your Honor, as the agencies

 3   addressed in the Federal Register announcing the church

 4   exemption, their justification there was based on the special

 5   constitutional protections that are provided to churches to

 6   prevent governmental interference with their internal

 7   governance.  And that's why --

 8              THE COURT:   This is just a cousin of that?

 9              MS. TANNER:   Rather, Your Honor --

10              THE COURT:   Go ahead.

11              MS. TANNER:   I'm so sorry.

12       The agencies here do not suggest that they have

13   constitutional authority to create these.  They cite to two

14   specific statutes, the ACA and RFRA, and that's why the church

15   exemption is wholly of a different kind.  The authority there

16   is through that special protection provided under both of the

17   religion clauses.  And plaintiffs' claims here will simply have

18   no effect on the constitutional rights of churches.

19              THE COURT:   No, I understand that.  My point is that

20   if I accept you at face value, then it would have been improper

21   for them to even come up with a church exemption.

22              MS. TANNER:   That, again, is not what plaintiffs are

23   arguing because there is this separate -- wholly separate

24   authority which is the doctrine of constitutional law as shown

25   in *Amos*.

```
 1          THE COURT:  I thought it's RFRA that led to the
 2    church exemption.
 3          MS. TANNER:  No, Your Honor, that is simply not what
 4    the government's position was up until this series of
 5    litigation.  You can look to -- and I believe it is cited in
 6    our brief -- but the actual Federal Register announcement in
 7    2011 for the church exemption does not claim any authority
 8    under RFRA.  Rather, it looks specifically to these
 9    constitutional concerns.
10          Further, Your Honor, I would just note that the church
11    exemption applies to all houses of worship and not just to
12    those that have religious objections to contraception, and
13    that's how we know, also, that RFRA is not the authority for it
14    because RFRA only applies to, you know, religious objectors
15    with a substantial burden on their religious exercise, as I
16    will turn to shortly.
17          Moving back, I just want to address that the exemptions
18    here are contrary to the purpose of the Women's Health
19    Amendment, which is the amendment that is at issue today.  So
20    when the Women's Health Amendment was passed by Congress, their
21    specific purpose was to ensure that women were not paying more
22    out of pocket than men for healthcare as they had prior to the
23    ACA.
24          But as the Northern District of California has already
25    held, the exemptions here transform the contraceptive coverage
```

 1   requirement from a legal entitlement to a wholly gratuitous

 2   benefit that is subject to an employer's discretion and thus

 3   puts women back in that unequal position.  And we should look

 4   specifically to what Notre Dame has done here, which I don't

 5   believe has been mentioned yet, Your Honor.

 6        Notre Dame says it objects to certain types of IUDs and

 7   the emergency contraception, and, therefore, those are wholly

 8   not covered by their plan.  But, additionally, Your Honor,

 9   Notre Dame has imposed a copayment for all other forms of

10   contraception.  This runs counter to the express commands of

11   the ACA that there not be any cost-sharing requirements for

12   preventive women's health services, but Notre Dame, under the

13   settlement agreement -- and, I mean, they haven't really

14   explained the source of authority for this -- they are imposing

15   copayments on women in contravention of the Women's Health

16   Amendment.

17        Also it's important to note because the two other district

18   courts have addressed this issue, found it compelling, that

19   Congress considered sweeping exemptions from the ACA and

20   rejected those exemptions.  That was discussed in *Hobby Lobby*

21   at footnote 30, so Congress already considered the issue of

22   whether to grant religious exemptions here and refused to do

23   so.  So here the federal agencies have replaced their judgment

24   for Congress's.

25        Now, turning to RFRA, Your Honor.  RFRA does not authorize

 1    much less require these rules.  RFRA's statutory protections

 2    are only triggered when its prerequisite has been met.  So,

 3    first, the government must have imposed a substantial burden on

 4    religious exercise.

 5        And looking to the text of the interim final rules, the

 6    final rules, and the settlement agreement, the decision here to

 7    grant the religious exemptions was explicitly based on the

 8    federal agency's determination that the accommodation created a

 9    substantial burden.  So that's in paragraph 4 of the settlement

10    agreement, in the IFRs that's at 47,800, and in the final rule

11    that's at 57,546.  That is their interpretation.

12        But as you well know, most federal courts to have

13    considered whether the accommodation created a substantial

14    burden held that it does not.  And yet after these court

15    victories, the agencies completely reversed their position and

16    specifically premised the rules on their newfound conclusion

17    that the accommodation violated RFRA.  That conclusion is

18    wrong, and it is not entitled to deference from this Court.

19        RFRA does not dedicate to any specific agency the

20    interpretation of whether or not a burden is substantial.

21    Rather, as the Seventh Circuit held in *Korte v. Sebelious*,

22    which is one of those cases leading up to *Hobby Lobby*, and in

23    that case the Seventh Circuit held that whether a burden is

24    substantial is a legal question and RFRA specifically provides

25    for judicial review.

1    And the government's legal conclusion here is wrong as a

2  matter of law because the facts, Your Honor, simply have not

3  changed since this Court first ruled on that issue in 2013.

4  Since the Seventh Circuit's two decisions in *Notre Dame* I and

5  II and since those eight -- or sorry -- seven other federal

6  circuit courts of appeals decisions.

7    While the Supreme Court in *Zubik* vacated and remanded

8  those decisions, it did not reverse the reasoning of those

9  decisions or even attack the underlying reasoning.  And,

10  therefore, we think this Court should look to the Third

11  Circuit's decision in a case called *Real Alternatives* that was

12  post-*Zubik*.  There, the Third Circuit reaffirmed its pre-*Zubik*

13  decision in *Geneva College*, in which that Court agreed with

14  this Court and the Seventh Circuit that the accommodation did

15  not create a substantial burden.

16    And the Third Circuit specifically reasoned that because

17  the vacating and remanding did not attack its earlier

18  reasoning, that earlier reasoning was at the very least highly

19  persuasive.  And that is also what the Northern District of

20  California concluded in its recent decision that RFRA did not

21  authorize these rules.  And so the facts have not changed and

22  therefore Your Honor's reasoning should still hold.

23    The accommodation does not compel Notre Dame to modify its

24  behavior in a way that is contrary to its religious beliefs

25  but, rather, merely requires it to provide notice to its

 1   third-party administrator and health insurance issuer of its

 2   desire not to cover contraceptives just as Notre Dame had done

 3   prior to the passage of the ACA.

 4       Whether Notre Dame now characterizes the resulting

 5   contraceptive coverage that is required by law after that

 6   notification, the results of their "authorization," as they

 7   have said previously, are now as a result of the "hijacking" of

 8   their plan matters, not because the specific text of the

 9   regulation here, 45 CFR 147.131, states that the accommodation

10   excludes contraception coverage from Notre Dame's group health

11   plan.  It requires the third-party administrator to segregate

12   all of the premium revenue, and it requires that third-party

13   administrator to provide separate notice of anything having to

14   do with that contraceptive coverage.

15       Further, when --

16           THE COURT:  Who pays for it?

17           MS. TANNER:  So there's two processes at issue here

18   because the employee -- or employer plan is self-insured so

19   there the third-party administrator is the one who is paying.

20   Whereas, with the student plan, that's through an Aetna plan

21   and there Aetna gets reimbursement from the government.

22           THE COURT:  Does the third-party administrator get

23   reimbursement from the government?

24           MS. TANNER:  The third-party administrator is --

25           THE COURT:  In the self-funded plan situation.

1         **MS. TANNER:**  Yeah.  The third-party administrator

2    receives money from the individual marketplace, and

3    Your Honor's opinion in 2013 explains this very well.

4         **THE COURT:**  Well, yeah, it was confusing though.

5         **MS. TANNER:**  Yes.

6         **THE COURT:**  I wasn't quite sure I had that right,

7    frankly, to be candid about it.  But I don't really understand

8    the mechanics of how the third-party administrator is made

9    whole without it having some impact on the underlying provider,

10   in this case, Notre Dame.

11        **MS. TANNER:**  The only thing relevant to the Court's

12   analysis here is that it is in no way coming out of Notre

13   Dame's pocket as provided.

14        **THE COURT:**  Costless to them?

15        **MS. TANNER:**  Yes, Your Honor.

16       And also when Notre Dame was complying with the

17   accommodation, so prior to the 2018/2019 school year, those on

18   the student plan would receive a wholly separate card for their

19   contraceptive coverage, so they even, you know, had a different

20   than from their regular Notre Dame health insurance plan, a way

21   to receive that contraception coverage.

22       And as this Court previously held, it is simply not Notre

23   Dame's prerogative to dictate based on its religious beliefs

24   what healthcare services the government may require from third

25   parties.

 1         So Judge Posner's decision in *Notre Dame* I is particularly

 2    instructive here.  He analogized it to a religious objector to

 3    war who is able to be -- is able to refuse to engage in

 4    fighting, but that religious objector is not able to block the

 5    government from then going ahead and selecting another

 6    individual to fight in his stead.  This is because RFRA

 7    requires that an accommodation of certain religious beliefs

 8    does not mean that the accommodated can dictate how the

 9    government then achieves by substitute measures its overall

10    aim.

11         Likewise, this is in line with the Supreme Court's

12    decision in *Bowen v. Roe* in which the Supreme Court held that a

13    Native American father was not entitled to dictate based on his

14    religious objection how the government would use Social

15    Security numbers in its internal administration.

16         So because there is no substantial burden here created by

17    the accommodation process and -- meaning, that RFRA's statutory

18    prerequisite simply has not been met -- there is no RFRA

19    authorization, let alone requirement, for the religious

20    exemptions here.

21         Therefore, the Court need not reach the compelling

22    interest by least restrictive means analysis, but if it were

23    to, the accommodation would pass that test.  That is what the

24    D.C. Circuit and Eleventh Circuit previously held.  In the D.C.

25    Circuit, that was *Priests for Life* and the Eleventh Circuit it

 1   was *Eternal World Television Network.*

 2        The defendant's assertion here that the federal agencies

 3   have the last say on what constitutes a compelling governmental

 4   interest simply cannot be abided because this would allow the

 5   federal agencies to say if they did not like or if they did not

 6   think a statutory regime was important they could refuse to

 7   enforce it no matter what Congress said, and this would simply

 8   grant outside authority to the federal agencies.

 9        **THE COURT:**  I understand these arguments.

10   Can you just briefly address the constitutional claims.

11        **MS. TANNER:**  Absolutely, Your Honor.

12        **THE COURT:**  I'm running out of time here.

13        **MS. TANNER:**  Of course.

14        And I would just note that the compelling interest in

15   addition to the, you know, women's equality is also in

16   preventing the Establishment Clause violation that occurs under

17   these rules which is forcing third parties to bear the harms

18   of -- you should be very glad that you're telling me to skip

19   over all of this -- that is forcing third parties to bear the

20   harms of Notre Dame's religious beliefs.

21        So under the Establishment Clause, that is simply a

22   well-settled rule.  The Court should turn to *Estate of Thornton*

23   *v. Caldor* as a prior statement of it.  There the Supreme Court

24   invalidated a law that required employers to accommodate

25   workers' religious days of rest in all instances without

1   exception because that law imposed on employers the costs of

2   having to find someone or hire enough staff to fill whatever

3   day of rest another employee required, and it also required the

4   other employees the inconvenience of having to fill in those

5   positions.

6       The Supreme Court held in *Cutter* V Wilkinson that RLUIPA,

7   which is RFRA's sister statute, must be interpreted so as to

8   take into account these third-party harms in order to comply

9   with the Establishment Clause.

10      So here, Your Honor, the exemptions here force plaintiffs

11   and other women to bear the costs of Notre Dame's religious

12   objections either by paying out of pocket for their

13   contraception or to also pay now copays under the regime that

14   Notre Dame has established.

15      And in addition to those financial burdens, it also, for

16   many women, will limit their choice of contraception because

17   they must also pay for the medical advice that they receive

18   about which contraception is right for them.

19      And so if they are experiencing side effects from a type

20   of contraception, they may be deterred from returning to the

21   doctor to see if there's a different form that's better for

22   them because, again, they would have to pay out of pocket for

23   that additional doctor's visit.

24      The Establishment Clause issue here is also that there is

25   no substantial burden on Notre Dame's religious exercise under

1    the accommodation and thus this grants Notre Dame a wholly

2    gratuitous new right on the basis of its religious beliefs, and

3    that is an impermissible promotion of religion.  Indeed, the

4    rules single out this particular religious belief for extremely

5    favorable treatment that is provided to no other request for an

6    accommodation because under the rules there is no test for the

7    sincerity of a religious belief.  There is no test for the

8    nexus between what is objected to and what is excluded from the

9    plan, and there is no test for the burden.  And so this is a

10   unique, special, and extremely favorable treatment of the

11   religious beliefs at issue here.

12        Turning to the substantive due process claim.  We can rest

13   on the papers except to say that *Harris v. McRae* is just not

14   controlling here because the government already wishes to

15   provide the subsidy, and the government action here is

16   authorizing Notre Dame to then intervene and block that

17   provision.  And so that's interference that implicates the

18   substantive due process pleas of plaintiffs and other women.

19        And further, I just would like to, again, rest on the

20   papers on the equal protection except to address one statement

21   made by government counsel, which is that the Equal Protection

22   Clause actually can apply even when it is a small class or

23   single individual who is being discriminated against when that

24   discrimination is based on a suspect classification.

25        Thank you, Your Honor.

1        **THE COURT:**  Thank you.

2        Mr. Dick, I will give you just a couple of minutes to

3   reply.

4        **MR. DICK:**  Thank you, Your Honor.

5        Thanks very much, Your Honor.  I know we've kept you here

6   long enough already, so I will keep it brief on just a few

7   points.

8        Starting on the settlement.  We do think it's well within

9   Your Honor's discretion to hold off on deciding that.

10  Plaintiffs don't dispute this Court has the discretion to wait

11  until the final rules are resolved.

12       As you noted, they haven't moved for preliminary

13  injunction.  They haven't asserted that they're suffering any

14  irreparable harm.  We think the reason for that, frankly, it's

15  not in the record, but the harms they're facing right now we

16  think would not be sufficient because they effectively are

17  already getting all the coverage they need.

18       If you look at the allegations in their complaint, my

19  understanding from the University's health plans is that they

20  can get oral contraceptives for a $5 copay per month.  Weigh it

21  against harms to Notre Dame forcing it to violate its religious

22  beliefs, we don't think that that balance is particularly

23  close.

24       And with respect to the two plaintiffs they discuss who

25  have IUDs, it's not clear whether they still need to get them

1   or they already have them.  Even if they did need to replace

2   them, they last for three to six years, and we think at the

3   worst-case scenario, the cost of that would average out to less

4   than $20 a month over the life of that device.

5        So we just don't think there's any real emergency here.

6   They haven't alleged an impediment to actually being able to

7   get any of the services they want.  So we do think it would be

8   reasonable.  There's no crisis.  As you noted, this is a

9   gigantic mess across the country.  The Supreme Court is going

10  to have to resolve this.  So to do this in an orderly fashion,

11  to most efficiently use this Court's resources, and stay out of

12  the quagmire of weighing in on the settlement agreement.

13       To address that settlement briefly, I do want to emphasize

14  just how far out on a limb the plaintiffs would put Your Honor

15  to hold that this would be a reviewable settlement agreement.

16  We think it's quite clear that this is a nonenforcement

17  agreement and that this type of nonenforcement agreement is not

18  reviewable.

19       If you look at the settlement itself -- I was part of the

20  settlement negotiations.  I can tell you it has always been

21  understood as a nonenforcement agreement.  That's made clear

22  both in paragraph 2 and paragraph 4.

23       In paragraph 2, it does refer to --

24            THE COURT:  What's the distinction you are drawing?

25            MR. DICK:  So it does not affect the substantial

 1    rights of the plaintiffs if they want to bring claims.  It only

 2    says the government will not enforce the mandate or the

 3    regulations against Notre Dame.  It does not affect the

 4    substantial rights of the parties.  If the plaintiffs want to

 5    bring their own claims, they can bring those claims

 6    independently.

 7         Because what the settlement agreement clearly says is the

 8    government will treat the plaintiffs as exempt from the

 9    regulations, so that contemplates two different things.  There

10    may be regulations that require Notre Dame to provide the

11    coverage.  It just says the government will not enforce.  It

12    expressly says "enforce" in paragraph 4.

13         And in paragraph 2 it says, "The government agrees to

14    abide by the terms of the permanent injunction in *Zubik v.*

15    *Sebelious*."  If you look at that order that's cited, that order

16    specifically refers to "The government will not apply or

17    enforce the requirements in the regulations."  So we think it

18    was clear to everybody at the time that this agreement was just

19    that the government was not going to enforce the mandate

20    against the regulations.  The plaintiffs have a private right

21    of action they could assert, and they just can't get the

22    government to enforce it on their behalf.

23         So we think in that type of situation *Heckler* makes quite

24    clear that you can't have judicial review of that type of

25    nonenforcement agreement.  The contrary argument made by the

 1    plaintiffs --

 2           THE COURT:  So I guess -- explain how that would

 3    work.  Let's say in the future an individual plaintiff would

 4    want to enforce their rights under some contraceptive mandate.

 5    How would they go about doing that?

 6           MR. DICK:  They would file a private cause of action,

 7    a private claim --

 8           THE COURT:  Against who?

 9           MR. DICK:  Against Notre Dame under ERISA saying

10    there's a regulation that says you have to --

11           THE COURT:  How does a student do it under ERISA?

12           MR. DICK:  So it's not clear to us whether students

13    have a private claim under ERISA.  If not, that's Congress's

14    choice not to grant them that right, and it is sometimes the

15    case that there is no private right of action to assert a claim

16    like that.  Sometimes if you're a private party, you just have

17    to rely on the government's enforcement discretion.  And

18    sometimes --

19           THE COURT:  They can't here.

20           MR. DICK:  Sometimes the government will decide not

21    to enforce a law to benefit a third party just like in *Heckler*

22    where the parties were going to be executed by drugs that they

23    claimed from unlawful, and the government said, "We're not

24    going to enforce the law that you think makes those execution

25    drugs unlawful."  The Supreme Court said, "I'm sorry.  Even

```
 1    though it would benefit you, you don't have the right to sue to

 2    make the government enforce a law that will benefit you."

 3         That happens every day with all kinds of laws.  It happens

 4    with murder laws.  It happens with obstruction of justice laws.

 5    Lots of people would like to see those laws enforced, and

 6    sometimes the government decides not to bring the prosecution,

 7    and parties who would benefit from enforcement nonetheless

 8    can't enforce the government to enforce the law.

 9              THE COURT:  But the point remains then -- you started

10    by saying that they retain a private right of action, but they

11    really don't retain a private right of action.

12              MR. DICK:  Well, they retain a private right of

13    action to the extent Congress gave them one.  We think it's

14    clear that they had that private right of action --

15              THE COURT:  Which is to say that they have no private

16    right of action?

17              MR. DICK:  With respect to the faculty and staff

18    plan, they clearly do.

19              THE COURT:  That I understand.

20              MR. DICK:  With respect to the student plans, it's

21    not clear whether they could sue the insurance company, whether

22    they could sue the University.  We haven't taken a definitive

23    position on that because we don't know.  But even if they don't

24    have a private right of action, my point was it's still not the

25    case that just because you don't have a private right of action
```

1    you can compel the government to enforce the law to benefit

2    you.

3              **THE COURT:**  I understand that.

4              **MR. DICK:**  Because in *Heckler* there was no private

5    right of activity, and they still couldn't compel that type of

6    thing.

7         Just briefly on the two cases they mentioned, *Executive*

8    *Business Media* and *Carpenter*.  Those are addressed at pages 9

9    and 10 of our reply brief.  We think they're clearly apposite

10   because those involved substantive regulations and actions that

11   changed people's rights.  It didn't just say, "We're not going

12   to enforce."  Neither was a nonenforcement case.

13        In *Executive Business Media*, the government actually

14   entered a settlement agreement that granted a no-bid contract

15   to someone, and there were regulations that specifically said,

16   "You have to follow competitive bidding rules."

17        Likewise in *Carpenter*, the government entered a settlement

18   that granted a disputed property right to someone, and there

19   were regulations that said, "You have to do other things when

20   you're renting a property."

21        The relevant point here is that there's no regulation or

22   statute that regulates how the government is going to enforce

23   whatever the mandate may be.  And so in that type of situation,

24   when there's no law saying how the government or whether the

25   government needs to enforce anything, there's just nothing for

1    the Court to review, and so that kind of decision is entrusted

2    to executive discretion.

3        **THE COURT:**  So do you take the position that if three

4    years from now there's new regulations that go back to the old

5    paradigm that your client is inoculated by virtue of this

6    settlement agreement?

7        **MR. DICK:**  Well, Your Honor, we take the position

8    that the government agreed not to enforce, and we think that if

9    the government did enforce it would be in violation of that

10   agreement.  And we would then fight with the government to

11   enforce, and there would be a dispute.

12       **THE COURT:**  That is to say yes.

13       **MR. DICK:**  Yes, that would be a dispute about what

14   the remedy is.  That's the same with any type of settlement

15   agreement private parties reach with the government all the

16   time, and we're quite confident we would win in a dispute about

17   that.

18       **THE COURT:**  Even if it was contrary to then existing

19   rulemaking?

20       **MR. DICK:**  Right.  Well, rulemaking is about the

21   substantive law, not about whether the government is going to

22   enforce.  So there can be a rule that requires something, but

23   the government may decide not to enforce that rule.  And we

24   think that this settlement agreement doesn't constrain the

25   government in what kind of rules it makes, but it does

1   constrain the government from enforcing against the particular

2   named parties here.

3              **THE COURT:**  Right.  Which is to say that if they

4   change the rules in 2021, you won't have to follow them.

5              **MR. DICK:**  That's our position, that the government

6   would not be able to enforce them against us.  We think the

7   plaintiffs would have a right to bring a private cause of

8   action.

9              **THE COURT:**  Why were these settlements -- there is a

10  backroom feel to this.

11             **MR. DICK:**  Yes, Your Honor.  We think the standard

12  process was followed here, so two points on that.

13      One, the plaintiffs in those cases, who we don't --

14             **THE COURT:**  I literally had no idea why these cases

15  just kind of disappeared.

16             **MR. DICK:**  Well, yes, Your Honor.  So, again, on the

17  two points.  Number one, the plaintiffs had not intervened in

18  this court.  They had filed a motion to intervene, but they

19  were not yet parties.  So I'm talking about the Jane Doe

20  intervenors.

21             **THE COURT:**  Right.

22             **MR. DICK:**  I don't mean to call them plaintiffs.

23  They were not plaintiffs.  They were not parties, and so there

24  was no ordinary course in which they would have been part of

25  those settlement negotiations for that reason.

```
 1        In addition, because the settlement agreement did not
 2   affect their substantive rights, it only affected the
 3   government's decision whether or not to enforce, we don't think
 4   it had any impact on any third-party rights, so there was no
 5   reason to bring them in.
 6        THE COURT:  Why would the government have kept these
 7   quiet?  That's what I don't understand.
 8        MR. DICK:  I'm not sure the government kept them
 9   quiet, Your Honor.  You'll have to ask the government for why
10   it proceeded in the way they did, but I don't think the
11   government refused to provide them in FOIA.  I think the
12   government didn't put out a press release and say, here you go,
13   but I think this was just done -- the justice department isn't
14   necessarily in the process of publicizing all of these, and it
15   was a settlement that settled out of court.
16        THE COURT:  My experience is totally different from
17   that.  Boy, they send out press releases all the time notifying
18   the public what's going on and what they're doing.  But I will
19   talk to your colleague here.
20        MR. DICK:  Sure.
21        I just have one more brief point on RFRA, which is -- I
22   want to emphasize why our primary RFRA argument here is
23   entirely consistent with Your Honor's previous view of the
24   accommodation, which is to say, even if you don't think the
25   accommodation imposes a substantial burden, we don't think that
```

1   matters here because there's nothing in any statute that

2   requires the accommodation to be imposed as a matter of

3   regulation much less enforced against any particular party,

4   right.

