# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

IRISH 4 REPRODUCTIVE      )
HEALTH, *et al.*,           )
                              )
          Plaintiffs,    )
                              )     Cause No. 3:18-CV-491-PPS-JEM
         vs.            )
                              )
UNITED STATES            )
DEPARTMENT OF HEALTH   )
AND HUMAN SERVICES, *et al.*,  )
                              )
          Defendants.   )

## OPINION AND ORDER

This lawsuit is the continuation of a longstanding dispute over the provision of

contraceptive services for students and employees of the University of Notre Dame.

There are really two separate disputes at play here. The first involves a challenge to

regulations that would allow Notre Dame to declare itself exempt from the Women's

Health Amendment of the Patient Protection and Affordable Care Act ("ACA"). This

first challenge is being brought against the federal agencies responsible for the

implementation of the challenged regulations — the Department of Health and Human

Services, the Department of Labor, and the Department of the Treasury. For ease of

reference I will refer to this group as the "Federal Defendants." The regulations are

being challenged under the Administrative Procedures Act ("APA"), and they have

already been enjoined by two different district courts and those preliminary injunctions

have been affirmed in the Ninth and the Third Circuits.

The second part of this case presents a wrinkle not present in the cases out of the Third and Ninth Circuits. Notre Dame has been named as a defendant because a week after issuing the interim final rules ("IFRs"), the Federal Defendants executed a private settlement agreement with Notre Dame exempting the university from all existing *and future* requirements with respect to contraceptive coverage. Notre Dame did not seek input from its students or faculty before entering into the settlement agreement. The Plaintiffs in this case — Irish 4 Reproductive Health (an association of Notre Dame students), Natasha Reifenberg, and Jane Does 1-3 — claim this backroom deal is illegal and unconstitutional.

Two motions to dismiss the amended complaint are before me: one filed by Notre Dame, and the other by the Federal Defendants. The motions will largely be denied because Plaintiffs have stated plausible claims that the Final Rules violate the procedural requirements of the APA, the Settlement Agreement and Final Rules substantively violate the APA, the Settlement Agreement is void for illegality, and the Settlement Agreement and Rules violate the Establishment Clause. Dismissal is only warranted for two of the constitutional claims.

### Factual Background

This is not the first time a controversy involving Notre Dame, the ACA and the provision of contraceptive care has arrived at my doorstep. In December 2013, Notre Dame unsuccessfully sought to enjoin an earlier version of the ACA's Women's Health

Amendments.  Much has changed in the six years since I last considered this issue.  But before I dive into the legal morass presently before the court, a brief recounting of the extensive litigation history surrounding the ACA's contraception mandate is necessary to give some context about how we got here.  To put it mildly, litigation over the contraceptive mandate of the ACA has been widespread and vigorous.  It reached the Supreme Court in 2016 but the Court essentially punted on the issue hoping that the parties could just resolve the matter on their own.  No such luck.  And so the fight trundles on.

Here's how we got here: the Women's Health Amendment to the ACA was passed in 2010 and requires insurance plans to cover women's preventive health services. Critically, the services must be provided without cost-sharing. [Am. Compl. ¶ 51; 42 U.S.C. § 300gg-13(a)(4).]  While the Act itself does not specify the types of women's preventive care that must be covered, it does require coverage for such "additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]." 42 U.S.C. § 300gg-13(a)(4).  HRSA, in turn, commissioned the Institute of Medicine to convene a committee of experts on women's and adolescents' health and disease prevention to review their preventive-health needs and produce a report recommending the preventive services that should be included in the Guidelines.  [Am. Compl. ¶ 59; Institute of Medicine, Clinical Prevention Services for Women: Closing the

Gaps (2011)  ("IOM Report")[1].]

The Institute of Medicine found that access to contraception reduces unintended pregnancies, abortions, adverse pregnancy outcomes, and negative health consequences for women and children, and that even small out-of-pocket costs significantly reduce the use of contraception.  [Am. Compl. ¶ 60.]  Based on these findings, the Institute recommended that HRSA should include critical preventive services for women that must cover the "full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  [*Id.*; *see* IOM Report at 109-10.]

In August 2011, HRSA adopted the Guidelines, implementing the recommendation requiring coverage of the full range of FDA-approved contraceptive methods for women.  [Am. Compl. ¶ 61.[2]]  In regulations implementing the Women's Health Amendment, it was acknowledged that "cost sharing can be a significant barrier to effective contraception" and that "[c]ontraceptive coverage, by reducing the number of unintended and potentially unhealthy pregnancies, furthers the goal of eliminating [the gender] disparity [in health coverage] by allowing women to achieve equal status as healthy and productive members of the job force."  [Am. Compl. ¶ 65; 77 Fed. Reg.

---

[1]*available at* https://cdn.cnsnews.com/documents/INSTITUTE%20OF%20MEDICINE-PREVENTIVE%20SERVICES%20REPORT.pdf (last viewed January 9, 2020).

[2]*available at* www.hrsa.gov/womens-guidelines/index.html (last viewed January 9, 2020).

8,725, 8,728 (Feb. 15, 2012).]

Shortly thereafter, in 2013, the government created a regulatory exemption from the contraceptive requirement for houses of worship. [Am. Compl. ¶ 66; 78 Fed. Reg. 39,870-01, 39,874 (July 2, 2013).] Certain religiously affiliated employers and universities (like Notre Dame) that didn't qualify for the house-of-worship exemption objected to having to include coverage for contraception in their insurance plans. [Am. Compl. ¶¶ 3, 66-67.]

From this discontent, the so-called "accommodation" was born. *See* 78 Fed. Reg. 39,870, 39,871 (July 2, 2013). Through this process, an objecting employer or university could inform the government, or the entity's insurer or third-party administrator, that it had religious objections to providing coverage for contraceptive services. [Am. Compl. ¶¶ 3, 72; 26 C.F.R. § 54.9815-2713A(2015).] This was accomplished by filling out a one page opt out form and providing it to the entity's insurance issuer or third-party administrator who would, in turn, fulfill its legal obligation by separately providing or arranging payments for contraceptive services, without cost-sharing. [Am. Compl. ¶¶ 3, 73; 78 Fed. Reg. 39,875-80 (July 2, 2013).] This was an attempt by the government to try and ensure the provision of contraceptive services, on the one hand, while being respectful to the legitimate religious concerns of religiously affiliated employers, on the other.

But the objectors were not mollified. Notre Dame, along with other nonprofit religious organizations, filed suit challenging the contraceptive mandate under the

Religious Freedom Restoration Act ("RFRA"). As referenced earlier, I issued an opinion rejecting Notre Dame's RFRA claim in its quest for a preliminary injunction, finding that making Notre Dame comply with the accommodation did not impose a substantial burden on its religious exercise. *See Univ. of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912, 921-26 (N.D. Ind. 2013). A divided panel of the Seventh Circuit affirmed. *See Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 554 (7th Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1528 (2015).

Shortly after the Seventh Circuit's decision in *Sebelius*, the Supreme Court decided *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) in which Hobby Lobby, a closely held corporation, objected under RFRA to providing contraceptive services to its employees. The Supreme Court agreed, holding that a closely held corporation with a religious objection is exempt from the contraceptive mandate if there is a less restrictive means of furthering the law's interest. In response to *Hobby Lobby*, the government extended the accommodation to certain closely held for-profit entities with religious objections to providing contraceptive coverage. *See* 80 Fed. Reg. 41,318; 41,323-28 (July 14, 2015). But this effort appears to have satisfied no one. Many organizations continued to challenge the contraceptive-coverage mandate.

Notre Dame's position in the earlier lawsuit was that filling out the opt out form or otherwise notifying the government or their insurance issuer of their religious objection violated RFRA and the United States Constitution. [Am. Compl. ¶¶ 72, 75, 77, 85.] Notre Dame argued that the accommodation made it a "conduit" for the provision

of contraceptive coverage, in violation of its religious beliefs. *See Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 612 (7th Cir. 2015), *vacated on other grounds*, 136 S. Ct. 2007 (2016). Eight of the nine federal courts of appeals to consider legal challenges to the accommodation, including the Seventh Circuit in *Burwell*, rejected them.[3] [Am. Compl. ¶ 78.]

