## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

|  |  |  |
|---|---|---|
| IRISH 4 REPRODUCTIVE HEALTH, *et al.*, | ) ) ) ) | |
| Plaintiffs | ) | Case No. 3:18-cv-491-PPS-JEM |
| v. | ) ) | Judge Philip Simon |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT UNIVERSITY OF NOTRE DAME'S MOTION TO DISMISS
## <u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

Matthew A Kairis
JONES DAY
325 John H McConnell Blvd
 Suite 600
Columbus, OH 43216
(614) 281-3605
makairis@jonesday.com

*Counsel for Defendant*
*University of Notre Dame*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 6

I.   *LITTLE SISTERS* MAKES PLAINTIFFS' ATTACK ON THE SETTLEMENT
     AGREEMENT PREMATURE............................................................................... 6

II.  *LITTLE SISTERS* DEMONSTRATES THAT THE GOVERNMENT'S
     DECISION NOT TO ENFORCE THE MANDATE AGAINST NOTRE DAME
     IS NOT JUDICIALLY REVIEWABLE ............................................................... 7

III. *LITTLE SISTERS* SHOWS THAT THE SETTLEMENT IS NOT ILLEGAL................. 9

     A.   The Settlement Does Not Violate Any Constitutional Command ........................ 9

     B.   The Settlement Does Not Violate Any Statutory or Regulatory Authority ......... 13

          1.   The Settlement Is Both Authorized and Required by RFRA................... 13

          2.   Plaintiffs' Remaining Allegations of Illegality Are Without Merit......... 19

CONCLUSION............................................................................................................... 25

CERTIFICATE OF SERVICE .......................................................................................

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Petroleum Inst. v. E.P.A.*,
  683 F.3d 382 (D.C. Cir. 2012) ............................................................................7

*Aronson v. K. Arakelian, Inc.*,
  154 F.2d 231 (7th Cir. 1946) ...........................................................................23

*Bock v. Computer Assocs. Intern., Inc.*,
  257 F.3d 700 (7th Cir. 2001) ...........................................................................23

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ................................................................................ *passim*

*Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*,
  492 U.S. 573 (1989) ..........................................................................................12

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
  483 U.S. 327 (1987) ..........................................................................................12

*Fleming v. U.S. Postal Serv. AMF O'Hare*,
  27 F.3d 259 (7th Cir. 1994) .............................................................................23

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................ *passim*

*Irish 4 Reproductive Health v. U.S. Dep't Health & Human Serv.*,
  434 F. Supp. 683 (N.D. Ind. 2020) ......................................................... *passim*

*Listecki v. Official Comm. of Unsecured Creditors*,
  780 F.3d 731 (7th Cir. 2015) ...........................................................................17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) .............................................................................. *passim*

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 918 (2020) .........................................................................................5

*Newkirk v. Vill. of Steger*,
  536 F.3d 771 (7th Cir. 2008) ...........................................................................23

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................................................7

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981) ...................................................................................10, 22

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*U.S. Dep't of Health & Human Servs. v. California,*
No. 19-1038, 2020 WL 3865243 (U.S. July 9, 2020)............................................................7

*Univ. of Notre Dame v. Sebelius,*
743 F.3d 547 (7th Cir. 2014) ...........................................................................................22

*Univ. of Notre Dame v. Sebelius,*
988 F. Supp. 2d 912 (N.D. Ind. 2013) ......................................................................4, 22

*University of Notre Dame v. Burwell,*
136 S. Ct. 2007 (2016)........................................................................................................5

*Walz v. Tax Comm'n,*
397 U.S. 664 (1970)..........................................................................................................12

*Wis. Cent., Ltd. v. Shannon,*
539 F.3d 751 (7th Cir. 2008) .............................................................................................7

*Zubik v. Burwell,*
136 S. Ct. 1557 (2016) ...........................................................................................1, 5, 11

STATUTES

26 U.S.C. § 4980D ..................................................................................................................4

26 U.S.C. § 4980H ..................................................................................................................4

42 U.S.C. § 300gg-13 .............................................................................................................5

42 U.S.C. § 2000bb-1 ....................................................................................................14, 17

OTHER AUTHORITIES

32 Am. Jur. 2d Federal Courts § 373 .................................................................................23

26 C.F.R. § 54.9815-2713A .................................................................................................3

82 Fed. Reg. 47.792 (Oct. 13, 2017)..................................................................................17

83 Fed. Reg. 57,536 (Nov. 15, 2018).............................................................................4, 17

83 Fed. Reg. 57,592 (Nov. 15, 2018)........................................................................ *passim*

Authority of the United States to Enter Settlements Limiting the Future Exercise
of Executive Branch Discretion, 1999 WL 1262049 (O.L.C. June 15, 1999)..................20, 21

Restatement (Second) of Contracts § 203(a) ...................................................................23

11 Williston on Contracts § 32:11 (4th ed.)......................................................................23

## INTRODUCTION

Three times, religious organizations with complicity-based objections to the contraceptive Mandate have appeared before the Supreme Court. And three times, they have been vindicated. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the Court concluded that the Mandate, "standing alone, violated [the Religious Freedom Restoration Act (RFRA)] as applied to religious entities with complicity-based objections." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2377 (2020). In *Zubik v. Burwell,* 136 S. Ct. 1557 (2016), the Court "directed" the Government to "'acommodat[e]' the free exercise rights of those with complicity-based objections to the self-certification accommodation." *Little Sisters*, 140 S. Ct. at 2383. And in *Little Sisters*, an exasperated Court left no doubt that the Government has "the statutory authority to craft" categorical "exemptions from the regulatory contraceptive requirements for employers with religious and conscientious objections." *Id.* at 2373, 2386.

There is no reason to believe the University of Notre Dame would not be similarly vindicated if the Supreme Court were given a *fourth* opportunity to compel compliance with the Mandate. Yet Plaintiffs nonetheless contend that the non-enforcement agreement (the "Settlement") between the Government and the University is "illegal." They maintain this position even though the Settlement is designed to accommodate the same objection at issue in *Zubik*—a "complicity based objection[] to the self-certification accommodation"—and effectively provides the same relief authorized by *Little Sisters*—a full exemption from the Mandate. In other words, Plaintiffs anticipate that the same Court that just concluded that the Government has "virtually unbridled discretion" to exempt whole categories of employers from the Mandate, *id.* at 2380, 2383, will strike down a Settlement that precludes enforcement of that Mandate against a discrete group of litigants. Not likely.