5        The accommodation was a completely discretionary executive

6   regulation that came about in response to what was perceived as

7   a substantial burden under the statute which the Supreme Court

8   recognized in *Hobby Lobby*.  The only statutory provision at

9   issue is the provision that says preventative care has to be

10  part of a health plan.  *Hobby Lobby* says that can't apply to a

11  religious objector, right.  That's the statutory burden.  And

12  once that's true, once there's an exemption that RFRA requires

13  from the statutory burden, which says you've got to provide

14  this stuff as part of your health plan and pay for it, right,

15  once there's an exemption required for that, the accommodation

16  is just a discretionary tool that the executive may choose to

17  adopt or may not choose to adopt.

18       But there's no colorable argument anywhere that the

19  accommodation is somehow required by any statute, and therefore

20  we don't see how it can be argued that giving an exemption from

21  the accommodation in any way violates any statute because the

22  accommodation is not required by anything in the first place.

23  It is completely a discretionary tool.

24       So what the Supreme Court said in *Hobby Lobby* was, you

25  know, there's this statutory requirement to provide the stuff

 1   as part of your health plan and pay for it.  That can't be

 2   enforced against a religious objector, and so there's a number

 3   of objective less restrictive means that the government could

 4   use.

 5        One of those might be the accommodation.  One of them

 6   might be to set up a different program where you subsidize

 7   contraception in some different way without having to get

 8   parasitic on the plan, on the health plan, of the religious

 9   objector at all.  You could set up Title X clinics, and we

10   think that's exactly what the government has done here.

11        And in particular, we think the only thing that they have

12   identified as Notre Dame not providing, which is emergency

13   contraception, this is the Plan B and ella, category of drugs

14   that can cause the destruction of a fertilized egg, which some

15   consider to be abortion, those are available at Title X

16   clinics.

17        There's a Title X clinic three miles from Notre Dame's

18   campus which anybody can go into.  And on the website -- it's

19   Olive Health Center -- it says, "We're not gonna turn away

20   anybody that cannot afford these.  Anybody can get these for

21   free if they need them."  And so we really, again, think

22   there's no impediment to access because federal funds go to

23   those Title X clinics.

24        It's like saying, you know, there's a liquor store down

25   the street that anybody can go to and get something for free,

1    but we're, nonetheless, going to require a Baptist or a Muslim

2    to provide liquor instead.  We think there's a way to do this

3    that respects the religious conscience of people who don't want

4    to have any part in providing and have an independent clinic

5    like that that's going to allow people to get access to it if

6    they need it.

7         I think that conflict is especially irreconcilable.  If

8    you look at the *Zubik* oral argument, Your Honor -- I would just

9    urge you if you haven't read that transcript -- I think the

10   solicitor general, which was under the previous administration,

11   made two key concessions there that seriously call into

12   question.  It did not concede the substantial burden under the

13   accommodation for two reasons.

14        One of them was that as an ERISA matter, once the

15   accommodation is invoked, the objectionable coverage is

16   actually provided as part of the same plan as the sponsor.

17   Because under a self-insured plan, the TPA has no authority to

18   provide anything other than what the sponsor authorizes and no

19   authority to provide anything other than as part of the plan.

20   That's just a feature of ERISA law.

21        So at least for self-insured plans like Notre Dame's, you

22   can't have a TPA providing something outside of that.  So

23   that's one point.  That's actually part of the same plan, and

24   we quoted that in our brief and cite to where the government

25   admitted that.

1        And the second point is that --

2            THE COURT:  There was an argument in the Ninth

3    Circuit that they were explaining to the Ninth Circuit the

4    exact opposite of that, that it is really a separate plan.

5            MR. DICK:  That's certainly not the case for

6    self-insured TPAs and --

7            THE COURT:  No, they were saying for self-insured,

8    like Notre Dame, where they have a TPA, that the TPA has to

9    establish -- "plan" is a term of art.

10           MR. DICK:  Correct.

11           THE COURT:  But speaking pragmatically, a separate

12   mechanism by which they provide this contraceptive wholly

13   separate from the underlying insurer.

14           MR. DICK:  Well, Your Honor, they call it separate in

15   certain places, but if you look at the concession in the

16   Supreme Court --

17           THE COURT:  I will have to read that.  I understand

18   the point.

19           MR. DICK:  -- it is part of the same plan.

20           THE COURT:  I appreciate that.

21           MR. DICK:  And the second thing is, as an ERISA

22   matter, also a third-party administrator is not authorized to

23   provide any coverage that the plan sponsor itself does not

24   effectively say is okay, does not authorize.  And so that's why

25   unless the University files the self-certification or the

1   notice that the regulations require, the TPA literally will not

2   have any authority or any obligation to provide that coverage,

3   right.

4       If Notre Dame just sat on its hands --

5           **THE COURT:**  This is the trigger point.

6           **MR. DICK:**  Correct.

7       And Your Honor's previous opinion said the TPA is required

8   to provide the coverage regardless.  Respectfully, that's just

9   incorrect as a matter of law because the TPA only acts as an

10  administrator, only provides the coverage that the University

11  says, "Here is the menu of our plan, TPA now provide it."

12      And so there's no obligation on the TPA, for example, just

13  under the regular statutory mandate.  There's no obligation on

14  the TPA.  There's an obligation on the plan sponsor, on Notre

15  Dame, to include this coverage as part of its plan; but if

16  Notre Dame said, "no" and sat on its hands, it would get hit

17  with massive penalties, nobody would provide the coverage, and

18  that's why we think it is really a trigger, and forcing Notre

19  Dame to do that really does make a difference whether it's

20  provided or not.

21      Your Honor, if there's no further questions, that's all I

22  have today.

23          **THE COURT:**  Thank you.

24          **MR. DICK:**  Thank you very much.

25          **THE COURT:**  Just a couple of minutes because I do

```
 1   have to run here, but I don't want to cut you off too much.

 2          MS. KOPPLIN:  Well, thank you, Your Honor, and I will

 3   try not to belabor anything you've heard a lot about already

 4   but there are a couple points that I wanted to make.

 5          THE COURT:  Sure.

 6          MS. KOPPLIN:  Just going in the same order that

 7   plaintiffs went, starting with the settlement agreement.  I

 8   mean, as you just heard from Notre Dame and from us, it's now

 9   very odd because plaintiffs are, essentially, taking an

10   interpretation of the settlement agreement that the parties

11   don't take, that is, that it has some effect on individual

12   substantive rights and then asking you to overturn it on that

13   basis.  And it's also just against a clear reading of the text.

14       They read you from paragraph 2.  The key language in

15   paragraph 2 is that the government will treat plaintiffs and

16   their health plans, et cetera, et cetera, et cetera, as exempt.

17   Everything that follows and the letters after paragraph 2 is

18   sort of a definition of what the policies are that it's going

19   to treat them as exempt from.  But that's the key kernel here,

20   is that what the government is going to do under the settlement

21   agreement is going to treat the signatories as exempt from

22   these certain policies.  So this has no effect on any other

23   private party's rights.  Whether they have them or they don't,

24   that remains the same before and after the settlement

25   agreement.  That's not being changed.
```

```
 1        There was some discussion of the fact that this is also a

 2   prospective agreement, that it's forward-looking.  Without

 3   going too far into that, I'll just say this whole question of

 4   what kind of a bargain was made to reach the settlement, what

 5   kind of things that both sides agreed to give up -- I mean,

 6   obviously, it's a better bargain to offer if you say, "I will

 7   not enforce this against you for one week versus I will not

 8   enforce this against you for a month versus if we create a new

 9   rule next month will I enforce that rule against you," that

10   that question of what was kind of brought to the table on both

11   sides is one that for the reasons previously discussed should

12   be committed to the executive branch's discretion in how to

13   settle a case, that kind of thing.

14        THE COURT:  What did the government get out of the

15   settlement agreement?

16        MS. KOPPLIN:  The end of the litigations.

17        THE COURT:  Oh, really?

18        MS. KOPPLIN:  Well, with -- it's the suits -- the

19   listed suits brought by Notre Dame and the other signatories of

20   the settlement agreement.

21        THE COURT:  There's no end to this.  You didn't get

22   anything that you bargained for in that regard.  I mean, you've

23   said that -- seriously -- that you guys wanted to buy peace.

24   That's nonsense.  That's complete nonsense.  That's why we're

25   here.
```

1          MS. KOPPLIN:  Well, in light of what a mess this has

2    become, I mean, I will just say, we see that as support for our

3    argument about why the agencies need additional leeway in

4    dealing with RFRA, because of the sort of impossibility of

5    threading a needle.

6          THE COURT:  Wouldn't it be easier to get this through

7    Congress?  I mean, that's the real answer.

8          MS. KOPPLIN:  Just moving on from that, this case is

9    so different than the cases that plaintiffs cite like *Executive*

10   *Business Media*.  In *Executive Business Media*, there was a

11   regulation that told the government, "Only assign these

12   contracts through a competitive bidding process," and the

13   government tried to enter into a settlement agreement but said,

14   "We're going to give you a contract without any competitive

15   bidding."

16       There's no analogous provision here, which would be if the

17   plaintiffs found something in the ACA that said, "Okay,

18   government, don't settle any cases in a way that lets people

19   not provide contraceptive."  There's just no such command about

20   how the government should settle litigation, and those cases

21   are all persuasive only, and so the Court should just consider

22   for whatever (indiscernible) discourse they have, which we

23   don't think is very much.

24       Finally, plaintiffs in the settlement agreement suggest

25   that there's some kind of usurpation happening of the executive

```
 1   function.  I think it's actually quite the opposite.  I mean,
 2   we cited a number of statutes in our brief that give discretion
 3   for controlling litigation on behalf of the United States to
 4   the Attorney General, and I think as you alluded to, that's
 5   part and parcel of it, is the decision when to settle
 6   litigation and that's part of the separation of powers in the
 7   other direction.  The president, who's elected by the people,
 8   gets to select the Attorney General, and that's the way that
 9   this process will be managed, not through the courts.
10       And I think at the very end of the settlement agreement --
11   I still don't understand necessarily --
12           THE COURT:  I totally agree with you on that.  That's
13   an important point.  But where it falls off the wagon is if,
14   you know, the White House changes again in 2021, you've
15   effectively prevented -- and the rules change again -- you've
16   effectively prevented these students and these folks from
17   benefiting from those new rules by virtue of the way it's been
18   settled.
19       I mean, am I wrong on that?
20           MS. KOPPLIN:  I mean, I don't want to go too far into
21   a hypothetical, what might happen in 20 years and what
22   regulations might exist then and who would be enforcing them
23   against --
24           THE COURT:  I'm just responding to your point -- and
25   I accept it and totally agree with it, by the way -- that
```

```
 1   that's the way the system works.  But why should it work
 2   prospectively like that?  That's troubling to me.
 3            MS. KOPPLIN:  I mean, I guess I'll just say I don't
 4   know too much about these issues.  I think they're also a
 5   little bit above my pay grade, but we discussed earlier these
 6   internal DOJ guidance that the plaintiffs brought in.  And I
 7   think we're kind of on the same page.  They're not really
 8   binding.  But I will just say the concerns that you mention are
 9   some of the same concerns that are discussed there, so it's not
10   that DOJ doesn't have guidance on this.  But as I mentioned,
11   DOJ has a process, and that process allocates discretion to
12   various people to make exceptions and to decide how to pursue
13   its objectives, and that process was followed here.
14        The last thing I'll say about the settlement agreement is
15   just that I think actually on the merits their arguments that
16   the settlement agreements violate the constitution or violates
17   the ACA are actually exceptionally weak for the same reasons we
18   discussed and for the kind of additional reason that the
19   settlement agreement is just a very strange vehicle.
20        She mentioned regarding the Equal Protection Clause you
21   can discriminate against a class of one.  Sure, you can
22   discriminate against a class of one.  My point was more I've
23   never heard of an equal protection case where the class was
24   sort of everyone who signed the settlement agreement is the
25   classification that we're using.
```

1    Turning to the final rules.  On the procedural point about

2    how the final rules were entered into, I think the key question

3    that you asked was, "Well, what were the agencies supposed to

4    do then?"  And I heard plaintiffs to say that the agencies

5    should have invalidated the IFRs and then began again.  There's

6    several problems with this.

7    The first and the biggest problem is that has no source in

8    the APA.  The APA contains no such requirement like "Thou shall

9    then invalidate this IFR" and then go forward.  And *Vermont*

10   *Yankee* says there is no federal common law for the APA.  So if

11   it's not in the APA, the Court should not be imposing those

12   restrictions on the agencies.

13   Finally, here, as a logical matter, the IFRs have been

14   enjoined nationwide several times over at that point, so it's

15   not clear what effect it would have had for the agencies to

16   also say, "Okay, we're also going to invalidate them."  They

17   were governing no one at the time that these comments were

18   being considered and at the time that the agencies were doing

19   this.

20   And the last thing I will point out on this question of

21   how the agencies considered the comments, in addition to the

22   fact that the *Steel Corps* case really is on point here.  It's a

23   different statute, but it really is the same analysis of what

24   do we look at to see whether or not the agencies considered

25   comments.  And the conclusion is that seeing their responses of

 1   the comments were written into the final rule is probably

 2   enough.

 3        But the final point is that the Eastern District of

 4   Pennsylvania case, which that opinion, the most recent one,

 5   plaintiffs generally like it a lot, and the judge did not agree

 6   with the government on very many points, but she did agree with

 7   us that the agencies were likely to show that they had

 8   successfully considered all of the comments when they went back

 9   to do the final rule.  So we think that's actually a really

10   important point, and the fact that she reached that conclusion

11   should carry a lot of weight.

12        Turning to the substantive issues about the rules.  It's

13   strange because plaintiffs are talking a lot like the church

14   exemption and the accommodation just don't exist.  And the

15   authority for those has to come from somewhere.  And the

16   question is, if it doesn't come from the ACA and it doesn't

17   come from RFRA, then where would it possibly come from?

18        I think I hear them to suggest now that this is somehow

19   related to *Amos*, but that really doesn't make sense.  In *Amos*

20   the Supreme Court was analyzing a statute that exempted

21   churches from Title VII to see if that statute satisfied the

22   establishment clause.  So it's not that *Amos* would provide any

23   separate authority somehow for entering into an exemption.

24        And on this question of our interpretation of the statute,

25   the language that was given to HRSA and to HHS was very broad,

1    and I don't think it's unusual to think that Congress would

2    have expected some kind of religious exemption to be made,

3    especially because the topic is contraception.  And

4    contraception is an area where there are a number of exemptions

5    and a number of religious accommodations.  There's the Hyde

6    amendment, there's the Church amendment, and now, I mean, the

7    one named for Frank Church, not the one we are talking about

8    with the churches and integrated auxiliaries.

9        It's just an area where Congress may have had a background

10   expectation, and it seems strange to me to suggest that our

11   interpretation is foreclosed and that Congress could never have

12   considered the agencies would be able to allow religious

13   exemptions here.  I think if the provisions were more specific,

14   maybe plaintiffs would have more of a point, but I think it's

15   kind of the opposite too in that if Congress had actually been

16   listing specific contraceptive services, Congress had been

17   listing, okay, sterilization services, that might have caused

18   Congress to pause and talk about religious exemptions itself

19   instead of just kind of saying, "Okay, this whole ball of wax,

20   HRSA, is for you to figure out."

21       Plaintiffs, of course, note that Congress rejected a

22   Congress amendment, but we don't know which way that cuts.

23   It's hard to draw any conclusions from that.  Perhaps Congress

24   rejected it because they wanted to see what HRSA was going to

25   do.  Perhaps Congress rejected it because they knew, hey, we

 1   have RFRA, which is this background norm telling the agencies

 2   not to violate -- not to impose substantial burdens on

 3   religious practice without a compelling reason, so we just

 4   don't really know what intent from Congress to draw from that.

 5       Turning to RFRA.  There is a lot of discussion of the past

 6   cases here and before the Seventh Circuit.  Now, of course

 7   those cases at the Seventh Circuit were ultimately vacated, and

 8   the entire chain was done on a pretty thin record.  I just -- I

 9   don't think it's quite as overwhelming as plaintiffs think it

10   is, especially since both the Seventh Circuit opinions were a

11   2-1 decision with a dissent.

12       Plaintiffs also are now trying to draw in cases from the

13   Third Circuit like this *Real Alternatives* case.  That case does

14   not say what plaintiffs say it says.  It did not reaffirm the

15   prior holding.  The part the plaintiffs are talking about is

16   actually dicta because the most recent version was not about

17   whether or not an employer was substantially burdened, so the

18   Court just couldn't have reached any holding about whether or

19   not employers were substantially burdened in that case, and, of

20   course, it's another out-of-circuit case.

21       Finally, just briefly turning to the constitutional

22   claims.  I think I'll just rely on what we previously said as

23   far as due process and equal protection goes, but to address

24   the Establishment Clause, they discuss here some of these

25   alleged burdens on third parties.

```
 1        Certainly, we agree that the Establishment Clause is a

 2   limitation the government has to follow.  But the Supreme Court

 3   has shown that there is a space in between the Establishment

 4   Clause and the ability to accommodate religious beliefs, and

 5   many of these accommodations that the Supreme Court has given

 6   the okay to in the past impose some burdens on third parties.

 7   It cannot be the case that there can be no incidental effect on

 8   someone else.

 9        Every time, let's say, that a church entity is given a tax

10   exemption, those taxes are collected from someone else, or

11   every time a church is allowed to fire its building engineer as

12   in Amos, that's an individual who was burdened by that

13   decision.  And all of the same reasons that applied in Amos

14   also applied here.

15        The Supreme Court said -- I think in footnote 15 -- it's

16   not really that the government is directionally burdening that

17   individual; it's that the government is removing its regulation

18   and allowing the church to decide what to do with him.

19        It's the same thing here.  The government is not

20   directionally burdening any woman's choice to use

21   contraceptives; it's just narrowing the burden that it places

22   on employers to provide subsidies for them.

23        So similarly, I think plaintiffs say that Notre Dame has

24   gotten some kind of a new right here that no one else is

25   getting, but this is exactly like every other religious
```

1    accommodation.  The Supreme Court in *Amos* says it's not that

2    we're giving religion some kind of a new right to discriminate;

3    we're just removing the government burden that was placed on

4    them.

5         For those reasons, we would ask that you dismiss, and

6    that's all that I have.  Thank you.

7              **THE COURT:**  All right, guys, I will take this under

8    advisement.  I'm going to get an opinion out to you as quickly

9    as I can.  I can't promise -- I have a lot to unpack here.  I

10   do very much appreciate the excellent advocacy.

11        Thank you.

12             **MS. BANKER:**  Thank you, Your Honor.

13        (A recess was had at 12:34 p.m.)

14   * * *

15        (End of requested transcript.)

16                         CERTIFICATE

17        I, Stacy L. Drohosky, certify that the foregoing is a true

18   and correct transcript from the record of proceedings in the

19   above-entitled matter.

20   Date:  August 20, 2019

21                                S/Stacy L. Drohosky
                                 S/STACY L. DROHOSKY
22                               Court Reporter
                                 U.S. District Court
23

24

25

**DEPUTY CLERK: [2]** 3/3 62/7

**MR. DICK: [58]** 3/12 4/16 5/4 5/11 5/16 6/11 7/1 7/3 7/20 8/20 8/24 9/15 9/17 10/25 11/4 11/7 11/22 12/1 12/16 13/15 13/17 13/20 13/23 13/25 14/16 14/24 15/5 15/7 15/9 15/14 16/4 16/7 84/4 85/25 87/6 87/9 87/12 87/20 88/12 88/17 88/20 89/4 90/7 90/13 90/20 91/5 91/11 91/16 91/22 92/8 92/20 96/5 96/10 96/14 96/19 96/21 97/6 97/24

**MR. KAIRIS: [3]** 3/10 4/3 27/5

**MR. MACEY: [1]** 3/17

**MS. BANKER: [44]** 3/24 42/17 42/19 43/10 43/15 43/18 44/19 45/1 45/18 45/21 46/13 46/17 47/20 48/3 49/9 51/5 53/12 53/19 54/6 54/12 55/2 55/5 55/13 56/9 56/15 56/21 57/21 58/8 58/13 58/15 58/23 62/3 62/10 62/18 63/6 63/12 63/15 63/22 63/24 64/8 66/23 67/4 69/5 108/12

**MS. GREEN: [1]** 3/20

**MS. KOPPLIN: [54]** 3/14 16/10 16/14 17/21 18/19 21/25 22/4 22/14 22/16 23/10 23/16 24/25 25/5 26/17 26/25 27/10 27/19 27/23 28/2 28/13 28/22 29/1 29/12 30/9 30/17 30/24 31/1 31/9 31/15 31/25 32/9 33/6 33/21 34/3 34/7 34/17 34/21 34/23 35/10 36/8 36/19 36/21 39/3 40/12 41/7 41/14 98/2 98/6 99/16 99/18 100/1 100/8 101/20 102/3

**MS. TANNER: [18]** 3/22 4/9 69/7 71/5 72/23 73/2 73/9 73/11 73/22 74/3 78/17 78/24 79/1 79/5 79/11 79/15 81/11 81/13

**THE COURT REPORTER: [1]** 64/2

**THE COURT: [179]**

**$**

**$20 [1]** 85/4
**$5 [1]** 84/20

**'**

**'17 [1]** 47/25

**.**

**.will [1]** 45/1
**.1 [2]** 3/24 47/1
**.1 percent [2]** 9/23 47/1

**1**

**10 [2]** 71/8 89/9
**10-minute [1]** 62/1
**10:07 [1]** 3/2
**11 [1]** 1/19
**110,000 [2]** 24/23 26/10
**1100 [1]** 2/5
**11:20 [1]** 62/4
**11:29 [1]** 62/6
**1237 [1]** 57/8
**12:34 [1]** 108/13
**13 [2]** 29/10 50/4
**1310 [1]** 1/16
**147.131 [1]** 78/9
**15 [1]** 107/15
**165017 [1]** 2/13
**17,000 [1]** 45/10
**1993 [1]** 57/3

**2**

**2-1 [1]** 106/11
**20 [3]** 1/9 101/21 108/20
**20-odd [1]** 47/16
**200 [1]** 1/16
**20001 [1]** 2/9
**20005 [2]** 1/17 2/5
**20036 [1]** 1/20
**2008 [1]** 57/9
**2011 [1]** 74/7
**2013 [2]** 77/3 79/3
**2017 [1]** 46/24
**2018 [2]** 50/3 50/7
**2018/2019 [1]** 79/17
**2019 [3]** 1/9 79/17 108/20
**202 [4]** 1/17 1/21 2/5 2/10
**2020 [1]** 54/16
**2021 [3]** 45/16 91/4 101/14
**22 [1]** 55/20
**2345 [1]** 1/24
**25 million [1]** 37/6
**281-3605 [1]** 2/14
**2B [1]** 44/5
**2E [1]** 43/25

**3**

**30 [1]** 75/21
**30-page [1]** 44/14
**300gg-13 [1]** 29/10
**300gg-92 [1]** 24/1
**317 [1]** 1/24
**3234 [1]** 1/17
**325 [1]** 2/12
**3605 [1]** 2/14
**3953 [1]** 2/5
**3:18-CV-491 [1]** 1/5

**4**

**401 [1]** 1/23
**41 [1]** 47/23
**42 [2]** 24/1 29/10
**43216 [1]** 2/13

**45 [1]** 78/9
**455 [1]** 1/23
**462041 [1]** 2/9
**466-3234 [1]** 1/17
**47,800 [1]** 76/10
**491 [2]** 1/5 3/6

**5**

**51 [1]** 2/9
**514-3953 [1]** 2/5
**526 [1]** 57/8
**54,000 [1]** 17/9
**553 [2]** 24/5 24/6
**57,546 [1]** 76/11
**588-7602 [1]** 1/21