As referenced above, the United States Supreme Court granted certiorari in seven of these cases and ultimately vacated and remanded them, instructing that the parties "should be afforded an opportunity to arrive at an approach going forward that accommodates [the entities'] religious exercise while at the same time ensuring that women covered by [the entities'] health plans receive full and equal health coverage, including contraceptive coverage." *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation marks omitted). The *Zubik* Court remanded the Notre Dame decision for further proceedings while the parties tried to reach an accord. *Univ. of Notre Dame v. Burwell*, 136 S. Ct. 2007 (2016). This was the punt that I referred to earlier.

To put it bluntly, the Supreme Court's attempt to nudge a settlement has gone

---

[3] *See Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1160-95 (10th Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 427-43 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 237-67 (D.C. Cir. 2014); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 459-63 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 611-19 (7th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 217-26 (2d Cir. 2015); *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738, 749-50 (6th Cir. 2015); *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't Health & Human Servs.*, 818 F.3d 1122, 1148-51 (11th Cir. 2016); *but see Dordt Coll. v. Burwell*, 801 F.3d 946, 949-50 (8th Cir. 2015).

nowhere. Here's what happened instead: First, the government issued a Request for

Information soliciting comments as to how it might alter the regulations to implement

the compromise contemplated by the Supreme Court in *Zubik*. *See* 81 Fed. Reg. 47,741-

01 (July 22, 2016). After receiving 54,000 comments, the government announced in

January 2017 that no "feasible approach has been identified" and reiterated that "the

Departments continue to believe that the existing accommodation regulations are

consistent with RFRA . . . ." [Am. Compl. ¶ 82; *see* Dept. Of Labor, FAQs About

Affordable Care Act Implementation Part 36, 4 (Jan. 9. 2017).[4]] Meanwhile, on remand,

the various cases were held in abeyance while the parties tried to negotiate resolutions.

[Am. Compl. ¶83.]

The tide in favor of the contraceptive mandate turned against it in 2017.

President Trump issued an Executive Order in May of that year directing the Federal

Defendants in this case to issue the rules which are challenged here. [Am. Compl.

¶¶86-87; Exec. Order No. 13, 798, *Promoting Free Speech and Religious Liberty*, 82 Fed.

Reg. 21,675 (May 4, 2017)]. The Federal Defendants complied and issued two interim

final rules (IFRs) which created exemptions from the ACA contraceptive coverage

requirement for entities asserting religious and moral objections, and made the

accommodation process optional. 82 Fed. Reg. 47,792-01, 47,848 (Oct. 13, 2017). The

first rule expanded the religious exemption because the Federal Defendants

---

[4]*Available at*
www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/faq
s/aca-part-36.pdf (last viewed January 9, 2020).

"determined that an expanded exemption, rather than the existing accommodation [wa]s the most appropriate administrative response to the religious objections raised by certain entities and organizations." *Id.* at 47,799. The second rule created a similar exemption for entities with sincerely held moral objections issued "in part to bring the [m]andate into conformity with Congress's long history of providing or supporting conscience protections in the regulation of sensitive health-care issues." *Id.* at 47,844.

There was no public notice or comment before the issuance of the IFRs; comments were only solicited *after* the IFRs went into effect. [Am. Comp. ¶¶ 88-89.] In December 2017, two federal courts issued nationwide preliminary injunctions blocking the IFRs. Am. Compl. ¶¶ 92-95; *see Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 576 (E. D. Pa. 2017); *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 829 (N.D. Cal. 2017), *affirmed in part and vacated in part by California v. Azar*, 911 F.3d 558 (9th Cir. 2018) (affirming the preliminary injunction, but finding it should only be issued as to plaintiff states and not nationwide). These courts found the plaintiffs would likely succeed on the merits of the claims that the IFRs were substantively unlawful because they were promulgated without statutory authority and procedurally infirm for failing to follow the APA's notice and comment procedures. The United States Court of Appeals for the Ninth Circuit affirmed the ruling that the states in the California case were likely to succeed on their procedural APA claim. *Azar*, 911 F.3d at 575.

One week after issuing the IFRs, on October 13, 2017, the Federal Defendants executed a Settlement Agreement with Notre Dame and more than 70 other entities to

resolve pending challenges to the ACA's contraceptive coverage requirement. [Am. Compl. ¶¶ 106-07.] Depending on what side you're on, the Settlement Agreement was either a monumental victory for the religious employers or a total capitulation by the Government. Specifically, the Agreement exempts Notre Dame, along with its "subsidiaries, affiliates, and successors; and related entities that offer coverage through the [signatories'] health plan[s]" from the contraceptive coverage requirement and "any materially similar regulation or agency policy." [Am. Compl. ¶¶ 107-08; Settlement Agreement, DE 1-1, at 5, 13.] In other words, the Settlement Agreement inoculates Notre Dame in perpetuity from any *future* regulation that might mandate the provision of contraception to its students or employees. Under the terms of the Settlement Agreement, "[n]o person may receive [contraceptive coverage] as an automatic consequence of enrollment in any health plan sponsored by Plaintiffs." [Am. Compl. ¶ 109; Settlement Agreement at 6, ¶ 2(e).] And for good measure, the Government tossed in $3 million for legal fees to boot. [Settlement Agreement at 8, ¶ 7.]

Despite the two preliminary injunctions prohibiting the IFRs, the Final Rules were promulgated on November 15, 2018, with an effective date of January 14, 2019. [Am. Compl. ¶ 97.] The religious exemption allows all nongovernmental entities, including for-profit businesses, nonprofits, and universities, to declare themselves exempt from the ACA's contraceptive coverage requirement based on religious beliefs. [Am. Compl. ¶ 100; 83 Fed. Reg. 57,536 (Nov. 15, 2018).] The moral exemption allows all nongovernmental entities except publicly traded corporations to exempt themselves

from the law based on "moral convictions."  83 Fed. Reg. 57,592 (Nov. 15. 2018).  Those

entities refusing to provide contraceptive coverage do not need to explain their

decision, and "do not need to file notices or certifications of their exemption, and [the

Rules] do not impose any new notice requirements on them . . . ."  *Id.* at 57,558, 57,614.

In January 2019, just before the Final Rules were supposed to take effect, federal

district courts in California and Pennsylvania preliminarily enjoined them.  The Eastern

District of Pennsylvania preliminarily enjoined the Final Rules nationwide, finding the

Final Rules both substantively and procedurally unlawful.  *Pennsylvania v. Trump*, 351 F.

Supp. 3d 791 (E.D. Pa. 2019).  The Third Circuit recently affirmed this decision.

*Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019), *petition for cert. filed*

Oct. 7, 2019.  The Northern District of California also preliminarily enjoined the Final

Rules for substantive illegality in 13 states and the District of Columbia.  *California v.*

*Health & Human Servs.*, 351 F. Supp. 3d 1267 (N.D. Cal. 2019).  The Ninth Circuit

followed suit and affirmed this decision too.  *California v. U.S. Dep't of Health & Human*

*Servs.,* 941 F.3d 410 (9th Cir. 2019).

All of which brings us to the present dispute.  Notre Dame sponsors health

insurance plans for students, faculty and staff (and their dependents).  [Am. Compl. ¶

19.]  After the Settlement Agreement, Notre Dame amended its health plans to

terminate coverage for certain FDA-approved contraceptives which it views as

abortifacients or sterilization, and to impose cost-sharing (including co-payments and

deductibles), for other types of contraceptives (like birth control pills).  [*Id.* ¶¶ 128-49.]

The members of Irish 4 Reproductive Health and the individual plaintiffs in this case are women of child-bearing age who are enrolled in health plans sponsored by Notre Dame. [*Id.* ¶¶ 14-17.] They have been denied coverage for some contraceptives, and must engage in cost-sharing for others. [*Id.* ¶¶ 13-17.]

Plaintiffs filed suit in this case on June 26, 2018. [DE 1.] They filed an amended complaint on December 5, 2018, to reflect they are now challenging the Final Rules (instead of the interim rules). [DE 43.] The amended complaint states the following claims: (1) the Settlement Agreement violates the APA; (2) the Settlement Agreement is void under federal common law because it is illegal under the *Zubik* remand order, the ACA, and the Constitution; (3) the Final Rules procedurally violate the APA because the IFRs were issued without pre-promulgation notice-and-comment; (4) the Final Rules substantively violate the APA because they contradict the Constitution and the ACA; (5) the Settlement Agreement and the Final Rules violate the Establishment Clause; (6) the Settlement Agreement and the Final Rules violate the Due Process Clause by depriving Plaintiffs of a fundamental right (access to contraceptives); and (7) the Settlement Agreement and Final Rules violate the Equal Protection Clause because, *inter alia*, they "target women for adverse treatment." [Am. Compl. ¶¶ 165-232.]