– 1 –

In truth, *Little Sisters* all but requires dismissal of Count II of Plaintiffs' Second Amended Complaint (the only count in which Notre Dame is named).

*First*, because *Little Sisters* vacated the existing injunctions against the Government's regulatory exemption, Plaintiffs' challenge to the Settlement is no longer ripe. Unless and until that exemption is invalidated, the Mandate does not apply to the University and would not apply even if the Settlement were enjoined.

*Second*, by holding that the Affordable Care Act (ACA) authorizes the Government to exempt entities from the Mandate, *Little Sisters* eliminated the primary basis for this Court's conclusion that it could reach the merits of Plaintiffs' attack on the Settlement. This, in turn, renders Plaintiffs' claims non-reviewable.

*Third*, were this Court to reach the merits, *Little Sisters* shows not only that there is "no basis" for Plaintiffs' claim that the Settlement violates the Establishment Clause—a claim two Justices dismissed out of hand, *id.* at 2396 n.13 (Alito, J., concurring)—but also that RFRA requires an exemption for Notre Dame. In any event, Plaintiffs belated attempts to buttress their challenge to the Settlement with new allegations of illegality fail on their own terms.

It took "seven years," "two [Supreme Court] decisions," and "multiple failed regulatory attempts," but the Government has finally "arrived at a solution"—a full exemption from the Mandate—that relieves religious objectors like Notre Dame from "the source of their complicity-based concerns." *Id.* at 2386 (majority op.). That is enough to bring this litigation to an end.

## BACKGROUND

The ACA's "contraceptive mandate—a product of agency regulation—has existed for approximately nine years. Litigation surrounding that requirement has lasted nearly as long." *Little Sisters*, 140 S. Ct. at 2373. This Court is well aware of the details surrounding that litigation, *Irish*

*4 Reproductive Health v. U.S. Dep't Health & Human Serv.*, 434 F. Supp. 683, 690-94 (N.D. Ind. 2020), so Notre Dame will summarize them only briefly here.

This case arose out of "regulations promulgated under a provision of the ACA that requires covered employers to provide women with 'preventive care and screenings' without 'any cost sharing requirements.'" *Little Sisters*, 140 S. Ct. at 2373 (quoting 42 U.S.C. § 300gg–13(a)(4)). The "statute itself does not explicitly require coverage for any specific form of 'preventive care,'" but rather states that it should be included "'as provided for in comprehensive guidelines supported by the Health Resources and Services Administration,' (HRSA), an agency of the Department of Health and Human Services (HHS)." *Id.*

Those guidelines were eventually promulgated in conjunction with regulations that "included the contraceptive mandate" (the "Mandate"), "which required [certain] health plans to provide coverage for all contraceptive methods and sterilization procedures approved by the Food and Drug Administration as well as related education and counseling." *Id.* at 2374. At the same time, the Government created a "narrow" exemption for churches and their integrated auxiliaries (the "Church Exemption"). *Id.* Subsequent litigation resulted in the creation of an alternative mechanism for religious objectors who did not qualify for the Church Exemption to comply with the Mandate (the "Accommodation"). *Id.* at 2375. Under the Accommodation, such objectors could submit a self-certification to their insurance company or a notice to the Government, at which point their health insurer (or third-party administrator) would become subject to a unique obligation to "provide or arrange payments for contraceptive services" to individuals enrolled in the objector's health plans. 26 C.F.R. § 54.9815-2713A(b)(2), (c)(2)(ii). Those "payments" were available to plan beneficiaries only "so long as [they were] enrolled in [the objector's] plan." *Id.* §

– 3 –

54.9815-2713A(d). And to avoid penalties, the objector had to continue offering a plan that entitled its beneficiaries to the free contraceptive "payments." 26 U.S.C. § 4980H; *id.* § 4980D(b).

These regulations were the subject of extensive litigation—including litigation brought by Notre Dame. *E.g.*, *Univ. of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912 (N.D. Ind. 2013). After two trips to the Supreme Court—which resulted in a holding that the Mandate, "standing alone, violated RFRA as applied to religious entities with complicity-based objections" and a "directive" to "accommodate" entities with a similar objection to the Accommodation, *Little Sisters*, 140 S. Ct. at 2377, 2383—the Government attempted a different tack. Rather than compel compliance with the Mandate (through the Accommodation or otherwise), the Government expanded the original Church Exemption to include any "employer that 'objects . . . based on its sincerely held religious beliefs,' 'to its establishing, maintaining, providing, offering, or arranging [for] coverage or payments for some or all contraceptive services.'" *Id.* at 2377 (quoting 82 Fed. Reg. 47812 (Oct. 18, 2017)). The Government also retained the Accommodation, but made it optional. *Id.* After receiving comments, these changes were memorialized in final rules, along with a similar exemption for entities with "sincerely held moral objections." *See* 83 Fed. Reg. 57,536 (Nov. 15, 2018); 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the "Expanded Exemption").

Meanwhile, the Government sought to resolve pending legal challenges to the Mandate. As part of that effort, it entered into the Settlement at issue in this litigation. In that Settlement, the Government agreed it would not enforce the Mandate or the Accommodation against the University, in exchange for the University's dismissing its claims. Settlement ¶¶ 4, 8-9 (Dkt. 1-1).

Plaintiffs brought suit, challenging both the Government's Expanded Exemption and the Settlement. In both their initial and amended complaint, Plaintiffs named Notre Dame only in the count challenging the Settlement. They contended that the Settlement was "illegal" and thus "void

– 4 –

*ab initio*" because it allegedly violated 1) the Supreme Court's orders in *Zubik* and *University of Notre Dame v. Burwell*, 136 S. Ct. 2007 (2016); 2) the ACA's "Women's Health Amendment, 42 U.S.C. § 300gg-13(a)(4) and the HRSA *Women's Preventive Services Guidelines*"; 3) the Establishment Clause; and 4) the Due Process Clause. Amend. Compl. ¶¶ 186-87 (Dkt. 43).