**6**

**600 [1]** 2/12
**614 [1]** 2/14
**637-2345 [1]** 1/24

**7**

**70 [1]** 14/23
**73 [2]** 16/3 47/15
**74 [1]** 15/1
**759 [1]** 57/2
**7602 [1]** 1/21
**7679 [1]** 2/10

**8**

**800 [1]** 1/20
**879-7679 [1]** 2/10

**9**

**92 [1]** 24/1
**93 [1]** 60/2
**97 [1]** 47/13
**99.9 percent [2]** 9/24 11/15

**A**

**a.m [3]** 3/2 62/4 62/6
**ab [1]** 56/12
**abdication [3]** 7/19 50/16 63/18
**abide [1]** 86/14
**abided [1]** 81/4
**ability [2]** 60/8 107/4
**able [10]** 22/19 28/4 38/18 60/11 80/3 80/3 80/4 85/6 91/6 105/12
**abortion [2]** 9/11 94/15
**abortion-inducing [1]** 9/11
**about [60]** 7/14 7/14 8/14 9/1 13/8 16/19 17/22 18/19 18/23 20/19 20/20 21/23 22/17 22/2 22/23 24/22 24/23 35/9 37/6 38/25 39/23 39/24 40/3 40/13 40/21 46/13 49/22 51/6 51/14 53/14 58/24 61/5 62/1 62/11 63/3 79/7 82/18 87/5 90/13 90/16 90/20 90/21 91/19 93/6 98/3 100/3 100/19 102/4 102/14 103/1 104/12 105/7 105/18 106/15

**106/16 106/18**
**above-entitled [1]** 108/19
**above-face [1]** 25/12
**above... [3]** 25/12 108/19 108/19
**absence [1]** 42/3
**absent [1]** 56/1
**absolute [3]** 47/2 57/13 63/4
**absolutely [5]** 48/6 48/17 54/23 56/12 81/11
**abuse [1]** 47/9
**ACA [36]** 20/8 20/10 20/15 23/24 24/2 29/3 29/6 33/3 33/17 36/14 37/6 41/21 45/12 46/4 51/1 51/7 51/19 60/23 61/20 67/11 69/20 69/21 70/4 70/6 70/9 72/14 72/17 72/20 73/14 74/23 75/11 75/19 78/3 100/17 102/17 104/16
**ACA's [2]** 43/7 46/20
**accept [2]** 72/25 73/20 101/25
**access [6]** 37/9 39/23 40/5 45/11 94/22 95/5
**accessing [1]** 56/5
**accommodate [3]** 39/9 81/24 107/4
**accommodated [1]** 80/8
**accommodates [1]** 60/16
**accommodation [59]** 6/1 6/9 6/17 8/15 13/10 13/11 14/5 14/13 17/15 18/2 26/16 26/18 27/2 28/17 31/22 32/17 34/16 35/14 35/15 35/20 35/22 35/24 36/5 36/9 36/24 37/8 37/21 38/6 42/8 44/12 45/9 56/3 61/1 67/16 76/8 76/13 76/17 77/14 77/23 78/9 79/17 80/7 80/17 80/23 83/1 83/6 92/24 92/25 93/2 93/5 93/15 93/19 93/21 93/22 94/5 95/13 95/15 104/14 108/1
**accommodations [2]** 105/5 107/5
**accordance [1]** 39/18
**Accordingly [1]** 68/20
**account [1]** 82/8
**accurate [1]** 12/8
**achieves [1]** 80/9
**acronym [1]** 11/9
**across [4]** 9/15 9/16 20/22 85/9
**act [10]** 23/1 39/18 53/21 59/5 59/11 59/24 60/1 63/19 66/6 70/2
**Act's [1]** 50/2
**acted [1]** 57/15
**acting [1]** 68/2

**action [24]** 12/25 20/12 26/2 41/1 41/11 42/6 48/10 48/16 52/17 52/18 57/13 68/9 83/15 86/21 87/6 87/15 88/10 88/11 88/13 88/14 88/16 88/24 88/25 91/8
**actions [4]** 26/23 46/19 67/5 89/10
**activity [1]** 89/5
**acts [1]** 97/9
**actual [2]** 66/12 74/6
**actually [28]** 4/3 5/7 7/25 10/1 17/10 18/24 23/23 34/4 40/16 41/21 43/11 43/12 46/22 49/1 49/21 66/19 67/19 83/22 85/6 89/13 95/16 95/23 101/1 102/15 102/17 104/9 105/15 106/16
**added [1]** 21/2
**addition [10]** 20/6 24/3 39/22 50/1 65/3 67/14 81/15 82/15 92/1 103/21
**additional [7]** 29/8 36/3 40/14 72/2 82/23 100/3 102/18
**additionally [1]** 75/8
**address [11]** 19/25 21/1 33/4 39/1 59/1 66/22 74/17 81/10 83/20 85/13 106/23
**addressed [6]** 25/18 56/23 66/1 73/3 75/18 89/8
**addressing [2]** 19/12 69/9
**adequately [1]** 26/13
**administration [21]** 8/25 9/3 9/7 9/11 9/20 9/21 10/3 10/14 11/8 11/13 17/11 17/12 23/20 50/19 53/17 61/16 72/4 72/5 72/8 80/15 95/10
**administrations [2]** 23/18 31/21
**administrative [4]** 37/20 57/22 70/1 72/15
**administrator [12]** 44/17 44/21 78/1 78/11 78/13 78/19 78/22 78/24 79/1 79/8 96/22 97/10
**administrators [3]** 32/18 43/22 45/3
**admits [1]** 55/21
**admitted [1]** 95/25
**adopt [2]** 93/17 93/17
**adopted [1]** 50/15
**advanced [1]** 31/16
**advantage [1]** 12/3
**advice [1]** 82/17
**advisement [1]** 108/8
**advocacy [1]** 108/10
**Aetna [2]** 78/20 78/21
**affect [4]** 47/1 85/25 86/3 92/2

USCA11 Case 3:18-cv-00919-JPB Document 78 filed 08/21/19 page...

# A

**affected [5]** 9/24 18/24 19/2 47/8/22

**affiliated [1]** 47/14

**affirmative [1]** 46/2

**affirmatively [1]** 39/15

**affirms [1]** 26/20

**afford [1]** 94/20

**Affordable [4]** 50/2 59/24 60/1 63/19

**afforded [1]** 17/7

**after [13]** 5/18 6/15 23/3 24/17 32/6 49/16 66/2 67/5 67/9 76/14 78/5 98/17 98/24

**afterwards [1]** 67/9

**again [22]** 3/11 13/4 13/13 17/21 28/18 30/24 31/9 31/17 31/19 34/21 40/12 51/13 60/6 61/16 73/22 82/22 83/19 91/16 94/21 101/14 101/15 103/5

**against [30]** 5/2 5/6 6/1 14/13 14/20 15/22 20/17 37/8 41/13 41/17 42/23 50/20 51/17 83/23 84/21 86/3 86/20 87/8 87/9 91/1 91/6 93/3 94/2 98/13 99/7 99/8 99/9 101/23 102/21 102/22

**agencies [58]** 16/22 17/8 17/9 19/18 20/11 20/13 23/24 24/3 24/16 25/11 25/14 26/9 26/13 26/14 35/13 35/17 36/23 37/19 38/4 38/5 38/11 38/18 40/25 42/4 46/24 49/11 50/15 51/12 52/6 53/20 61/14 67/23 68/1 68/14 70/1 70/7 70/24 71/13 72/17 72/19 73/2 73/12 75/23 76/15 81/2 81/5 81/8 100/3 103/3 103/4 103/12 103/15 103/18 103/21 103/24 104/7 105/12 106/1

**agency [24]** 10/22 11/5 24/12 24/21 31/6 43/24 45/4 45/23 45/25 46/19 49/6 49/17 51/2 52/18 52/20 52/21 53/1 57/13 57/15 65/11 68/9 68/10 68/11 76/19

**agency's [6]** 19/15 25/19 26/1 26/3 66/1 76/8

**ago [3]** 27/19 28/12 44/13

**agree [12]** 15/20 16/24 25/16 25/17 51/3 51/3 58/4 101/12 101/25 104/5 104/6 107/1

**agreed [4]** 17/17 77/13 90/8 99/5

**agreement [93]** 4/19 4/20 4/23 5/1 7/16 12/12 14/21 15/12

15/18 16/12 17/3 19/14 19/22 19/23 20/2 20/9 20/16 20/19 21/2 21/3 22/2 39/5 40/15 40/19 40/21 40/24 40/25 41/2 41/4 41/6 41/10 41/15 42/22 43/12 44/19 45/6 48/6 48/8 48/12 48/16 48/18 48/21 49/18 51/24 53/4 53/8 53/14 53/22 53/25 54/3 54/7 55/23 56/7 56/10 59/18 59/21 59/22 59/23 60/8 60/11 61/2 61/8 68/25 75/13 76/6 76/10 85/12 85/15 85/17 85/17 85/21 86/7 86/18 86/25 89/14 90/6 90/10 90/15 90/24 92/1 98/7 98/10 98/21 98/25 99/2 99/25 99/20 100/13 100/24 101/10 102/14 102/19 102/24

**agreements [1]** 14/23 14/25 47/13 47/17 49/24 52/5 60/5 61/18 67/8 102/16

**agrees [1]** 86/13

**ahead [4]** 39/17 63/14 73/10 80/5

**aim [1]** 80/10

**Air [1]** 66/6

**akin [1]** 19/19

**al [3]** 1/3 1/7 3/7

**alien [1]** 57/3

**ALISON [9]** 1/14 3/22 4/9 42/23 51/6 53/3 61/19 69/2 69/7

**Alison Tanner [1]** 69/7

**all [56]** 3/3 3/6 3/13 3/23 4/4 5/19 7/4 7/22 8/16 9/2 9/15 9/17 10/13 16/8 16/10 17/11 18/16 19/16 33/7 37/5 39/18 41/21 42/14 46/15 51/11 53/8 55/1 57/12 62/7 63/16 64/1 64/4 66/18 67/20 70/9 70/14 71/11 72/1 72/9 74/11 75/9 78/12 81/19 81/25 84/17 88/3 90/15 92/14 92/17 94/9 97/21 100/21 104/8 107/13 108/6 108/7

**allegations [1]** 57/14 84/18

**alleged [2]** 85/6 106/25

**alleviate [2]** 36/6 42/5

**alleviated [1]** 38/24

**alleviating [1]** 39/13 39/16

**allocates [1]** 102/11

**allocating [1]** 63/25

**allow [7]** 10/16 10/17 52/9 57/4 81/4 95/5 105/12

**allowed [4]** 52/2 54/17 107/11

**allowing [1]** 60/25 107/18

**alluded [3]** 19/14 36/2 101/4

**almost [1]** 44/3

**alone [1]** 80/19

**along [1]** 4/24

**already [18]** 26/2 37/3 37/3 48/20 49/19 54/19 59/21 68/11 68/21 69/17 69/25 74/24 75/21 83/14 84/6 84/17 85/1 98/3

**also [43]** 17/2 19/3 19/25 20/16 21/1 23/17 24/18 30/5 31/19 34/4 35/17 35/25 42/6 42/8 44/5 48/4 54/14 60/1 61/2 61/19 65/4 65/17 68/5 68/6 69/2 74/13 75/17 77/19 79/16 81/15 82/3 82/13 82/15 82/17 82/24 96/22 98/13 99/1 102/4 103/16 103/16 106/12 107/14

**Alternatives [2]** 77/11 106/13

**although [2]** 43/5 46/25

**always [1]** 85/20

**am [3]** 34/23 42/15 101/19

**ameliorate [1]** 68/13

**amended [1]** 21/3

**amendment [12]** 29/3 29/5 29/6 32/21 53/6 74/19 74/19 74/20 75/16 105/6 105/6 105/22

**Amendments [1]** 61/21

**American [1]** 80/13

**Americans [1]** 1/15

**among [1]** 5/21

**Amos [9]** 39/10 39/19 73/25 104/19 104/19 104/22 107/12 107/13 108/1

**amount [1]** 50/16

**analogized [1]** 80/2

**analogous [1]** 100/16

**analysis [3]** 79/12 80/22 103/23

**analyzed [1]** 20/23

**analyzing [1]** 104/20

**animating [1]** 68/4

**announcement [1]** 74/6

**announcing [1]** 73/3

**another [7]** 48/4 58/6 63/21 72/14 80/5 82/3 106/20

**answer [7]** 6/12 13/3 18/15 23/2 30/20 63/11 100/7

**answers [2]** 31/10 31/18

**ANTHONY [4]** 2/8 3/12 4/3 4/16

**anybody [6]** 15/12 51/17 94/18 94/20 94/20 94/25

**anymore [1]** 51/4

**anyone [1]** 21/7 39/16

**anyway [1]** 64/8

**anywhere [1]** 93/18

**APA [25]** 19/14 24/3 25/14 42/22 42/24 48/22 52/20 52/22 54/2 59/13 61/25 62/11 64/10 64/18 65/9 66/4 66/15 67/23 68/17 69/10 69/15 103/8 103/8 103/10 103/11

**APA's [3]** 65/7 66/3 67/25

**apart [1]** 51/23

**apologies [1]** 64/8

**appeal [7]** 5/15 5/17 58/10 58/12 58/13 58/15 63/1

**appealed [1]** 58/9

**appeals [1]** 77/6

**appear [1]** 39/4

**appellate [1]** 6/7

**applicable [1]** 59/15

**application [1]** 33/10

**applied [4]** 21/18 39/19 107/13 107/14

**applies [6]** 11/19 42/4 52/17 64/20 74/11 74/14

**apply [14]** 9/23 12/23 12/23 20/9 20/18 42/7 48/25 49/5 49/7 50/10 50/14 83/22 86/16 93/10

**applying [1]** 26/9

**apposite [1]** 89/9

**appreciate [2]** 96/20 108/10

**approach [2]** 24/16 38/20

**appropriate [2]** 29/25 36/5

**appropriately [1]** 16/24

**arbitrarily [1]** 69/13

**are [114]**

**area [4]** 22/20 33/1 105/4 105/9

**areas [1]** 25/22

**Aren't [1]** 22/12

**argue [1]** 32/22

**argued [6]** 7/13 12/17 27/18 27/19 27/22 93/20

**arguing [4]** 39/4 41/23 42/19 73/23

**argument [13]** 1/9 4/10 35/11 36/2 40/14 55/14 58/24 86/25 92/22 93/18 95/8 96/2 100/3

**arguments [7]** 27/25 29/1 31/16 33/12 39/23 81/9 102/15

**around [2]** 16/2 26/12

**arrive [1]** 32/10

**art [1]** 96/9

**aside [3]** 28/10 28/19 68/23

**ask [6]** 17/7 30/21

42/12 55/1 92/9 108/5

**asked [2]** 17/19 103/3

**asking [7]** 1/29 9/13 18/24 21/18 24/18 26/25 71/1 98/12

**assert [2]** 86/21 87/15

**asserted [1]** 84/13

**assertion [1]** 81/2

**assign [1]** 100/11

**assistance [1]** 31/6

**assume [1]** 4/2

**assumed [1]** 57/14

**attack [2]** 77/9 77/17

**attainment [1]** 25/21

**attempt [2]** 46/20 72/12

**attempts [1]** 19/13

**Attorney [6]** 21/12 56/19 57/5 57/9 101/4 101/8

**attorney's [1]** 7/9

**audible [1]** 58/22

**August [1]** 108/20

**authoring [1]** 6/17

**authority [33]** 9/9 23/24 24/13 30/11 56/24 56/25 57/6 57/15 69/12 69/19 70/2 70/7 70/16 70/18 71/6 71/13 71/15 72/7 72/13 72/17 72/20 73/13 73/15 73/24 74/7 74/13 75/14 81/8 95/17 95/19 97/2 104/15 104/23

**authorization [3]** 70/22 78/6 80/19

**authorize [3]** 75/25 77/21 96/24

**authorized [5]** 29/2 29/4 59/25 61/20 96/22

**authorizes [1]** 95/18

**authorizing [1]** 83/16

**automatic [1]** 44/2

**auxiliaries [2]** 23/20 27/1 31/22 32/12 32/15 37/8 105/8

**available [1]** 94/15

**Avenue [1]** 2/9

**average [1]** 85/3

**avoid [1]** 55/3

**avoiding [1]** 18/4

**aware [2]** 31/25 37/25

**away [5]** 48/17 61/3 61/13 69/11 94/19

# B

**back [21]** 6/2 6/9 7/22 18/9 22/19 23/2 24/16 26/22 27/13 28/10 30/21 31/19 32/14 41/21 49/21 58/10 58/16 74/17 75/3 90/4 104/8

**background [3]** 33/7 105/9 106/1

**backroom [1]** 91/10

**balance [1]** 84/22

**ball [1]** 105/19

**ban [1]** 22/22

**banc [1]** 6/19

**BANKER [8]** 1/18 3/24

USDC IN/ND case 3:19-cv-01016-JD-MGG document 78 filed 08/21/19 page 111 of 123

**B**

**BANKER__ [6]** 4/9 42/24 42/25 46/25 62/8 69/4
**Baptist [1]** 95/1
**bargain [2]** 99/4 99/6
**bargained [1]** 99/22
**barred [2]** 5/25 16/1
**barring [1]** 27/14
**bars [1]** 4/21
**based [13]** 9/24 10/4 11/2 11/11 29/22 29/24 41/20 55/22 73/4 76/7 79/23 80/13 83/24
**basic [1]** 52/12
**basically [4]** 6/2 12/17 19/23 44/19
**basis [4]** 42/3 62/19 83/2 98/13
**bear [3]** 81/17 81/19 82/11
**began [2]** 50/1 103/5
**beginning [2]** 3/2 62/6
**behalf [3]** 44/17 86/22 101/3
**behavior [1]** 77/24
**behind [1]** 51/7 67/22
**belabor [1]** 98/3
**belief [3]** 34/14 83/4 83/7
**beliefs [14]** 10/19 33/24 35/2 36/12 39/18 42/9 77/24 79/23 80/7 81/20 83/2 83/11 84/22 107/4
**believe [11]** 10/25 11/8 15/1 17/4 26/11 26/17 36/9 37/21 47/4 74/5 75/5
**believed [1]** 8/7
**belt [5]** 24/16 51/23 72/3 72/5 72/8
**belts [2]** 72/1 72/11
**bench [1]** 6/16
**BEND [1]** 1/2
**benefit [9]** 47/6 50/3 58/2 75/2 87/21 88/1 88/2 88/7 89/1
**benefiting [1]** 101/17
**benefits [1]** 60/12
**best [1]** 66/15
**better [4]** 6/12 64/6 82/21 99/6
**between [9]** 4/23 15/1 39/8 40/4 48/13 48/16 56/10 83/8 107/3
**bid [1]** 89/14
**bidding [3]** 89/16 100/12 100/15
**big [2]** 5/20 19/8
**biggest [1]** 103/7
**bind [1]** 61/15
**binding [3]** 21/6 40/18 102/8
**birth [2]** 50/2 54/9
**bit [7]** 24/9 29/13 35/22 38/12 49/21 68/8 102/5
**blanche [1]** 68/16
**blank [1]** 70/19
**blanket [1]** 59/24

**block [4]** 44/23 60/25 80/4 83/16
**blown [1]** 94/11
**blue [1]** 72/10
**board [1]** 9/15
**both [22]** 6/3 6/16 17/13 29/4 32/1 39/24 43/1 52/24 53/4 53/25 54/1 55/22 56/4 56/23 68/25 69/24 70/3 73/16 85/22 99/5 99/10 106/10
**Boulevard [1]** 2/12
**bound [1]** 41/2
**Bowen [1]** 80/12
**box [2]** 2/13 56/17
**Boy [1]** 92/17
**branch [2]** 2/4 16/23
**branch's [1]** 99/12
**break [1]** 62/1
**Brennan [1]** 52/25
**brief [8]** 25/10 46/21 74/6 84/6 89/9 92/21 95/24 101/2
**briefed [1]** 8/3
**briefing [9]** 17/9 19/21 20/3 21/5 24/11 25/20 29/21 37/24 40/15
**briefly [7]** 19/25 21/11 39/3 81/10 85/13 89/7 106/21
**briefs [3]** 50/1 50/4 50/5
**bring [10]** 24/14 40/23 41/8 41/9 86/1 86/5 86/5 88/6 91/7 92/5
**bringing [2]** 40/23 61/7
**brings [1]** 49/1
**broad [4]** 29/18 71/2 71/9 104/25
**broader [3]** 24/9 35/25 70/25
**broadly [1]** 71/6
**brought [12]** 3/25 5/6 12/2 12/2 14/8 15/2 15/10 15/23 16/2 99/10 99/19 102/6
**building [1]** 107/11
**bullseye [1]** 38/14
**bunch [1]** 8/22
**burden [39]** 33/9 33/10 33/15 35/11 35/13 35/19 35/23 36/4 36/6 36/7 36/13 36/13 38/3 38/5 38/20 39/13 39/17 65/15 66/7 66/15 67/18 67/18 74/15 76/3 76/9 76/14 76/20 76/23 77/15 80/16 82/25 83/9 92/25 93/7 93/11 93/13 95/12 107/21 108/3
**burdened [5]** 18/2 34/5 106/17 106/19 107/12
**burdening [2]** 107/16 107/20
**burdens [8]** 33/23 34/11 38/23 42/5 82/15 102/6 106/25 107/6
**business [9]** 35/8 48/22 56/22 57/2 59/17

**C**

**cabins [1]** 61/16
**Caldor [1]** 81/23
**California [5]** 26/11 47/4 64/23 74/24 77/20
**call [5]** 13/12 36/15 91/22 95/11 96/14
**called [3]** 14/2 26/16 77/11
**calling [1]** 52/5
**calls [1]** 21/13
**came [7]** 9/1 9/7 10/23 28/11 28/17 41/22 93/6
**campus [1]** 94/18
**Cancer [1]** 9/17
**candid [1]** 79/7
**cannot [7]** 33/9 45/7 46/1 52/21 53/23 61/15 65/21 65/22 66/17 81/4 94/20 107/7
**capable [1]** 7/15
**capriciously [1]** 69/13
**card [1]** 79/18
**care [15]** 9/5 9/8 9/13 9/15 10/21 19/7 29/8 31/8 50/2 51/1 52/7 59/24 60/1 63/19 93/9
**careful [1]** 20/25
**CARMEN [2]** 1/14 3/20
**Carpenter [6]** 48/23 56/22 57/8 59/17 89/8 89/17
**carry [2]** 23/25 104/11
**cars [6]** 72/1 72/6 72/9 72/10 72/10 72/10
**carte [1]** 68/16
**carve [1]** 70/21
**cases [37]** 5/8 5/20 7/9 8/4 15/9 15/13 16/18 16/22 18/16 19/22 38/1 39/7 40/16 40/16 47/21 48/24 49/4 49/4 49/14 50/4 55/7 56/22 56/23 57/1 59/3 63/3 63/16 76/22 89/7 91/13 91/14 100/9 100/18 100/20 106/6 106/7 106/12
**catch [1]** 55/20
**catch-22 [1]** 55/20
**categories [1]** 41/1
**category [2]** 70/8 70/13 94/13
**cause [7]** 3/6 24/5 24/7 64/19 87/6 91/7 94/14
**caused [1]** 105/17
**causes [1]** 55/24
**Center [2]** 1/19 94/19
**cert [1]** 5/17
**certain [5]** 72/1 75/6 80/7 96/15 98/22
**certainly [8]** 8/13 11/1 17/13 41/2 42/4 52/13 96/5 107/1
**CERTIFICATE [1]** 108/16