Both the Federal Defendants and Notre Dame seek dismissal of the amended complaint [DE 58 and 59]. At the request of the Plaintiffs, I held a hearing in this matter and heard oral argument from all parties.

## Discussion

In the midst of this extended litigation with complicated issues, it is important to keep in mind the procedural posture of the present motions. This case is before me on two motions to dismiss the amended complaint. The Federal Defendants have moved to dismiss all the claims in the amended complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Notre Dame has moved to dismiss all the claims in the amended complaint under Rule 12(b)(6).

In order to survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While I must accept all factual allegations as true and draw all reasonable inferences in the complainant's favor, I don't need to accept threadbare legal conclusions supported by purely conclusory statements. *See Iqbal*, 556 U.S. at 678. Plaintiffs must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Making the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

When evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), I must use the same "plausibility" standard; therefore, I must accept alleged

factual matters as true and draw all reasonable inferences in favor of Plaintiffs. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). Plaintiffs bear the burden of establishing the jurisdictional requirements. *Ctr. For Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014). "Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further." *Illinois v. Chicago*, 137 F.3d 474, 478 (7th Cir. 1998). Therefore, I'll start with the Federal Defendants' arguments under Rule 12(b)(1) first.

## I.     Federal Defendants' 12(b)(1) Arguments

In claiming that this Court lacks jurisdiction over Plaintiffs' claims, the Federal Defendants initially make two arguments that can be disposed of quickly. First, they contend the APA only permits judicial review of final agency actions "for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and second, they argue Plaintiffs have alternative remedies. The Federal Defendants then set forth a much closer issue relating to the Settlement Agreement. They claim that the decision to refrain from enforcement is a decision that is committed to agency discretion as a matter of law, and beyond the scope of judicial review. And so, when the Federal Defendants decided to settle the protracted litigation with Notre Dame, that was an enforcement decision beyond judicial review. Finally, they argue Plaintiffs don't have standing to challenge the Final Rules. As detailed below, none of these jurisdictional attacks have merit.

### A.     The Availability of Alternative Remedies

The APA only permits a plaintiff to obtain judicial review of a "final agency

action for which there is no other adequate remedy in a court."  5 U.S.C. § 704; *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016); *Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998) (holding a court lacks jurisdiction over an APA claim where Congress has provided an adequate alternative remedy under another statute).  The Federal Defendants essentially argue that because Count I states a claim for violation of the Settlement Agreement under the APA, and Count II states a cause of action that the Settlement Agreement is void for illegality, Plaintiffs are *already* pursuing alternative remedies because "[i]f Plaintiffs were to prevail on any of the[] non-APA challenges to the Settlement Agreement and it were voided, then the Settlement Agreement could not cause Plaintiffs to lose meaningful access to contraceptive services."  [DE 58-1 at 28.][5]

In other words, the Federal Defendants think the non-APA challenges to the settlement can and should stand alone.  But it isn't quite so binary.  Plaintiffs' claims challenging the Settlement Agreement are intertwined — they are claiming *both* that the Settlement Agreement violates the APA *and* is an illegal contract under *Zubik*, the Women's Health Amendment, and the Constitution.  The Federal Defendants' argument seems to be that because the Plaintiffs *might* prevail on their non-APA challenges, they are prevented from pursuing their APA challenge simultaneously.  In other words, under the Federal Defendants' conception of the statute, the Plaintiffs have

---

[5] Citations to the memoranda in this case indicate the docket entry number and the pagination found in the upper right-hand corner of the docket entry.

to fully litigate, through appeal, the non-APA challenge to the Settlement Agreement, and then if they lose, come back and assert their APA claims. This seems like a hopelessly inefficient way to conduct litigation — one claim at a time. At this point, who's to say whether the Plaintiffs have "an adequate remedy in court" as that phrase is used in the APA. It is way too early to know that; their non-APA challenges to the Settlement Agreement might be complete duds. And because Plaintiffs are allowed to plead in the alternative, *see* Fed. R. Civ. P. 8(d)(2), it is senseless to require litigation to proceed *ad seriatim* as the Federal Defendants propose. While it is true that "courts routinely dismiss alternatively pled APA claims upon finding that another statute offers an adequate alternative remedy," here, the Federal Defendants have not pointed to another such statute. *R.J. Reynolds Tobacco Co. v. United States Dep't of Agriculture*, 130 F. Supp. 3d 356, 379 (D.D.C. 2015). In fact, their argument that Plaintiffs have another "adequate remedy" in this situation is unsupported by any case law whatsoever, and can better be considered at the summary judgment stage of litigation, when all parties and the Court have a better sense of the challenges and remedies. For now, both claims will go forward.

The Federal Defendants also argue that Plaintiffs Natasha Reifenberg, Jane Doe 2, and Jane Doe 3 (all who are enrolled as dependents in Notre Dame's faculty and staff health plan), have an additional adequate alternative remedy under ERISA. [DE 58-1 at 28-29.] This is totally beside the point. Even though in theory these plaintiffs could bring a civil action under ERISA to enjoin an act or practice that they believe violates a

term of the ACA or a provision of ERISA, the Settlement Agreement (which effectively immunizes Notre Dame from coverage), would stand in the way of any other mechanism to address the injury at issue in this case.

      **B.**      **Whether The Decision to Settle Litigation is Committed to Agency Discretion and Not Reviewable By This Court**

The much meatier jurisdictional issue is whether the decision to settle litigation is subject to judicial review. The Federal Defendants argue Plaintiffs' APA challenges to the Settlement Agreement should be dismissed for lack of jurisdiction because the deal is an exercise of enforcement discretion that is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore beyond the scope of APA review. [DE 58-1 at 29.] Notre Dame makes a similar assertion that the Settlement Agreement is not judicially reviewable, although Notre Dame does this under the guise of its 12(b)(6) motion. [DE 59-1 at 16-19.] From a procedural point of view, Notre Dame has correctly advanced this issue, as the Seventh Circuit has agreed "that this issue is not termed properly one of jurisdiction: This is not a question of whether this court has the authority to review, but rather whether the lack of any judicially manageable standard makes any review within our power, as a practical matter, impossible." *Vahora v. Holder*, 626 F.3d 907, 917 (7th Cir. 2010) (internal quotation marks and quotation omitted). Regardless of how the different defendants have procedurally postured their arguments, they will both be addressed together in this section.

Defendants say this matter is governed by *Heckler v. Chaney*, 470 U.S. 821 (1985). In that case, inmates sentenced to death challenged a decision by the Food and Drug

Administration not to enforce a statute it administered in the context of lethal injections.

The Court held that section 701(a)(2) of the APA prevented review because there was

"no meaningful standard against which to judge the agency's exercise of discretion." *Id.*

at 830; *see also Vahora*, 626 F.3d at 917 (commenting on *Heckler*). The Seventh Circuit has

noted that a "classic example of such a[] [non reviewable] action is an agency's decision

not to prosecute." *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335

F.3d 607, 615 (7th Cir. 2003).

However, *Heckler* itself gives indications that its ruling should not dictate what

happens in a case like this. *Heckler* explained that "Congress did not set agencies free to

disregard legislative direction in the statutory scheme that the agency administers," and

that it was not addressing reviewability of an agency decision to "consciously and

expressly adopt [] a general policy that is so extreme as to amount to an abdication of its

statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4 (internal quotation marks

omitted). Indeed, *Heckler* left the door open for situations like this. In his concurring

opinion, Justice Brennan clarified the point:

> the Court properly does not decide today that nonenforcement
> decisions are unreviewable in cases where (1) an agency flatly
> claims that it has no statutory jurisdiction to reach certain conduct .
> . . ; (2) an agency engages in a pattern of nonenforcement of clear
> statutory language . . . ; (3) an agency has refused to enforce a
> regulation lawfully promulgated and still in effect . . . ; or (4) a
> nonenforcement decision violates constitutional rights.