Both Notre Dame and the Government filed motions to dismiss, which this Court granted in part and denied in part. As relevant here, the Court first determined that Plaintiffs' challenge to the Settlement was ripe for adjudication and that it was subject to judicial review under *Heckler v. Chaney*, 470 U.S. 821 (1985). *See* 434 F. Supp. 3d at 696-700, 701-02. It then proceeded to the merits, where it concluded that Plaintiffs had adequately stated claims that the Settlement violated Supreme Court orders, *id.* at 700-01, the ACA, *id.* at 703-06, and the Establishment Clause, *id.* at 708-10. The Court further held that the Settlement was not authorized or required by RFRA, *id.* at 706-08, before dismissing Plaintiffs' Due Process claims, *id.* at 710-12.

The day after this Court ruled on the motions to dismiss, the Supreme Court granted certiorari in *Little Sisters*. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 918 (2020). This Court subsequently stayed further proceedings pending the Supreme Court's resolution of that case. *See* Order of Apr. 15, 2020 (Dkt. 93).

On July 8, 2020, the Supreme Court handed down its decision in *Little Sisters*. By a 7-2 margin, the Court held that the Government has "the statutory authority" under the ACA to craft "exemptions from the regulatory contraceptive requirements for employers with religious and conscientious objections." *Little Sisters*, 140 S. Ct. at 2373, 2386. It further held that it was "appropriate for the [Government] to consider RFRA" when framing those exemptions, *id.* at 2382-84, and "that the rules promulgating the [Expanded Exemption] are free from procedural

defects," *id.* at 2384-86. Consequently, it lifted the Third Circuit's injunction against the Expanded Exemption, and remanded the case for further proceedings. *Id.* at 2386.

After *Little Sisters* issued, the parties submitted differing proposals on potential next steps for this litigation. This Court held a hearing to consider those proposals and subsequently ordered Plaintiffs to file a Second Amended Complaint. Order of Aug. 6, 2020 (Dkt. 97). Plaintiffs did so on August 24, 2020. As relevant here, Plaintiffs continue to maintain that the Settlement is illegal. 2d Amend. Compl. 172-77 (Dkt. 102). The grounds for this purported illegality, however, have shifted. While Plaintiffs still allege that the Settlement violates the Establishment Clause, they now also assert that it runs afoul of the internal policy of the Department of Justice, the ACA's prohibition on cost-sharing for preventive services, and what they describe as "lawful regulations implementing the Women's Health Amendment"—essentially the Mandate and Accommodation as they existed prior to the implementation of the Expanded Exemption. *Id.* ¶ 175.

## ARGUMENT

**I.**   ***LITTLE SISTERS* MAKES PLAINTIFFS' ATTACK ON THE SETTLEMENT AGREEMENT PREMATURE**

This Court's conclusion that Plaintiffs' challenge to the Settlement was ripe for review hinged on the fact that the Expanded Exemption had been enjoined by "two circuit courts." 434 F. Supp. 3d at 701-02 (citing *Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019); *California v. U.S. Dep't of Health & Human Servs*. 941 F.3d 410 (9th Cir. 2019)). Those injunctions, this Court explained, meant that the Settlement was the sole basis for Notre Dame's continued decision to "den[y]" certain forms of "contraceptive coverage" to its employees and students. *Id.* at 702. Moreover, the circuit courts' conclusion that challenges to the Expanded Exemption were "likely to succeed on the merits" made it "more and more likely that Notre Dame

– 6 –

w[ould] need to seek refuge in the Settlement Agreement [going forward] as its reason for denying contraceptive coverage without cost sharing." *Id.*

The injunctions upon which this Court's reasoning relied are no longer in place. *Little Sisters* itself vacated the injunction arising out of the Third Circuit. *Little Sisters*, 140 S. Ct. at 2386. And the very next day, the Supreme Court similarly vacated the injunction affirmed by the Ninth Circuit. *See U.S. Dep't of Health & Human Servs. v. California*, No. 19-1038, 2020 WL 3865243, at *1 (U.S. July 9, 2020) (granting certiorari, vacating the judgment, and remanding the case to the Ninth Circuit "in light of *Little Sisters*").

The elimination of those injunctions means there is no longer a dispute "of sufficient immediacy and reality" to warrant adjudicating Plaintiffs' challenge to the Settlement. *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). That challenge "is not ripe for adjudication [because] it rests upon contingent future events that may not occur"—i.e., the speculative possibility that the Expanded Exemption will be invalidated as a result of ongoing litigation. *Id.* (internal quotation marks omitted). Unless and until that exemption is definitively struck down, it cannot be said that "the Settlement Agreement is, in its own right, injuring the Plaintiffs right now." 434 F. Supp. 3d at 702. There is thus no "genuine need to resolve a real dispute," *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008), and under the doctrine of prudential ripeness, this Court should refrain from deciding Plaintiffs' attack on the Settlement, *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012) ("Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to.").

II.    ***LITTLE SISTERS* DEMONSTRATES THAT THE GOVERNMENT'S DECISION NOT TO ENFORCE THE MANDATE AGAINST NOTRE DAME IS NOT JUDICIALLY REVIEWABLE**

In its decision on Defendants' initial motions to dismiss, this Court concluded that the Settlement was judicially reviewable notwithstanding the Supreme Court's decision in *Heckler v.*

– 7 –

*Chaney*, 470 U.S. 821 (1985). *Heckler*, of course, held that "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," *id.* at 831, and is "presumed immune from judicial review." *Id.* at 832. This Court believed, however, that "*Heckler* itself gives indication that it its ruling should not dictate what happens in a case like this." 434 F. Supp. 3d at 697. Specifically, "*Heckler* explained that 'Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers' and that it was not addressing reviewability of an agency decision to 'consciously and expressly adopt [ ] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* (quoting *Heckler*, 470 U.S. at 833 n.4). And here, Plaintiffs had argued that the Settlement was "a conscious and express adoption of a general policy to authorize Notre Dame to prospectively circumvent the [ACA's] contraceptive coverage requirement." *Id.* at 698. This Court therefore reasoned that "[j]udicial review seem[ed] particularly warranted" because Plaintiffs maintained that by exempting Notre Dame via the Settlement, the "Federal Defendants" had "'abdicat[ed] their] statutory responsibilities' under the ACA." *Id.* (quoting *Heckler*, 470 U.S. at 833 n.4).