**certification [1]** 96/25
**certified [3]** 14/4 62/17 63/8
**certify [1]** 108/17
**cetera [4]** 58/7 98/16 98/16 98/16
**CFR [1]** 78/9
**chain [1]** 106/8
**challenge [6]** 4/19 19/13 20/2 42/24 55/17 55/19
**challengeable [1]** 15/20
**challenged [3]** 15/12 53/7 59/18
**challenges [5]** 7/13 20/8 20/8 50/3 60/15
**challenging [3]** 16/3 16/4 67/11
**chance [3]** 27/24 27/25 58/9
**Chaney [4]** 4/21 17/1 19/24 52/15
**change [6]** 22/11 30/7 32/8 40/21 91/4 101/15
**changed [10]** 10/21 30/23 31/7 51/10 53/15 66/11 77/3 77/21 89/11 98/25
**changes [2]** 25/9 101/14
**characterizes [1]** 78/4
**cheaper [1]** 19/6
**Chevron [3]** 11/12 32/22 69/22
**chief [1]** 57/4
**chime [1]** 16/16
**choice [6]** 9/1 10/18 38/8 82/16 87/14 107/20
**choose [3]** 8/10 93/16 93/17
**chose [4]** 8/11 35/19 38/5 60/2
**chosen [1]** 35/13
**church [14]** 1/15 27/1 73/3 73/14 73/21 74/2 74/7 74/10 104/13 105/6 105/7 107/9 107/11 107/18
**churches [11]** 23/19 31/21 32/12 32/15 37/7 72/22 72/23 73/5 73/18 104/21 105/8
**Circle [1]** 1/19
**circuit [52]** 5/10 5/12 5/14 5/18 5/19 6/16 6/19 6/21 13/16 13/19 17/23 25/18 25/25 26/20 27/12 27/17 27/21 27/25 28/7 28/8 28/15 38/19 48/20 48/23 49/19 57/3 57/9 58/3 64/14 64/22 65/10 65/17 65/20 65/25 66/1 76/21 76/23 77/6 77/12 77/14 77/16 80/24 80/24 80/25 80/25 96/3 96/3 106/6 106/7 106/13 106/20

**Circuit's [1]** 27/11 28/6 77/4 77/11
**circuits [2]** 16/7 16/16
**circumstance [1]** 10/16
**circumstances [3]** 7/19 11/20 57/12
**cite [5]** 21/4 40/16 73/13 95/24 100/9
**cited [3]** 74/5 86/15 101/2
**citing [1]** 61/9
**Civil [1]** 2/18
**claim [21]** 4/18 6/8 16/2 42/23 59/12 59/14 61/7 61/25 62/11 64/10 64/14 69/18 74/7 83/12 87/7 87/13 87/15
**claimed [1]** 87/23
**claims [31]** 5/5 7/8 7/12 7/15 12/2 12/2 15/23 20/17 21/1 39/1 40/17 40/22 40/23 40/24 41/8 42/12 42/25 48/6 52/23 53/1 57/23 60/4 61/5 69/10 69/15 73/17 81/10 86/1 86/5 86/5 106/22
**clarifications [1]** 25/6
**clarify [2]** 25/7 35/10
**clarity [1]** 24/14
**class [11]** 14/4 62/15 62/15 62/17 62/18 62/19 62/20 83/22 102/21 102/22 102/23
**class-wide [1]** 62/19
**classification [3]** 20/21 83/24 102/25
**classifications [1]** 20/23
**clause [16]** 20/23 39/4 39/8 39/8 39/21 53/4 81/16 81/21 82/9 82/24 83/22 102/20 104/22 106/24 107/1 107/4
**clauses [1]** 73/17
**Clean [1]** 66/6
**clear [17]** 17/5 20/14 20/16 59/23 60/2 62/14 71/10 84/25 85/16 85/21 86/18 86/24 87/12 88/14 88/21 98/13 103/15
**clearly [15]** 15/19 15/25 45/25 70/7 86/7 88/18 89/9
**client [1]** 90/5
**clients [10]** 45/10 48/13 52/1 54/7 54/20 55/6 57/7 60/8 61/3 63/7
**clinic [2]** 94/17 95/4
**clinics [3]** 94/9 94/16 94/23
**close [1]** 84/23
**collapse [2]** 8/23 8/25
**collapsed [1]** 18/15
**collapses [1]** 20/4
**collapsing [1]** 8/21
**colleague [8]** 42/23

# C

colleague... [7] 51/6 53/44 53/53 55/25 57/13 69/1 92/19

colleagues [1] 53/8

collected [1] 107/10

colorable [1] 93/18

Columbus [1] 2/13

coming [2] 44/22 79/12

command [1] 100/19

commands [1] 75/10

comment [17] 22/22 23/2 23/3 23/24 24/4 24/9 24/20 25/16 25/22 65/7 65/12 65/20 66/4 66/10 67/1 67/25 68/14

commentary [2] 68/13 68/16

comments [29] 17/10 24/17 24/17 24/18 24/20 24/21 24/23 25/1 25/6 25/11 25/17 25/23 26/1 26/5 26/10 26/13 64/15 65/5 65/22 66/2 66/17 67/14 67/24 68/17 103/17 103/21 103/25 104/1 104/8

commissioner [1] 48/15

committed [6] 16/22 19/15 52/20 52/21 57/13 99/12

common [4] 20/1 23/15 23/16 103/10

company [1] 88/21

compel [3] 77/23 89/1 89/5

compelling [11] 33/11 36/25 37/2 37/22 37/25 65/14 75/18 80/21 81/3 81/14 106/3

competitive [3] 89/16 100/12 100/14

complaint [4] 21/3 61/8 67/21 84/18

complete [3] 25/12 56/4 99/24

completely [8] 17/13 21/9 29/3 33/25 60/7 76/15 93/5 93/23

compliance [1] 21/9

complicit [1] 34/11

comply [3] 45/13 65/7 82/8

complying [2] 45/20 79/16

component [2] 31/10 31/17

comport [1] 66/3

comprehensive [8] 29/7 29/15 32/6 70/5 70/11 70/12 71/20 71/22

compromise [5] 7/22 7/23 8/10 11/14 11/19

concede [1] 95/12

concept [1] 57/3

concern [1] 59/4

concerns [3] 74/9 102/8 102/9

concession [1] 96/15

concessions [1] 95/11

conclude [1] 7/11

concluded [5] 26/3 26/11 36/23 37/20 77/20

concluding [1] 17/12

conclusion [6] 6/23 76/16 76/17 77/1 103/25 104/10

conclusions [1] 105/23

concrete [1] 63/8

concurrence [1] 52/25

conferred [1] 70/3

confident [3] 6/13 13/5 90/16

conflict [1] 95/7

confusing [1] 79/4

confusion [1] 28/14

Congress [31] 9/4 9/18 29/16 29/18 45/25 52/11 53/21 64/18 66/7 70/3 71/25 72/7 72/15 72/16 74/20 75/19 75/21 81/7 88/13 100/7 105/1 105/9 105/11 105/15 105/16 105/18 105/21 105/22 105/23 105/25 106/4

Congress's [3] 72/9 75/24 87/13

connection [2] 7/25 43/22

conscience [2] 10/4 95/3

conscience-based [1] 10/4

consciously [1] 50/15

consequence [1] 44/3

consider [6] 9/10 25/14 64/22 67/14 94/15 100/21

consideration [1] 27/9

considered [14] 24/23 25/1 25/25 26/5 26/13 54/18 75/19 75/21 76/13 103/18 103/21 103/24 104/8 105/12

consistent [1] 92/23

consistently [1] 65/11

constitutes [3] 70/17 71/6 81/3

constitution [6] 52/6 52/19 61/21 69/3 69/14 102/16

constitutional [17] 20/8 39/1 42/25 52/21 52/23 53/2 57/23 61/3 61/13 69/10 73/5 73/13 73/18 73/24 74/9 81/10 106/21

constitutionally [1] 40/1

constrain [3] 52/22 90/24 91/1

construct [1] 72/13

contains [1] 103/8

contemplated [2] 50/12 52/14

contemplates [1] 86/9

contend [1] 56/16

contention [1] 56/9

context [5] 23/13 23/16 23/22 46/22 71/18

continue [3] 16/6 54/11 62/8

continued [2] 2/1 9/25

contraception [19] 22/24 29/19 33/19 37/5 37/10 37/14 74/12 75/7 75/10 78/10 79/21 82/13 82/16 82/18 82/20 94/7 94/13 105/3 105/4

contraceptive [31] 5/2 9/2 9/19 35/7 43/7 44/2 44/10 44/15 45/11 46/1 46/3 46/20 47/5 48/10 50/20 50/22 50/25 51/16 56/2 60/9 60/15 60/19 61/2 74/25 78/5 78/14 79/19 87/4 96/12 100/19 105/16

contraceptives [13] 9/10 19/6 32/11 34/12 39/24 40/2 40/6 40/7 40/8 41/25 78/2 84/20 107/21

contract [7] 58/25 59/5 59/6 59/8 59/10 89/14 100/14

contracts [1] 100/12

contrary [8] 24/8 27/15 28/19 71/17 74/18 77/24 86/25 90/24 90/25

contravention [1] 75/15

control [2] 50/2 54/9

controlling [2] 83/14 101/3

controversial [1] 9/9

controversy [2] 54/23 54/25

convoluted [1] 35/22

cool [2] 28/2 28/3

copay [1] 84/20

copayment [1] 75/9

copayments [1] 75/15

copays [1] 82/13

copy [2] 13/12 14/3

Corp [1] 25/20

corporation [1] 35/7

corporations [2] 33/15 35/12

Corps [1] 103/22

correctly [2] 21/18 36/23

cost [3] 45/12 75/11 85/3

cost-sharing [2] 45/12 75/11

Costless [1] 79/14

costs [2] 82/1 82/11

couldn't [3] 8/9 89/5 106/18

counsel [2] 28/20 62/12 83/21

Count [2] 19/12 19/25

counter [2] 72/14 75/10

counters [1] 42/17

couldn't [3] 1/16 12/25 16/3 57/4 85/9

couple [8] 16/14 29/9 29/12 43/11 58/20 84/2 97/25 98/4

course [10] 11/11 12/25 17/2 33/23 43/3 81/13 91/24 105/21 106/6 106/20

Court's [7] 7/21 58/23 60/13 68/4 79/11 80/11 85/11

courts [22] 5/10 5/21 5/23 6/7 7/5 17/24 24/15 28/19 35/3 38/1 47/4 48/20 49/19 54/12 54/18 57/14 69/17 70/4 75/18 76/12 77/6 101/9

cousin [1] 73/8

cover [5] 29/19 34/19 34/20 57/5 78/2

coverage [48] 7/25 8/7 9/2 9/19 9/24 11/18 43/7 44/2 44/2 44/6 44/10 45/11 46/2 46/3 46/20 48/10 50/20 50/22 51/9 51/17 53/15 55/22 56/2 56/5 60/9 60/15 60/19 60/20 60/22 61/1 67/12 70/11 71/10 74/25 78/5 78/10 78/14 79/19 79/21 84/17 86/11 95/15 96/23 97/2 97/8 97/10 97/15 97/17

covered [9] 9/25 10/24 29/9 30/4 51/13 51/13 60/18 62/22 75/8

covering [3] 42/20 42/21 42/23

create [14] 11/16 21/6 35/21 35/25 69/20 70/7 70/18 71/13 72/17 72/20 72/21 73/13 77/15 99/8

created [6] 70/12 71/21 71/25 76/8 76/13 80/16

creates [5] 59/24 70/15 79/8 84/9

crisis [1] 85/8

curative [1] 65/19

cure [6] 23/1 64/15 65/22 66/4 66/17 67/23

current [1] 26/21

currently [4] 12/23 54/8 54/22 63/7

cut [2] 40/10 98/1

cuts [2] 20/21 105/22

Cutter [2] 42/10 82/6

CV [2] 1/5 3/6

# D

D-E-O-T-T-E [1] 14/2

D.C [5] 6/19 64/14 65/10 80/24 80/24

DAME [70] 2/7 3/10 3/12 4/2 4/13 4/17 4/18 4/24 5/6 6/4 8/22 10/9 14/22 16/25 19/14

28/11 28/20 33/24 34/4 37/17 41/13 44/9 44/16 44/23 44/23 45/10 45/19 46/1 47/13 47/15 47/21 48/7 48/8 48/10 49/1 49/25 51/25 52/1 55/15 55/21 56/10 60/25 55/4 75/6 75/9 75/12 77/4 77/23 78/2 78/4 79/10 79/16 79/20 80/1 82/14 83/1 83/16 84/21 86/3 86/10 87/9 94/12 96/8 97/4 97/15 97/16 97/19 98/8 99/19 107/23

Dame's [9] 60/14 78/10 79/13 79/23 81/20 82/11 82/25 94/17 95/21

date [2] 71/23 108/20

day [8] 2/8 2/11 8/22 13/3 38/15 53/15 82/3 88/3

days [4] 10/15 44/14 47/12 81/25

DC [4] 1/17 1/20 2/5 2/9

deal [2] 7/10 23/7

dealing [2] 3/9 100/4

dealt [1] 44/13

decades [1] 38/9

decide [11] 10/12 10/13 11/12 20/13 51/2 54/15 58/3 87/20 90/23 102/12 107/18

decided [12] 9/12 10/3 10/14 11/13 45/13 49/16 50/13 52/14 52/14 62/13 68/12 69/25

decides [2] 28/8 88/6

deciding [3] 10/23 18/5 84/9

decision [29] 8/19 16/21 16/23 19/15 20/14 21/19 29/25 33/23 46/7 46/9 49/15 50/13 55/3 57/11 63/25 67/6 68/4 68/10 76/6 77/11 77/13 77/20 80/1 80/12 90/1 92/3 101/5 106/11 107/13

decision-maker [1] 29/25

decision-making [1] 68/10

decisions [11] 4/22 5/19 17/23 19/19 29/14 52/6 69/25 77/4 77/6 77/8 77/9

decline [1] 52/10

dedicate [1] 76/19

deemed [2] 59/3 59/9

deems [1] 26/21

deep [1] 65/18

defect [4] 64/16 65/23 66/18 66/21

defective [1] 64/11

defend [5] 50/2 50/6 51/20 64/1 67/11

**D**

**defendant [2]** 2/7 4/18 68/18 81/2

**defendants [3]** 64/23

**defendants [29]** 1/8 2/2 3/15 4/6 8/18 42/13 43/5 46/25 48/23 50/5 50/7 50/14 50/21 51/16 52/2 55/18 56/11 57/22 58/24 59/4 60/21 60/24 64/11 64/14 65/24 69/11 69/19 71/14 72/12

**defendants' [1]** 69/21

**defended [1]** 67/13

**defending [1]** 63/16

**defensive [1]** 14/8

**defer [1]** 28/7

**deference [2]** 32/23 71/17 76/18

**defiance [1]** 61/4

**defies [2]** 60/13 61/20

**define [1]** 9/5

**defined [1]** 70/8

**definition [2]** 9/12 98/18

**definitions [1]** 24/6

**definitive [1]** 88/22

**definitively [1]** 17/25

**delegate [1]** 71/5

**delegated [2]** 69/24 72/7

**delegates [1]** 71/5

**delegating [1]** 71/3

**denial [2]** 6/19 6/21

**deny [2]** 58/4 58/18

**Deotte [3]** 13/12 14/2 28/20 62/12

**department [4]** 1/6 2/3 56/23 92/13

**department's [2]** 47/7 47/12

**depend [1]** 27/10

**depends [1]** 28/13

**depriving [1]** 11/17

**describe [1]** 29/7

**described [2]** 17/9 30/18

**deserves [1]** 71/16

**designates [1]** 70/4

**desire [1]** 78/2

**destruction [1]** 94/14

**detail [1]** 51/14

**details [1]** 71/3

**determinant [1]** 63/3

**determination [2]** 54/21 76/8

**determine [1]** 71/6

**determines [1]** 52/17

**deterred [1]** 82/20

**developed [1]** 5/18

**device [1]** 85/4

**DICK [9]** 2/8 3/12 4/3 4/4 4/16 16/8 16/12 18/23 84/2

**dicta [1]** 106/16

**dictate [3]** 79/23 80/8 80/13

**dictates [1]** 34/4

**difference [2]** 40/4

97/19

**different [22]** 6/23 7/6 14/6 20/23 22/25 37/14 43/2 44/11 46/5 66/9 66/13 71/8 72/24 73/15 79/19 82/21 86/9 92/16 94/6 94/7 100/9 103/23

**differently [1]** 26/7

**difficult [4]** 18/6 46/14 46/15 56/17

**difficulty [1]** 18/11

**digest [1]** 4/12

**direct [1]** 30/14

**directing [1]** 39/16

**direction [3]** 21/15 60/20 101/7

**directionally [2]** 107/16 107/20

**directs [1]** 31/13

**disagree [2]** 58/8 60/7

**disagreed [1]** 24/15

**disagreement [1]** 5/21

**disappeared [2]** 48/2 91/15

**discomfort [1]** 56/20

**discourse [1]** 100/22

**discovery [3]** 57/19 57/24 58/6

**discrete [1]** 20/19

**discretion [24]** 9/6 11/11 12/18 14/19 19/15 19/20 21/12 29/14 30/4 48/19 51/12 52/20 52/22 57/10 57/13 61/16 75/2 84/9 84/10 87/17 90/2 99/12 101/2 102/11

**discretionary [5]** 57/11 63/25 93/5 93/16 93/23

**discriminate [3]** 102/21 102/22 108/2

**discriminated [1]** 83/23

**discrimination [4]** 41/17 42/2 42/3 83/24

**discuss [5]** 53/3 59/25 61/19 84/24 106/24

**discussed [8]** 12/7 56/1 65/24 75/20 99/11 102/5 102/9 102/18

**discussing [1]** 49/22

**discussion [3]** 40/11 99/1 106/5

**dismiss [5]** 1/9 42/12 58/5 58/9 108/5

**dismissal [1]** 47/23

**dismissed [1]** 47/23

**disparate [1]** 41/23

**dispose [2]** 40/17 60/3

**dispute [7]** 7/5 13/1 14/6 84/10 90/11 90/13 90/16

**disputed [1]** 12/10 89/18

**dissent [3]** 6/19 6/21 106/11

**distinction [2]** 41/20 85/24

**distinguish [1]** 48/24

**district [20]** 1/1 1/1 1/10 5/23 13/9 14/11 24/24 28/18 43/18 65/6 65/17 68/21 69/17 69/24 74/24 75/17 77/19 104/3 108/22

**diverse [2]** 10/5 10/7

**diversity [1]** 10/16

**DIVISION [1]** 1/2 2/4

**docket [1]** 12/19

**doctor [1]** 82/21

**doctor's [1]** 82/23

**doctrine [1]** 73/24

**document [1]** 51/25

**Doe [1]** 91/19

**does [30]** 21/6 26/22 28/7 31/14 31/15 41/4 46/18 48/6 51/9 53/11 64/15 68/13 70/6 70/17 74/7 75/25 76/14 76/19 77/23 78/22 80/8 85/23 85/25 86/3 87/11 90/25 96/23 96/24 97/19 106/13

**DOJ [10]** 21/4 21/18 61/4 61/5 61/9 61/13 61/17 102/6 102/10 102/11

**DOJ's [1]** 21/17

**down [9]** 14/7 14/11 21/16 28/8 31/24 46/12 64/3 64/9 94/24

**dozens [1]** 49/24

**drafted [1]** 72/3

**draw [5]** 34/8 35/3 105/23 106/4 106/12

**drawing [1]** 85/24

**drew [1]** 53/9

**drill [1]** 55/4

**drive [1]** 19/8

**Drohosky [3]** 108/17 108/21 108/21

**drugs [1]** 9/11 87/22

**due [5]** 39/22 53/4 83/12 83/18 106/23

**Dupont [1]** 1/17

**during [2]** 17/11 17/12

**duties [1]** 60/4

**E**

**earlier [3]** 77/17 77/18 102/5

**earliest [1]** 54/16

**easier [2]** 18/13 100/6

**Eastern [6]** 64/23 65/3 65/6 65/17 68/21 104/3

**easy [2]** 8/17 36/15

**Educate [1]** 23/14

**effect [12]** 21/6 22/8 32/13 32/17 40/18 41/24 67/5 73/18 98/11 98/22 103/15 107/7

**effectively [6]** 5/25 22/18 84/16 96/24 101/15 101/16

**effects [1]** 82/19

**effectuated [1]** 51/19

**effectuates [1]** 51/25

**effectuating [1]** 52/3

**efficiently [1]** 85/11

**egg [1]** 60/12

**egregiously [1]** 67/5

**eight [4]** 5/10 5/12 17/16 77/5

**Eighth [1]** 5/14

**either [5]** 27/2 32/17 60/10 69/19 82/12

**elected [1]** 101/7

**Eleventh [2]** 80/24 80/25

**ella [1]** 94/13

**else [7]** 9/13 15/12 21/10 53/7 107/8 107/10 107/24

**else's [1]** 37/11

**emergency [5]** 64/20 64/25 75/7 85/5 94/12

**emphasize [2]** 85/13 92/22

**employee [2]** 78/18 82/3

**employees [2]** 34/18 82/4

**employer [10]** 9/24 11/15 11/21 11/22 33/20 37/13 37/13 40/1 78/18 106/17

**employer's [2]** 33/20 75/2

**employer-based [1]** 9/24

**employers [21]** 9/25 10/1 10/4 10/6 10/8 10/13 11/24 14/4 14/9 18/23 37/15 37/16 39/11 39/14 39/17 41/19 62/21 81/24 82/1 106/19 107/22

**en [1]** 6/19

**enacted [3]** 9/18 37/6 52/11

**end [7]** 13/3 13/4 53/20 99/16 99/21 101/10 108/15

**enforce [43]** 5/1 12/22 14/19 15/21 43/6 44/8 46/4 48/9 48/16 48/18 49/12 50/11 50/20 59/4 60/9 63/18 81/7 86/2 86/11 86/12 86/17 86/19 86/22 87/4 87/21 87/24 88/2 88/8 88/8 89/1 89/12 89/22 89/25 90/8 90/9 90/11 90/2 90/23 91/6 92/3 99/7 99/8 99/9