470 U.S. at 839 (internal citations omitted).

While it is true that some courts have extended the *Heckler* presumption of

unreviewability to various agency decisions to settle enforcement actions[6], courts have distinguished "*single-shot* non-enforcement decision[s]," which are presumptively immune from judicial review, from an "agency's statement of a *general enforcement policy*," which is reviewable. *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676-77 (D.C. Cir. 1994) (emphasis in original; citations omitted); *see also OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("[A]n agency's adoption of a general enforcement policy is subject to review."). The rationale behind this distinction makes sense, as individual enforcement decisions involve "the sort of mingled assessments of fact, policy, and law" that are "peculiarly within the agency's expertise and discretion," but general enforcement policies "are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings" and "are more likely to be direct interpretations of the commands of the substantive statute . . . ." *Crowley Caribbean Transp.*, 37 F.3d at 677; *see also Edison Elec. Inst. v. U.S. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) ("[S]ubstantive requirements of the law," are "not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* shields from judicial review").

Judicial review seems particularly warranted in this case where Plaintiffs are

---

[6] *See, e.g., New York State Dep't of Law v. FCC*, 984 F.2d 1209, 1213-15 (D.C. Cir. 1993) (FCC's decision to enter into a consent decree with two telephone affiliates was nonreviewable); *Mahoney v. U.S. Consumer Prods. Safety Comm'n*, 146 F. App'x 587, 589 (3d Cir. 2005) (granting motion to dismiss where parents of a child killed by injuries from a latent defect in a rifle brought action against Consumer Products Safety Commission which entered into settlement agreement with rifle manufacturer).

alleging that the enforcement policy of the involved agencies amounts to "abdication of its statutory responsibilities" or abandonment of its promulgated regulations. *See NAACP v. Sec'y of HUD*, 817 F.2d 149, 158-59 (1st Cir. 1987) (holding HUD's pattern of failure "affirmatively . . . to further" Title VII's fair housing policy was reviewable as an "abdication of [HUD's] statutory responsibilities"); *N. Ind. Pub. Serv. Co. v. FERC*, 782 F.2d 730, 745-46 (7th Cir. 1986) ("[W]e do not think that the Commission can essentially abandon its regulatory function. . . . under the guise of unreviewable agency inaction."). Plaintiffs contend that the Settlement Agreement is a conscious and express adoption of a general policy to authorize Notre Dame to prospectively circumvent the contraceptive coverage requirement, and therefore "amount[s] to an abdication of [Federal Defendants'] statutory responsibilities" under the ACA. *Heckler*, 470 U.S. at 833 n.4.

I agree that these allegations survive dismissal. It is especially disturbing to me that the Federal Defendants have purported to bind future administrations, as well as future faculty, staff, and students at Notre Dame, by entering into such a broad Settlement Agreement that exempts Notre Dame from "the Regulations or any materially similar regulation or agency policy," and provides that no penalties will be assessed for noncompliance with "any law or regulation" requiring contraceptive coverage. [Settlement Agreement, DE 1-1, at ¶¶ 2, 4.]

In its reply, the Federal Defendants profess that "the Settlement Agreement is far from the vast and generalized policy that Plaintiffs claim it is," and instead posit that it is nothing more than the "single-shot" decision that is commonly within agencies'

discretion. [DE 69 at 3-4.]  That's a little hard to swallow.  The Settlement Agreement

was between the Federal Defendants, Notre Dame, and 74 other entities and

individuals, and it also covers "subsidiaries, affiliates, and successors; and related

entities that offer coverage through the [signatories'] health plans."  [Settlement

Agreement DE 1-1, Ex. A; *see also* Oral Argument Tr., DE 78 at 14-15 (where Notre

Dame agrees that this is a global settlement agreement entered into between the

government and 74 other entities).]  Notre Dame's health plan alone covers more than

17,000 people, including employees, students, and dependents.  [Am. Compl. ¶ 19.]  As

such, it is at least plausible to view this as a general enforcement policy that is

impacting thousands of individuals right now, and not just a single fact-specific

resource-allocation decision subject to *Heckler* discretion.  Consequently, the Settlement

Agreement is reviewable.

But even if I were to consider the Settlement Agreement an individual

enforcement decision, the discretion accorded under *Heckler* is inapplicable to claims

that an agency has taken action that exceeds its legal authority.  The Federal Defendants

rely upon 28 U.S.C. § 516-19 which gives the Attorney General discretion to settle

litigation in which the federal government is a party.  [DE 58-1 at 31.] But the Attorney

General's litigation authority extends only to "legitimate objectives and does not

include license to agree to settlement terms that would violate the civil laws governing

the agency." *Exec. Bus. Media, Inc. v. U.S. Dep't of Defense*, 3 F.3d 759, 762 (4th Cir. 1993);

*see also U.S. v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008).

In *Executive Business Media*, an unsuccessful bidder for a government contract brought an action against the Department of Defense and the successful bidder, arguing that the contract, which was awarded pursuant to a settlement agreement, was void for failure to comply with the competitive bidding procedures. The Fourth Circuit concluded that the settlement agreement was reviewable, explaining:

> We think it alien to our concept of law to allow the chief legal officer of the country to violate its laws under the cover of settling litigation. The Attorney General's authority to settle litigation for its government clients stops at the walls of illegality.

*Exec. Bus. Media*, 3 F.3d at 762. A similar comment was made by the Seventh Circuit when it recognized that if a "Settlement Agreement is unlawful, as [a non-party] claims it is, it can bring a suit under the APA challenging as arbitrary and capricious the Secretary's ultimate decision." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000).

And then, a few years later, the Ninth Circuit adopted reasoning along the same lines of *Executive Business Media* in *Carpenter*. There, the Court found the Attorney General's decision to settle a case by entering into a settlement agreement with a Nevada county was subject to judicial review under the APA:

> While it is true that the Attorney General has plenary discretion under 28 U.S.C. §§ 516 and 519 to settle litigation to which the federal government is a party, a decision that is discretionary is not rendered unreviewable in all circumstances. Rather, where an action is committed to absolute agency discretion by law, . . . courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations.

*Carpenter*, 526 F.3d at 1241-42 (internal citations and quotation omitted).

The Federal Defendants attempt to distinguish these cases by arguing Plaintiffs "cite cases indicating that the government may not *violate the law* when it settles cases, but this proposition finds no application here." [DE 69 at 4 (emphasis in original).] This circular logic gets us nowhere. The amended complaint *does* allege that the Federal Defendants acted unlawfully when they executed the Settlement Agreement with Notre Dame. Plaintiffs in this case claim the Federal Defendants committed all three of the violations identified in *Carpenter* in executing the Settlement Agreement: they exceeded their legal authority, they acted unconstitutionally, and they failed to follow their own regulations. I can review these claims because they are "not that the Attorney General exercised his discretion poorly but that he settled the lawsuit in a manner that he was not legally authorized to do - in other words, that he exceeded his legal authority." *Carpenter*, 526 F.3d at 1242 (quotation omitted). Judicial review under the APA is therefore appropriate.

### C.        Whether Plaintiffs Have Standing

The last jurisdictional challenge raised by the Federal Defendants is that Plaintiffs lack standing to challenge the Final Rules. The Federal Defendants submit that Plaintiffs can't show an injury in fact that is traceable to the Final Rules, because those rules are enjoined right now and Notre Dame relied upon the Settlement Agreement when making the decision not to cover certain contraceptives. [DE 58-1 at 32.] In other words, the Federal Defendants claim that Notre Dame's refusal to provide

contraceptive coverage is based only on the Settlement Agreement, and Plaintiffs "cannot establish standing by speculating that one day Notre Dame *might* rely on [the Rules] to take an action that might harm the Plaintiffs." [*Id.* at 33 (emphasis in original).]

But this mischaracterizes Notre Dame's position. Indeed, in their briefing, Notre Dame lays claim to the very argument that the Federal Defendants allege Notre Dame has disavowed: "current regulations exempt Notre Dame from the Mandate wholly apart from the settlement agreement." [DE 59-1 at 14.] There's more: Notre Dame further suggests that the Rules provide a basis for its refusal to provide coverage, contending "[a]s long as those regulations remain on the books (and the government continues to defend them in litigation), it would be premature to consider a challenge to the settlement." *Id.* In other words, while the Federal Defendants claim that the Settlement Agreement prevents the Court from considering the regulations, Notre Dame argues the exact opposite: that the Court should *refrain* from relying on the Settlement Agreement to decide the case. *See infra* at Section II. B. If I were to follow both defendants' house of mirrors approach I would end up doing precisely nothing.