*Little Sisters* again eliminates the basis for that conclusion. It is now clear that, under the ACA, the Government has broad "statutory authority" to decide who is covered by the Mandate and who is not. *Little Sisters*, 140 S. Ct. at 2386. The statute does not impose an unyielding duty to apply the Mandate to everyone. It is an "extraordinarily 'broad general directive[e]'" that grants the Government "virtually unbridled discretion" as to who is covered. *Id.* at 2380-82 (citation omitted). Accordingly, far from "abdicating" it statutory responsibilities, the Government was acting well within its legal authority when it decided not to enforce the Mandate against Notre Dame and its fellow litigants. Thus, even under this Court's reading of *Heckler*, there is no longer

– 8 –

any basis to say that the Settlement violates any statutory or regulatory responsibility imposed by the ACA.

To be sure, this Court also held that it could review Plaintiffs "claim[]" that the Settlement was "unconstitutional[]" under the Establishment Clause. 434 F. Supp. 3d at 699. Notre Dame continues to believe that holding (like the rest of the Court's *Heckler* analysis) was erroneous for the reasons previously explained. *E.g.*, Reply in Supp. of Notre Dame's Mot. to Dismiss at 4-12 (Apr. 23, 2019) (Dkt. 68). After *Little Sisters*, however, the error is even more clear because there is even less basis to say that the Establishment Clause constrains the Government's ability to settle a RFRA claim against a purely *discretionary* regulatory mandate. In any event, even if this Court's constitutional reviewability holding were correct, it would allow judicial review *only* of Plaintiffs' tenuous Establishment Clause claim, which fails for the reasons outlined below.

## III. *LITTLE SISTERS* SHOWS THAT THE SETTLEMENT IS NOT ILLEGAL

Even were this Court to reach the merits, *Little Sisters* demonstrates that Plaintiffs' challenge to the Settlement must be dismissed. In the wake of that decision, there is no basis for any claim that the Establishment Clause prohibits an exemption for entities that have a complicity-based objection to the Mandate or the Accommodation. Indeed, the logic of *Little Sisters* shows that such exemptions are not only lawful, but required by RFRA.

### A.   The Settlement Does Not Violate Any Constitutional Command

This Court's prior conclusion that Plaintiffs adequately pled an Establishment Clause violation—Plaintiffs' only remaining constitutional claim—rested on its determination that the Settlement did not "lift 'an identifiable [government-imposed] burden *on the exercise of religion.*'" 434 F. Supp. 3d at 708 (quoting *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 613 n.59 (1989)). From the Court's perspective, "the accommodation procedure d[oes] not substantially burden Notre Dame or anyone else's religious exercise." *Id*. at 708-09. Consequently,

– 9 –

this Court did not see the Settlement "as alleviating unjustified substantial burdens on the exercise of . . . religious beliefs." *Id.* at 709.

That holding is no longer tenable. After *Little Sisters*, there can be no doubt that compelled compliance with the Mandate—even as modified by the Accommodation—burdens the religious exercise of those who have a complicity-based religious objection. The Supreme Court explained that "for the past seven years," the Little Sisters "have had to fight for the ability to continue in their noble work *without violating their sincerely held religious beliefs*." 140 S. Ct. at 2386 (emphasis added). Of course, as even Plaintiffs admit, a compelled violation of one's religious beliefs is the archetypal example of a burden—indeed, of a "substantial" burden—on religious exercise. *See* Pls. Mem. of Law in Opp'n to Defs. Mots. to Dismiss at 32 (Mar. 19, 2019) (Dkt. 61) (stating that a "legally cognizable burden on religious exercise exists . . . when the government is 'forc[ing claimants] to engage in conduct that their religion forbids'" (citation omitted)); *e.g.*, *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981) (noting that where the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists"). The Government's regulatory action relieved the Little Sisters and "many other religious objectors" from that burden by "exempt[ing]" them "from the source of their complicity-based concerns—the administratively imposed contraceptive mandate," including the Accommodation. 140 S. Ct. at 2386; *see also id.* at 2376 (explaining the Little Sisters' position that compliance with the Accommodation would violate their sincerely held religious beliefs).

As the Court further explained, the notion that the Accommodation can impose complicity-based burdens is no innovation. *Zubik¸* for example, required the Government to "'accommodate' the free exercise rights of those with complicity-based objections to the self-certification accommodation." *Id.* at 2383 (quoting *Zubik*, 136 S. Ct. at 1560); *see also id.* at 2381 n.7 (stating

that *Zubik* "expressly directed the Departments to 'accommodat[e]' petitioners' religious exercise"). This reading of *Zubik* necessarily acknowledges that the Accommodation burdens religious exercise. Otherwise what, exactly, was the Government directed to "accommodate"?

The Court's discussion of *Hobby Lobby* likewise confirms that the Accommodation substantially burdens religious exercise. That decision "made it abundantly clear that" both the Government and the courts "must accept the sincerely held complicity-based objections of religious entities." *Id.* at 2383. "That is, they could not 'tell the plaintiffs their beliefs are flawed' because, in [their] view, 'the connection between what the objecting parties must do . . . and the end that they find to be morally wrong . . . is simply too attenuated." *Id.* (quoting *Hobby Lobby*, 573 U.S. at 723-24). To be sure, *Hobby Lobby* did not itself involve a challenge to the Accommodation, but its reasoning applies with equal force to such a challenge. Just as courts cannot second-guess a religious objection to complying with the Mandate, they cannot second-guess a religious objection to complying with the Accommodation. Even if a court believes that compliance is too "attenuated" from wrongful conduct to make it religiously objectionable, that is a call for the religious objector, not the court. *Id.* at 2391 (Alito, J., concurring) (analogizing the situation to "that of the conscientious objector" who "refused to participate in the manufacture of tanks but did not object to assisting in the production of steel used to make the tanks" (citing *Thomas*, 450 U.S. at 715)).