**enforced [6]** 50/22 51/16 59/7 88/5 93/3 94/2

**enforcement [13]** 4/22 8/15 13/10 19/17 20/11 41/1 41/9 41/10 41/11 44/14 56/8 87/17 88/7

**enforcing [4]** 5/25 13/11 91/1 101/22

**engage [1]** 80/3

**engaged [1]** 66/9

**engineer [1]** 107/11

**enjoin [2]** 14/12 56/7

**enjoined [1]** 103/14

**enjoy [1]** 60/12

**enough [7]** 3/11 4/15 14/18 14/18 82/2 84/6 104/2

**enrollment [1]** 44/3

**ensure [2]** 60/22 74/21

**ensuring [2]** 60/17 60/17

**entangling [1]** 39/14

**enter [2]** 14/12 100/13

**entered [5]** 5/22 15/1 89/14 89/17 103/2

**entering [1]** 104/23

**enters [1]** 61/18

**entire [2]** 32/20 106/8

**entirely [6]** 46/5 59/7 63/17 65/25 66/13 92/23

**entities [9]** 18/1 18/3 36/4 36/8 37/4 47/14 47/14 47/16 49/24

**entitled [7]** 32/22 38/11 60/12 60/22 76/18 80/13 108/19

**entitlement [2]** 47/5 75/1

**entity [2]** 34/10 107/9

**entity's [1]** 60/18

**entrench [1]** 67/6

**entrenching [1]** 67/8

**entrusted [1]** 90/1

**EPA [2]** 25/21 66/9

**equal [10]** 20/17 20/23 41/16 53/5 60/18 83/20 83/21 102/20 102/23 106/23

**equality [1]** 81/15

**erased [1]** 26/23

**ERISA [8]** 48/14 60/10 87/9 87/11 87/13 95/14 95/20 96/21

**err [1]** 8/11

**error [2]** 22/21 64/12

**especially [5]** 20/7 68/10 95/7 105/3 106/10

**essential [1]** 71/8

**essentially [5]** 5/20 7/17 8/22 13/25 47/6 50/9 98/9

**establish [2]** 39/6 96/9

**established [3]** 36/12 38/3 82/14

**establishment [12]** 39/4 39/8 39/20 53/4 81/16 81/21 82/9 82/24 104/22 106/24 107/1 107/8

**Estate [1]** 81/22

**estimate [2]** 12/7 12/9

**estimated [1]** 9/22

**estimates [1]** 47/7

**et [7]** 1/3 1/7 3/7 58/7 98/16 98/16 98/16

**Eternal [1]** 81/1

**evaluated [1]** 37/19

**evaluation [2]** 11/3 30/22

**even [32]** 19/6 21/8

USDC IN/ND case 3:18-cv-00019-PPS-SEM document 78 filed 08/26/19 page 114 of 123

# E

even... **[30]** 25/2 26/2
25/4 25/18 29/25
37/12 38/21 42/7 44/20
44/23 45/21 45/23
45/24 49/15 49/17
52/16 58/11 67/17
67/18 72/19 73/1 73/21
77/9 79/19 83/22 85/1
87/25 88/23 90/18
92/24
**event [1]** 59/3
**events [3]** 46/22 49/22
50/19
**eventually [1]** 23/11
**ever [3]** 15/24 22/19
45/20
**every [9]** 11/15 21/19
21/19 38/15 64/21 88/3
107/9 107/11 107/25
**everybody [2]** 3/8
86/18
**everyone [2]** 3/4
102/24
**everything [2]** 21/10
98/17
**evidence [5]** 29/22
29/23 29/24 29/24
67/19
**evidence-based [2]**
29/22 29/24
**evidence-informed [2]**
29/23 29/24
**exact [5]** 38/13 38/16
38/21 67/13 96/4
**exactly [9]** 18/16 23/4
27/10 28/14 43/10 68/3
72/11 94/10 107/25
**example [5]** 20/10
20/16 33/25 37/16
97/12
**exceeded [1]** 57/15
**excellent [1]** 108/10
**except [3]** 53/21 83/13
83/20
**exception [8]** 48/25
49/5 49/8 49/10 52/20
64/20 67/24 82/1
**exceptionally [1]**
102/17
**exceptions [3]** 21/13
49/13 102/12
**excess [1]** 69/12
**excluded [1]** 83/8
**excludes [1]** 78/10
**Excuse [1]** 46/10
**executed [5]** 47/12
49/23 51/22 52/7 87/22
**executing [1]** 67/7
**execution [1]** 87/24
**executive [17]** 4/22 9/6
16/23 48/22 52/9 56/22
57/2 59/17 89/7 89/13
90/2 93/5 93/16 99/12
100/9 100/10 100/25
**exempt [12]** 12/20
39/11 43/23 44/9 45/3
45/22 48/8 48/10 86/8
98/16 98/19 98/21
**exempted [2]** 72/6

104/20
**exemption [33]** 9/22
10/7 10/12 12/13 13/9
14/8 14/11 23/19 26/25
28/18 31/21 32/12
35/21 36/1 38/6 47/2
47/3 55/22 59/24 71/4
73/4 73/15 73/21 74/2
74/7 74/11 93/12 93/15
93/20 104/14 104/23
105/2 107/10
**exemptions [26]** 12/3
12/4 22/24 23/18 37/3
37/7 47/10 70/7 70/18
71/13 71/16 72/17
72/20 72/22 72/23
74/17 74/25 75/19
75/20 75/22 76/7 80/20
82/10 105/4 105/13
105/18
**exercise [9]** 33/9 33/24
39/8 42/6 60/17 72/7
74/15 76/4 82/25
**Exhibit [2]** 15/4 15/9
**exist [7]** 12/3 27/6
29/16 68/2 71/4 101/22
104/14
**existence [2]** 55/16
55/18
**existing [1]** 90/18
**exists [7]** 27/2 28/17
28/18 48/13 49/10
60/11 61/7
**expect [2]** 19/3 19/10
**expectation [1]** 105/10
**expectations [1]** 16/18
**expected [1]** 105/2
**experience [1]** 92/16
**experiencing [3]** 54/8
55/24 82/19
**expertise [1]** 32/22
**explain [4]** 25/15 34/24
69/2 87/2
**explained [4]** 24/11
61/12 69/9 75/14
**explaining [1]** 96/3
**explains [1]** 79/3
**explicitly [4]** 18/4
24/18 66/7 76/7
**express [1]** 75/10
**expressly [5]** 50/15
64/18 86/12
**extensively [1]** 40/3
**extent [3]** 31/10 39/5
88/13
**extinguish [2]** 48/6
60/8
**extreme [3]** 50/12
50/16 52/9
**extremely [3]** 71/2 83/4
83/10

# F

**F.3d [2]** 57/2 57/8
**face [3]** 25/12 73/1
73/20
**facial [2]** 41/17 42/3
**facing [2]** 10/19 84/15
**fact [15]** 19/17 19/18
19/19 26/10 29/14

32/25 37/9 38/8 49/3
54/18 67/7 68/7 99/1
99/3 101/15
**factors [1]** 11/12
**facts [2]** 77/2 77/21
**faculty [1]** 88/17
**fail [1]** 39/25
**failed [1]** 57/16 64/25
66/3
**failure [1]** 65/6
**fair [4]** 4/11 7/2 7/17
8/13
**faithfully [1]** 52/7
**falls [1]** 101/13
**far [5]** 16/5 85/14 99/3
101/20 106/23
**fashion [1]** 85/10
**fast [2]** 64/5 64/8
**fatally [2]** 65/8 68/22
**father [1]** 80/13
**favor [2]** 5/23 14/10
**favorable [3]** 53/17
83/5 83/10
**feature [1]** 95/24
**federal [50]** 2/2 2/4
3/14 4/5 8/18 10/10
33/8 33/8 34/19 37/12
42/13 50/5 50/7 50/14
50/21 51/16 52/2 55/17
56/11 57/10 57/22
58/24 59/4 60/6 60/24
64/10 64/14 64/24
65/24 68/12 68/18
69/11 69/13 69/16
69/19 69/24 70/1 70/15
70/24 73/3 74/6 75/23
76/8 76/12 77/5 81/2
81/5 81/8 94/22 103/10
**feel [2]** 13/4 91/10
**feels [1]** 18/20
**fees [2]** 7/9 18/17
**felt [1]** 8/5
**fertilized [1]** 94/14
**few [3]** 27/19 49/25
84/6
**fewer [1]** 9/23
**fiat [1]** 30/13
**Fifth [2]** 53/5 61/21
**fight [3]** 7/14 80/6
90/10
**fighting [1]** 80/4
**figure [3]** 6/10 30/14
105/20
**file [1]** 87/6
**filed [3]** 50/4 50/5
91/18
**files [1]** 96/25
**filing [1]** 50/1
**fill [2]** 82/2 82/4
**filled [1]** 70/19
**filling [1]** 36/18
**final [63]** 12/6 20/5
20/17 22/2 22/5 22/6
22/8 22/10 22/11 22/12
23/24 24/7 24/19 25/2
25/3 25/24 26/4 26/12
26/14 27/3 27/5 27/6
27/13 27/14 28/24 29/2
36/5 39/5 40/5 41/18
46/25 50/8 50/8 55/8

55/9 58/10 58/17 58/19
63/2 64/12 64/12 64/17
65/6 65/23 65/25 66/22
67/3 67/4 67/10 68/5
68/6 68/11 68/21 69/1
76/5 76/6 76/10 84/11
103/1 103/2 104/1
104/3 104/9
**finalized [1]** 50/8
**finally [9]** 21/15 32/20
38/15 41/16 50/7 52/16
100/24 103/13 106/21
**financial [2]** 19/4 82/15
**financially [1]** 77/3
**find [5]** 6/3 7/22 12/13
17/12 82/2
**fine [2]** 26/8 43/16
**finish [1]** 68/24
**fire [2]** 55/4 107/11
**firing [1]** 39/12
**first [29]** 4/13 15/16
16/17 22/4 22/6 22/17
24/4 24/9 25/22 29/14
33/18 35/10 38/6 42/15
43/5 46/6 47/11 58/25
59/2 61/21 64/17 67/24
68/2 69/15 69/21 76/3
77/3 93/22 103/7
**fish [1]** 34/1
**fit [3]** 48/24 48/25 49/4
**five [2]** 28/11 44/13
**fix [1]** 38/4
**flesh [2]** 12/12 12/14
**flip [1]** 32/8
**FOIA [2]** 53/14 92/11
**folks [1]** 101/16
**follow [4]** 57/16 89/16
91/4 107/2
**followed [3]** 30/19
91/12 102/13
**following [3]** 3/1 52/10
62/5
**follows [3]** 3/2 62/6
98/17
**footnote [1]** 50/13
75/21 107/15
**force [2]** 63/11 82/10
**forced [1]** 18/14
**forcing [4]** 81/17 81/19
84/21 97/18
**foreclosed [2]** 32/25
33/2 105/11
**foregoes [1]** 65/11
**foregoing [1]** 108/17
**forever [1]** 46/3
**form [5]** 34/12 35/1
36/18 49/17 82/21
**forms [2]** 67/15 75/9
**forth [1]** 64/13
**forward [6]** 55/10
57/22 57/24 58/18 99/2
103/9
**forward-looking [1]**
99/2
**found [9]** 13/8 15/25
27/8 33/16 39/11 53/14
53/18 75/18 100/17
**founded [1]** 59/10
**four [2]** 50/13
**Fourth [3]** 30/2 48/22

57/2
**frank [2]** 18/6 105/7
**frankly [4]** 25/15 53/12
79/7 84/14
**free [4]** 10/11 39/8
94/21 94/25
**Friday [1]** 27/22
**front [2]** 22/17 24/22
43/13
**frustrating [1]** 63/9
**full [2]** 30/14 60/18
**full-blown [1]** 30/14
**fully [1]** 13/1
**fun [1]** 19/9
**function [2]** 52/10
101/1
**functionally [1]** 68/20
**fundamental [2]** 39/23
69/25
**funded [1]** 78/25
**funds [1]** 94/22
**further [16]** 22/1 28/22
33/3 33/11 36/23 38/25
42/11 58/20 61/15
61/23 67/8 72/19 74/10
78/15 83/19 97/21
**furthermore [1]** 37/23
**future [2]** 22/9 43/9
45/24 61/15 61/16 87/3

# G

**gave [3]** 18/9 18/15
88/13
**general [12]** 21/12 24/3
49/23 50/15 51/19
51/25 52/4 56/19 57/9
95/10 101/4 101/8
**General's [1]** 57/6
**generality [1]** 29/20
**generalized [1]** 33/7
**generally [4]** 4/21 19/5
20/22 104/5
**Geneva [1]** 77/13
**gets [3]** 54/4 78/21
101/8
**getting [5]** 26/24 29/13
38/15 84/17 107/25
**ghost [1]** 17/19
**giant [1]** 14/13
**gigantic [1]** 85/9
**gives [3]** 23/23 51/12
56/20
**giving [3]** 35/5 93/20
108/2
**glad [1]** 81/18
**global [1]** 15/6
**go-around [1]** 26/12
**going [67]** 9/1 10/16
10/17 12/22 13/3 14/11
14/12 15/21 17/18
18/10 18/25 19/8 19/12
20/13 20/13 22/9 27/12
28/5 28/7 28/16 29/17
31/19 35/20 35/25
39/13 41/1 41/11 42/15
46/10 46/23 47/1 48/1
50/6 51/2 51/24 53/10
53/13 54/11 55/10
56/18 57/24 58/5 61/10
63/3 63/6 63/7 63/8

**G**

going... [20] 80/5 85/9 86/4 87/22 88/25 89/11 89/22 90/21 92/18 95/1 95/5 98/6 98/18 98/20 98/21 99/3 100/14 103/16 105/24 108/8
gone [1] 7/6
gonna [1] 94/19
good [11] 3/4 3/11 6/8 24/5 24/7 35/8 42/17 42/18 49/16 64/9 69/7
Gorsuch [2] 6/15 6/20
gotten [2] 5/24 107/24
govern [1] 46/18
governance [1] 73/7
governing [1] 103/17
government [127]
government's [8] 7/7 18/20 19/1 38/2 74/4 77/1 87/17 92/3
governmental [2] 73/6 81/3
grab [1] 46/10
grade [2] 54/5 102/5
graduate [1] 55/7
grandfathered [1] 37/5
grant [9] 10/14 58/2 70/18 71/16 72/16 75/22 76/7 81/8 87/14
granted [6] 5/17 14/9 62/25 72/19 89/14 89/18
grants [2] 70/22 83/1
grateful [1] 55/12
gratuitous [3] 47/6 75/1 83/2
great [1] 17/18
green [3] 1/14 3/20 72/10
ground [1] 69/16
groundbreaking [1] 25/9
grounds [1] 10/2
group [9] 4/24 15/22 20/19 40/8 40/9 70/10 70/14 71/11 78/10
guarantees [1] 53/5
guess [11] 8/17 16/9 16/18 18/19 28/22 31/3 34/7 37/15 53/10 87/2 102/3
guessing [1] 34/13
guidance [10] 21/4 21/6 21/10 21/10 61/4 61/6 61/9 61/13 102/6 102/10
guidelines [8] 29/7 29/15 29/16 70/12 71/20 71/22 72/3 72/6
guys [6] 3/25 46/15 64/4 64/5 99/23 108/7

**H**

hadn't [1] 26/13
Hammond [1] 56/18
handful [1] 37/17
hands [4] 5/21 50/5 97/4 97/16
happen [5] 13/4 22/9 28/6 37/12 101/21
happened [6] 13/5 30/17 31/3 31/4 40/19 60/7
happening [3] 21/20 50/18 100/25
happens [4] 22/8 88/3 88/3 88/4
happy [1] 61/24
hard [6] 17/8 28/5 37/2 64/5 64/7 105/23
harm [2] 55/24 84/14
harmed [1] 54/22
harmony [1] 29/3
harms [7] 54/8 63/8 81/17 81/20 82/8 84/15 84/21
Harris [2] 40/3 83/13
hasn't [2] 29/18 60/6
have [185]
haven't [7] 51/17 75/13 84/12 84/13 85/6 88/22 95/9
having [6] 35/22 78/13 79/9 82/2 82/4 94/7
head [1] 68/15
health [37] 1/3 3/7 8/1 11/7 29/3 29/5 29/6 32/20 34/2 41/22 43/21 44/3 45/2 60/18 60/19 70/10 70/10 70/11 70/14 70/14 71/11 71/11 71/19 74/18 74/20 75/12 75/15 78/1 93/10 93/14 94/1 94/8 94/19 98/16
healthcare [7] 7/18 70/5 70/17 70/20 71/7 74/22 79/24
hear [4] 4/13 16/9 42/15 104/18
heard [5] 4/15 98/3 98/8 102/23 103/4
Heckler [27] 4/21 15/16 15/25 16/25 19/12 19/17 19/24 46/9 46/18 48/19 49/4 49/10 49/13 49/15 49/16 50/10 50/13 50/14 52/14 52/16 52/17 52/17 52/19 52/24 86/23 87/21 89/4
Heckler's [1] 48/25
heel [1] 50/1
held [21] 3/1 27/15 48/20 49/19 55/7 62/5 64/24 65/4 65/6 65/17 68/21 69/17 70/4 74/25 76/14 76/21 76/23 79/22 80/12 80/24 82/6
help [1] 38/23
helpful [5] 28/4 43/11 46/21 57/24 68/8
her [1] 46/15
Here's [1] 24/21
hey [1] 105/25
HHS [15] 3/7 14/22 20/12 30/10 30/11

31/10 31/10 31/14 31/18 31/18 36/18 44/21 98/1 98/2 106/7
HHS's [1] 32/21
highly [1] 77/18
hijacking [1] 78/7
him [1] 107/18
hire [1] 82/2
hiring [1] 39/12
historically [1] 21/21
hit [2] 38/13 97/16
Hobby [17] 33/14 33/15 34/3 34/5 34/7 35/2 35/6 35/6 35/11 36/3 36/10 36/15 75/20 76/22 93/8 93/10 93/24
hold [4] 19/22 77/22 84/9 85/15
holding [3] 53/1 106/15 106/18
honest [1] 49/23
Honor [99] 3/5 3/18 4/10 4/16 6/11 6/23 7/20 8/24 10/25 12/16 13/2 13/20 14/3 14/14 15/14 16/7 16/10 16/11 18/6 18/18 21/25 22/14 27/20 32/9 33/6 40/12 41/7 42/11 42/17 43/1 43/10 43/25 44/8 44/19 46/6 46/8 46/17 48/3 48/20 49/20 50/10 50/18 51/5 51/15 52/2 52/16 53/13 53/19 53/20 54/6 55/2 55/6 55/13 56/13 56/21 57/17 57/23 58/8 58/17 58/20 59/20 61/23 62/10 63/6 65/24 67/17 68/18 68/24 69/5 69/7 69/16 71/14 72/11 72/19 72/23 73/2 73/9 74/3 74/10 75/5 75/8 75/25 77/2 79/15 81/11 82/10 83/25 84/4 84/5 85/14 90/7 91/11 91/16 92/9 95/8 96/14 97/21 98/2 108/12
Honor's [5] 77/22 79/3 84/9 92/23 97/7
HONORABLE [1] 1/10
hoping [1] 18/10
House [2] 10/20 101/14
houses [1] 74/11
how [46] 7/16 11/25 12/9 16/19 16/21 18/23 18/24 19/2 20/12 20/14 20/16 22/25 24/20 24/21 25/18 27/13 33/1 34/6 34/22 38/9 44/11 44/25 49/11 49/25 52/11 53/7 53/18 58/12 66/22 72/16 74/13 79/8 80/8 80/14 85/14 87/2 87/5 87/11 89/22 89/24 93/20 99/12 100/20 102/12 103/2 103/21
however [2] 58/6 60/24
HR [1] 11/5
HRSA [34] 11/8 29/7

29/13 29/16 29/20 29/23 29/25 30/3 30/3 30/11 30/14 31/6 31/9 31/11 31/13 31/17 32/6 32/10 32/14 32/16 51/10 51/10 70/13 70/19 71/6 71/7 71/23 104/25 105/20 105/24
huh [1] 45/18
hundreds [1] 47/7
Hyde [1] 105/5
hypothetical [2] 71/25 101/21

**I**

I'd [2] 16/11 21/1
I'll [10] 4/13 4/15 16/9 20/6 29/5 33/13 99/3 102/3 102/14 106/22
I'm [30] 11/9 14/12 16/19 17/21 18/19 19/1 26/17 26/24 27/7 29/24 31/2 32/9 34/17 34/24 40/12 42/16 46/10 50/24 54/24 55/12 58/13 64/2 64/8 73/11 81/12 87/25 91/19 92/8 101/24 108/8
I've [1] 102/22
idea [3] 21/16 56/17 91/14
identical [2] 25/4 50/9
identified [3] 35/12 71/8 94/12
identify [2] 20/10 33/14
IFR [2] 23/21 24/12 28/17 103/9
IFR's [1] 68/22
IFRs [20] 22/10 23/8 23/13 23/17 23/17 24/4 24/18 24/19 24/24 24/25 25/4 26/18 28/16 64/25 65/8 66/25 67/13 76/10 103/5 103/13
II [1] 77/5
illegal [3] 54/3 61/2 61/21
illegality [9] 20/2 21/8 42/22 56/11 56/25 57/7 59/9 59/20 61/24
illustrates [1] 65/2
imagine [2] 63/1 71/25
immediately [1] 67/6
immunity [3] 59/6 59/12 59/13
impact [3] 41/24 79/9 92/4
impacted [2] 41/5 48/7
impediment [3] 60/11 85/6 94/22
impediments [1] 56/5
impermissible [1] 83/3
impermissibly [1] 48/17
implementing [1] 67/15
implicates [1] 83/17
implicit [1] 71/4
important [2] 20/25

42/9 62/20 72/14 75/17 81/6 101/13 104/10
importantly [1] 62/16
impose [3] 60/4 106/2 107/6
imposed [5] 33/17 75/9 76/3 82/1 93/2
imposes [1] 92/25
imposing [2] 75/14 103/11
impossibility [1] 100/4
impossible [1] 7/24
impractical [1] 24/7
impression [1] 44/14
improper [4] 27/8 61/17 73/1 73/20
improperly [2] 12/14 26/22
inapplicable [1] 64/19
inapposite [2] 65/25 66/5
incentive [2] 19/4 19/10
incidental [1] 107/7
include [4] 9/9 34/1 72/10 97/15
included [3] 47/22 47/24 51/11
includes [1] 47/15
including [7] 9/10 43/21 45/2 49/24 60/19 64/22 72/2
inconsequential [1] 64/21
inconvenience [1] 82/4
incorrect [1] 97/9
incrementing [1] 38/14
Indeed [1] 83/3
independent [2] 55/24 95/4
independently [1] 86/6
INDIANA [2] 1/1 63/21
Indianapolis [1] 1/24
indicating [1] 11/10
indiscernible [1] 100/22
individual [8] 52/5 79/2 80/6 83/23 87/3 98/11 107/12 107/17
individuals [2] 34/8 41/20
inducing [1] 9/11
indulgence [1] 58/23
ineffective [1] 86/7
infected [1] 64/12
inferences [1] 72/13
infirm [4] 65/4 68/6 68/6 69/1
infirmities [1] 68/22
influence [1] 68/9
information [1] 31/1
informed [2] 29/23 29/24
initial [4] 23/19 31/21 32/11 65/22
initially [1] 64/11
initio [1] 56/12
injunction [17] 13/9 13/14 13/18 13/21 14/1 14/7 14/10

**I**

injunction [9] 14/12 20/21 53/N53/6 23/9 60/4 61/20 62/4 62/19 62/22 84/13 86/14
injunctions [2] 5/22 54/13
inoculate [2] 45/19 52/3
inoculated [1] 90/5
input [1] 68/15
inside [1] 56/16
instances [1] 81/25
instead [13] 9/11 18/15 35/21 35/24 38/12 39/16 41/23 51/18 59/12 63/13 63/15 95/2 105/19
Institute [3] 11/2 30/21 31/6
instruction [1] 60/14
instructive [1] 80/2
instrument [1] 47/15
insufficient [1] 8/6
insurance [12] 43/21 44/21 45/2 45/14 48/15 70/10 70/15 71/10 71/11 78/1 79/20 88/21
insured [5] 78/18 95/17 95/21 96/6 96/7
insurer [1] 96/13
integrated [7] 23/19 27/1 31/22 32/12 32/15 37/7 105/8
intended [1] 72/16
intent [1] 106/4
interest [13] 24/8 33/12 37/1 37/2 37/22 37/25 38/2 39/24 40/1 42/9 80/22 81/4 81/14
interesting [1] 4/13
interference [2] 73/6 83/17
interim [16] 23/6 23/24 24/19 25/23 26/2 46/24 50/8 64/12 64/17 66/3 67/4 67/10 68/6 68/11 68/14 76/5
intermediate [1] 42/7
internal [8] 21/4 21/17 61/4 61/6 61/9 73/6 80/15 102/6
interpret [2] 32/21 69/23
interpretation [7] 69/21 71/16 76/11 76/20 98/10 104/24 105/11
interpreted [3] 21/12 52/19 82/7
interpreting [2] 61/10 69/23
interprets [1] 61/6
intervene [3] 62/23 83/16 91/18
intervened [1] 91/17
intervenors [3] 47/20 47/21 91/20
intervention [1] 62/24
introduce [1] 3/8

invalid [1] 65/12
invalidate [3] 66/25 8/3 9/9 9/9 100/21
invalidated [2] 81/24 103/5
invalidity [1] 65/21
invoked [2] 45/6 95/15
involved [8] 8/12 14/17 66/5 89/10
IRISH [2] 1/3 3/7
irreconcilable [1] 95/7
irreparable [1] 84/14
isn't [12] 28/3 34/14 44/18 45/14 46/6 48/8 49/14 50/11 57/25 58/1 67/2 92/13
issuance [5] 30/8 64/24 65/9 68/13 68/16
issue [25] 12/13 18/14 22/21 22/23 23/4 23/6 23/18 23/24 24/4 32/15 43/1 46/24 53/25 64/22 66/8 66/25 68/14 74/19 75/18 75/21 77/3 78/17 82/24 83/11 93/9
issued [13] 13/9 14/1 24/17 25/1 25/22 25/24 26/14 54/13 62/18 64/11 64/17 68/11 72/5
issuer [3] 44/21 45/14 78/1
issuers [6] 32/19 43/21 45/3 70/11 70/15 71/12
issues [8] 18/11 20/24 28/23 42/21 51/7 54/1 102/4 104/12
issuing [5] 30/16 51/19 65/8 66/2 67/23
it [285]
iteration [1] 32/4
its [35] 5/21 5/24 12/19 20/19 21/8 26/2 30/7 50/16 55/21 55/21 56/7 57/4 57/6 57/15 57/16 60/25 76/2 77/12 77/17 77/20 77/23 77/24 77/25 78/1 79/23 80/9 80/15 83/2 84/21 97/4 97/15 97/16 102/13 107/11 107/17
itself [5] 52/24 70/9 85/19 96/23 105/18
IUDs [2] 75/6 84/25