In all events, I don't think it is speculative that Notre Dame might rely on the Rules at some point in time — indeed, it seems to be relying on both the Rules *and* the Settlement Agreement right now to support its contraceptive decisions. If the Settlement Agreement was struck down as unconstitutional, Notre Dame would surely take shelter in the Rules in continuing to deny contraceptive coverage to its students

and staff. While it is true that enforcement of the Rules is currently enjoined, they are

enjoined on a *preliminary* basis; the litigation in those cases is ongoing. Who knows

what the future holds? As it stands right now, both the Rules and Settlement

Agreement are responsible for Plaintiffs' injuries. *See Lewert v. P.F. Chang's China Bistro,*

*Inc.*, 819 F.3d 963, 969 (7th Cir. 2016) ("Merely identifying potential alternative causes

does not defeat standing.").

For all of these reasons, I am satisfied that I have jurisdiction over this

controversy and will proceed to the merits of the substantive claims.

## II.    Federal Defendants and Notre Dame's 12(b)(6) Arguments

I'm going to address the arguments surrounding just the Settlement Agreement

first. Then, I'll turn to the arguments applicable only to the Rules, and last to those that

involve both the Rules and Settlement Agreement.

### A.    Whether Plaintiffs Have Stated a Claim That the Settlement Agreement is Void for Illegality (Count II)

Count II alleges that the Settlement Agreement is void for illegality because it

violates the ACA, the Establishment Clause, the Due Process Clause, the Supreme

Court's order in *Zubik*, and the Constitution.

Plaintiffs have stated a claim that the Settlement Agreement violates the Supreme

Court's directives in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016). Recall that in *Zubik*, the

Supreme Court remanded with the instruction that the parties "should be afforded an

opportunity to arrive at an approach going forward that accommodates [objectors']

religious exercise while at the same time ensuring that women covered by [objectors']

health plans receive full and equal health coverage, including contraceptive coverage."
*Id.* at 1560 (internal quotation marks omitted). And in *Notre Dame*, the Court reiterated
that "[n]othing in the *Zubik* opinion, or in the opinions or orders of the courts below, is
to affect the ability of the Government to ensure that women covered by petitioners'
health plans obtain, without cost, the full range of FDA approved contraceptives.").
*University of Notre Dame v. Burwell*, 136 S. Ct. 2007 (2016) (internal quotation marks
omitted).

    Although the Federal Defendants contend the Settlement Agreement still allows
for "full coverage" in accordance with *Zubik* and *Notre Dame* because Notre Dame
insureds can go find "a separate or distinct health plan" elsewhere [DE 58-1 at 35], this
argument borders on the absurd. I'd like to see a plan that offers Notre Dame students
and faculty (who are already covered under Notre Dame's insurance plan) additional
health care coverage for contraceptive care with no cost-sharing. There is no such thing.
The Settlement Agreement does *not* ensure that women get full contraceptive coverage
without cost-sharing. To the contrary, it authorizes Notre Dame to give them no
contraceptive coverage at all — now, and in the future. As the Court found in *Florida
Steel Corp. v. NLRB*, 713 F.2d 823, 829, 831 (D.C. Cir. 1983), such an agency action can be
struck down where it "do[es] not respond to this court's guidance on remand" and is
not "remotely responsive to the 'concern' expressed by this court in its opinion
accompanying the remand."

    Trying to put the Settlement Agreement on an untouchable pedestal, Notre

Dame contends it is not illegal because the ACA and RFRA authorize it. [DE 59-1 at 19-22, 28-31.] I'll look at these arguments later in this opinion, as the Federal Defendants make the same assertion. But for now, it is enough to say that Plaintiffs have stated at least a plausible claim that the Settlement Agreement is void for illegality.

### B.  Whether the Claims Based On the Settlement Agreement are Ripe

According to Notre Dame, the current attack on the Settlement Agreement is not ripe for adjudication because current regulations exempt Notre Dame from the mandate. It encourages me to refrain from deciding any challenge to the Settlement Agreement until the validity of the mandate's religious exemption has been definitively decided. [Oral Argument Tr., DE 78 at 12-13.]

While "[r]ipeness concerns may arise when a case involves uncertain or contingent events . . . [c]laims that present purely legal issues are normally fit for judicial decision." *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). The Settlement Agreement challenges are ripe now because Plaintiffs' claims address an active controversy that turns on Defendants' past actions and legal issues, not on uncertain future contingencies. There is no doubt that the Plaintiffs are currently experiencing an injury — they have lost coverage for contraceptive care and are currently paying out-of-pocket for those needs. [Am Compl. ¶¶ 8-10, 13-17.] And there is no question in my mind that the Settlement Agreement is causing this injury — Notre Dame has repeatedly and specifically invoked it as a basis for refusing to provide contraceptive coverage. When Notre Dame announced it was

terminating contraceptive coverage under its health plans, the University President

explained the decision was due to a "favorable" settlement with the government, which

gave "the University, its insurers and third party administrators the option of an

exemption from providing" coverage. [*Id.* ¶ 130.]

Under the Settlement Agreement, Notre Dame has been denying contraceptive

coverage since October 2017 even though the Rules have been enjoined nationwide

since December 2017. So the Settlement Agreement is, in its own right, injuring the

Plaintiffs right now. Notre Dame proclaims the preliminary injunctions in California

and Pennsylvania are unlikely to survive on the merits, and are likely to be reversed.

[DE 59-1 at 15.] Given that two circuit courts have affirmed those preliminary

injunctions and found the plaintiffs are likely to succeed on the merits of their claim that

the Rules violate the APA, it is becoming more and more likely that Notre Dame will

need to seek refuge in the Settlement Agreement as its reason for denying contraceptive

coverage without cost-sharing. *See Pennsylvania v. President United States*, 930 F.3d 543

(3d Cir. 2019), *petition for cert. filed* Oct. 7, 2019; *California v. U.S. Dep't of Health & Human

Servs.*, 941 F.3d 410 (9th Cir. 2019). Consequently, the claims aimed at the Settlement

Agreement are ripe.

### C. Whether Plaintiffs Have Stated a Claim That the Final Rules Violate the Procedural Requirements of the APA (Count III)

Defendants maintain the Final Rules are procedurally proper for two reasons: (1)

regardless of whether there were procedural deficiencies in the IFRs, the Final Rules

don't suffer from the same defect because the Agencies solicited and considered public

comments before issuing the Final Rules; and (2) issuance of the IFRs without notice and comment was procedurally proper anyway. [DE 58-1 at 36.] Both of these arguments were dealt with head on by the Third Circuit in *Pennsylvania*, and I concur with that Court's analysis. *Pennsylvania* found "[t]he Agencies [] lacked good cause for dispensing with notice of and comment to the IFRs." *Pennsylvania*, 930 F.3d at 567. I agree that the Agencies' desire to quickly address purported harm to religious objections did not ameliorate the need to follow appropriate procedures, the need to address uncertainty didn't establish good cause, and the previous solicitation and collection of comments regarding others rules about the contraceptive mandate can't substitute for notice and comment about these IFRs. *Id.* at 567-68. For those reasons, I don't think the Agencies had good cause to ignore the APA's notice and comment requirement.

Moreover, the Agencies' approach to this issue — in other words, decide the issue first and then get comments — did not cure these procedural defects. The caselaw is clear that "provision of post-promulgation notice and comment procedures cannot cure the failure to provide such procedures prior to the promulgation of the rule at issue." *NRDC v. EPA*, 683 F.2d 752, 768 (3d Cir. 1982); *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979) ("We hold that the period for comments after promulgation cannot substitute for the prior notice and comment required by the APA."). Although the D.C. Circuit has recognized a bare possibility of curing a Section 553 violation of the APA with post-promulgation notice and comment, it "emphasized that we could reach

such a conclusion *only* upon a *compelling* showing that the agency's mind remained

open enough at the later stage." *Air Tranport Ass'n v. Dep't of Transp.*, 900 F.2d 369, 379-

80 (D.C. Cir. 1990) (emphasis added) (internal quotation marks omitted), *remanded*, 498

U.S. 1077 (1991), *and vacated as moot*, 933 F.2d 1043 (D.C. Cir. 1991).