For these reasons, it cannot be said that the Accommodation imposes no burden on Notre Dame's exercise of religion. Like the plaintiffs in *Zubik* and *Little Sisters*, Notre Dame has a complicity-based objection to compliance with the Accommodation. And like the Expanded Exemption at issue in *Little Sisters*, the Settlement relieves Notre Dame "from the source of [its] complicity-based concerns." 140 S. Ct. at 2386. In other words, the Settlement "lift[ed] a

regulation that burden[ed] the exercise of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338 (1987). By definition, such actions do not impermissibly advance religion or otherwise violate the Establishment Clause. *See id.*; *see also Cnty. of Allegheny*, 492 U.S. at 613 n.59 (same); *Walz v. Tax Comm'n*, 397 U.S. 664, 675 (1970) ("There is no genuine nexus between [regulatory] exemption[s] and establishment of religion."). As Justices Alito and Gorsuch explained in their concurring opinion, there is thus "no basis for an argument" that an exemption from the Mandate—whether embodied in a regulation or Settlement—violates the Establishment Clause. 140 S. Ct. at 2396 n.13 (Alito, J., concurring).

To the extent this Court previously held that the Settlement is nonetheless impermissible because Plaintiffs allege it imposes "costs and burdens" on third parties, 434 F. Supp. 3d at 709, *Little Sisters* likewise repudiates that notion. Plaintiffs' third-party-burden theory is premised on the notion that federal law entitles them to contraceptive coverage. But as *Little Sisters* explained, "contraceptive coverage is mentioned nowhere in [the Affordable Care Act], and no language in the statute itself even hints that Congress intended that contraception should or must be covered." 140 S. Ct. at 2381-82. Rather, Congress provided an "extraordinarily 'broad general directiv[e]'" to the agency to issue the Mandate, "without any qualifications as to the substance of the [Mandate] or whether exemptions were permissible." *Id.* at 2382. Indeed, if the agency "chose to exercise [its] discretion to remove contraception coverage" entirely from the relevant guidelines, "it would arguably nullify the contraceptive mandate altogether without proceeding through notice and comment." *Id.* at 2382 n.8. Accordingly, as Justice Alito stated, a "woman who does not have the benefit of contraceptive coverage under her employer's plan is not the victim of a burden imposed by [an exemption] or her employer. She is simply not the beneficiary of something that federal law does not provide." *Id.* at 2396 (Alito, J., concurring). "She is in the same position as a woman who

– 12 –

does not work outside the home or a woman whose health insurance is provided by a grandfathered plan that does not pay for contraceptives or a woman who works for a small business that may not provide any health insurance at all." *Id.*

### B.      The Settlement Does Not Violate Any Statutory or Regulatory Authority

In addition to their constitutional claim, Plaintiffs raise a hodgepodge of other claims regarding the purported illegality of the Settlement. According to Plaintiffs, the Settlement violates (1) "[l]ong-standing and binding Department of Justice policy," (2) the ACA's cost-sharing provisions, and (3) prior regulatory iterations of the Mandate. 2d Amend. Compl. ¶ 175. But if RFRA both authorizes and requires an exemption for entities with complicity-based objections to the Mandate—as *Little Sisters* strongly suggests it does—these claims must fail. And in all events, they are without merit.

#### 1.      The Settlement Is Both Authorized and Required by RFRA

This Court previously rejected the argument that the Settlement was either authorized or required by RFRA. 434 F. Supp. 3d at 706-08. While *Little Sisters* did not "need [to] reach these arguments," 140 S. Ct. at 2382, the manner in which the Court handed down its decision—coupled with Justice Alito and Justice Gorsuch's concurrence—leaves little doubt as to how the Court would rule were the question squarely presented.

**(a)**      As an initial matter, *Little Sisters* indicates that RFRA—which "'provide[s] very broad protection for religious liberty'"—*authorizes* the government to decline to enforce the Mandate against Notre Dame. *Little Sisters*, 140 S. Ct. at 2383 (quoting *Hobby Lobby*, 573 U.S. at 693). When crafting the Settlement, the Government was "aware that *Hobby Lobby* held the mandate unlawful [under RFRA] as applied to religious entities with complicity-based objections." *Id.* at 2384. At that point, it was "left . . . to the [Government] to decide how best to rectify this problem." *Id.* at 2395 (Alito, J., concurring). Indeed, even the "dissent appears to agree that the

– 13 –

[Government] ha[s] the authority under RFRA to 'cure' any RFRA violations caused by its regulations." *Id.* at 2382 n.11 (majority op.). Notably, "RFRA does not specify the precise manner in which a violation must be remedied; it simply instructs the Government to avoid 'substantially burden[ing]' the 'the exercise of religion'—*i.e.*, to eliminate the violation." *Id.* at 2395 (Alito, J., concurring).

"The solution [the Government] devised" here—a Settlement exempting certain named litigants with complicity-based objections to the Mandate—does exactly that. *Id.* Even assuming a more limited remedy would likewise "cure the problem," "[n]othing in RFRA requires that a violation be remedied by the narrowest permissible corrective." *Id.* at 2396. To so hold would "get[] RFRA entirely backwards": "RFRA requires the Government to employ the least restrictive means of furthering a compelling interest that burdens religious belief, it does not require the converse." *Id.*

Accordingly, to the extent this Court held that implementation of RFRA was the exclusive "purview of the courts," 434 F. Supp. 3d at 706, that holding is no longer good law. Not only was it "appropriate for the [Government] to consider RFRA" when crafting the Settlement, 140 S. Ct. at 2383 (majority op.), but it also had wide discretion in choosing how to remedy the RFRA violation identified in *Hobby Lobby*—discretion that plainly encompasses the decision not to enforce the Mandate or the Accommodation against Notre Dame and its fellow litigants.

**(b)** In any event, *Little Sisters* further indicates that RFRA *requires* an exemption for entities, like Notre Dame, with complicity-based objections to the Mandate.

**i.** The RFRA analysis begins by asking whether the regulation at issue "substantially burden[s] a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). As Justice Alito explained, under *Hobby Lobby*, this inquiry "can be separated into two parts." *Little Sisters*, 140 S. Ct. at 2389

– 14 –

(Alito, J., concurring). First, "would compliance" with the Mandate—through the Accommodation or otherwise—"cause the objecting party to violate its religious beliefs, as it sincerely understands them?" *Id.* (citing *Hobby Lobby*, 573 U.S. at 723-26). And second, "would non-compliance have substantial adverse practical consequences?" *Id.* (citing *Hobby Lobby*, 573 U.S. at 720-23).