**J**

Jane [1] 91/19
Jeff [1] 3/17
JEFFREY [1] 1/22
John [1] 2/12
joined [2] 6/15 6/20
joining [1] 6/17
Jones [3] 2/8 2/11 8/21
judge [9] 1/10 6/18 6/20 14/4 14/9 56/18 63/10 80/1 104/5
judges [2] 6/16 21/17
judgment [8] 55/9 58/7 58/11 58/17 58/19 72/9 72/9 75/23
judicial [6] 4/21 27/14

52/3 53/23 76/25 86/24
July [1] 50/3
jurisprudence [1] 78
June [2] 1/9 54/16
jurisdictional [1] 42/20
just [147]
justice [5] 2/3 6/18 52/25 88/4 92/13
Justice's [1] 56/24
Justices [1] 6/15
justification [1] 73/4

**K**

KAIRIS [4] 2/11 3/10 3/11 4/2
Kavanaugh [3] 6/15 6/18 6/18
keep [6] 9/12 11/14 38/14 50/25 67/18 84/6
keeping [1] 67/7
kept [6] 9/21 65/15 67/4 84/5 92/6 92/8
kernel [1] 98/19
kettle [1] 103/2
key [6] 16/20 22/6 95/11 98/14 98/19 103/2
kind [35] 8/7 15/24 18/8 21/7 21/15 22/22 25/7 25/10 27/15 29/19 30/10 33/12 41/23 43/2 48/1 49/11 53/25 54/4 55/4 73/15 90/1 90/25 91/15 99/4 99/5 99/10 99/13 100/25 102/7 102/18 105/2 105/15 105/19 107/24 108/2
kinds [2] 9/17 88/3
knew [2] 61/5 105/25
know [59] 3/9 4/15 6/5 7/9 7/18 10/11 10/20 10/21 11/11 11/25 12/1 13/13 16/19 18/22 18/25 20/22 24/14 27/15 28/20 30/11 31/11 31/15 32/14 32/16 32/18 33/1 33/22 34/9 34/23 36/13 38/19 44/13 47/13 47/16 49/25 50/3 51/9 53/13 53/13 53/16 55/9 56/18 62/20 62/25 64/6 68/3 74/13 74/14 76/12 79/19 81/15 84/5 88/23 93/25 94/24 101/14 102/4 105/22 106/4
knowledge [2] 15/14 40/13
known [1] 31/7
knows [2] 29/16 72/15
KOPPLIN [4] 2/3 3/14 4/5 16/9
Korte [1] 76/21
Kurtzman [1] 39/20

**L**

LABOR [1] 1/7
language [5] 57/1 71/1 71/5 98/14 104/25
languish [1] 58/5

lap [1] 6/10
large [5] 31/14 33/17 33/8 40/9 60/3
last [9] 13/7 14/2 49/20 62/13 68/15 81/3 85/2 102/14 103/20
late [2] 13/7 14/2
later [7] 34/12 47/12 50/1 67/24 68/2 68/9 71/23
laundry [1] 10/23
law [39] 1/19 9/18 20/1 48/11 48/21 48/25 49/5 49/7 49/12 49/17 52/10 52/20 55/19 57/3 57/13 60/12 61/6 61/7 61/8 61/10 69/13 70/1 70/15 72/15 73/24 77/2 78/5 81/24 82/1 87/21 87/24 88/2 88/8 89/1 89/24 90/21 95/20 97/9 103/10
laws [10] 45/24 45/24 52/7 52/8 57/5 70/18 88/3 88/4 88/4 88/5
lawsuit [5] 20/15 40/22 56/19 62/24 63/21
lawsuits [2] 4/25 40/24
lawyer [1] 18/17
lay [2] 33/13 37/1
lead [1] 35/1
leading [1] 76/22
leads [1] 22/25
least [11] 33/11 36/11 36/24 37/21 47/13 47/16 47/21 50/4 77/18 80/22 95/21
leave [2] 35/24 55/19
leaves [1] 28/5
led [4] 27/15 32/1 38/8 74/1
leeway [4] 35/17 38/12 38/22 100/3
left [2] 9/5 16/12
legal [1] 21/6 47/5 50/3 57/4 57/15 59/12 59/14 60/15 75/1 76/24 77/1
legality [1] 54/16
legally [2] 21/5 40/18
legislative [1] 52/10
Lemon [1] 39/20
length [2] 37/1 51/6
less [6] 68/9 68/15 76/1 85/3 93/3 94/3
lets [1] 100/18
letters [1] 98/17
letting [2] 32/17 39/17
level [2] 22/17 29/19
liberty [2] 8/12 39/24
life [3] 6/20 80/25 85/4
light [4] 32/25 33/18 37/19 100/1
likely [5] 14/17 14/18 18/24 54/14 54/19 68/9 68/15 69/18 104/7
Likewise [2] 80/11 89/17
limb [1] 85/14
limit [2] 29/23 82/16

limitation [1] 107/2
limited [1] 11/19 19/17
line [4] 30/12 34/9 35/3 80/11
liquor [2] 94/24 95/2
list [7] 10/23 25/21 25/23 25/23 25/24 32/10 51/11
listed [2] 25/21 99/19
listing [2] 105/16 105/17
lists [1] 15/9
literally [1] 53/18 53/21 91/14 97/1
litigation [23] 16/21 17/19 21/13 21/20 24/13 38/9 43/4 51/20 51/21 56/24 57/5 57/6 57/10 58/5 60/3 63/17 63/21 64/1 67/11 74/5 100/20 101/3 101/6
litigations [1] 99/16
little [8] 24/9 38/12 49/21 53/11 56/16 68/8 69/16 102/5
live [1] 14/6
LLP [1] 1/22
load [1] 3/25
Lobby [17] 33/14 33/15 34/4 34/5 34/7 35/3 35/6 35/6 35/11 36/3 36/10 36/15 75/20 76/22 93/8 93/10 93/24
local [2] 37/12 60/2
logic [3] 26/9 34/3 36/3
logical [1] 103/13
long [8] 12/19 12/23 24/21 38/8 48/12 58/6 60/10 84/6
longer [4] 45/11 45/13 45/15 58/11
look [17] 12/19 18/9 26/4 35/14 38/19 43/18 56/21 70/9 74/5 75/3 77/10 84/18 85/19 86/15 95/8 96/15 103/24
looked [1] 26/4
looking [7] 20/24 21/17 22/6 44/5 58/1 76/5 99/2
looks [1] 74/8
lopsided [1] 7/7
lost [1] 5/7
lot [16] 4/12 7/9 7/10 18/12 18/23 39/10 53/13 63/6 63/7 67/19 98/3 104/5 104/11 104/13 106/5 108/9
Lots [1] 88/5
Louisiana [1] 2/9
lower [2] 5/21 63/9

**M**

MACEY [4] 1/22 1/22 3/17 3/19
made [14] 16/23 25/6 35/14 40/9 40/13 60/2 68/19 79/8 83/21 85/21

**M**

made [4] 86/25 95/11 99/4 105/20
magic [1] 38/16
magnitude [1] 36/16
main [2] 17/3 29/1
major [1] 46/8
majority [2] 6/7 52/25
majority's [1] 53/1
maker [1] 29/25
manage [1] 12/19
managed [1] 101/9
mandate [16] 5/2 5/7 7/17 7/24 9/2 9/22 10/10 11/14 12/20 23/25 41/22 86/2 86/19 87/4 89/23 97/13
mandates [1] 52/21
mandating [2] 17/6 33/19
mandatory [1] 27/8
manner [2] 30/5 60/16
marketplace [1] 79/2
massive [1] 97/17
materially [4] 43/23 45/4 45/22 68/20
Matt [1] 3/10
matter [11] 22/22 31/14 49/3 77/2 81/7 93/2 95/14 96/22 97/9 103/13 108/19
matters [2] 78/8 93/1
MATTHEW [1] 2/11
McConnell [1] 2/12
McRae [2] 40/3 83/13
meaning [5] 44/2 50/4 70/16 71/17 80/17
meaningless [1] 68/1
means [13] 9/5 10/23 32/23 33/11 36/25 37/21 45/13 48/12 51/2 63/2 71/21 80/22 94/3
meant [1] 25/8
meanwhile [1] 54/21
measures [1] 80/9
mechanics [1] 79/8
mechanism [3] 47/9 60/10 96/12
Media [8] 48/22 56/22 57/2 59/17 89/8 89/13 100/10 100/10
medical [1] 82/17
Medicine [2] 30/21 31/7
Medicine's [1] 11/2
Meese [1] 61/17
meet [3] 35/19 35/23 72/1
members [1] 62/15
memo [2] 61/14 61/17
memos [1] 21/18
men [1] 74/22
mention [4] 25/20 29/21 49/4 102/8
mentioned [12] 17/2 19/21 20/3 20/7 21/5 28/20 51/8 53/16 75/5 89/7 102/10 102/20
menu [1] 97/11
merely [5] 44/8 46/4

48/18 60/20 77/25
merits [5] 20/5 28/24 43/6 43/9 48/25
mess [7] 5/21 14/14 14/15 63/4 63/5 85/9 100/1
met [2] 76/2 80/18
methods [2] 8/5 37/16
MICHELLE [4] 1/18 3/24 4/9 42/19
might [10] 10/21 19/6 40/22 43/11 48/15 94/5 94/6 101/21 101/22 105/17
miles [1] 94/17
million [1] 37/6
mind [13] 18/7 25/19 26/1 26/3 30/7 30/23 65/15 66/12 66/16 67/7 67/19 67/20 68/18
minority [1] 10/15
minute [1] 62/1
minutes [2] 84/2 97/25
mischaracterization [2] 43/8 47/2
mixed [1] 17/24
modify [1] 77/23
money [3] 8/22 19/9 79/2
month [4] 84/20 85/4 99/8 99/9
months [1] 49/25
moot [1] 12/21
mooted [1] 7/13
mootness [1] 7/14
moral [1] 11/23
morass [1] 38/8
more [20] 8/17 12/8 17/10 17/24 18/19 21/23 35/20 49/21 51/14 56/16 58/3 62/16 63/23 69/2 71/22 74/21 92/21 102/22 105/13 105/14
Moreover [1] 61/2
morning [4] 3/4 42/17 42/18 69/7
Moss [1] 61/14
most [7] 12/25 37/15 62/20 76/12 85/11 104/4 106/16
motion [6] 1/9 58/4 58/9 58/18 62/24 91/18
motions [1] 58/2
move [5] 28/23 55/7 55/9 58/18 58/18
moved [1] 84/12
moving [2] 74/17 100/8
Mr [3] 3/11 3/19 4/4
Mr. [5] 4/2 16/8 16/12 18/23 84/2
Mr. Dick [1] 16/8 16/12 18/23 84/2
Mr. Kairis [1] 4/2
Ms [2] 4/5 4/7
Ms. [7] 16/9 42/15 42/16 46/12 62/8 69/4 69/6
Ms. Banker [4] 42/16 46/12 62/8 69/4

**Ms. Kopplin** [1] 16/9
**Ms. Tanner** [2] 42/15 42/16
much [16] 4/14 16/19 16/19 17/24 18/19 25/3 40/13 64/6 76/1 84/5 93/3 97/24 98/1 100/23 102/4 108/10
multiple [2] 43/5 52/4
murder [1] 88/4
Muslim [1] 95/1
must [9] 68/23 70/4 70/13 71/9 72/1 72/10 76/3 82/7 82/17
myriad [1] 72/12
mystifying [1] 17/20

**N**

name [2] 11/5 42/19
named [3] 15/22 91/2 105/7
names [1] 4/18
narrow [4] 10/1 11/16 11/19 64/20
narrowing [1] 107/21
National [1] 1/19
nationwide [10] 11/18 13/8 13/14 14/4 14/7 14/10 26/21 62/14 62/15 103/14
Native [1] 80/13
natural [1] 10/11
nature [2] 7/24 20/19
necessarily [2] 92/14 101/11
necessary [2] 23/25 71/7
needed [2] 7/10 10/24
needle [1] 100/5
needs [1] 89/25
negotiations [4] 8/4 47/22 85/20 91/25
neither [4] 40/19 49/3 49/4 89/12
Network [1] 81/1
Nevada [1] 62/23
never [4] 22/23 62/24 102/23 105/11
new [25] 7/12 8/25 9/3 9/7 9/11 9/21 11/13 23/4 26/23 30/8 30/16 45/17 45/20 61/5 61/7 66/25 67/15 69/16 71/13 83/2 90/4 99/8 101/17 107/24 108/2
newfound [1] 76/16
next [3] 13/4 62/25 99/9
nexus [1] 83/8
Ninth [9] 13/19 27/21 27/25 28/6 48/23 57/8 64/22 96/2 96/3
no [64] 12/23 15/23 16/2 19/4 22/14 25/15 26/3 26/6 26/12 30/20 37/20 44/1 45/11 45/13 47/8 53/21 58/22 63/2 64/25 66/13 67/4 68/4 71/16 73/18 73/19 74/3 78/2 78/4 78/10 79/10 79/12 79/16 79/20

82/25 83/5 83/6 83/7 83/9 85/8 87/15 88/15 89/9 90/8 91/3 91/12 91/14 91/24 92/4 93/18 94/22 95/17 95/18 96/7 97/12 97/13 97/16 97/21 98/22 99/21 100/16 100/19 103/7 103/8 103/10 103/17 107/7 107/24
no-bid [1] 89/14
No. [1] 3/6
No. 3:18-CV-491 [1] 3/6
nobody [1] 53/7 97/17
Nodding [1] 33/5
non [1] 25/21
non-attainment [1] 25/21
nonenforcement [10] 15/18 19/22 46/7 46/9 52/5 85/16 85/17 85/21 86/25 89/12
nonetheless [2] 88/7 95/1
nongrandfathered [3] 70/10 70/14 71/11
nonprofit [1] 33/15
nonprosecution [1] 19/23
nonsense [2] 99/24 99/24
norm [2] 33/8 106/1
NORTHERN [6] 1/1 13/9 14/1 64/22 74/24 77/19
not [232]
Notably [1] 49/1
note [7] 18/22 25/2 50/21 74/10 75/17 81/14 105/21
noted [4] 36/14 40/15 84/12 85/8
nothing [11] 20/10 20/12 31/5 38/6 40/5 40/6 70/22 71/12 71/22 89/25 93/1
notice [20] 22/22 23/1 23/3 23/3 24/4 24/8 25/22 35/4 65/7 65/12 65/19 66/3 66/9 66/25 67/25 68/14 68/17 77/25 78/13 97/1
notification [1] 78/6
notifying [1] 92/17
NOTRE [79] 2/7 3/10 3/12 4/2 4/13 4/17 4/18 4/24 5/6 6/4 8/22 10/9 14/22 16/25 19/14 28/11 28/20 33/24 34/4 37/17 41/13 44/9 44/16 44/22 44/23 45/10 45/19 46/1 47/13 47/15 47/21 48/7 48/8 48/9 49/1 49/25 51/25 52/1 55/15 55/21 56/10 60/14 60/25 75/4 75/6 75/9 75/12 77/4 77/23 78/2 78/4 78/10 79/10 79/12 79/16 79/20

79/22 80/1 81/20 82/11 82/14 82/25 83/1 83/16 84/21 86/3 86/10 87/9 94/12 94/17 95/21 96/8 97/4 97/14 97/16 97/18 98/8 99/19 107/23
notwithstanding [3] 54/18 64/14 65/5
novel [1] 53/11
November [1] 50/7
nowhere [1] 70/6
number [21] 5/5 5/9 5/8 5/22 7/5 11/12 12/1 12/5 12/10 15/2 18/23 19/21 20/3 37/4 62/22 62/23 91/17 94/2 101/2 105/4 105/5
numbers [1] 80/15
numerous [1] 39/7
NW [4] 1/16 1/19 2/5 2/9

**O**

Obama [2] 17/11 23/20
object [8] 14/5 31/23 32/2 32/3 32/5 37/13 37/16 37/18
objected [2] 10/1 83/8
objecting [5] 14/8 37/15 37/15
objection [3] 19/11 38/2 80/14
objectionable [3] 44/1 44/6 95/15
objections [6] 10/5 11/23 17/3 41/19 74/12 82/12
objective [1] 94/3
objectives [1] 102/13
objector [6] 34/23 80/2 80/4 93/11 94/2 94/9
objectors [3] 14/10 14/20 74/14
objects [3] 37/13 37/17 75/6
obligated [1] 52/6
obligation [5] 63/11 97/2 97/12 97/13 97/14
obligations [1] 60/5
obstacle [1] 59/19
obstruction [1] 88/4
obtaining [1] 40/7
obviously [6] 4/5 9/8 15/15 40/19 41/17 99/6
occasions [1] 43/5
occur [1] 54/11
occurring [2] 70/16 72/11
occurs [1] 81/16
October [2] 46/24 47/25
odd [3] 20/7 47/16 98/9
off [4] 16/12 84/9 98/1 101/13
offer [1] 99/6
officer [1] 57/4
often [1] 23/7
OH [3] 2/13 25/10 99/17
old [2] 26/22 90/4

USDC IN/ND case 3:19-cv-... PPS-JEM document 78-7 ... filed ... page 118 of 123

# O

**Olive [1]** 94/19
**once [7]** 22/21 36/11 38/3 93/12 93/12 93/15 95/14
**one [45]** 5/5 5/16 6/8 7/7 8/10 14/25 17/3 18/22 24/7 29/2 35/12 38/13 38/14 38/15 38/21 39/23 39/24 46/19 47/15 49/10 49/12 51/22 53/15 58/23 62/22 76/22 78/19 83/20 88/13 91/13 91/17 92/21 94/5 94/5 95/14 95/23 99/7 99/11 102/21 102/22 103/17 104/4 105/17 105/7 107/24
**ones [2]** 27/9 41/25
**open [11]** 3/1 25/19 26/1 26/4 62/5 65/15 66/12 66/16 67/7 67/19 67/20
**operating [1]** 29/20
**opinion [6]** 14/3 44/14 79/3 97/7 104/4 108/8
**opinions [3]** 6/17 27/14 106/10
**opportunity [3]** 6/2 7/21 17/7
**opposing [1]** 62/12
**opposite [5]** 13/22 60/24 96/4 101/1 105/15
**opposition [2]** 21/2 21/4
**opt [3]** 11/21 19/4 19/10
**opting [1]** 19/8
**option [2]** 26/18 35/25
**optional [1]** 67/16
**oral [3]** 1/9 84/20 95/8
**order [11]** 5/24 7/21 26/7 27/11 42/1 42/5 72/13 82/8 86/15 86/15 98/6
**ordered [1]** 18/8
**orderly [1]** 85/10
**orders [2]** 17/2 28/14
**ordinary [4]** 43/3 46/6 46/9 91/24
**original [1]** 18/13
**originally [1]** 24/12
**other [50]** 4/25 8/4 8/10 8/21 10/6 10/6 10/12 10/13 14/23 15/13 16/2 16/3 24/9 24/14 26/7 27/14 28/19 29/23 31/2 35/4 37/3 37/7 37/10 40/23 40/24 41/13 41/14 42/21 47/14 47/15 47/16 53/8 58/20 60/10 65/21 72/12 75/9 75/17 77/5 82/4 82/11 83/5 83/18 89/19 95/18 95/19 98/22 99/19 101/7 107/25
**others [3]** 37/18 47/17 49/25

**otherwise [3]** 27/15 38/14 45/8
**ought [50]** 54/23 1/10 5/2 6/10 7/8 7/13 10/9 12/12 12/14 13/2 13/7 13/8 13/19 16/15 18/10 19/3 19/4 19/8 19/10 20/6 20/25 23/13 23/25 27/3 30/14 30/24 31/11 33/13 36/18 37/1 37/23 40/14 47/17 51/21 53/14 53/18 54/5 55/15 63/2 68/17 70/21 74/22 79/12 81/12 82/12 82/22 83/4 85/3 85/11 85/14 92/12 92/15 92/17 99/14 103/20 105/20 106/20 108/8
**outcry [1]** 65/1
**outside [4]** 49/15 69/22 81/8 95/22
**over [6]** 30/11 38/2 65/1 81/19 85/4 103/14
**overall [1]** 80/9
**oversight [1]** 47/9
**overturn [1]** 98/12
**overwhelming [2]** 6/7 106/9
**own [4]** 47/7 57/16 60/14 86/5