But as the Court found in *Pennsylvania*, "[t]he notice and comment exercise

surrounding the Final Rules does not reflect any real open-mindedness toward the

position set forth in the IFRs." *Pennsylvania*, 930 F.3d at 568-69. This is evidenced by

the fact that, as the government has conceded, the IFRs and the Final Rules are

fundamentally the same. [DE 58-1 at 24; Oral Argument Tr., DE 78 at 25; *see also* Am.

Compl. ¶ 197(a).] Plus, even before the post-promulgation comment period closed, the

government was already taking steps to implement the IFRs, including preparing

revised forms to be used for the optional accommodation and seeking public comments

on these forms. [Am. Compl. ¶¶ 91, 197(c).] These preparatory measures could show

that the Federal Defendants were locked in on a decision no matter what comments

they received.

Plaintiffs have pleaded substantial facts that the government did not keep an

open mind, and that the Final Rules are procedurally defective and violate the APA.

*See Prometheus Radio Project v. FCC*, 652 F.3d 431, 452 (3d Cir. 2011) (vacating and

remanding rule for failure to comply with APA's notice and comment requirements,

and stating the agency "had an obligation to remain 'open-minded' about the issues

raised and engage with the substantive responses submitted"); *Pennsylvania*, 930 F.3d at

569 ("because deficits in the promulgation of the IFRs compromised the procedural integrity of the Final Rules, the States have demonstrated a likelihood of success in showing that the Final Rules are procedurally defective, and in turn, violate the APA."). For now, the claim that the Final Rules procedurally violate the APA must survive dismissal.

### D. Whether Plaintiffs Have Stated a Claim That the Final Rules Violate the Substantive Requirements of the APA - Count IV

Aside from the procedural problems with the Rules, there are also serious substantive challenges that additionally survive dismissal. Count IV alleges the Final Rules violate the Women's Health Amendment and are arbitrary and capricious because they "were adopted with no valid justification." [Am. Compl. ¶ 206-07, 209.] Therefore, the claim alleges that the Rules violate the substantive requirements of the APA.

An agency that "neglects to" "acknowledge and provide an adequate explanation for its departure from [its] established precedent . . . acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal quotation marks omitted). That is especially true when "serious reliance interests" are at stake or when a new policy "rests upon factual findings that contradict those which underlay" an agency's prior regulation — in which case a "detailed justification" for the policy change is required. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-51 (1983) (National Highway Traffic Safety

Administration order rescinding crash protection requirements of federal motor vehicle safety standard was arbitrary and capricious where agency failed to address earlier factual findings and did not "cogently explain why it has exercised its discretion in a given manner").

According to the amended complaint, the Federal Defendants have not offered any substantial or reasoned justification for their abrupt change of course from first requiring objecting entities to request an accommodation, to giving Notre Dame a complete pass from providing contraceptive care. This runs contrary to the Federal Defendants' recognition of the importance of providing women with access to contraception without cost-sharing after the HRSA guidelines were adopted. *See, e.g.*, 76 Fed. Reg. 46,621-01, 46,623 (Aug. 3, 2011) (recognizing critical need to extend "any coverage of contraceptive services under the HRSA Guidelines to as many women as possible"); *Certain Preventive Services Under the Affordable Care Act*, 77 Fed. Reg. 16,501-01, 16,503 (Mar. 21, 2012) (requesting comment on how to "provide women access to the important preventive services at issue without cost sharing while accommodating religious liberty interests.").

The Plaintiffs allege that the agencies have now subordinated this compelling interest, and the women HRSA protects, in favor of the religious and moral objections of Notre Dame. As a result, the agencies need to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 516. But aside from wanting to settle

pending litigation, neither the Settlement Agreement nor the Rules provide new facts or provide meaningful analysis for the change of mind, and the amended complaint also alleges that the Departments failed to address substantial empirical and scientific data regarding the benefits and effectiveness of contraception and contraceptive coverage. [Am. Compl. ¶ 105(d).]  Because they have offered little explanation, and have not "show[n] that there are good reasons" for the change, Plaintiffs have stated a plausible claim under Count IV that the Rules are arbitrary and capricious.  *Fox Television Stations*, 556 U.S. at 515 (finding actions arbitrary and capricious where federal agencies "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotation marks and citations omitted) (an agency "must at least display awareness that it is changing position and show that there are good reasons for the new policy. . . . An arbitrary and capricious regulation [] is itself unlawful . . . ."); *California*, 941 F.3d at 424 (affirming district court's determination "that the rules likely are arbitrary and capricious.").

### 1.  Whether the ACA Authorizes the Rules and Settlement Agreement

The Federal Defendants take the position that the Rules are not contrary to the Women's Health Amendment because the ACA does not specify the types of preventive services that must be provided.  This argument is based on a misreading of the statute.

The Women's Health Amendment to the ACA, 42 U.S.C. § 300gg-13(a)(4),

provides that non-grandfathered "group health plan[s] and health insurance issuer[s] offering group or individual health insurance coverage *shall*, at a minimum provide coverage" for "additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by" HRSA without "impos[ing] any cost sharing requirements." 42 U.S.C. § 300gg-13(a)(4) (emphasis added). That provision delegates to HRSA the authority to issue guidelines defining "preventive care." It did so in 2011 when it released guidelines construing the term "preventive care" to include all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." [Am. Compl. ¶ 60.]

Defendants urge that this merely imposes a general requirement on health plans; it doesn't say anything about the government's duty to enforce that requirement against any particular party, which should be left to executive discretion. In other words, they believe section 300gg-13(a)(4) also delegates to them the authority to define *who* must abide by the ACA. While an agency's reasonable interpretation of an ambiguous statute may generally be entitled to deference (assuming Congress exclusively entrusted the statutory interpretation to that agency), no deference is due when an agency's interpretation conflicts with a statute's plain language. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984); *California*, 941 F.3d at 425 (quotation omitted) ("an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear.").

Here, the plain language of the ACA specifically requires that all group health

plans "shall" cover "preventive care" as defined by HRSA. Contrary to Notre Dame's suggestion, I fail to see the ambiguity in this directive. [DE 69 at 12-14.] "'[S]hall' is a mandatory term that 'normally creates an obligation impervious to judicial [or agency] discretion.'" *Pennsylvania*, 351 F.Supp.3d at 818 (quoting *Lexecon, Inc. v. Millberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1988)). "[B]y stating that the specified plans 'shall' provide coverage for 'preventive care,' the statute sets forth who is bound by the coverage mandate (any 'group health plan' . . . )" and delegates to HRSA only "the task of defining what counts as 'preventive care.'" *Id.* In affirming this reasoning, the Third Circuit came to the blunt and correct conclusion that "[n]othing from § 300gg-13(a) gives HRSA the discretion to wholly exempt actors of its choosing from providing the guidelines services. On the contrary, the mandate articulated in § 300gg-13(a) forecloses such exemptions." *Pennsylvania*, 930 F.3d at 570.

Moreover, Congress provided only one category of health plans exempt from the Women's Health Amendment - "grandfathered health plans" - which are being phased out over time. 42 U.S.C. § 18011(d). "When Congress provides exceptions in a statute . . . [t]he proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). As the court in P*ennsylvania* concluded after engaging in a similar ACA analysis, "[p]ut simply, the discretion the statute grants HRSA to issue comprehensive guidelines concerning services to be provided does not include the power to exempt actors from the statute itself." *Pennsylvania*, 930 F.3d at 570; *see also California*, 941 F.3d at 425

(reasoning the Women's Health Amendment "grants HRSA the limited authority to determine which, among the different types of preventative care, are to be covered," but that "nothing in the statute permits the agencies to determine exemptions from the requirement.").

What's more, it seems plain that the Rules and Settlement Agreement are directly contrary to the obvious intent of the Women's Health Amendment: to ensure access to contraceptive care. The Ninth Circuit in *California* persuasively made this point when it analyzed the legislative history of the Women's Health Amendment. *California*, 941 F.3d at 425-26. The Court then concluded, albeit at a preliminary injunction phase of the case, that "the evidence is sufficient for us to hold that providing free contraceptive services was a core purpose of the Women's Health Amendment." *Id.* at 426. Indeed, this commonsense approach to review of administrative action is mandated by the Supreme Court: "[a] reviewing court must reject administrative constructions of a statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Securities Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 143 (1984) (internal quotation marks and citation omitted).