As to the first step, this Court previously concluded "that the accommodation does *not* compel Notre Dame to change its 'own actions and speech . . . in a manner contrary to its sincerely held religious beliefs.'" 434 F. Supp. 3d at 707. The Court stated that it did not "buy Notre Dame's argument that checking a box on a piece of paper makes it a 'conduit' to providing birth control." *Id*. But whether "checking [the] box" violates Notre Dame's religious beliefs is up to the University to decide, not the Court. *Little Sisters* makes it "abundantly clear" that this Court "must accept the sincerely held complicity-based objections of religious entities." 140 S. Ct. at 2383. It is not this Court's place to "'tell [Notre Dame] that [its] beliefs are flawed.'" *Id.* (quoting *Hobby Lobby*, 573 U.S. at 723-24). "Where to draw the line in a chain of causation that leads to objectionable conduct is a difficult moral question," and the Supreme Court has rejected efforts by courts to "override the sincere religious beliefs of an objecting party on that question." *Id.* at 2391 (Alito, J., concurring).

Moreover, this Court appears to have misunderstood the nature of Notre Dame's objection to compliance with the Accommodation, which is explained well by Justice Alito. Contrary to this Court's evident belief, 434 F. Supp. 3d at 707, Notre Dame does not object to "notifying the Government that [it] wishe[s] to be exempted from complying with the mandate *per se*." 140 S. Ct. at 2390-91 (Alito, J., concurring). Rather, it objects to submitting the particular notification "required by the accommodation because without that certification [the University's] plan could not be used to provide contraceptive coverage." *Id.* Furthermore, Notre Dame objects to "the

– 15 –

requirement that [it] maintain and pay for a plan" by which coverage for certain contraceptives will "be provided." *Id.* at 2391. Maintenance of that plan, after all, is essential for the Accommodation to work: if Notre Dame "were willing to incur ruinous penalties by dropping [its] health plans, [neither third party administrators nor] insurance companies would have [any] authority or obligation to provide or procure the objectionable coverage for [the University's] plan beneficiaries." *Id.* (citation omitted). Ultimately, "[t]he inescapable bottom line is that the accommodation demand[s] that parties like [Notre Dame] engage in conduct that [is] a necessary cause of the ultimate conduct to which they ha[ve] strong religious objections." *Id.*

That being the case, all that is left for this Court to do is to proceed to the second step of the substantial burden analysis and determine whether non-compliance "would have substantial adverse practical consequences." *Id.* at 2389. But again, the Supreme Court has already answered that question: if Notre Dame refuses to comply with the Accommodation, it will face the same penalties as the petitioners in *Hobby Lobby*—penalties the Supreme Court deemed unquestionably substantial. *See id.* at 2377 (majority op.) ("'If these consequences do not amount to a substantial burden . . . it is hard to see what would.'" (quoting *Hobby Lobby*, 573 U.S. at 691)); *id.* at 2390 (Alito, J., concurring) ("[T]hese 'severe' financial consequences [are] sufficient to show that the practical effect of non-compliance would be 'substantial.'" (quoting *Hobby Lobby*, 573 U.S. at 720)).[1]

"For these reasons, the contraceptive mandate imposes a substantial burden" on Notre Dame because it, "like the Little Sisters, has a sincere religious objection to the use of a listed

---

[1] This emphasis on the practical consequences of noncompliance confirms that the question of substantiality relates to the "severity" of the pressure placed on an objector to comply, not the level of exertion required to complete the mandated act. *Contra* 434 F. Supp. 3d at 707 (describing the Accommodation's requirement to provide notice as "hardly a burdensome requirement").

contraceptive and a sincere religious belief that compliance with the mandate (through the accommodation or otherwise) makes it complicit in the provision" of coverage for that contraceptive. *Id.* at 2391; *supra* pp. 9-11 (discussing how *Little Sisters* demonstrates that the Mandate—even as modified by the Accommodation—burdens religious exercise).

  **ii.**  The existence of a substantial burden, however, does not end the RFRA inquiry. A court must evaluate whether the Mandate is the "least restrictive means" of furthering "a compelling governmental interest." 42 U.S.C. § 2000bb-1(b). In this case, however, that question is easily resolved, because the Government "concedes" that it cannot satisfy strict scrutiny. *Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring); *see also* 82 Fed. Reg. 47,792, 47,806 (Oct. 13, 2017); 83 Fed. Reg. at 57,547. Under Seventh Circuit precedent, this is dispositive. "A private party cannot step into the shoes of the 'government' and demonstrate a compelling governmental interest and that it is the least restrictive means of furthering that compelling governmental interest because the statute explicitly says that the 'government' must make this showing." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015) (quoting 42 U.S.C. § 2000bb-1(b)).

  Should this Court nevertheless proceed to the strict-scrutiny analysis, Justice Alito's concurrence—which mirrors the arguments laid out in Notre Dame's initial motion to dismiss briefing, Mem. of Law in Support of Def. Notre Dame's Mot. to Dismiss at 23-25 (Feb. 12, 2019) (Dkt. 58)—is again instructive. With respect to compelling interest, the relevant inquiry is "whether *Congress* has treated the provision of free contraceptives to all women as a compelling interest." *Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring). That is, the Court must determine whether congressional action reflects a judgment that "it would commit one of 'the gravest abuses' of its responsibilities if it did not furnish free contraceptives to all women." *Id.* One way to make

that determination is to consider the scope of congressional regulation: is the Mandate a "rule of general applicability" or is it riddled with "exceptions" that leave "appreciable damage" to the "supposedly vital interest"? *Id.* (citations omitted).