# P

**p.m [1]** 108/13
**P.O [1]** 2/13
**page [3]** 43/13 44/14 102/7
**pages [1]** 89/8
**pages 9 [1]** 89/8
**paid [1]** 18/17
**papers [4]** 55/21 58/25 83/13 83/20
**paradigm [5]** 17/16 26/22 36/17 44/12 90/5
**paragraph [12]** 43/15 43/17 43/19 76/9 85/22 85/22 85/23 86/12 86/13 98/14 98/15 98/17
**paragraph 2 [7]** 43/19 85/22 85/23 86/13 98/14 98/15 98/17
**paragraph 4 [2]** 85/22 86/12
**parasitic [1]** 94/8
**parcel [1]** 101/5
**parents' [1]** 37/11
**part [20]** 8/2 8/4 9/2 44/7 54/5 59/23 85/19 91/24 93/10 93/14 94/1 95/4 95/16 95/19 95/23 96/19 97/15 101/5 101/6 106/15
**Participants [1]** 68/8
**participate [1]** 36/4
**participating [1]** 36/9
**particular [12]** 4/22 6/15 17/6 17/22 23/22 25/16 66/6 71/19 83/4 91/1 93/3 94/11
**particularly [2]** 80/1 84/22
**parties [27]** 7/10 7/21 17/10 18/11 18/14 18/7 18/8 18/10 20/20 41/14 48/18 59/18 60/2 61/14 79/25 81/17 81/19 86/4 87/22 88/7 90/15 91/2 91/19 91/23 98/10 106/25 107/6
**parties' [1]** 63/10
**party [24]** 32/18 40/17 40/18 43/22 44/16 44/21 45/3 57/11 60/4 60/5 78/11 78/11 78/12 78/19 78/22 78/24 79/1 79/8 82/8 87/16 87/21 92/4 93/3 96/22
**party's [2]** 60/5 98/23
**pass [1]** 80/23
**passage [1]** 78/3
**passages [1]** 43/11
**passed [1]** 74/20
**past [7]** 23/17 23/18 31/21 33/1 37/7 106/5 107/6
**path [2]** 35/21 38/21
**pause [1]** 105/18
**pay [7]** 54/5 82/13 82/17 82/22 93/14 94/1 102/5
**paying [7]** 8/21 19/5 19/6 54/8 74/21 78/19 82/12
**payments [3]** 44/22 45/8 45/15
**pays [1]** 78/16
**peace [1]** 63/20 99/23
**penalties [2]** 10/19 33/17 36/14 36/16 97/17
**Pennsylvania [9]** 1/23 64/24 65/3 65/6 65/18 68/4 68/7 68/21 104/4
**people [30]** 3/25 9/3 9/7 10/6 10/12 10/17 12/2 19/2 19/5 19/8 19/10 20/19 25/6 26/19 34/25 35/22 37/6 38/23 40/6 40/8 45/10 47/1 47/8 53/13 88/5 95/3 95/5 100/18 101/7 102/12
**people's [1]** 89/11
**per [1]** 84/20
**perceived [1]** 93/6
**percent [4]** 9/23 9/24 11/15 47/1
**perhaps [6]** 12/8 37/10 37/12 45/25 105/23 105/25
**permanent [3]** 5/22 14/12 86/14
**permissible [2]** 35/16 72/21
**permits [1]** 53/21
**permitting [1]** 88/20
**person [2]** 33/11 44/1
**person's [1]** 33/9
**perspective [3]** 6/13 7/7 7/11
**persuasive [2]** 77/19 100/21
**pervasion [1]** 52/12
**Philadelphia [1]** 13/14 14/7
**PHILIP [1]** 1/10
**phrase [3]** 59/11 71/14 71/18
**phrased [1]** 65/18
**PI [1]** 55/11
**piece [1]** 21/19
**piecemeal [1]** 52/4
**place [9]** 9/12 9/22 11/14 12/24 22/13 22/13 26/23 38/5 93/22
**placed [1]** 108/3
**places [2]** 96/15 107/21
**plain [1]** 71/17
**plainly [2]** 70/13 72/16
**plaintiff [1]** 87/3
**plaintiffs [88]** 1/4 1/13 3/17 3/20 3/22 3/24 4/10 4/25 5/23 6/1 8/2 8/5 8/12 11/17 12/9 15/2 15/10 15/16 18/16 20/1 20/7 20/10 21/16 22/7 22/9 25/10 31/16 31/23 32/2 32/23 39/4 39/22 40/13 40/22 41/3 41/16 41/23 42/20 43/20 44/4 44/7 45/2 55/16 55/17 55/19 55/20 56/2 60/22 65/14 65/16 66/7 66/12 66/18 67/17 69/8 73/22 82/10 83/18 84/10 84/24 85/14 86/1 86/4 86/8 86/20 87/1 91/7 91/13 91/17 91/22 91/23 98/7 98/9 98/15 100/9 100/17 100/24 102/6 103/4 104/5 104/13 105/14 105/21 106/9 106/12 106/14 106/15 107/23
**plaintiffs' [11]** 17/3 19/13 20/16 21/1 22/18 39/1 55/24 69/11 69/15 69/17 73/17
**plan [36]** 33/20 34/2 34/13 37/11 37/11 37/11 44/3 44/7 75/8 78/8 78/11 78/18 78/20 78/20 78/25 79/18 79/20 83/9 88/18 93/10 93/14 94/1 94/8 94/8 94/13 95/16 95/17 95/19 95/23 96/4 96/9 96/19 96/23 97/11 97/14 97/15
**plans [16]** 8/1 37/5 43/21 43/22 44/24 45/2 45/7 45/11 60/18 70/10 70/14 71/11 84/19 88/20 95/21 98/16
**plausibly [1]** 72/6
**play [1]** 66/14
**plead [1]** 61/5
**pleas [1]** 83/18
**please [1]** 64/2
**pled [2]** 61/7 67/21
**plenary [1]** 25/7 25/10
**pluralistic [2]** 10/5 10/7
**plus [3]** 47/14 47/16 54/20
**pocket [4]** 74/22 79/13 82/12 82/22
**point [41]** 7/4 9/21 12/21 13/7 16/20 19/3 20/6 22/6 23/8 27/4 30/24 31/16 32/16 49/20 49/23 55/15 55/18 61/4 62/11 62/25 71/24 72/12 73/19 88/9 88/24 89/21 92/21 95/23 96/1 96/18 97/5 101/13 101/24 102/22 103/1 103/14 103/20 103/22 104/3 104/10 105/14
**pointed [1]** 13/2 37/23 50/21 51/17
**points [15]** 45/24 55/15 84/7 91/12 91/17 98/4 104/6
**policies [2]** 98/18 98/22
**policy [16]** 17/6 18/7 21/18 32/8 43/24 45/5 45/23 49/23 50/16 51/19 51/25 52/4 67/6 67/22 68/3 68/12
**population [1]** 20/22
**portion [2]** 10/4 10/8
**portray [1]** 11/17
**posed [1]** 59/7
**position [26]** 6/12 6/22 7/23 9/4 11/14 12/11 18/3 18/20 21/21 27/16 31/11 31/12 31/17 33/18 35/16 37/24 38/11 38/18 52/9 74/4 75/3 76/15 88/23 90/3 90/7 91/5
**positions [1]** 82/5
**Posner's [1]** 80/1
**possibility [1]** 54/17
**possible [1]** 24/6
**possibly [2]** 15/17 104/17
**post [9]** 64/15 65/5 65/19 65/22 66/2 66/17 68/13 68/16 77/12
**post-issuance [2]** 68/13 68/16
**post-promulgation [6]** 64/15 65/5 65/19 65/22 66/9 66/14
**post-Zubik [1]** 77/12
**postpartum [1]** 5/22
**pot [2]** 30/15 31/8
**power [3]** 53/21 57/14 70/3
**powers [3]** 52/13 65/19 101/6
**practice [5]** 33/1 34/9 34/10 34/11 106/3
**pragmatically [1]** 96/11

**P**

pre [1] 77/12
precedent [2] 16/1 57/17
precise [2] 11/9 38/4
precisely [1] 68/1
preclude [1] 52/18
predictions [1] 19/1
preexisting [1] 56/3
prejudice [1] 66/13
preliminary [5] 6/24 54/13 55/1 55/8 84/12
premised [1] 76/16
premium [1] 78/12
preordained [1] 38/22
prepared [1] 51/6
prepartum [1] 19/7
prerequisite [2] 76/2 80/18
prerogative [1] 79/23
prescribe [2] 38/3 51/12
present [1] 62/21
preserve [1] 7/18
president [2] 53/16 101/7
press [3] 53/17 92/12 92/17
presumed [1] 65/12
presumption [2] 65/13 65/20
pretty [4] 25/3 25/5 28/2 106/8
prevailing [1] 6/14
prevent [5] 22/18 41/4 47/9 68/1 73/6
preventative [9] 9/5 29/8 31/8 51/1 70/5 70/17 70/20 71/7 93/9
prevented [2] 101/15 101/16
preventing [2] 40/5 81/16
preventive [8] 9/8 9/13 9/15 10/21 11/12 51/9 71/19 75/12
prevents [1] 40/6
previous [3] 92/23 95/10 97/7
previously [9] 31/20 35/19 44/20 69/9 78/7 79/22 80/24 99/11 106/22
Priests [2] 6/20 80/25
primary [1] 92/22
principals [1] 52/12
principle [2] 70/1 72/15
prior [11] 17/11 22/13 26/15 30/7 34/15 38/6 74/22 78/3 79/17 81/23 106/15
prioritize [3] 16/21 19/18 20/14
private [20] 41/9 41/9 48/13 86/20 87/6 87/7 87/13 87/15 87/16 88/10 88/11 88/12 88/14 88/15 88/24 88/25 89/4 90/15 91/7

98/23
privately [1] 60/9
privity [6] 48/12 49/14 49/16 58/3 59/10 59/19
probably [5] 9/18 13/2 18/8 63/23 104/1
problem [3] 23/1 55/4 103/7
problems [4] 17/8 20/6 35/23 103/6
procedural [11] 20/3 28/23 42/22 61/25 62/11 64/10 65/22 66/18 67/23 68/22 103/1
procedurally [5] 22/5 64/11 65/4 68/5 69/1
procedure [1] 66/21
procedures [1] 65/20
proceeded [1] 92/10
proceedings [3] 3/1 62/5 108/18
process [35] 23/14 23/17 27/2 30/18 32/1 34/11 35/1 36/5 36/9 38/19 39/22 46/16 46/16 47/24 53/5 55/8 55/10 56/3 58/17 61/1 64/6 67/1 67/15 68/10 80/17 83/12 83/18 91/12 92/14 100/12 101/9 102/11 102/11 102/13 106/23
processes [1] 78/17
procured [1] 44/17
profit [1] 35/12
program [2] 37/12 94/6
Programs [1] 2/4
prohibited [1] 8/15
prohibiting [1] 13/9 13/10
promise [5] 43/6 44/8 46/4 50/11 108/9
promised [1] 5/1
promotion [1] 83/3
prompted [2] 5/15 5/17
promulgated [6] 7/12 12/6 12/14 26/22 54/2 54/11
promulgating [1] 67/10
promulgation [6] 64/15 65/5 65/19 65/22 66/2 66/17
proper [3] 15/20 22/5 22/21
property [2] 89/18 89/20
proposed [2] 66/25 69/21
proposing [1] 69/23
prosecution [1] 88/6
prosecutorial [1] 19/19
prospective [2] 22/7 43/9 99/2
prospectively [1] 102/2
protected [1] 40/1
protecting [1] 8/11
protection [10] 20/17 20/23 41/16 53/5 73/16

83/20 83/21 102/20 102/23 106/23
protections [2] 73/8 76/1
prove [1] 66/8
provide [32] 8/6 30/6 35/7 37/4 45/7 46/1 46/3 55/22 70/5 70/11 70/14 71/9 71/24 77/25 78/13 83/15 86/10 92/11 93/13 93/25 95/2 95/18 95/19 96/12 96/23 97/2 97/8 97/11 97/17 100/19 104/22 107/22
provided [17] 30/3 30/5 32/18 34/12 44/6 44/7 70/12 71/15 71/21 71/23 72/3 73/5 73/16 79/13 83/5 95/16 97/10
provider [1] 79/9
provides [5] 51/9 76/24 97/10
providing [7] 34/25 44/22 45/8 45/14 94/12 95/4 95/22
proving [1] 66/16
provision [12] 7/25 24/1 29/21 30/2 44/15 52/22 66/6 66/14 83/17 93/8 93/9 100/16
provisions [2] 29/23 105/13
prudential [1] 12/18
public [5] 17/9 24/8 65/1 68/15 92/18
publicizing [1] 92/14
punishes [1] 40/5
punt [1] 18/9
punted [1] 9/20
purporting [1] 67/14
purports [3] 45/22 45/24 61/15
purpose [2] 74/18 74/21
purposeful [1] 42/2
pursue [1] 102/12
puts [1] 75/3
putting [1] 10/18

**Q**

quagmire [2] 53/25 85/12
question [24] 6/12 8/14 16/17 17/25 18/6 18/22 22/4 22/25 25/18 25/25 36/11 52/16 56/17 59/6 59/7 59/10 76/24 95/12 99/3 99/10 103/2 103/20 104/16 104/24
questions [9] 8/17 22/1 28/23 33/3 38/25 42/11 58/21 61/23 97/21
quick [1] 58/1
quickly [3] 58/3 58/18 108/8
quiet [2] 92/7 92/9
quite [13] 6/13 11/18 11/23 13/5 15/15 29/13 53/12 79/6 85/16 86/23

90/16 101/1 106/9
quote [1] 68/7
quotes [2] 11/25 11/24

**R**

raise [1] 20/17
raised [4] 20/1 58/24 59/2 62/12
raising [1] 61/5
rare [1] 23/21
rather [11] 10/17 55/10 57/12 63/18 67/7 72/8 73/2 73/9 74/8 76/21 77/25
rational [2] 42/3 42/4
re [2] 30/22 37/19
re-evaluated [1] 37/19
re-evaluation [1] 30/22
reach [9] 8/10 11/13 53/1 55/8 58/10 58/19 80/21 90/15 99/4
reached [5] 4/23 6/23 60/21 104/10 106/18
reaching [1] 58/17
read [9] 19/1 28/5 40/16 43/11 56/25 59/18 95/9 96/17 98/14
reading [5] 17/5 32/24 32/24 32/24 98/13
reaffirm [1] 106/14
reaffirmed [1] 77/12
real [4] 77/11 85/5 100/7 106/13
really [24] 12/13 19/10 28/3 30/20 34/9 34/13 35/4 64/7 65/1 75/13 79/7 88/11 94/21 96/4 97/18 97/19 99/17 102/7 103/22 103/23 104/9 104/19 106/4 107/16
realm [1] 32/20
reason [23] 14/6 19/3 23/23 24/11 26/3 26/6 26/12 37/20 39/25 40/14 42/5 46/6 46/8 46/18 48/19 49/16 53/22 59/16 84/14 91/25 92/5 102/18 106/3
reasonable [6] 8/13 11/19 33/22 35/18 38/20 85/8
reasonably [2] 4/14 12/7
reasoned [1] 77/16
reasoning [5] 77/8 77/9 77/18 77/18 77/22
reasons [15] 5/5 19/16 22/16 25/15 39/19 43/4 59/22 61/22 67/22 68/3 95/13 99/11 102/17 107/13 108/5
REBECCA [2] 2/3 3/14
rebutted [2] 65/13 65/21
receive [5] 44/1 60/18 79/18 79/21 82/17
received [2] 24/22 60/22

receives [1] 79/2
receiving [2] 40/1 61/1
recent [4] 12/20 104/4 106/16
recently [1] 65/3
recess [2] 62/4 108/13
recognized [4] 42/10 52/24 52/25 93/8
recognizes [1] 18/5
record [10] 3/6 6/16 6/24 16/20 17/24 37/20 57/22 84/15 106/8 108/18
red [2] 72/6 72/10
redefine [1] 9/8
redo [1] 30/16
refer [1] 85/23
referenced [1] 9/19
references [2] 29/9 29/12
referencing [1] 17/23
referring [2] 29/15 32/11
refers [1] 86/16
refusal [1] 55/21
refuse [2] 80/3 81/6
refused [3] 67/11 75/22 92/11
refusing [1] 50/1 50/19 51/20
regard [1] 99/22
regarding [1] 102/20
regardless [1] 97/8
regime [2] 81/6 82/13
regional [1] 13/18
Register [2] 73/3 74/6
regular [2] 79/20 97/13
regulates [1] 89/22
regulation [15] 15/22 18/14 30/2 43/24 45/4 45/23 48/11 66/8 78/9 87/2 89/21 93/3 93/6 100/11 107/17
regulations [24] 12/20 12/22 12/23 13/5 14/18 15/20 23/25 26/21 26/24 30/8 43/23 45/4 57/16 86/3 86/9 86/10 86/17 86/20 89/10 89/15 89/19 90/4 97/1 101/22
regulatory [5] 8/5 12/4 12/24 13/1 55/22
rehearing [1] 6/20
reimbursement [2] 78/21 78/23
reinstitute [1] 6/9
reiterated [1] 65/11
rejected [4] 75/20 105/21 105/24 105/25
related [1] 104/19
relating [1] 24/2
release [2] 53/17 92/12
releases [1] 92/17
relevant [3] 51/20 79/11 89/21
relief [4] 22/7 22/10 22/11 56/4
religion [8] 33/10 36/10 39/6 39/9 39/14 73/17

**R**

religion... **[2]** 83/3
108/2

religious **[57]** 8/8 8/12
9/22 10/2 10/15 10/18
11/16 11/22 14/9 14/10
14/20 19/11 22/23
33/24 34/11 34/14 35/2
36/12 39/11 39/18
41/19 42/6 42/9 60/16
74/12 74/14 74/15
75/22 76/4 76/7 77/24
79/23 80/2 80/4 80/7
80/14 80/19 81/20
81/25 82/11 82/25 83/2
83/4 83/7 83/11 84/21
93/11 94/2 94/8 95/3
105/2 105/5 105/12
105/18 106/3 107/4
107/25

rely **[4]** 59/4 66/5 87/17
106/22

relying **[2]** 19/16 67/8

remain **[2]** 10/24 54/11

remained **[1]** 66/16

remains **[3]** 12/24 88/9
98/24

remanded **[3]** 5/20
58/10 77/7

remanding **[1]** 77/17

remedy **[3]** 38/4 56/6
90/14

remember **[2]** 9/4
47/25

remove **[1]** 56/4

removing **[2]** 107/17
108/3

rendered **[1]** 57/12

renting **[1]** 89/20

repetition **[1]** 7/15

replace **[1]** 85/1

replaced **[1]** 75/23

replacing **[1]** 72/9

reply **[5]** 55/21 58/25
59/2 84/3 89/9

reported **[2]** 3/2 62/6

reporter **[2]** 46/15
108/22

**REPRODUCTIVE [2]**
1/3 3/7

request **[3]** 24/20 53/15
83/5

requested **[1]** 108/15

require **[9]** 8/18 9/1
40/7 46/1 76/1 79/24
86/10 95/1 97/1

required **[14]** 7/25 8/8
29/4 45/12 51/10 60/21
78/5 81/24 82/3 82/3
93/15 93/19 93/22 97/7

requirement **[18]** 25/15
43/7 44/10 46/21 47/5
48/10 50/20 50/23
50/25 51/17 59/14
60/16 67/12 67/25 75/1
80/19 93/25 103/8

requirements **[5]** 65/7
66/4 68/2 75/11 86/17

requires **[9]** 29/6 51/7
77/25 78/11 78/12 80/7

---

religion... **[2]** 83/3

requiring **[3]** 34/1
66/1 98/13

research **[1]** 32/14

resolution **[1]** 8/13

resolutions **[1]** 60/21

resolve **[4]** 24/13 60/3
60/15 85/10

resolved **[2]** 13/1 84/11

resources **[5]** 11/7
16/21 19/18 63/25
85/11

respect **[7]** 8/24 11/9
54/7 55/14 84/24 88/17
88/20

respectfully **[4]** 18/18
42/12 58/17 97/8

respects **[2]** 54/25
57/25 95/3

respond **[1]** 35/13

responded **[4]** 25/1
26/5 26/6 26/10

responding **[1]** 101/24

response **[5]** 35/16
35/18 36/6 58/22 93/6

responses **[1]** 103/25

responsibilities **[1]**
50/17

responsibility **[1]**
63/18

rest **[4]** 81/25 82/3
83/12 83/19

rested **[1]** 69/25

restrictions **[2]** 39/12
103/12

restrictive **[5]** 33/11
36/25 37/21 80/22 94/3

result **[4]** 8/9 45/9
45/14 78/7

resulting **[2]** 65/12
78/4

results **[1]** 78/6

retain **[3]** 88/10 88/11
88/12

returning **[1]** 82/20

revenue **[1]** 78/12

reverse **[1]** 77/8

reversed **[1]** 76/15

review **[9]** 4/21 15/17
42/4 52/3 52/23 57/14
76/25 86/24 90/1

reviewability **[1]** 58/21

reviewable **[7]** 43/1
48/21 49/18 53/22
68/25 85/15 85/18

reviewed **[2]** 15/24
17/10

reviewing **[1]** 52/18

**RFRA [39]** 5/6 6/8 6/18
8/14 12/2 17/17 29/5
33/4 33/7 35/17 35/17
38/3 38/5 38/7 38/12
38/13 38/25 61/20
69/20 73/14 74/1 74/8
74/13 74/14 75/25
75/25 76/17 76/19
76/24 77/20 80/6 80/18
92/21 92/22 93/12
100/4 104/17 106/1
106/5

---

**RFRA's [3]** 76/1 80/17
82/7

**RI [1]** 105/2

right **[78]** 3/6 3/13 3/23
4/4 5/11 5/17 6/4 7/1
7/3 8/16 8/19 10/7
11/10 12/16 13/17
13/20 14/24 16/8 16/11
18/12 18/15 22/20
28/12 28/18 28/21
30/25 33/7 33/20 39/23
41/14 42/14 43/9 48/3
48/3 48/16 54/1 54/8
54/12 54/15 55/25 56/9
56/15 57/25 58/14 59/1
60/9 60/12 63/4 63/12
63/22 79/6 82/18 83/2
84/15 86/20 87/14
87/15 88/1 88/10 88/11
88/12 88/14 88/16
88/24 88/25 89/5 89/18
90/20 91/3 91/7 91/21
93/4 93/11 93/14 97/3
107/24 108/2 108/7

rightly **[1]** 49/5

rights **[16]** 41/5 48/17
53/2 54/21 61/3 61/13
69/12 73/18 86/1 86/4
87/4 89/11 92/2 92/4
98/12 98/23

ripe **[2]** 54/22 54/24

ripeness **[2]** 12/18
55/15

rise **[2]** 3/3 62/7

risk **[1]** 7/8

**RLUIPA [1]** 82/6

**Roe [1]** 80/12

room **[1]** 10/7 39/7

routine **[2]** 64/21 65/2

rule **[19]** 7/12 22/19
22/21 22/23 23/4 24/19
47/3 47/23 66/3 66/25
67/25 76/10 81/22
90/22 90/23 99/9 99/9
104/1 104/9