In sum, I agree with the Ninth Circuit, that "[g]iven the text, purpose, and history of the Women's Health Amendment, the district court did not err in concluding that the agencies likely lacked statutory authority under the ACA to issue the final rules." *See California*, 941 F.3d at 426. And recall that the *California* case was decided on

an appeal of the grant of a motion for preliminary injunction. It would be preposterous to conclude under the present procedural posture — a motion to dismiss — that at least a plausible claim for a violation of the APA has not been made. So Plaintiffs' claims under the substantive component of the APA must survive dismissal.

## 2. Whether RFRA Justifies the Rules and Settlement Agreement

Aside from the ACA, Defendants rely upon another statute, RFRA, to also justify their actions. Notre Dame argues that the government "was not only authorized to enter into a settlement agreement with Notre Dame, it was - and is - *required* to do so by federal law" under RFRA. [DE 59-1 at 28 (emphasis in original).] The Federal Defendants similarly claim that RFRA independently authorizes the religious exemption and the Settlement Agreement. [DE 58-1 at 44.] I had substantial doubts six years ago that the ACA accommodation was a substantial burden on Notre Dame's religious beliefs. *See Sebelius*, 988 F.Supp.2d at 920-24. I remain skeptical.

Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person - (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). As a threshold matter, "[a] person whose religious exercise has been burdened in violation of this section" may seek relief in a judicial proceeding. *Id.* § 2000bb-1(c). In other words, RFRA authorizes a cause of action for government measures that impose a substantial

burden on a person's sincerely-held religious beliefs, and provides a judicial remedy via individualized adjudication. *Id.* § 2000bb-3(a).

The determination about whether a burden is substantial is committed to the courts, not to individual claimants. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 358 n. 23 (3d Cir. 2017); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 588 (6th Cir. 2018). Put another way, the decision about whether an alleged burden is substantial is a legal question, not a factual one, and that legal question is committed to the purview of the courts, not to an administrative agency. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006) (emphasis in original) ("RFRA . . . plainly contemplates that *courts* would recognize exceptions - that is how the law works . . . ."). Thus, the position adopted by the Federal Defendants on this topic is not entitled to deference. *See Pennsylvania*, 930 F.3d at 572 (quoting *Adams v. Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649 (1990) (declining to defer to agency's statutory interpretation where Congress "expressly established the Judiciary and not the [agency] as the adjudicator of private rights of action arising under the statute.")).

I have already held, and the Seventh Circuit has affirmed (although the Supreme Court vacated the Circuit's decision on other grounds), that the accommodation does *not* compel Notre Dame to change its "own actions and speech . . . in a manner contrary to its sincerely held religious beliefs," but instead merely requires the University to state its objections to contraception coverage. *Sebelius*, 988 F.Supp.2d 924. Having to give

38

this notice is hardly a burdensome requirement, and I still don't buy Notre Dame's argument that checking a box on a piece of paper makes it a "conduit" to providing birth control, in contravention of its religious beliefs. *Id.* at 923-27; *Burwell*, 786 F.3d at 611-12. The Third Circuit agrees, reasoning that once an employer invoked the accommodation process, it is "no longer responsible for providing coverage for contraceptive care," and "the actual provision of contraceptive coverage is by a third party, so any possible burden from the notification procedure is not substantial." *Pennsylvania*, 930 F.3d at 557, 573 (internal quotation omitted).

Moreover, as other courts have already found, RFRA probably does not authorize the religious exemption in the Rules. As the Court in *California* recognized, "[f]irst, the religious exemption *contradicts* congressional intent that all women have access to appropriate preventative care." *California*, 941 F.3d at 427 (emphasis in original). It elaborated:

> The religious objection is thus notably distinct from the accommodation, which attempts to accommodate religious objections *while still meeting* the ACA's mandate that women have access to preventative care. The religious exemption here chooses winners and losers between the competing interests of two groups, a quintessentially legislative task. Strikingly, Congress already chose a balance between those competing interests and chose both to mandate preventative care and to reject religious and moral exemptions. The agencies cannot *reverse* that legislatively chosen balance through rulemaking.

*Id.* (emphasis in original). Additionally, the blanket exemption that both the Rules and the Settlement Agreement provide "operates in a manner fully at odds with the careful, individualized, and searching review mandated by RFRA." *Id.*

I do not think the regime in place before the Rules infringed upon the religious exercise of covered employers, and I also don't believe that RFRA creates a basis for the Rules or the Settlement Agreement. Of course, the Supreme Court has not yet decided whether the accommodation violates RFRA. Although the Federal Defendants argue that *Hobby Lobby* supports their position [DE 58-1 at 44-45], *Hobby Lobby* can be read to suggest the exact opposite: that the Supreme Court does *not* think the accommodation violates RFRA. It described the accommodation as:

> effectively exempt[ing] certain religious nonprofit organizations . . . from the contraceptive mandate . . . [and highlighted that] [u]nder the accommodation, the plaintiffs' female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to face minimal logistical and administrative obstacles . . . because their employers' insurers would be responsible for providing information and coverage.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 698, 732 (2014) (citation omitted). While that Court did not specifically decide whether the accommodation complies with RFRA, it found that "[a]t a minimum, however, it does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well." *Id.* at 731. This treatment from the Supreme Court, coupled with the fact that before *Zubik*, eight courts of appeals (out of nine that considered the issue), concluded the accommodation process did not impose a substantial burden of religious exercise under RFRA, support my conclusion here that RFRA does not prevent Plaintiffs from stating claims in this lawsuit.

To sum up, the Plaintiffs have stated a plausible claim that the Final Rules and Settlement Agreement violate the substantive provisions of the APA. The statutes relied upon by the Defendants, the ACA and RFRA, do not authorize or require these actions.

**E.      Whether Plaintiffs Have Stated A Claim That the Rules and Settlement Agreement Deprive Plaintiffs of Rights Under the Establishment Clause of the First Amendment - Count V**

The Plaintiffs also bring three constitutional claims: Count V alleges a violation of the Establishment Clause of the First Amendment; Count VI alleges a substantive due process claim; and finally, Count VII is a claim under the Equal Protection Clause. The defendants seek dismissal of all three claims. I'll start with the Establishment Clause claim.

Count V alleges that the Rules and Settlement Agreement violate the Establishment Clause because they are intended to and have the effect of advancing religious interests. The defendants seek dismissal on the grounds that the Final Rules and Settlement Agreement don't promote or subsidize a religious belief or message. [DE 58-1 at 49.]

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Plaintiffs maintain that both the Settlement Agreement and Rules "impermissibly favor and prefer some denominations and religious beliefs over others." [Am. Compl. ¶ 216(f).] This is supported by allegations in the amended complaint that

the Settlement Agreement prefers some religious beliefs and denominations over others, and imposes costs, burdens, and harms on Plaintiffs in favor of the religious beliefs of the University of Notre Dame. [*Id.* ¶ 176.] And that the Rules provide religious exemptions from the ACA that will harm Plaintiffs by depriving them, or limiting, their access to critical contraceptive services. [*Id.* ¶ 216(a).]

In analyzing whether Plaintiffs have stated a claim that the Final Rules and Settlement Agreement violate the Establishment Clause, the Federal Defendants try to cast the accommodation as a "burden" which they are now relieving [DE 58-1 at 49]. An "accommodation of religion, in order to be permitted under the Establishment Clause, must lift 'an identifiable [government-imposed] burden *on the exercise of religion.'" Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 613 n. 59 (1989) (quoting *Amos*, 483 U.S. at 348 (O'Connor, J., concurring) (emphasis in original)). I have more than hinted several times during this Opinion that I agreed with the accommodation and thought it was a neutral law. *See Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1199 (10th Cir. 2015) (finding the accommodation did not violate the Establishment Clause because "the Departments have chosen to distinguish between entities based on neutral, objective organizational criteria and not by denominational preference or religiosity, [and] this distinction does not run afoul of the Establishment Clause."). As previously listed, eight of the nine circuit courts agreed that the accommodation procedure did not substantially burden Notre Dame or anyone else's religious exercise. So, I don't see the present measures as

alleviating unjustified substantial burdens on the exercise of moral convictions and religious beliefs.