Here, there are "exceptions aplenty." *Id.* "First, the ACA does not provide contraceptive coverage for women who do not work outside the home. If Congress thought that there was a compelling need to make free contraceptives available for all women, why did it make no provision for women who do not receive a paycheck?" *Id.* Second, as noted above, *see supra* pp. 12-13, not only does the ACA fail even to mention contraceptive coverage, but it also leaves to the discretion of the agencies "whether to require such coverage *at all.*" 140 S. Ct. at 2392 (Alito, J. concurring). "[I]f Congress thought that there was a compelling need to provide cost-free contraceptives for all working women, why didn't Congress mandate that coverage in the ACA itself?" *Id.* Third, the ACA "'exempts a great many employers from most of its coverage requirements,'" including employers with fewer than 50 employees and employers with grandfathered plans *Id.* (quoting *Hobby Lobby*, 573 U.S. at 699). Moreover, pursuant to *Little Sisters* itself, the ACA also "authorizes the creation of exemptions that go beyond anything required by the Constitution." *Id.*

This "very incomplete coverage speaks volumes." *Id.* at 2392. Ultimately, this Court need look no further than "[t]he ACA—which fails to ensure that millions of women have access to free contraceptives—[to reach the] unmistakabl[e conclusion] that Congress, at least to date, has not regarded this interest as compelling." *Id.*[2]

---

[2] As Justice Alito notes, the arguments for compelling compliance with the Accommodation become "even weaker" if the asserted interest is described "as an interest in providing 'seamless' cost-free coverage." *Id.* at 2393-94. While it "is undoubtedly convenient for employees to obtain all types of medical care and all pharmaceuticals under their general health insurance plans," it cannot "be said that all women . . . have a compelling need for this convenience." *Id.*

But "[e]ven if the mandate served a compelling interest, the accommodation still would not satisfy the 'exceptionally demanding' least-restrictive-means standard." *Id.* at 2394 (quoting *Hobby Lobby*, 573 U.S. at 728). Indeed, the Supreme Court has already explained that the Government could provide cost-free contraceptives without piggybacking on Notre Dame's private health plans and forcing the University to act in violation of its religious beliefs. Most obviously, the Government could "'assume the cost of providing [contraceptives] to any women who are unable to obtain them under their health-insurance policies due to [Notre Dame's] religious objections." *Id.* (quoting *Hobby Lobby*, 573 U.S. at 729). "In the context of federal funding for health insurance, the cost of such a program would be 'minor.'" *Id.*

"Congress has taken steps in this direction." *Id.* "'[E]xisting federal, state, and local programs,' including Medicaid, Title X, and Temporary Assistance for Needy Families, already 'provide free or subsidized contraceptives to low-income women.'" *Id.* (citation omitted). Of particular note, "[t]he Government recently amended the definitions for Title X's family planning program," making woman who work for employers with "'sincerely held religious or moral objection to providing [contraceptive] coverage'" eligible to participate in that program. *Id.* at 2394 n. 12 (citing 84 Fed. Reg. 7734 (2019); 42 C.F.R. § 59.2(2)). These steps show that it is well within the Government's power to facilitate the provision of full contraceptive coverage without forcing Notre Dame to violate its religious beliefs.

### 2.    Plaintiffs' Remaining Allegations of Illegality Are Without Merit

Even if RFRA did not apply, Plaintiffs' allegations of illegality—which this Court has not previously addressed—would fail on their own terms.

**(a)**    Plaintiffs allege that insofar as the Settlement purports to limit the discretion of federal agencies going forward, it violates "[l]ongstanding and binding Department of Justice policy that precludes Government Defendants from entering into settlement agreements that would

– 19 –

convert a federal agency's discretionary authority into a mandatory duty for the agency." 2d Amend. Compl. ¶ 175. This claim fails for multiple reasons.

*First*, it would be premature to decide whether the Settlement validly binds *future* administrations, because the *current* administration is standing by its non-enforcement decision. If a future administration ever seeks enforcement against Notre Dame, *that* will be the time to decide whether the settlement is binding.

*Second*, Plaintiffs point to no authority suggesting that the Department of Justice guidance they rely on is judicially enforceable, much less that it can form the basis for a claim brought by individual litigants. To the contrary, while Plaintiffs apparently rely on the "Meese Memo" from 1986, 2d Amend. Compl. ¶ 166 (citing Mem. from Edwin Meese III, Att'y Gen., to All Assistant Attorneys General & U.S. Attorneys (Mar. 13, 1986) ("Meese Memo")), subsequent authority from the Department Justice's Office of Legal Counsel states that "the concerns that led to [the] adoption [of the Meese Memo] do not, in general, amount to legally binding limitations on the scope of the executive branch's power to settle litigation in a manner that may limit the future exercise of executive branch discretion." Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion, 1999 WL 1262049, at *4 (O.L.C. June 15, 1999) ("OLC Opinion").

*Third*, in any event, Plaintiffs are mistaken to claim that the Government has maintained a "[l]ongstanding and binding" policy against settlement agreements that restrict its enforcement discretion. "In general, the Attorney General is free to enter into settlements that would limit the future exercise of executive branch discretion that has been conferred pursuant to statute," as long as the settlement is "consistent" with statutory and constitutional limits. OLC Opinion, 1999 WL 1262049, at *37. In other words, a limitation on the future exercise of executive branch discretion

is only problematic if it would violate the "statutory limitations that constrain the authority of the executive branch agencies on behalf of which the settlement is entered." *Id.* And here, for the reasons outlined above and in *Little Sisters*, the settlement is consistent with all relevant statutory and constitutional limits. *See supra* pp. 9-19.

The "Meese Memo" cited by Plaintiffs does not suggest otherwise. It expressly contemplates that the government may enter "settlement agreement[s]" in which it "agrees to exercise [its] discretion in a particular way." Meese Memo § II.B.2. And it makes clear that it does not eliminate the government's "necessary discretion to deal with the realities of any given case," and that enforceable settlements may be approved by DOJ leadership if "circumstances require." *Id.* § II.C.

(b)     Plaintiffs next contend that, to the extent the Settlement allows Notre Dame to cover some contraceptives in its health plan while charging co-payments, it violates the ACA's requirement that health plans "'shall not impose any cost sharing requirements.'" 2d Amend. Compl. ¶ 175 (quoting 42 U.S.C. § 300gg-13). Plaintiffs are mistaken.

*Little Sisters* made clear that the government has authority to exempt religious entities from complying with the Mandate or the Accommodation to the extent compliance would violate their religious beliefs. And here, it is undisputed that compliance would violate Notre Dame's religious beliefs because the University's plan beneficiaries would consequently receive the full range of FDA-approved contraceptives without cost-sharing. However, under the circumstances, Notre Dame has made the religious determination that its health plans may provide only a *limited* set of contraceptives, and only if they are offered *with cost-sharing*, to avoid privileging contraceptives over other types of coverage. Notre Dame made this religious judgment after it was forced to provide access to contraceptives to its plan beneficiaries, which created reliance interests that the

– 21 –

University felt bound to accommodate. When this Court refused to enjoin the Mandate, *Notre Dame*, 988 F. Supp. 2d 912, and the University's Seventh Circuit appeal was unsuccessful, *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), Notre Dame—under threat of crushing penalties—was forced to submit the Accommodation's self-certification form under protest. Consequently, at the time the University entered into the Settlement, its beneficiaries had been receiving contraceptive coverage for nearly four years.

Notre Dame was thus presented with a "difficult and important question of religion and moral philosophy" about whether to continue covering contraceptives, cut them off, or find some middle ground. *Hobby Lobby*, 573 U.S. at 724. In Catholic theology, the appropriate course of action required the University to make a prudential judgment taking into account all relevant circumstances. And here, the University's coerced compliance with the Mandate had engendered reliance interests that could not responsibly be ignored. In consultation with theologians and ethicists, Notre Dame identified a limited set of non-abortifacient contraceptives that, given the circumstances, it was willing to cover through its health plans—provided they were still subject to cost-sharing, so that they were not privileged or set apart from other covered services. For that reason, as Plaintiffs note, beneficiaries are required to "pay the same out-of-pocket costs for contraception covered by the plan as for other prescription drugs." 2d Amend. Compl. ¶¶ 140-41.

Ultimately, Notre Dame continues to believe that compliance with the Mandate or the Accommodation would violate its religious beliefs. That is not changed by the fact that the University was forced to make a difficult judgment about how its religious beliefs applied in the current circumstances. Just as the religious objector in *Thomas* was willing to assist with the production of steel used in tanks but not the tanks themselves, under the circumstances, Notre Dame is willing to offer certain contraceptives, but not without copays. *See* 450 U.S. at 715.

Others—including those of the University's own faith—may draw that line differently. But as the Supreme Court has repeatedly made clear, that line is undoubtedly Notre Dame's to draw. *See Hobby Lobby*, 573 U.S. at 725; *Little Sisters*, 140 S. Ct. at 2390 (Alito, J., concurring). Accordingly, as *Little Sisters* recognized, the Government may decline to enforce the Mandate (and the Accommodation) against Notre Dame to avoid burdening the University's religious beliefs.

In any event, even assuming Plaintiffs were correct, the appropriate remedy would not be to declare the Settlement "void *ab initio*," 2d. Amend. Compl. ¶ 176, or to enjoin its implementation, but rather to construe it in a lawful fashion. *See, e.g.*, *Aronson v. K. Arakelian, Inc.*, 154 F.2d 231, 235 (7th Cir. 1946) ("A contract will receive that construction which would render performance under it legal, rather than one which would render performance illegal."); 11 Williston on Contracts § 32:11 (4th ed.) (same); Restatement (Second) of Contracts § 203(a) (same).[3] In this case, that would mean construing the Settlement to preclude co-pays—but still leaving the University free from compelled compliance with either the Mandate or Accommodation.

**(c)**     Finally, Plaintiffs contend that the Settlement violates "[l]awful regulations implementing the [ACA's] Women's Health Amendment"—essentially, the Mandate and Accommodation as they existed prior to the Expanded Exemption. 2d Amend. Compl. ¶175 (citing

---

[3] "A settlement agreement is a particular kind of contract, and so contract law . . . governs," *Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008), and "[c]ontracts to which the federal government is a party pursuant to federal law are interpreted according to federal common law," 32 Am. Jur. 2d Federal Courts § 373. To determine the applicable federal common law, courts look to general principles of contract law and secondary sources such as the Restatement and Williston. *E.g.*, *Bock v. Computer Assocs. Intern., Inc.*, 257 F.3d 700, 707–08 (7th Cir. 2001); *Fleming v. U.S. Postal Serv. AMF O'Hare*, 27 F.3d 259, 261 (7th Cir. 1994).

78 Fed. Reg. 39,870; 80 Fed. Reg. 41,318). Once again, this claim is based both on a flawed premise and a misapprehension of the relevant law.

To begin, Plaintiffs' contention depends entirely on the assumption that the Expanded Exemption is itself invalid. But as both the Government and *Little Sisters* itself have explained, that Exemption is perfectly lawful. It is justified as a valid exercise of the Government's statutory authority either under the ACA itself or under RFRA. *See, e.g., supra* pp. 13-19.

More fundamentally, even assuming the Expanded Exemption is invalid, Plaintiffs continue to misunderstand the nature of non-enforcement agreements between the Government and private litigants. *All* such agreements allow litigants to operate in a manner inconsistent with applicable law. That is, in fact, the entire point of non-enforcement agreements. Such agreements become potentially unlawful only if they constitute "'a general policy' that is so extreme as to amount to an abdication of [the agency's] statutory responsibilities," or run afoul of statues or regulations that "provide guidelines for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 833 & n.4.

Neither scenario is present here. In light of the Supreme Court's holding that the relevant agencies have "virtually unbridled discretion" to fully exempt whole categories of employers from the Mandate, *Little Sisters*, 140 S. Ct. at 2380, it cannot be the case that declining to enforce the Mandate against a discrete group of litigants with strong RFRA claims amounts to an "abdication" of statutory or regulatory responsibilities. Likewise, the regulations cited by Plaintiffs—which mirror the text of the Women's Health Amendment itself—say nothing about how they are to be enforced. Put differently, the regulations do not impose any enforcement requirements on the Government. They tell *private* entities what to include in their health plans; they do not purport to tell the government how (or whether) to enforce those requirements. Thus, even assuming those

regulations remain binding, they do not create a right to Government enforcement in any particular case.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claim against Notre Dame should be dismissed.

Dated: September 21, 2020                                Respectfully submitted,


                                                         /s/ Matthew A. Kairis
                                                         Matthew A. Kairis (OH 0055502)
                                                         JONES DAY
                                                         325 John H. McConnell Blvd., Suite 600
                                                         Columbus, OH 43215
                                                         Tel.: 614-281-3605
                                                         Fax: 614-461-4198
                                                         makairis@jonesday.com

                                                         *Attorney for Defendant*
                                                         *University of Notre Dame*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served to the

Plaintiffs' counsel and to the government defendants using the Court's CM/ECF system on the

21st day of September, 2020:

*/s/ Matthew A. Kairis*
Matthew A. Kairis (OH 0055502)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215
Tel.: 614-281-3605
Fax: 614-461-4198
makairis@jonesday.com

*Counsel for Defendant*
*University of Notre Dame*