**Rule 41 [1]** 47/23

ruled **[4]** 5/14 6/8 17/25
77/3

rulemaking **[3]** 27/8
90/19 90/20

rules **[109]**

ruling **[1]** 58/1

run **[1]** 98/1

running **[1]** 81/12

runs **[2]** 72/14 75/10

---

**S**

**S/Stacy [2]** 108/21
108/21

safe **[1]** 72/10

safety **[3]** 72/3 72/5
72/8

sat **[2]** 97/4 97/16

satisfied **[2]** 42/8
104/21

satisfy **[4]** 6/3 7/22
17/13 39/19

save **[1]** 19/9

scenario **[1]** 85/3

scheme **[1]** 51/23

---

school **[1]** 79/17

screenings **[2]** 9/17
79/20

screw **[1]** 66/21

scrutiny **[2]** 42/7 53/23

seat **[5]** 72/1 72/3 72/5
72/8 72/10

seated **[1]** 3/5

**Sebelious [2]** 76/21
86/15

second **[10]** 26/11 34/7
34/13 36/2 46/8 46/18
58/23 60/13 96/1 96/21

second-guess **[1]** 34/7

second-guessing **[1]**
34/13

secret **[1]** 47/19

secretary **[1]** 30/10

section **[2]** 29/9 29/13

**Security [1]** 80/15

see **[12]** 3/11 14/3
15/11 54/25 57/21
82/21 88/5 93/20 100/2
103/24 104/21 105/24

seeing **[1]** 103/25

seeking **[3]** 22/7 55/10
67/24

seem **[2]** 32/7 41/23

seems **[9]** 7/19 19/5
32/2 35/4 41/21 45/23
56/16 63/10 105/10

sees **[1]** 43/3

segregate **[1]** 78/11

select **[2]** 30/4 101/8

selecting **[1]** 80/5

self **[7]** 78/18 78/25
95/17 95/21 96/6 96/7
96/25

self-certification **[1]**
96/25

self-funded **[1]** 78/25

self-insured **[5]** 78/18
95/17 95/21 96/6 96/7

send **[1]** 92/17

sending **[1]** 36/18

sense **[5]** 8/25 20/15
28/6 28/7 104/19

sensible **[1]** 12/25
32/24

separate **[16]** 20/25
31/11 44/16 44/22 45/8
45/15 59/7 73/23 73/23
78/13 79/18 96/4 96/11
96/13 96/14 104/23

separation **[4]** 1/15 8/7
52/13 101/6

series **[2]** 46/19 74/4

serious **[1]** 8/14

seriously **[3]** 25/11
95/11 99/23

services **[18]** 10/24
11/7 11/13 30/4 30/5
35/8 44/15 51/10 51/11
70/6 70/12 71/8 71/19
75/12 79/24 85/7
105/16 105/17

serving **[2]** 36/25 37/22

set **[7]** 17/16 28/10
29/7 64/13 68/23 94/6
94/9

---

setting **[1]** 28/18

settle **[13]** 52/3

settlement **[11]** 25/18
56/19 56/24 57/6 57/10
99/13 100/18 100/20
101/5

settled **[8]** 5/4 6/6
16/17 53/9 63/16 81/22
92/15 101/18

settlement **[110]**

settlements **[2]** 43/2
91/9

settling **[4]** 15/23 20/21
51/21 57/5

seven **[4]** 5/9 5/12 7/7
77/5

**Seventh [11]** 25/18
25/25 65/25 66/1 76/21
76/23 77/4 77/14 106/6
106/7 106/10

several **[6]** 22/16 49/12
54/12 59/21 103/6
103/14

severe **[1]** 10/19

sex **[2]** 41/19 41/20

shall **[2]** 70/11 103/8

sharing **[2]** 45/12 75/11

sharp **[1]** 7/5

sharpen **[1]** 71/24

she's **[1]** 11/10

shelf **[1]** 54/4

shifted **[1]** 66/7

short **[3]** 37/1 38/19
53/10

short-circuit **[1]** 38/19

shortly **[1]** 74/16

shouldn't **[1]** 30/15

show **[10]** 32/23 37/2
41/16 42/1 54/1 63/24
66/11 66/12 67/21
104/7

showing **[1]** 65/14

shown **[2]** 73/24 107/3

shows **[2]** 25/11 50/19

side **[3]** 8/10 8/11
82/19

sides **[5]** 6/3 7/22
17/13 99/5 99/11

signatories **[3]** 41/15
98/21 99/19

signed **[1]** 102/24

significant **[1]** 65/1

similar **[10]** 14/23
14/24 25/5 32/16 35/4
43/23 45/4 45/23 48/11
66/13

similarly **[3]** 17/5 39/15
107/23

**SIMON [1]** 1/10

simply **[19]** 43/6 51/8
51/24 52/11 61/6 65/21
66/17 69/22 70/21
71/20 72/18 73/17 74/3
77/2 79/22 80/18 81/4
81/7 81/21

simultaneous **[1]**
55/23

since **[5]** 16/12 77/3
77/4 77/5 106/10

sincere **[1]** 10/4 11/22

**S**

sincere... [1] 19/11
sincerity [1] 88/7
single [5] 50/22 51/18 66/5 83/4 83/23
sir [1] 53/19
sister [1] 82/7
sitting [1] 56/18
situation [5] 21/14 51/15 78/25 86/23 89/23
situations [1] 64/20
six [2] 44/13 85/2
size [1] 33/16
skepticism [1] 65/18
skip [2] 24/4 81/18
Skipping [1] 43/25
slice [1] 10/1
slightly [1] 40/9
slow [4] 31/24 46/12 64/3 64/9
small [11] 10/4 10/15 10/16 11/23 12/4 12/10 12/10 18/24 18/25 19/4 83/22
smaller [1] 40/9
so [203]
so-called [1] 26/16
Social [1] 80/14
society [3] 10/5 10/8 10/12
solicitation [4] 64/15 65/5 66/2 66/17
solicitor [1] 95/10
solution [1] 6/3
solve [1] 17/7
solving [1] 38/21
somebody [1] 30/22
somebody's [1] 33/23
somehow [5] 19/9 72/20 93/19 104/18 104/23
someone [6] 37/10 82/2 89/15 89/18 107/8 107/10
sometimes [5] 87/14 87/16 87/18 87/20 88/6
somewhere [2] 13/16 104/15
sooner [1] 24/14
sorry [14] 23/17 26/17 29/25 31/25 32/9 34/17 42/16 46/13 46/17 58/13 64/2 73/11 77/5 87/25
sort [14] 19/1 19/6 19/12 20/1 20/21 24/15 38/1 40/14 44/18 55/4 63/1 98/18 100/4 102/24
sorted [1] 63/2
sorting [1] 10/11
sought [1] 12/3
source [2] 75/14 103/7
sources [1] 37/10
SOUTH [1] 1/2
sovereign [3] 59/6 59/12 59/13
space [1] 107/3
speak [4] 12/8 55/4

speaking [4] 4/2 4/5 63/7 90/1
speaks [1] 70/13
special [3] 73/4 73/16 83/10
specific [9] 18/7 24/1 38/7 73/14 74/21 76/19 78/8 105/13 105/16
specifically [11] 9/19 49/11 61/14 70/4 74/8 75/4 76/16 76/24 77/16 86/16 89/15
specifications [2] 72/2 72/2
speculating [1] 17/21
split [2] 5/12 5/18
splitting [1] 4/10
spoke [1] 18/23
sponsor [2] 95/16 95/18 96/23 97/14
sponsored [2] 44/3 44/7
spouse's [1] 37/11
squarely [1] 56/23
Stacy [3] 108/17 108/21 108/21
staff [2] 82/2 88/17
stages [1] 68/9
stand [3] 28/8 54/14 54/17
standard [5] 25/13 64/13 65/10 66/13 91/11
standing [1] 55/14
stands [3] 48/13 48/16 60/11
start [3] 16/11 29/5 35/1
started [1] 67/7 67/15 88/9
starting [4] 39/3 67/9 84/8 98/7
state [5] 1/15 37/12 39/7 48/14 62/23
stated [1] 64/18
statement [4] 44/9 46/2 81/23 83/20
states [6] 1/1 1/10 57/8 69/17 78/9 101/3
stating [1] 44/18
status [1] 27/17
statute [26] 31/13 32/21 32/25 33/2 33/7 51/8 51/12 70/22 71/2 71/5 71/9 71/10 71/15 71/18 71/20 71/25 82/7 89/22 93/1 93/7 93/19 93/21 103/23 104/20 104/21 104/24
statutes [3] 49/11 73/14 101/2
statutory [15] 7/24 23/24 24/13 50/17 52/22 69/12 72/13 76/1 80/17 81/6 93/8 93/11 93/13 93/25 97/13
stay [1] 85/11
stead [1] 80/6
Steel [2] 25/20 103/22

step [5] 38/15 38/15 38/16 47/11 49/21
steps [3] 11/6 12/23
sterilization [1] 105/17
still [13] 26/18 27/2 28/17 28/18 38/9 38/10 41/9 56/17 77/22 84/25 88/24 89/5 101/11
stop [2] 38/17 40/24
stopped [1] 63/16
stops [2] 56/25 57/7
store [1] 94/24
straightforward [1] 35/21
strange [4] 32/3 102/19 104/13 105/10
straw [1] 53/10
street [4] 1/16 1/23 2/5 94/25
stretch [1] 71/14
strike [2] 14/11 53/11
striking [1] 14/7
strong [2] 28/6 67/22
strongly [2] 8/5 47/17
structured [1] 36/22
stuck [1] 18/13
student [6] 47/20 62/21 78/20 79/18 87/11 88/20
students [13] 40/10 41/5 44/17 44/23 45/9 45/10 48/7 52/1 55/6 55/7 60/25 87/12 101/16
students' [2] 41/5 53/15
study [5] 30/14 32/6 32/10 32/16 32/17
stuff [3] 64/5 93/14 93/25
subject [4] 22/22 46/9 48/19 75/2
subjective [2] 69/10 69/15
submission [1] 4/20
submit [3] 9/18 24/20 34/12
subsection [1] 71/19
subsidiary [1] 30/10
subsidies [1] 107/22
subsidize [2] 40/8 94/6
subsidized [1] 40/2
subsidizing [1] 40/4
subsidy [1] 83/15
substantial [28] 33/15 33/16 35/11 35/19 35/23 36/4 36/6 36/7 36/13 36/15 38/20 38/23 42/5 74/15 76/3 76/9 76/13 76/20 76/24 77/15 80/16 82/25 85/25 86/4 92/25 93/7 95/12 106/2
substantiality [1] 36/11
substantially [7] 18/1 33/9 33/23 34/4 34/10 106/17 106/19
substantive [10] 42/24 51/7 59/20 83/12 83/18

89/10 90/21 92/2 98/12 104/12
substantively [1] 50/2
subterfuge [3] 66/8 66/9 69/2
substitute [1] 80/9
succeed [1] 69/18
successfully [1] 104/8
such [6] 7/23 18/3 59/10 65/8 100/19 103/8
sue [3] 88/1 88/21 88/22
sued [1] 38/15
suffering [2] 63/8 84/13
sufficient [1] 84/16
suggest [8] 25/10 29/13 31/5 56/21 73/12 100/24 104/18 105/10
suggesting [1] 30/3
suggestion [1] 60/20
suggests [2] 68/12 71/12
suit [2] 14/8 59/4
Suite [4] 1/16 1/20 1/23 2/12
suits [4] 15/2 15/3 99/18 99/19
summary [1] 58/7
supersede [1] 26/15
superseded [1] 26/18
supplied [1] 59/13
supplies [2] 59/5 59/11
support [1] 100/2
suppose [1] 6/11
supposed [3] 23/9 66/22 103/3
Supreme [47] 5/13 5/15 5/17 5/18 5/24 6/10 6/14 7/17 7/21 8/3 8/18 13/2 14/17 14/17 16/1 17/5 17/25 18/4 18/5 18/7 18/14 19/16 33/14 35/2 39/7 42/10 50/12 52/13 54/15 60/1 60/13 63/11 77/7 80/11 80/12 81/23 82/6 85/9 87/25 93/7 93/24 96/16 104/20 107/2 107/5 107/15 108/1
surprised [1] 54/25
surprising [1] 59/16
surprisingly [1] 71/2
survive [1] 53/23
suspect [2] 47/17 83/24
suspenders [2] 24/16 51/23
swallow [2] 47/10 67/25
swallows [1] 47/3
Swanson [1] 1/22
sweeping [1] 75/19
switch [1] 32/8
sympathetic [1] 50/24
system [1] 102/1

**T**

table [1] 99/10
tactical [1] 55/3

taint [1] 22/18
tainted [3] 22/12 65/8 88/22
taken [7] 17/6 18/20 26/9 31/12 46/20 57/20 88/22
takes [2] 31/10 49/17
taking [6] 6/21 21/16 24/21 25/11 37/24 98/9
talk [6] 22/2 49/21 51/6 51/14 92/19 105/18
talker [1] 64/8
talking [8] 4/7 16/15 35/9 54/16 91/19 104/13 105/7 106/15
TANNER [7] 1/14 3/22 4/7 4/9 42/15 69/6 69/7
tasked [1] 10/22
tax [1] 107/9
taxes [1] 107/10
tea [1] 28/5
team [1] 8/2
Television [1] 81/1
telling [5] 31/2 34/18 34/19 81/18 106/1
tells [1] 33/8
temper [1] 16/18
tend [1] 55/7
Tenth [1] 6/21
term [2] 13/4 96/9
terms [6] 12/17 19/23 21/9 41/18 71/9 86/14
test [6] 39/20 64/25 80/23 83/6 83/7 83/9
Texas [4] 13/9 13/21 14/1 14/9
text [4] 41/18 76/5 78/8 98/13
textual [1] 72/13
thank [20] 4/16 16/7 16/8 16/10 21/25 33/6 42/14 55/13 62/3 69/4 69/5 83/25 84/1 84/4 97/23 97/24 98/2 108/6 108/11 108/12
Thanks [2] 69/4 84/5
themselves [3] 3/8 30/18 52/3
theory [3] 22/18 41/24 42/1
thereafter [1] 67/6
therefore [5] 75/7 77/10 77/22 80/21 93/19
thin [2] 6/24 106/8
thing [17] 15/24 18/22 21/7 23/15 38/7 38/13 44/18 48/4 62/20 79/11 89/6 94/11 96/21 99/13 102/14 103/20 107/19
things [14] 5/16 6/2 9/17 16/14 17/18 18/12 20/25 40/19 54/13 58/20 67/20 86/9 89/19 99/5
think [103] 7/4 7/11 7/20 8/13 8/20 10/3 11/9 11/18 12/7 12/9 12/17 12/24 13/3 13/14 14/16 14/17 15/15

USDC IND case 3:19-cv-00917-RLM-JEM   document 78   filed 08/27/19   page 122 of 123

**T**

think... [86] 15/25 16/20 17/5 17/22 18/6 18/7 20/24 21/15 22/5 26/3 26/6 26/12 26/25 27/2 27/5 27/10 27/20 28/13 37/17 39/10 42/3 42/6 43/10 46/21 54/22 57/3 57/21 58/8 62/13 62/20 63/17 68/7 77/10 81/6 84/8 84/14 84/16 84/22 85/2 85/5 85/7 85/16 86/17 86/23 87/24 88/13 89/9 90/8 90/24 91/6 91/11 92/3 92/10 92/11 92/13 92/24 92/25 94/10 94/11 94/21 95/2 95/7 95/9 97/18 100/23 101/1 101/4 101/10 102/4 102/7 102/15 103/2 104/9 104/18 105/1 105/1 105/13 105/14 106/9 106/9 106/22 107/15 107/23

thinking [2] 63/20 68/2

third [42] 13/16 26/20 27/11 27/12 27/17 28/7 28/8 28/15 32/4 32/18 40/17 40/18 43/22 44/16 44/21 45/3 48/17 59/18 60/4 60/5 65/17 77/10 77/12 77/16 78/1 78/11 78/12 78/19 78/22 78/24 79/1 79/8 79/24 81/17 81/19 82/8 87/21 92/4 96/22 106/13 106/25 107/6

third-party [16] 32/18 43/22 44/16 44/21 45/3 78/1 78/11 78/12 78/19 78/22 78/24 79/1 79/8 82/8 92/4 96/22

this [259]

Thornton [1] 81/22

Thou [1] 103/8

though [8] 26/2 29/23 44/20 49/15 67/17 67/18 79/4 88/1

thought [5] 5/9 15/17 16/15 24/22 74/1

thousands [1] 47/7

threading [1] 100/5

threat [1] 36/14

three [6] 29/21 43/4 44/14 85/2 90/3 94/17

three miles [1] 94/17

threshold [1] 42/21

throughout [1] 9/25

throwing [1] 50/5

thru [1] 55/8

thus [3] 59/8 75/2 83/1

time [18] 4/14 8/14 31/20 35/13 38/15 58/25 59/2 60/17 67/13 68/14 81/12 86/18 90/16 92/17 103/17 103/18 107/9 107/11

timeline [1] 46/22

49/22 50/19

times [1] 103/14

Title [6] 39/12 94/9 94/15 94/17 94/23 104/21

Title VII [2] 39/12 104/21

today [4] 38/9 38/10 74/19 97/22

told [5] 35/3 38/1 38/7 38/12 100/11

too [8] 6/25 46/12 46/16 98/1 99/3 101/20 102/4 105/15

took [6] 7/23 22/13 24/17 25/23 26/1 67/5

tool [2] 93/16 93/23

topic [1] 105/3

topics [1] 41/12

total [3] 7/19 8/23 8/25

totally [4] 44/15 92/16 101/12 101/25

touched [1] 59/21

towards [1] 65/19

TPA [11] 45/14 95/17 95/22 96/8 96/8 97/1 97/7 97/9 97/11 97/12 97/14

TPAs [1] 96/6

traded [1] 69/11

trades [2] 48/17 61/13

trading [1] 61/3

transcript [1] 1/9 95/9 108/15 108/18

transform [1] 74/25

treading [1] 69/16

treat [6] 43/20 45/1 86/8 98/15 98/19 98/21

treatment [2] 83/5 83/10

trigger [2] 97/5 97/18

triggered [1] 76/2

troubling [1] 102/2

true [4] 10/22 57/9 93/12 108/17

truly [1] 47/9

Tucker [2] 59/5 59/11

turn [5] 47/4 61/24 74/16 81/22 94/19

turning [9] 59/20 64/10 69/15 75/25 83/12 103/1 104/12 106/5 106/21

twice [1] 64/24

two [24] 16/15 24/6 29/1 29/4 29/18 33/12 36/21 39/22 48/20 49/18 58/6 62/23 69/16 73/15 75/17 77/4 78/17 84/24 86/9 89/7 91/12 91/17 95/11 95/13

type [7] 82/19 85/17 86/23 86/24 89/5 89/23 90/14

types [1] 75/6

typically [3] 59/5 59/11 70/18

**U**

U.S [4] 1/6 2/3 25/19 82/2 82/6

U.S.C [3] 24/1 24/5 29/10

Uh [1] 45/18

Uh-huh [1] 45/18

ultimately [6] 6/14 17/11 24/22 55/6 58/15 106/7

unambiguous [1] 60/14

uncertainty [1] 7/10

unclear [1] 25/7

unconstitutionally [1] 57/15

under [50] 4/21 5/7 7/18 10/9 11/12 15/16 15/25 16/25 19/14 20/23 27/5 27/9 28/11 35/17 35/17 36/3 36/14 36/17 38/12 44/12 45/9 45/12 48/21 57/5 64/13 65/10 66/15 69/20 72/14 72/17 72/20 73/16 74/8 75/12 81/16 81/21 82/13 82/25 83/6 87/4 87/9 87/11 87/13 93/7 95/10 95/12 95/17 97/13 98/20 108/9

underlying [3] 77/9 79/9 96/13

undermine [4] 46/20 51/19 52/7 63/19

underscores [1] 14/16

understanding [6] 27/11 28/15 30/9 41/7 44/12 84/19

understood [1] 85/21

unequal [1] 75/3

unique [2] 14/22 83/10

uniquely [1] 71/20

UNITED [5] 1/1 1/10 1/15 57/8 101/3

universe [1] 11/23 69/22

universities [4] 10/6 10/8 10/12 53/9

UNIVERSITY [9] 2/7 4/17 4/24 5/2 12/20 53/16 88/22 96/25 97/10

University's [1] 84/19

unknown [1] 47/14

unlawful [11] 43/2 51/23 59/8 59/22 59/23 61/11 61/12 68/25 69/3 87/23 87/25

unless [12] 12/13 19/11 22/1 28/22 33/10 38/25 42/11 54/10 58/20 61/23 70/2 96/25

unnecessary [1] 24/8

unpack [1] 108/9

unquestionably [1] 68/18

unreviewable [5] 4/20 15/16 15/19 16/25 57/12

unspecified [1] 62/16

**unsurprising** [1] 68/19

until [6] 12/25 28/8 58/17 68/24 71/4

unusual [2] 23/21 105/1

upheld [1] 13/6

upon [2] 59/3 59/10

urge [1] 95/9

urging [2] 9/3 9/8

us [10] 21/16 22/25 25/7 26/6 35/3 43/11 87/12 91/6 98/8 107/20

use [7] 8/6 26/19 41/25 80/14 85/11 94/4 107/20

used [4] 23/18 35/4 40/7 51/3

using [3] 35/24 40/6 102/25

usually [1] 43/3

usurp [1] 52/9

usurpation [1] 100/25

**V**

vacate [3] 27/12 28/16 56/12

vacated [4] 5/19 54/19 77/7 106/7

vacating [1] 77/17

valid [1] 14/19

value [2] 73/1 73/20

various [5] 4/25 5/19 5/23 8/3 102/12

vehicle [1] 102/19

verbatim [1] 69/18

Vermont [1] 103/9

version [2] 37/2 106/16 99/8

versus [3] 3/7 99/7 99/8

victories [1] 76/15

videos [1] 27/25

view [6] 10/15 10/21 15/18 31/8 60/7 92/23

views [1] 8/8

vigorously [1] 67/13

VII [2] 39/12 104/21

violate [8] 20/15 21/8 39/20 57/4 69/3 84/21 102/16 106/2

violated [4] 36/12 53/2 65/9 76/17

violates [11] 17/4 21/3 35/2 48/21 49/17 52/19 53/4 61/8 61/20 93/21 102/16

violating [2] 10/18 52/21

violation [11] 5/7 6/18 17/17 21/14 34/14 36/10 54/2 66/4 69/13 81/6 90/9

violations [2] 67/23 69/10

virtue [2] 90/5 101/17

visit [1] 82/23

void [6] 21/8 40/15 56/11 56/11 56/12 59/9

voluntary [1] 27/4

vs [1] 1/5

**W**

wagon [1] 101/13

wait [3] 12/25 54/20 84/10

waiting [1] 54/15

waived [1] 59/3

waiver [3] 59/5 59/11 59/13

walls [1] 56/25 57/7

wanted [11] 7/11 18/16 18/22 19/3 24/13 40/23 41/8 55/9 98/4 99/23 105/24

wants [1] 28/8

war [1] 80/3

was [140]

Washington [5] 1/17 1/20 2/5 2/9 30/23

wasn't [1] 8/24 17/17 26/4 38/21 62/14 63/24 79/6

watch [3] 27/24 27/24 28/1

water [1] 46/10

wax [1] 15/1

ways [5] 7/6 20/4 36/21 58/2 61/12

we [140]

we'll [1] 35/24

we've [7] 15/25 24/11 28/14 36/21 38/10 40/8 84/5

weak [1] 102/17

website [1] 94/18

week [7] 13/7 14/2 51/22 62/13 67/9 67/9 99/7

weeks [1] 27/19

weigh [2] 37/8 84/20

weighing [1] 85/12

weight [1] 104/11

well-settled [1] 81/22

went [6] 16/16 24/16 32/12 32/14 98/7 104/8

what [109]

whatever [8] 22/8 30/10 31/7 40/22 60/21 82/2 89/23 100/22

whenever [1] 24/7

Whereas [3] 32/7 58/4 78/20

while [6] 6/1 55/17 57/9 60/17 67/12 77/7

White [2] 10/20 101/14

who's [1] 101/7

whoever [1] 29/25

wholly [10] 46/5 49/14 72/24 73/15 73/23 75/1 75/7 79/18 83/1 96/12

wide [2] 5/21 62/19

Wilkinson [1] 82/6

win [4] 42/1 53/25 58/16 90/16

wishes [1] 83/14

within [5] 71/10 71/12 71/15 71/18 84/8

without [10] 22/21 25/22 45/12 60/5 79/9 81/25 94/7 99/2 100/14 106/3

**W**

**woman's [1]** 107/20
**women [15]** 7/13 9/23
11/18 29/8 37/9 41/17
41/25 41/25 60/17
74/21 75/3 75/15 82/11
82/16 83/18
**women's [16]** 1/19
29/2 29/5 29/6 32/20
41/22 70/5 70/11 70/17
70/20 71/7 74/18 74/20
75/12 75/15 81/15
**won [2]** 5/9 5/12
**won't [1]** 91/4
**wondered [1]** 47/25
**words [1]** 65/21
**work [4]** 6/2 18/10 87/3
102/1
**worked [1]** 54/5
**workers' [1]** 81/25
**works [2]** 52/12 102/1
**World [1]** 81/1
**worse [1]** 66/16
**worship [1]** 74/11
**worst [1]** 85/3
**worst-case [1]** 85/3
**writ [2]** 31/14 63/17
**write [3]** 27/3 44/14
68/16
**written [2]** 41/18 104/1
**wrong [5]** 11/9 17/15
76/18 77/1 101/19
**wrote [2]** 6/19 40/3

**Y**

**Yankee [1]** 103/10
**yeah [7]** 11/7 28/3
53/12 54/10 64/4 79/1
79/4
**year [4]** 23/12 54/20
58/6 79/17
**year-plus [1]** 54/20
**years [7]** 28/11 38/10
44/13 58/6 85/2 90/4
101/21
**yes [17]** 4/9 13/23
13/25 27/5 45/21 53/19
53/19 55/2 56/9 56/12
62/13 79/5 79/15 90/12
90/13 91/11 91/16
**yet [9]** 29/16 31/23
62/15 63/2 71/21 72/14
75/5 76/14 91/19
**Your Honor [2]** 3/18
50/18
**Your Honor's [2]** 77/22
79/3
**yourselves [1]** 18/9

**Z**

**Zubik [13]** 5/25 8/3
17/2 17/4 17/5 18/5
20/7 60/14 77/7 77/12
77/12 86/14 95/8