The test under the Establishment Clause, as first articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), requires that government actions (1) have a "secular legislative purpose," (2) have a "principal or primary effect" that "neither advances nor inhibits religion," and (3) do not "foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13 (citations and internal punctuation omitted); *see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987). If the governmental action fails any of the three parts of this test, it violates the Establishment Clause. *See Freedom from Religion Found., Inc. v. Bugher*, 249 F.3d 606, 611 (7th Cir. 2011). Although the *Lemon* test has been much criticized, the Seventh Circuit continues to faithfully apply it. *See, e.g., Sherman ex rel. Sherman v. Koch,* 623 F.3d 501, 507 (7th Cir. 2010).

I think the allegations are sufficient at this juncture to allege that the Rules and Settlement Agreement both impermissibly advance religion. "The secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty., Ky. v. ACLU*, 545 U.S. 844, 864 (2005). While a secular purpose may have been to settle litigation, I'm not so sure these measures do not also have a principal effect of advancing religion. Plaintiffs claim the Settlement Agreement and Rules "have the primary purpose and principal effect of promoting, advancing, and endorsing religion" and "coercively impose religious beliefs and practices to which

Plaintiffs and other affected persons do not subscribe." [Am. Compl. ¶ 216(b), (c).] In support, they allege that the Rules and Settlement Agreement "impose the religious beliefs of a select few on individuals who may not share those beliefs." [*Id.* ¶ 10.]

Additionally, Plaintiffs allege the Settlement Agreement and Rules "excessively entangle the government with religion" and "impermissibly impose on Plaintiffs and other innocent third parties undue costs, burdens, and harms arising from the granting of religious exemptions from the ACA." [*Id.* ¶ 216(d), (e).] "[C]ourts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005). If, in purporting to accommodate the religious exercise of some, the government imposes costs and burdens of that religious exercise on others, it favors the faith of the benefitted over the benefits and rights of the burdened, and this could violate the Establishment Clause. *See Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985) (finding statute impermissibly advanced a particular religious practice and violated the Establishment Clause); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (plurality opinion) (1989) ("Texas' tax exemption . . . does not remove a demonstrated and possibly grave imposition on religious activity sheltered by the Free Exercise Clause. Moreover, it burdens nonbeneficiaries by increasing their tax bills . . . ."). The burden seems quite evident in this case, as Plaintiffs have alleged that allowing Notre Dame to opt out of providing contraceptive coverage practically affects and injures numerous students and faculty who would otherwise be entitled to the provision of contraceptive coverage.

[Am. Compl. ¶¶ 8, 10.]

At this early stage of the proceedings, I think Plaintiffs have stated a plausible claim for relief that the Settlement Agreement and Rules violate the Establishment clause, and this claim survives dismissal. Many of the arguments set forth by the parties in their memoranda can be more appropriately addressed after discovery, at the summary judgment/or trial phase of this case.

## F. Whether Plaintiffs Have Stated a Claim That the Rules and Settlement Agreement Violate the Due Process Clause (Count VI)

Plaintiffs allege the Rules and Settlement Agreement violate the Due Process Clause substantively by infringing on Plaintiffs' fundamental right to access contraceptives and procedurally by depriving Plaintiffs of a liberty interest without notice and an opportunity to be heard. [Am. Compl. ¶¶ 220-21.] This count fails to state a claim because Plaintiffs have not pleaded violation of a fundamental right or liberty.

The substantive component of the Due Process Clause prohibits the government from taking certain actions (regardless of procedure) only if the action infringes on a fundamental right or liberty. *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Idris v. City of Chicago*, 552 F.3d 564, 566 (7th Cir. 2009). Along the same lines, the procedural component of the Due Process Clause requires the government to satisfy procedural safeguards regarding an action, but only if the government action jeopardizes a protected liberty interest. *Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 621 (7th Cir. 2012) ("As a necessary component of a procedural due process claim [plaintiff] must identify a protected property or liberty interest.").

45

Plaintiffs contend that the right to contraception is a fundamental right. [DE 61 at 68.] There is no doubt that the Supreme Court has recognized a fundamental right to privacy that encompasses certain decisions about contraceptive use. *See, e.g., Griswold v. Connecticut*, 381 U.S. 479 (1965) (the Constitution protects the right of married couples to use contraception); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (statute permitting married people to obtain contraceptives to prevent pregnancy but prohibited distributing contraceptives to single people for that purpose violated the Equal Protection Clause); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 687 (1977) (constitutional protection extended to the sale and distribution of contraceptives); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 852 (1992) (reaffirming *Roe v. Wade's* holding recognizing a woman's right to choose an abortion before fetal viability). But it is a large leap from having the right to obtain contraception, on the one hand, to the right to have contraception paid by someone else, on the other. In short, employees don't have a fundamental right to employer subsidized contraception.

Indeed, this very argument is foreclosed by *Harris v. McRae*, 448 U.S. 297 (1980), in which the Court considered the constitutionality of the Hyde Amendment which restricted the use of federal funds for abortions. The Court concluded that "regardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty . . . , it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." *Id.* at 316.

In other words, "the Hyde Amendment . . . represents simply a refusal to subsidize certain protected conduct. A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity" in violation of the Constitution. *Id.* at 317 n.19; *see also Maher v. Roe*, 432 U.S. 464 (1977); *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 492, 509 (1989).

Although Plaintiffs argue that direct interference with a person's access to contraception "is also constitutionally suspect" [DE 61 at 68], the faculty and students in this case still have access to contraceptives (for example, they could go to other clinics or the drug store) — they just don't have access to free contraceptives. Because the Plaintiffs have not established that subsidized contraceptive coverage is a fundamental right, they have failed to state a claim upon which relief may be granted in Count VI.

### G. Whether Plaintiffs Have Stated a Claim That the Rules and Settlement Agreement Violate Equal Protection - Count VII

Plaintiffs' third and final constitutional claim is that the Final Rules and Settlement Agreement violate the equal protection principles of the Fifth Amendment largely because "the expansive exemptions that they create impermissibly target women for adverse treatment." [Am. Compl. ¶¶ 227.] Neither the Rules nor the Settlement Agreement facially discriminate on the basis of sex. I'm going to set aside the controversy between the parties about what level of review would apply (rational-basis or strict scrutiny), because ultimately this count fails to state a claim for the same reason as its predecessor count.

Plaintiffs have not cited any authority suggesting that declining to subsidize

contraception (or to force employers or schools to subsidize contraception) constitutes a sex-based equal protection violation. The cases cited by them are distinguishable. *Caban v. Mohammed*, 441 U.S. 380 (1979), involved a distinction between unwed mothers and unwed fathers in state domestic-relations law, not subsidization. Neither *International Union v. Johnson Controls*, 499 U.S. 187 (1991), nor *Commission Decision on Coverage of Contraception, EEOC*, 2000 WL 33407187 (Dec. 14. 2000), even involved alleged constitutional violations; rather, they were concerned with statutory claims under Title VII which are not present in this case. Unlike Title VII, "[t]he equal protection component of the Fifth Amendment prohibits only purposeful discrimination," not disparate impact. *McRae*, 448 U.S. at 323 n.26. But that is really the claim here by Plaintiffs - even though the Rules and Settlement Agreement do not facially discriminate against women, in effect, they disparately affect women. This does not state a cognizable equal protection claim on the basis of sex and there is no solid precedent for such a claim. Moreover, as explained above, the Rules and Settlement Agreement do not infringe on any fundamental right because there is no established right to subsidization of contraceptives. Dismissal is therefore warranted for Count VII.

## Conclusion

For the reasons set forth above, the Federal Defendants' motion to dismiss the amended complaint [DE 58] and the University of Notre Dame's motion to dismiss the amended complaint [DE 59] are both GRANTED IN PART AND DENIED IN PART. Both motions are DENIED as to Counts I-V, which remain pending. Both motions are

GRANTED as to Count VI (for violation of the Fifth Amendment Due Process Clause)

and Count VII (for violation of the Fifth Amendment Equal Protection Clause), which

are DISMISSED WITH PREJUDICE.

**SO ORDERED.**

ENTERED: January 16, 2020.

 s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT